UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
UNITED STATES OF AMERICA,                   )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )        Civil Action No. 04-0798 (PLF)
                                            )
ALL ASSETS HELD AT                          )
BANK JULIUS BAER & COMPANY, LTD.,           )
Guernsey Branch, Account Number             )
121128, in the name of Pavlo Lazarenko     )
last valued at approximately $2 million     )
in United States dollars, *et al.*,         )
                                            )
            Defendants *in rem*.            )
_____     )

## OPINION

        This is a civil action, brought *in rem*, in which the United States seeks forfeiture

of over $250 million scattered throughout bank accounts located in Antigua and Barbuda,

Guernsey, Liechtenstein, Lithuania, and Switzerland.  A number of people, preferring that the

United States government not get this money, have intervened to prevent its forfeiture.  So far,

plaintiff United States has managed to dismiss from this action seven of these intervening parties

and has successfully defeated a motion to dismiss the complaint.

        The plaintiff now moves to dismiss from the action, for lack of standing, one

more claimant: European Federal Credit Bank Limited ("Eurofed"), an Antiguan bank in

liquidation.  And here the plaintiff's winning streak comes to an end, because the Court

concludes that Eurofed, acting by and through its appointed liquidators, has standing to contest

the forfeiture of the defendant assets that are located in Antigua and Barbuda.  As for the

remaining assets to which Eurofed lays claim, however — those located in Lithuania and

Switzerland — the Court agrees with the plaintiff that Eurofed has not demonstrated its standing

to contest their forfeiture.  The Court therefore will grant the plaintiff's motion in part and deny

it in part.[1]

## I. BACKGROUND

### A. *Nature of the Forfeiture Action*

The United States initiated this litigation in 2004, seeking the forfeiture of money

that is allegedly traceable to a series of acts of "criminal fraud, extortion, bribery,

misappropriation, and money laundering" carried out by, among others, Pavel Ivanovich

Lazarenko, a.k.a. Pavlo Lazarenko, a prominent Ukrainian politician who, with the aid of various

associates, was "able to acquire hundreds of millions of United States dollars through a variety of

acts of fraud, extortion, bribery, misappropriation and/or embezzlement" committed during the

1990s.  Am. Compl. ¶¶ 1, 10.  According to the United States, those illegal acts, and subsequent

attempts to launder the resulting criminal proceeds, involved the transfer of large sums of U.S.

dollars into and out of United States financial institutions.  Id. ¶¶ 11-13.  The plaintiff seeks to

claim ownership of those sums of money pursuant to federal statutes that provide for the

---

[1]     The documents reviewed by the Court in resolving the pending motion include
the following: plaintiff's amended complaint ("Am. Compl."); Eurofed's verified claim and
statement ("Euro. Cl."); Eurofed's answer ("Euro. Ans."); plaintiff's corrected motion for
summary judgment ("MSJ") and supporting memorandum ("Mem."); Eurofed's opposition
("Opp."); plaintiff's reply ("Reply"); Eurofed's surreply ("Surreply"), and the various
declarations and statements of fact that the parties have included with their memoranda.  The
Court has also reviewed its earlier substantive opinions in this case: United States v. All Assets
Held at Bank Julius Baer & Co., Ltd., 571 F. Supp. 2d 1 (D.D.C. 2008) ("All Assets I"); id., 664
F. Supp. 2d 97 (D.D.C. 2009) ("All Assets II"); id., 772 F. Supp. 2d 191 (D.D.C. 2011) ("All
Assets III"); id., 772 F. Supp. 2d 205 (D.D.C. 2011) ("All Assets IV"), appeal dismissed, 455 F.
App'x 3 (D.C. Cir. 2012).

forfeiture to the United States government of funds traceable or otherwise related to criminal activity that occurred at least in part in the United States.  See id. ¶ 1.

### B.  Eurofed and its Liquidation

As permitted by the civil forfeiture statutes, several parties filed claims in this action asserting an interest in specific property sought by the plaintiff and contesting its forfeiture.  At issue here is the claim submitted by an Antiguan bank, Eurofed, which is now in the process of being liquidated under the laws of Antigua.  The plaintiff alleges that, before its liquidation, Eurofed was used by Lazarenko to launder proceeds of his criminal activities.  Over $100 million of the funds named as *in rem* defendants in the plaintiff's complaint are alleged to have been formerly held on deposit for Lazarenko's benefit at Eurofed.  See  Am. Compl. ¶ 5(d)-(h).

Eurofed, acting by and through its appointed liquidators (the "Liquidators"), has intervened in this action, asserting an interest in five of the specific properties being sought by the plaintiff and named in paragraphs 5(d) through 5(h) of the amended complaint:

> Approximately $85.5 million in United States dollars held at Bank of Nova Scotia (Antigua) in the name of the Registrar of the High Court of Antigua & Barbuda;

> Approximately $1.6 million in United States dollars held at Bank of Nova Scotia (Antigua) in the name of the Registrar of the High Court of Antigua & Barbuda;

> All assets held at Credit Suisse (Geneva), in account number 0251-562927-6, in the name of European Federal Credit Bank Limited, last valued at approximately $4.8 million in United States dollars;

> All assets held at Banque SCS Alliance S.A. (Geneva) in account number 5491, in the name of European Federal Credit Bank Limited, last valued at approximately $483,629.69 in United States dollars;

All assets held at Vilniaus Bankas [Lithuania] held for the benefit of European Federal Credit Bank Limited, formerly held at accounts 073721 and 073420 at Bankas Hermis in the name of European Federal Credit Bank Limited, last valued at approximately $29,344,05.35 in United States dollars.

Euro. Cl. at 3-4; see Am. Compl. ¶ 5(d)-(h). Eurofed has also asserted an interest in the plaintiff's catch-all *in rem* defendant: "All assets traceable to the above-mentioned proceeds and property." Am. Compl. ¶ 5(j); see Euro. Cl. at 4.[2]

Because many of the arguments raised in connection with Eurofed's standing to contest the forfeiture of these assets hinge on the precise details of Eurofed's history and liquidation, a detailed account of both is necessary.

The plaintiff alleges that Lazarenko and an associate, Peter Kiritchenko, obtained a controlling interest in Eurofed in 1997, becoming majority shareholders of the bank and placing Lazarenko in control of its investment decisions. See Plaintiff's Statement of Facts ("Pl.'s Stmnt.") ¶¶ 1, 4. Lazarenko and his criminal associates were both the bank's primary owners, the plaintiff alleges, and also its primary depositors. Id. ¶¶ 2-4. According to the plaintiff, the funds held by Eurofed on Lazarenko's behalf were spread across a number of bank accounts — one in Lazarenko's own name and six in the names of corporate entities that he allegedly controlled: Lady Lake Investments; Fairmont Group, Ltd.; Firststar Securities, Ltd.; Guardian Investment Group, Ltd.; Nemuro Industrial Group; and Orby International, Ltd. Id. ¶ 5(d). Eurofed is alleged to have held security deposits for two of these companies as well. Id.

According to the plaintiff, by the end of 1997 over $100 million of Lazarenko's money was held by Eurofed in these accounts. Pl.'s Stmnt. ¶ 4. In addition, the plaintiff alleges,

---

[2]    In addition to the Eurofed-related *in rem* defendants, the complaint also seeks forfeiture of over $150 million in funds located in Guernsey and Liechtenstein with no alleged connection to Eurofed or Antigua. See Am. Compl. ¶ 5(a)-(c), (i).

approximately $1.6 million was formerly held on deposit at Eurofed in the account of Lazarenko's associate Alexander Milchenko.  Id. ¶ 5(e).

Eurofed's Liquidators acknowledge that in 1997 Lazarenko obtained an ownership interest in the bank, but they profess to lack enough information to confirm that he and his associates were the majority depositors.  See Eurofed's Statement of Facts ("Euro. Stmnt.") ¶ 3.  The reason for this uncertainty, they say, is that in the course of their duties they have not yet been able to determine whether the six companies allegedly affiliated with Lazarenko truly were owned or controlled by him.  Id.  And the funds of those six companies make up the bulk of the money at issue here:  Lazarenko's personal bank account appears to have held only approximately $150,000 by 1999, while the combined value of the six companies' accounts exceeded $93 million.  Moreover, the Liquidators, while seemingly acknowledging that Lazarenko exerted some influence over Eurofed's actions and was more than a mere depositor, do not concede that he exerted total control over the bank or its investment decisions.  Id. ¶ 4.  The Liquidators also emphasize that Eurofed held millions of dollars in deposits from third parties who had no connection with Lazarenko.  Id.; see Declaration of Charles William Augustine Walwyn ¶ 6 (estimating that innocent third parties had in excess of $25 million on deposit at Eurofed when it went into liquidation).

Eurofed apparently maintained few of its deposits in Antigua itself.  Instead, it established "correspondent" bank accounts in its own name at various other financial institutions around the world, in which it stored the bulk of the money deposited by its customers.  See Declaration of Andrew Lewczyk, Ex. P, at 5.  "These correspondent bank accounts were not held for the benefit of any particular depositor," according to the Liquidators.  "As a result, a customer's deposits were not located in any particular location or correspondent account."  Id.

at 8.  In other words, if hypothetical Eurofed customers Sally, Sam, and Sue each deposited $40 with Eurofed in Antigua, the bank may well have divided that $120 among four of its own correspondent bank accounts in Switzerland, Lithuania, Liechtenstein, and the United States (placing, say, $30 into each account), making it impossible to trace Sally's $40 deposit to any of Eurofed's four correspondent accounts.

In 1999, Antiguan government authorities with responsibility over financial crimes began to investigate Eurofed.  Walwyn Decl. ¶ 2.  That fall, the nation's Office of Drug and Money Laundering Control Policy ("ONDCP") applied to the High Court of Justice of Antigua and Barbuda for an order freezing all Eurofed assets linked to Lazarenko.  Id.  The High Court granted this request in an order dated October 29, 1999, prohibiting Lazarenko and several of his associates and affiliated companies from removing any of their funds from Antigua or in any way disposing of or diminishing those funds.  Id., Ex. B, at 2.  The apparent basis for this restraining order was Lazarenko's criminal prosecution in Switzerland on money laundering charges, for which he was later convicted, and the alleged connection between those charges and the funds held at Eurofed.  See id., Ex. H.

On November 15, 1999, the Antiguan financial authorities placed Eurofed into receivership, pursuant to the International Business Corporations Act of Antigua and Barbuda (the "IBC Act").  See Declaration of Nicolette M. Doherty, Exs. B, C.  Charles Walwyn and Donald Ward, from the accounting firm of PricewaterhouseCoopers Antigua, were appointed as receiver-managers, and these appointments were confirmed on November 25, 1999 by the High Court of Justice, which ordered the receivers to reorganize the bank.  See id., Exs. C, D.  Under the IBC Act, the receivers were charged, among other things, with "taking into [their] custody

and control the property of the Bank" and "opening and maintaining a bank account or accounts for the moneys of the Bank coming under [their] control." Id., Ex. C, at 1.

In fulfillment of their responsibilities, in late November 1999 the receivers transferred approximately $76 million to Antigua that was being held in Eurofed correspondent bank accounts located within the United States. The Liquidators kept this money in a trust account that they established for Eurofed funds. Pl.'s Stmnt. ¶¶ 6-7; Euro. Stmnt. ¶¶ 6-7.[3]

On December 3, 1999, the High Court of Justice rescinded its previous receivership order and instead directed that Eurofed be liquidated and dissolved pursuant to the IBC Act. See Walwyn Decl., Ex. E. The court appointed Mr. Walwyn and Mr. Ward as liquidators, providing that they be remunerated at an hourly rate for their work from the funds of the bank. Id., Ex. E, at 2.[4]

Under the IBC Act, a liquidator "must," among other responsibilities, "take into his custody and control the property of the corporation," "open and maintain a trust account for the moneys of the corporation received and paid out to him," and, "after his final accounts are approved by the court, distribute any remaining property of the corporation among the shareholders according to their respective rights." IBC Act § 307(c), (d), (f). The Act also permits a liquidator to "bring, defend or take part in any civil, criminal or administrative action or proceeding in the name of and on behalf of the corporation." Id. § 308(1)(b).

---

[3]      By contrast, the Liquidators have not been able to secure the return of other Eurofed funds that were held in overseas correspondent accounts back to Antigua. Specifically, Eurofed deposits are still being maintained in accounts at Credit Suisse in Switzerland (last valued at approximately $4.8 million), Banque SCS Alliance S.A. in Switzerland (last valued at nearly $500,000), and Vilniaus Bankas in Lithuania (last valued at approximately $29.3 million). The Eurofed deposits located at these three institutions make up the *in rem* defendants named in paragraphs 5(f), 5(g), and 5(h) of the plaintiff's complaint.

[4]      The High Court of Justice later appointed Robert Wilkinson to replace Mr. Ward. Walwyn Decl. ¶ 5.

On July 7, 2000, granting an *ex parte* application by the ONDCP, the Antiguan High Court of Justice issued an order directing that "all funds of Pavel Lazarenko and all his associated accounts frozen by Order of this Court" (in October of the previous year) be forfeited to the Antiguan government. Walwyn Decl., Ex. F, at 2. The Liquidators were ordered to pay those funds — specified in the order as $114,919,356.82, "or such amount thereof as remains in the Liquidators' hands," along with any accrued interest — into an Antiguan government bank account at the Bank of Nova Scotia in St. John's, Antigua. Id.

Both Lazarenko and the Liquidators promptly appealed this forfeiture order to the Court of Appeal for Antigua and Barbuda of the Eastern Caribbean Supreme Court. See Walwyn Decl., Ex. H, at 1. Lazarenko also moved the appellate court for a stay of the forfeiture order pending his appeal. Id., Ex. G, at 1. The Court of Appeal granted Lazarenko's motion for a stay and ordered that, pending the appeal, the funds be placed into an interest-bearing account held at the Bank of Nova Scotia in the name of the Registrar of the High Court of Justice. Id. The preexisting freeze order from October 1999 remained in force. Id.

The Liquidators complied with the order and transferred the funds. This is how the assets listed in paragraphs 5(d) and 5(e) of the plaintiff's complaint in this action came to be "held at Bank of Nova Scotia (Antigua) in the name of the Registrar of the High Court of Antigua Barbuda." Am. Compl. ¶ 5(d), (e).

The Liquidators' appeal of the July 7, 2000 Antiguan forfeiture order was stayed by agreement of the parties, see Walwyn Decl., Ex. J, ¶ 4, while Lazarenko's appeal of that order continued and ultimately succeeded. On April 27, 2001, the Court of Appeal ruled that the October 29, 1999 freeze order and the July 7, 2000 forfeiture order were not authorized by the Antiguan money laundering statute under the authority of which they ostensibly were issued.

The appellate court held that at the time of the orders no evidence had been presented to the High Court linking the funds on deposit at Eurofed with the money laundering crime for which Lazarenko was convicted in Switzerland. Because the Antiguan money laundering statute required such a showing to be made, both the freeze order and the forfeiture order were invalid. See id., Ex. H, ¶ 1.[5]

A few days after the Court of Appeal ruled that the forfeiture and freeze orders were invalid, the Antiguan money laundering authorities applied for a new freeze order from the High Court of Justice. That court issued another *ex parte* order on May 2, 2001, directing that "[a]ll the rights and interests" of Lazarenko, "whether in his name or otherwise," be "frozen until further order." Walwyn Decl., Ex. I, ¶¶ 1-2. This order applied to any interests of Lazarenko in money held "within the account maintained by the Registrar . . . at the St John's Branch of the Nova Scotia Bank" or "within any account maintained by the liquidators of Eurofed Bank Ltd." Id.

In light of this new freeze order, Eurofed's Liquidators applied for their own order from the High Court of Justice later that month. The Liquidators explained to the court that the money held in the account of the Registrar of the High Court of Justice — where it had been

---

[5]     The Justice on the Court of Appeal who authored the judgment explained that the forfeiture order was "premature" because it "did not comply with the strict provisions" of Section 20(2a) of the Antiguan Money Laundering (Prevention) Act. Walwyn Decl., Ex. H, ¶ 17. Under the money laundering statute, the court ruled, "the property to be frozen must be proved to have been derived from or connected with the offence committed in Switzerland. And unlike the learned Trial Judge . . . I am unable to see that the required connection has been established. I am of the view that there was no evidence that the large sum of money which the learned Trial Judge ordered to be frozen was derived from or in connection with the offence with which [Lazarenko] was charged and convicted in Switzerland." Id. ¶ 31. Therefore, "the learned Trial Judge had no power, authority, or jurisdiction to invoke section 20(2a) of the Act to make the freezing order on October 29, 1999. It follows that the consequent forfeiture order made under section 20(2a) must also be bad. Indeed, in his submission learned Counsel for the Respondent recognized that it was for the [Antiguan government] to show under section 20(2a) that the property, proceeds or instrumentalities are at the time of the application derived from or connected with the offence for which a person has been charged." Id. ¶ 32.

ordered deposited for safekeeping pending Lazarenko's appeal of the now-vacated forfeiture order — made up the vast majority of the liquidation estate. Walwyn Decl., Ex. J, ¶¶ 3-6. The Liquidators further maintained that the innocent depositors and creditors of Eurofed who were not alleged by the government to be affiliated with Lazarenko "have been prejudiced by the fact that their funds have been removed from the liquidation together with the funds of [Lazarenko] and place[d] in the account of the Registrar." Id. ¶ 10. Accordingly, the Liquidators proposed a *pro rata* division of the funds being held in the Registrar's account, under which the funds of Lazarenko and the six companies he allegedly controlled would remain frozen in the Registrar's account, while the funds of the remaining third-party depositors of Eurofed would be released to the Liquidators for use in the liquidation. Id. ¶ 7.

The Liquidators also described the basis for their conclusions about which funds should be regarded as Lazarenko-related and remain frozen. As they explained, in view of the new restraining order, which imposed restrictions only on Lazarenko's interests in Eurofed's funds, it had become necessary to "quantify the funds held by the Liquidators for Pavlo Lazarenko and his alleged companies." Walwyn Decl., Ex. J, at 5. Although Lazarenko himself had asserted ownership of the six companies alleged to be under his control, and had made claims in the liquidation for over $100 million of Eurofed funds based on that purported ownership, the Liquidators stated that they had "not been able to independently verify ownership of the companies." Id. at 6. Taking a conservative approach, the Liquidators recommended treating the combined sum of the money in Lazarenko's personal bank account and the accounts of the six companies over which he claimed ownership as *potentially* Lazarenko-related for the purposes of the freeze order. Since Lazarenko "ha[d] not provided any evidence supporting a claim any higher than this" amount, the Liquidators reasoned that the remainder of the funds

could safely be regarded as non-Lazarenko-related and used to fund the liquidation claims of third-party depositors and creditors.  Id. at 6-7.[6]

The Liquidators proposed, in other words, that all funds potentially related to Lazarenko would remain in the Registrar's account, but that the remainder of the funds, which by all reports came from innocent third parties, be released to the Liquidators for use in funding the liquidation.[7]  After *pro rata* calculations and reductions, the Liquidators' proposal called for the release of nearly $20 million to the Liquidators, while approximately $65 million in potentially Lazarenko-related funds would stay in the Registrar's account.  Id. at 10-11.

In an order dated November 6, 2003, the High Court of Justice granted the Liquidators' motion, over the objections of Lazarenko's counsel.  See Walwyn Decl., Ex. K. The court directed the Registrar to release the nearly $20 million from its account at the Bank of Nova Scotia to the Liquidators "for the purpose of pro rata payment to third party depositors and

---

[6]        The Liquidators also noted, however, that "Mr. Lazarenko claims ownership [of the six companies] and no other claims to ownership have been made."  Walwyn Decl., Ex. J, at 5; see Supplemental Declaration of Charles William Augustine Walwyn, Ex. B (copy of Lazarenko's claim in Eurofed liquidation, stating that "he is the beneficial owner" of all six companies).  A clear link between Lazarenko and these companies is evident in certain financial agreements between the companies and Eurofed.  For instance, a document executed by the Fairmont Group Ltd., authorizing Eurofed to establish a bank account, provides: "Physical presence of Pavlo Lazarenko is required for all instructions or changes to this account." Declaration of John J. Truex, Ex. G, at 1.  The Liquidators report to this Court in their motion papers that the true owners of the six companies still "have not been proven or identified."  Euro. Stmnt. ¶ 2.  The plaintiff spills a fair amount of ink arguing that Lazarenko is in fact the owner of these companies and accusing the Liquidators of attempting to "obscure" the scope of his deposits with Eurofed.  See Pl.'s Reply Stmnt. at 2-4.  While this matter may become important later, nothing in this Opinion depends on whether or not Lazarenko is the owner of the six companies.

[7]        In the Liquidators' words, "at the time we proposed the 2003 segregation of funds, we conservatively attributed those funds to Lazarenko to avoid any potential argument that these funds could be subject to forfeiture.  We certainly were not disclaiming any right to use those funds in the future for liquidation purposes should the forfeiture fail, or if Lazarenko were unable to prove his ownership of those funds.  We proposed the division simply to provide a mechanism to allow partial payment of third party claims and to keep the Eurofed liquidation apace."  Walwyn Decl. ¶ 14.

11

creditors" and for expenses of the liquidation.  Id. ¶ 2.  "The funds designated to Pavlo

Lazarenko and associated companies," however, totaling approximately $65 million, were to

"remain frozen at the Bank of Nova Scotia, Antigua, in the account of the Registrar of the High

Court until further order."  Id. ¶ 5.  It is unclear whether Eurofed funds allegedly held for the

benefit of Alexander Milchenko (approximately $1.6 million) were designated as being

potentially Lazarenko-related in the Liquidators' calculations, and thus whether a corresponding

amount of money (reduced *pro rata*) was released to the Liquidators as part of the approximately

$20 million they received.  See Lewczyk Decl., Ex. P, at 10-11.

Since the division of funds in 2003, the Liquidators report that they have worked

to validate third-party claims and have used the $20 million released to them to make

distributions to validated depositors and creditors.  As of March 2012, they state, they had

validated approximately 74 claims submitted by claimants unrelated to Lazarenko and had

distributed over $14 million to those claimants.  Because of the cap on the funds presently

available to them, however, and because there are 107 additional third-party depositors and

creditors whose claims have not yet been validated, the Liquidators have paid the validated third-

party depositors and claimants on a *pro rata* basis.  They report that the balance still owed to

these 74 validated third-party claimants is $3,180,171.  They also report that the total value of

the "potential claims" of the additional 107 third-party depositors and creditors whose claims

have not yet been validated is $6,966,692.  "Thus . . . the total potential remaining amount due to

third party depositors and creditors unrelated to Lazarenko is $10,146,823," while the "total

unrestrained funds in the Liquidators' possession . . . is $4,347,542, and therefore, there is a

deficit in the liquidation estate of at least $5,799,280."  Walwyn Decl. ¶¶ 16-17.

## C. Lazarenko's Prosecution and the Initiation of this Forfeiture Action

Meanwhile, in the United States, Lazarenko was criminally prosecuted for offenses stemming from his alleged laundering of money through American banks. Indicted in the Northern District of California on dozens of counts of conspiracy, money laundering, wire fraud, and interstate transportation of stolen property, Lazarenko was convicted in June 2004 of numerous counts — eight of which, for money laundering and conspiracy, survived a post-trial motion for a judgment of acquittal and an appeal to the Ninth Circuit. See United States v. Lazarenko, 564 F.3d 1026, 1029-32, 1047 (9th Cir. 2009).

The plaintiff initiated civil forfeiture proceedings in this Court in May 2004. As grounds for the forfeiture, the complaint alleges criminal conduct by Lazarenko that is similar to the charges levied against him in his criminal prosecution. See Am. Compl. ¶¶ 120-155. This Court's jurisdiction rests on 28 U.S.C. § 1355(a), and venue is proper here because all of the defendant properties are located in foreign bank accounts, and "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country . . . an action or proceeding for forfeiture may be brought . . . in the United States District Court for the District of Columbia." All Assets I, 571 F. Supp. 2d at 7 & n.6 (quoting 28 U.S.C. § 1355(b)(2)); see United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain, 295 F.3d 2, 26 (D.C. Cir. 2002).

The amended complaint includes eight claims for forfeiture falling into two general categories. The first four claims for relief allege the direct forfeiture of criminal proceeds pursuant to 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of proceeds from violation of certain enumerated criminal statutes or any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7). See Am. Compl. ¶¶ 120-139. The last

four claims for relief allege forfeiture of property involved in money laundering violations pursuant to 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of any property involved in or traceable to a violation of the money laundering provisions of 18 U.S.C. §§ 1956 and 1957. Am. Compl. ¶¶ 140-155. The plaintiff argues that all of the defendant properties are forfeitable under either theory.

Civil forfeiture actions are governed by the procedures set forth in 18 U.S.C. § 983 and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), a subset of the Federal Rules of Civil Procedure. When the government files a complaint for forfeiture, "any person claiming an interest in the seized property may file a claim asserting such person's interest in the property in the manner set forth in the Supplemental Rules[.]" 18 U.S.C. § 983(a)(4)(A); see SUPP. R. G(5)(a).

Nine individuals and three business entities filed claims contesting the forfeiture in this action. The individual claims were filed by Pavel Lazarenko, Alexander Lazarenko, Alexei Ditiatkovsky, and six people who maintained that they were innocent depositors of Eurofed. The institutional claims were filed by Eurofed (acting through its Liquidators), OAO Gazprom, and Universal Trading & Investment Company, Inc. The latter two companies claimed an interest in the defendant funds stemming from a kickback scheme allegedly orchestrated by Lazarenko that involved natural gas contracts in the Ukraine. See All Assets III, 772 F. Supp. 2d at 196-205; All Assets IV, 772 F. Supp. 2d at 211-18.

The Court denied a motion by the Liquidators to transfer venue to the Northern District of California, where Lazarenko was being prosecuted, see Order, United States v. All Assets Held at Bank Julius Baer & Co., Ltd. (D.D.C. July 5, 2006), and it later denied a motion by Pavel and Alexander Lazarenko to dismiss the complaint for lack of subject matter

jurisdiction and for failure to state a claim.  See All Assets I, 571 F. Supp. 2d at 6-17.  Upon

motion by the plaintiff, the Court dismissed the claims of the six individual Eurofed depositors,

because those individuals did not file answers to the plaintiff's complaint as required by

Supplemental Rule G(5)(b), a fatal procedural deficiency under the Supplemental Rules.  See All

Assets II, 664 F. Supp. 2d at 101-03.  The Court also granted judgment on the pleadings against

OAO Gazprom and Universal Trading & Investment Company, Inc., concluding that neither

company had standing to participate in this action because each lacked a cognizable interest in

the property whose forfeiture they sought to contest.  See All Assets III, 772 F. Supp. 2d at

196-205; All Assets IV, 772 F. Supp. 2d at 211-18.  Four claimants now remain: Pavel

Lazarenko, Alexander Lazarenko, Alexei Ditiatkovsky, and Eurofed.

### D.  Background on the Pending Motion

Supplemental Rule G(6) permits the government to issue special interrogatories to

claimants early in the forfeiture proceedings, "limited to the claimant's identity and relationship

to the defendant property."  SUPP. R. G(6)(a).  The purpose of such special interrogatories is to

allow the government "to gather information that bears on the claimant's standing," id., Advisory

Committee Notes, 2006 Adoption, which facilitates the prompt elimination of claimants who

have no right to participate in the proceedings and frees the government from the burden of

responding to dispositive motions filed by such claimants.  "The special interrogatories,"

therefore, "are limited to questions dealing solely with claimant's ownership interests in the

property."  John K. Rabiej, *Supplemental Rule G Governing Pretrial Procedures in Forfeiture in*

*Rem Actions*, PRAC. LITIG., May 2008, at 51.[8]

---

[8]     See Rabiej, *Supplemental Rule G*, at 51 ("The advisory committee . . . provid[ed]
the government with an early, but limited, right to scrutinize and challenge the claimant's
asserted property interest before the court was required to consider the claimant's motion to

The plaintiff propounded special interrogatories to Eurofed's Liquidators in 2008, see Declaration of Jason A. Levine, Ex. 18, and the Liquidators responded. After a stay in discovery that temporarily put things on hold, and after two subsequent requests by the plaintiff for more complete responses after discovery resumed, the Liquidators provided their second set of supplemental responses and objections to the plaintiff's special interrogatories in April 2010. See Levine Decl., Ex. 20.

Approximately one year after receiving these special interrogatory responses, the plaintiff filed a "Motion to Strike Liquidators' Claim or, in the Alternative, to Compel Complete Responses to Special Interrogatories." See Dkt. No. 244. Rather than simply moving the Court to order the Liquidators to provide more comprehensive interrogatory responses, something the plaintiff had not yet attempted, the motion asked the Court to strike Eurofed's claim entirely and dismiss the bank from the proceedings under Supplemental Rule G(8)(c)(i)(A), which permits striking the claim of a forfeiture claimant who has failed to comply with Rule G(6).[9]

The plaintiff charged that the Liquidators had "repeatedly sought to avoid answering the threshold question of the nature and extent of their interest in the property subject to forfeiture through evasive and non-responsive answers to Special Interrogatories," Dkt. No.

dismiss the government's complaint. Under the rule, the government can issue special interrogatories early in the litigation. The scope of these interrogatories is much more limited than the scope of ordinary interrogatories issued under the Civil Rules.").

[9] Dismissal for failure to comply with Rule G(6) is authorized because a claimant's failure to respond to special interrogatories can frustrate the government's efforts to determine whether that claimant has standing to participate in the action. See Rabiej, *Supplemental Rule G*, at 54-55 ("Subdivisions (6) and (8) set up the framework for the government to review a claimant's bona fides before it must meet its burden of proof to show that the property is subject to forfeiture. At the start of many forfeiture actions, the government has little or no information about the claimant's interest in the seized property. Under subdivision (6), the government may file limited, special interrogatories that bear on the 'claimant's identity and relationship to the defendant property' at any time during discovery. . . . The claimant's response to the interrogatories provides the government with the necessary information to review and, if appropriate, to contest the claimant's standing.").

244-1 at 1-2, and that dismissal was an appropriate sanction for this noncompliance because the Liquidators had "provided conflicting evasive assertions of interest in their Claim, Answer and Special Interrogatory responses" and had "failed substantively to respond to Special Interrogatories despite multiple opportunities." Id. at 2. As an alternative to dismissal, the plaintiff requested that the Liquidators be ordered to "fully respond" to certain special interrogatories, "so that Plaintiff and the Court are apprised of Liquidators' purported interest in the Defendants In Rem." Id.

The Court heard argument on the plaintiff's motion in January 2012, combined with argument on another motion that has since been resolved. During the hearing, the Court indicated that, in its view, it would be unusual to strike a claim under Supplemental Rule G(8) based on *inadequate* responses to special interrogatories (as opposed to a complete failure to respond) where the plaintiff had not even taken the preliminary step of moving to compel additional responses. Cf. SUPP. R. G(8), Advisory Committee Note ("As with other pleadings, the court should strike a claim or answer only if satisfied that an opportunity should not be afforded to cure the defects[.] Not every failure to respond to subdivision (6) interrogatories warrants an order striking the claim."). The Court observed that much of the plaintiff's briefing was devoted to attacking the Liquidators' standing outright, rather than the adequacy of their special interrogatory responses, but that the plaintiff had not moved to dismiss the Liquidators for lack of standing, as it was authorized to do by Supplemental Rule G(8)(c)(i)(B), instead basing its motion exclusively on the Liquidators' purported discovery noncompliance. Given that the fight over the Liquidators' interrogatory responses appeared to be serving as a proxy for a more fundamental dispute about their standing to participate in this action, the Court asked the parties to confer about whether, in lieu of having the Court determine whether additional

interrogatory responses should be compelled, the parties would prefer to brief the question of the Liquidators' standing head-on and without further discovery.

Shortly thereafter, the parties advised the Court that they had agreed "to proceed without further supplementation of Liquidators' responses to the Special Interrogatories and to rely on the existing record." Dkt. No. 278 at 1. Under a jointly proposed scheduling order, the plaintiff agreed to file a motion to strike the Liquidators for lack of standing. Id. That motion, which the plaintiff has brought as a motion for summary judgment, is now before the Court.

## II. STANDARD OF REVIEW

In a forfeiture action brought *in rem* pursuant to a federal statute, at any time before trial the United States "may move to strike a claim or answer . . . because the claimant lacks standing." SUPP. R. G(8)(c)(i)(B). Such a challenge to a party's claim and answer "may be presented . . . as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Id. G(8)(c)(ii)(B).

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Holcomb

v. Powell, 433 F.3d at 895. When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Electric Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party is required to provide evidence that would permit a reasonable jury to find in his favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott v. Harris, 550 U.S. at 380 ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). "The inquiry performed [at this phase] is the threshold inquiry of determining whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.

## III.  STANDING IN CIVIL FORFEITURE ACTIONS

"Civil forfeiture actions are brought against property, not people.  The owner of the property may intervene to protect his interest."  United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain, 295 F.3d at 25. In order to contest the forfeiture of property to the federal government in an *in rem* forfeiture proceeding, a claimant must "assert[] an interest" in "specific property" that is named as a defendant.  Supp. R. G(5)(a)(i)(A); see 18 U.S.C. § 983(a)(4)(A) ("[A]ny person claiming an interest in the seized property may file a claim asserting such person's interest in the property[.]").  A claimant who lacks such an interest has no standing to challenge the forfeiture. See Supp. R. G(8)(c)(i)(B); United States v. Funds from Prudential Securities, 300 F. Supp. 2d 99, 103 (D.D.C. 2004) (referring to Supplemental Rule C(6), the predecessor of Supplemental Rules G(5) and G(6)).  "The extent of the interest in the defendant property sufficient to meet this standing requirement is left to case law."  Rabiej, *Supplemental Rule G*, at 55; see also United States v. Funds from Prudential Securities, 300 F. Supp. 2d at 103 (stating that a claimant must "demonstrat[e] an interest . . . sufficient to satisfy the court of his standing").

Establishing standing requires only that the claimant demonstrate "a colorable interest in the property, for example, by showing actual possession, control, title, or financial stake."  United States v. Real Property Located at 475 Martin Lane, 545 F.3d 1134, 1140 (9th Cir. 2008) (citation and internal quotation marks omitted); see United States v. One Lincoln Navigator, 328 F.3d 1011, 1013 (8th Cir. 2003).  At the summary judgment stage, a claimant bears the burden of proving such a facially colorable interest by a preponderance of the evidence. United States v. $148,840 in U.S. Currency, 521 F.3d 1268, 1273 (10th Cir. 2008); see Supp. R. G(8)(c)(ii)(B).  "Although a claimant must make [this] initial evidentiary showing of such an

interest, a claimant need not definitively prove the existence of that interest." United States v. $148,840 in U.S. Currency, 521 F.3d at 1273; see United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 79 (2d Cir. 2002) ("[T]he only question that the courts need assess regarding a claimant's standing is whether he or she has shown the required 'facially colorable interest,' not whether he ultimately proves the existence of that interest." (quotations omitted)); United States v. 116 Emerson St., 942 F.2d 74, 78 (1st Cir. 1991).

At the summary judgment stage, therefore, the question is only "whether a fair-minded jury could find that the claimant had standing on the evidence presented." United States v. $133,420.00 in U.S. Currency, 672 F.3d 629, 638 (9th Cir. 2012); see All Assets II, 664 F. Supp. 2d at 104-05 (stating that at the summary judgment stage, "each claimant must point to some evidence in the record that would allow a reasonable factfinder to conclude . . . by a preponderance of the evidence that they have a cognizable interest in the assets potentially subject to forfeiture"). The claimant's burden "is not a heavy one," United States v. Real Property Located at 475 Martin Lane, 545 F.3d at 1140, and courts must not conflate the standing inquiry "with the merits determination that comes later." United States v. One-Sixth Share of James J. Bulger in All Present and Future Proceeds of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 41 (1st Cir. 2003); see United States v. One Lincoln Navigator, 328 F.3d at 1013 ("This threshold burden is not rigorous: To have standing, a claimant . . . need only show a colorable interest in the property, redressable, at least in part, by a return of the property." (internal quotation and citation omitted)); see also United States v. $8,440,190.00 in U.S. Currency, 719 F.3d 49, 57 (1st Cir. 2013) ("At the initial stages of intervention, the requirements are not arduous and typically any colorable claim on the defendant property suffices."). Because the United States, rather than the claimant, is the plaintiff and bears the burden of proving the

property's forfeitability, "[t]he function of standing in a forfeiture action is therefore truly threshold only — to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture." United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d at 79.

The nature of a claimant's asserted property interest is "defined by the law of the State" — or here, nation — "in which the interest arose." United States v. One Lincoln Navigator, 328 F.3d at 1013; see United States v. $100,348 in U.S. Currency, 354 F.3d 1110, 1119 (9th Cir. 2004); United States v. One-Sixth Share, 326 F.3d at 45. But while state law defines a claimant's interest in specific property, "federal law determines the effect of [that] ownership interest on [the claimant's] right to bring a claim." United States v. U.S. Currency, $81,000.00, 189 F.3d 28, 33 (1st Cir. 1999) (citing United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985)); see United States v. 5 S 351 Tuthill Rd., 233 F.3d 1017, 1021 (7th Cir. 2000) ("State law defines and classifies property interests for purposes of the forfeiture statutes, while federal law determines the effect of the property interest on the claimant's standing."); United States v. BCCI Holdings, Luxembourg, S.A., 69 F. Supp. 2d 36, 57 (D.D.C. 1999) (same).[10]

_____

[10]     This Court has not previously had need to determine whether the requirement that a claimant have an "interest" in specific defendant property is one of constitutional, as opposed to statutory or prudential, standing. See All Assets III, 772 F. Supp. 2d at 198 n.2; All Assets II, 664 F. Supp. 2d at 103 n.7. The Court now adopts the consensus shared among the courts of appeals cited above — that civil forfeiture claimants must demonstrate Article III standing in addition to the separate, though partly overlapping, requirements of statutory standing. See 18 U.S.C. § 983 (a)(4)(A) (limiting intervention in civil forfeiture actions to "any person claiming an interest in the seized property" who "file[s] a claim asserting such person's interest in the property in the manner set forth in the Supplemental Rules"); United States v. Prop. Identified as $88,260.00, 925 F. Supp. 838, 840-41 (D.D.C. 1996) (explaining that compliance with the procedural and timing requirements of the Supplemental Rules for filing a verified claim is necessary in order for the claimant to acquire "statutory standing"). As for prudential standing, see infra at 61-62.

## IV. DISCUSSION

As a civil forfeiture claimant, Eurofed must establish standing as to each of the five *in rem* defendants named in the plaintiff's complaint in which it asserts an interest.   See Supp. R. G(5)(a)(i)(A) (providing that forfeiture claimants must "identify the specific property claimed").  These five properties fall into two fundamentally different categories.  On one hand are the funds that are currently being held at the Bank of Nova Scotia, Antigua, in the name of the Registrar of the High Court of Justice, which the plaintiff alleges were formerly maintained on deposit at Eurofed for the benefit of Lazarenko and Alexander Milchenko.  See Am. Compl. ¶ 5(d), (e).  On the other hand are the funds located in Lithuania and Switzerland that are still on deposit at financial institutions where Eurofed formerly maintained correspondent bank accounts.  See Am. Compl. ¶ 5(f), (g), (h).  Because these two categories of *in rem* defendants are separated by significant differences regarding their legal relationship to Eurofed and its Liquidators, with consequences for Eurofed's standing to contest their forfeiture, the Court will address the two categories separately.

### A. *Defendant Funds Held at the Bank of Nova Scotia, Antigua, in the Account of the Registrar of the High Court of Justice*

#### 1. Eurofed's Property Interest in the Antiguan Assets

##### a. Relationship Between a Bank and its Deposits

The parties agree that Antiguan law defines the nature of any interest that Eurofed and its Liquidators may have in the defendant funds that are located in Antigua and Barbuda.  See Mem. at 25-29; Opp. at 17, 20-21.  They further agree that where Antiguan statutes and case law do not answer a particular legal question, English common law applies, supplementing Antiguan law.  See Mem. at 19, 27-28; Opp. at 21; Declaration of Nicolette M. Doherty in

Support of Liquidators ¶ 13 (stating that "to the extent that local law has not restated or overruled English law, English statute and case law are deemed to form part of the law of Antigua and Barbuda"); Declaration of Felicity Rosalind Toube in Support of Plaintiff ¶ 6 (agreeing that "English common law applies unless Antiguan law has overruled or restated it").[11]

Under longstanding principles of English law, applicable in Antigua, funds deposited with a bank become the property of the bank, and the depositor becomes a creditor of the bank: "Money, when paid into a bank, ceases altogether to be the money of the principal; it is then the money of the banker, who is bound to return an equivalent by paying a similar sum to that deposited with him when he is asked for it." Foley v. Hill, [1848] 2 H.L.C. 28, 36, 9 E.R. 1002, 1005; see id., 2 H.L.C. at 36-37 ("The money placed in the custody of a banker is, to all intents and purposes, the money of the banker, to do with it as he pleases; he is guilty of no breach, of trust in employing it; he is not answerable to the principal if he puts it into jeopardy, if he engages in a hazardous speculation; he is not bound to keep it or deal with it as the property of his principal, but he is of course answerable for the amount, because he has contracted, having received that money, to repay to the principal, when demanded, a sum equivalent to that paid into his hands."). The plaintiff and the Liquidators both acknowledge that, based on this precedent, Antiguan banks as a general rule own the deposits made by their customers. See Opp. at 20-21; Reply at 10.

---

[11] See also Doherty Decl., Ex. F (Common Law Declaration and Application Act of 1705), § 2 (stating that "the Common Law of England, as far as it stands unaltered by any written Law of these Islands . . . is in force" and that it provides the rules whereby "Rights and Properties . . . are and ought to be determined"); Doherty Decl., Ex. G (Eastern Caribbean Supreme Court Act), Chap. 143, § 11 (stating that the jurisdiction vested in the High Court of Justice "shall be exercised in accordance with this Act and any other law in operation in Antigua and Barbuda and rules of court, and where no special provision is therein contained such jurisdiction shall be exercised as nearly as may be in conformity with the law and practice administered for the time being in the High Court of Justice in England").

Deposits made with Eurofed by its customers, therefore, became Eurofed's assets. But what, if anything, changed when the bank went into liquidation? The IBC Act, which governs the liquidation of international corporations registered in Antigua, does not explicitly address whether a corporation retains title to its assets once it enters liquidation. By repeatedly referring to "the property of the corporation," IBC Act § 306(2), 307(c), 310(1)-(2), and "the moneys of the corporation," id. § 307(d), however, the Act strongly suggests that it does retain title. Indeed, it is difficult to see how an appointed liquidator could, as the IBC Act directs, "carry on the business of the corporation," id. § 308(c), or "sell by public auction or private sale any property of the corporation," id. § 308(d), if that corporation was not the owner of its assets.

Applicable English case law, moreover, confirms that a corporation in the process of being liquidated retains title to its assets. See Ayerst (Inspector of Taxes) v. C. & K. (Construction) Ltd., [1975] A.C. 167 (H.L.), 177 (stating that "a winding-up order does not of itself divest the company of the legal title to any of its assets"). Once in liquidation, however, the corporation loses the "beneficial ownership" of those assets. Id. at 177-81. In this respect, the corporation in liquidation is comparable to a trustee in bankruptcy, who is vested with legal ownership of the bankrupt's property, but who "cannot enjoy the fruits of it himself or dispose of it for his own benefit" and instead is "under a duty to deal with it as directed by the statute for the benefit of all the creditors who come in to prove a valid claim." Id. at 178. In other words: "The resolution or order for winding up divests the company of the beneficial interest in its assets," and those assets "become a fund which the company thereafter holds in trust to discharge its liabilities." Buchler and another v. Talbot and others, [2004] UKHL 9, ¶ 28 (opinion of Lord Hoffman) (citing Ayerst).[12]

_____

[12] While the House of Lords in Ayerst construed the legal interests of corporations and their liquidators under a specific British statute, see Ayerst (Inspector of Taxes) v. C. & K.

Consistent with these principles of English law, the IBC Act dictates that a corporation in liquidation "shall cease to carry on business, except the business that is, in the opinion of the liquidator, required for an orderly liquidation," IBC Act § 305(1)(a), the aims of which are to pay off all creditors and to distribute any remaining corporate property among the shareholders.  Id. § 307(i).

In sum, an Antiguan bank in liquidation retains title to — though not beneficial ownership of — its assets, and those assets include the deposits made by the bank's former customers.  Therefore, the initiation of Eurofed's liquidation did not divest the bank of its ownership of funds that its customers deposited with the bank, though it did alter the bank's relationship with those funds by circumscribing what the bank could do with them.

b.  Relationship Between a Bank's Liquidators and the Bank's Assets

Under the IBC Act, when a corporation is ordered to be liquidated, "the powers of the directors and shareholders cease and are vested in the liquidator."  IBC Act § 305(1)(a).  A liquidator is required by the IBC Act to "take into his custody and control the property of the corporation," to discharge any obligations to "creditors and other persons having claims against the corporation," and, ultimately, to "distribute any remaining property of the corporation among the shareholders according to their respective rights."  IBC Act § 307(c)-(i).  A liquidator also may, among other things, "carry on the business of the corporation as required for all orderly liquidation," "do all acts and execute any documents in the name and on behalf of the corporation," and "bring, defend or take part in any civil, criminal or administrative action or proceeding in the name of and on behalf of the corporation."  Id. § 308(1)(b), (c), (e).  In other

_____

(Construction) Ltd., A.C. at 176, the court's interpretation of the terms of that statute drew upon "a consistent line of judicial authority," arising in a variety of contexts and dating back to the nineteenth century, establishing "that upon going into liquidation a company ceases to be 'beneficial owner' of its assets."  See id. at 179-81.

words, upon the commencement of a liquidation proceeding, the company's corporate structure

ceases to exist, and the liquidator — alone empowered to act on the company's behalf — runs

the company's affairs with the limited end of winding them down and appropriately distributing

its assets. "The functions of the liquidator are thus similar to those of a trustee [in] bankruptcy or

an executor in the administration of an estate of a deceased person." Ayerst (Inspector of Taxes)

v. C. & K. (Construction) Ltd., A.C. at 176-77.

A key distinction, however, is that under English law (applicable in Antigua) a

trustee in bankruptcy gains legal title to the bankrupt's property, and an estate administrator

gains legal title to the deceased's property, but a liquidator does not gain title to the corporation's

property. That is because, as explained earlier, the corporation in liquidation never loses title to

its assets — merely the "beneficial ownership" of those assets. Ayerst (Inspector of Taxes) v. C.

& K. (Construction) Ltd., A.C. at 177. While a liquidator is often described as being similar to a

trustee, therefore, "he is not a trustee in the strict sense," but rather "is more rightly described as

the agent of the company" who "has cast upon him by statute and otherwise special duties,"

including "the duty of applying the company's assets in paying creditors and distributing the

surplus among the shareholders." Knowles v. Scott, [1891] 1 Ch 717, 723; see Janvey v.

Wastell, [2010] EWCA Civ 137, ¶ 121 (opinion of Lady Arden) ("As a matter of law, the

liquidators have two capacities. First, they are the agents of SIB. Secondly they are trustees for

the unsecured creditors. . . . However, their only interest in the assets of SIB . . . is as

trustees[.]"); cf. Deloitte & Touche (Liquidator) v. Bennett, 81 O.R. 3d 389, 396 (May 18, 2006)

(Can. Ont. Sup. Ct. J.) ("A liquidator is separate and distinct from the company being

liquidated. . . . The liquidator acts as a quasi-trustee for creditors and stands in a different

position from the corporation.").

Under Antiguan law, in short, liquidators take possession of the corporation's property and control over its affairs (not ownership of its assets) — but they do so only with the limited end of winding down the corporation in accordance with the provisions of the IBC Act, in the process of which they exercise a quasi-fiduciary duty to the creditors of the corporation.

    2.  Implications of Eurofed's Property Interest in the Antiguan Assets under Federal Law

Having elucidated the legal relationships under Antiguan law among a bank in liquidation, its assets (which include the deposits of its customers), and its appointed liquidators, the Court must next determine whether a bank's interest in those assets is sufficient under federal law to support its standing, acting through its liquidators, to contest their forfeiture.  See United States v. 5 S 351 Tuthill Rd., 233 F.3d at 1021; United States v. U.S. Currency, $81,000.00, 189 F.3d at 33.  With little difficulty, the Court concludes that Eurofed, acting through its Liquidators, has a colorable interest in the defendant assets located in Antigua and therefore may not be barred from contesting their forfeiture at the summary judgment stage.  See United States v. Real Property Located at 475 Martin Lane, 545 F.3d at 1140; United States v. One Lincoln Navigator, 328 F.3d at 1013; United States v. $148,840 in U.S. Currency, 521 F.3d at 1275; United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d at 79.

A variety of property interests may serve as the basis for a claimant's entitlement to contest a civil forfeiture, including not only ownership but also possessory and other lesser forms of interest.  "The type of interest claimed dictates the type of evidence required to establish standing."  United States v. $148,840.00 in U.S. Currency, 521 F.3d at 1274 (citing United States v. $191,910.00 in U.S. Currency, 16 F.3d 1051, 1058 (9th Cir. 1994)).

A claimant who asserts an "ownership interest" in the defendant property and who presents "some evidence of ownership" supporting that assertion has satisfied its burden of

demonstrating standing at the summary judgment stage. United States v. $133,420.00 in U.S. Currency, 672 F.3d at 639. This is common ground among the courts of appeals. See, e.g., United States v. $148,840.00 in U.S. Currency, 521 F.3d at 1276 ("[W]hen a claimant has asserted an ownership interest in the res at issue and has provided some evidence tending to support the existence of that ownership interest, the claimant has standing to challenge the forfeiture."); United States v. U.S. Currency, $81,000.00, 189 F.3d at 35 ("[A]n allegation of ownership and some evidence of ownership are together sufficient to establish standing to contest a civil forfeiture."); Torres v. $36,256.80, 25 F.3d 1154, 1158 (2d Cir. 1994) (same); United States v. $38,570 U.S. Currency, 950 F.2d 1108, 1112-13 (5th Cir. 1992) ("[A] claimant is required to submit some additional evidence of ownership along with his claim in order to establish standing to contest the forfeiture.").

Eurofed has repeatedly claimed to be the owner of the defendant funds at issue here. See Euro. Cl. at 4 (asserting that Eurofed "is the legal owner of the accounts and/or funds" in which the bank has claimed an interest); Lewczyk Decl., Ex. P, at 5 (asserting that "all deposits into Eurofed became assets of the Bank."); Opp. at 17 (asserting that "Eurofed is the legal owner of all of the defendant Eurofed assets"). The only question, then, is whether the bank has provided enough evidence supporting this assertion of ownership to satisfy the Court of its standing at this stage in the proceedings.

In assessing the sufficiency and probity of evidence that purports to demonstrate a colorable ownership interest, courts generally look to "indicia of dominion and control such as possession, title, and financial stake." United States v. $38,570 U.S. Currency, 950 F.2d at 1113; see United States v. $148,840.00 in U.S. Currency, 521 F.3d at 1275; United States v. 1998

BMW "I" Convertible, 235 F.3d 397, 399 (8th Cir. 2000)).  Eurofed has demonstrated all of these.

As explained in the foregoing discussion of Antiguan banking and corporate law, Eurofed gained title to the deposits of its customers.  See supra at 23-25.  Those deposits are among the funds now being held in the Registrar's account that the plaintiff seeks to forfeit.  See Am. Compl. ¶ 5(d) (stating that the funds sought in the Registrar's account include "assets derived from deposits" of Lazarenko and his associated companies); id. ¶ 5(e) (making same assertion regarding deposits of Alexander Milchenko).

Based on the principle that a bank owns the deposits of its customers, it may be that Eurofed itself lost title to the funds when it deposited them in Eurofed's own correspondent bank accounts with other financial institutions overseas: at that point, it would appear, the financial institutions with whom Eurofed did business became the owners of the money, and Eurofed was put into the position of the customer, with nothing more than a claim for damages against the institutions if they did not return the money upon request.  But once Eurofed's receivers secured the transfer of these funds back to Antigua and placed them in the receivers' trust account, as ordered by the Antiguan courts, the funds once again became "the property of the corporation."  IBC Act § 307(c); see id. § 307(d), (e) (referencing "the moneys of the corporation received"); Doherty Decl., Ex. C, at 1.  Eurofed thus has made a sufficient showing that it owns the funds being held in the Registrar's account in Antigua, as it claims, and this is sufficient to establish the bank's standing at the summary judgment stage.  See, e.g., United States v. One Lincoln Navigator, 328 F.3d at 1013 (holding that where state law defines the "owner" of a vehicle as "a person who holds the legal title," such legal title "establishes a prima

facie case of ownership," which, in the circumstances, conferred standing to contest the vehicle's forfeiture).[13]

In addition to demonstrating a colorable ownership interest in these funds, Eurofed also has provided evidence that it has a possessory interest in the funds and a financial stake in their disposition. The funds were placed into Eurofed's hands by its customers, were maintained by the bank in its own overseas accounts, and were reclaimed from those foreign accounts by Eurofed's receivers. That the funds are not presently within Eurofed's control — being temporarily frozen, for the convoluted reasons explained earlier, in the account of the Registrar of the High Court of Justice — hardly diminishes Eurofed's clear possessory relationship to those funds. Moreover, Eurofed undoubtedly has a financial stake in the funds, as the bank's Liquidators are under a legal obligation to take into their control the bank's property, discharge financial obligations to creditors, and distribute any surplus to its shareholders. See IBC Act § 307(b). If the forfeiture action in this Court fails on the merits, and if no other attempts to forfeit the funds (whether by the government of Antigua or some other government) are successful, the funds presumptively will be released to Eurofed for use in the liquidation.

Having made a showing of ownership, possession, and financial stake with respect to the *in rem* defendants being held in Antigua, Eurofed has satisfied the "undemanding" requirements necessary to survive a summary judgment challenge to its standing, United States v. 5 S 351 Tuthill Rd., 233 F.3d at 1022, unless the plaintiff can demonstrate any countervailing legal or factual considerations that undermine this conclusion.

---

[13] The plaintiff suggests that Eurofed again lost title to the funds when it transferred them to the account of the High Court Registrar at the Bank of Nova Scotia, in accordance with that court's orders. But the plaintiff has offered no reason to believe that the general principles regarding a banker-customer relationship outlined above are applicable to this type of court-ordered deposit. As one of the plaintiff's own experts explains, a bank can serve "in either the role of an ordinary banker (a simple debtor creditor relationship) or also as an agent or trustee." Toube Decl. ¶ 14.

### 3. The Plaintiff's Counter-Arguments

In an effort to rebut the foregoing determinations, the plaintiff summons a veritable blizzard of legal and factual counter-arguments. Some of these arguments address Eurofed's property interest in the Antiguan assets, while others seek to pry Eurofed's interests and legal rights apart from those of its Liquidators. When the storm clears, however, it becomes evident that none of these arguments has merit.

### a. Fiduciary or Custodial Relationship

The plaintiff alleges that Lazarenko, his associates, and his affiliated companies did not have a normal depositor-creditor relationship with Eurofed. According to the plaintiff, the Lazarenko-related funds were not held "on deposit" at Eurofed at all. Instead, "Eurofed Bank had a 'fiduciary and investment' relationship with Lazarenko regarding his personal account, while the accounts of his corporate shells and the personal account of Milchenko were subject to custodial agreements." Pl.'s Stmnt. ¶ 28. Therefore, according to the plaintiff, even if Antiguan banks generally own the deposits of their customers, Eurofed's Lazarenko-related funds "did not become assets of the bank" because they were merely "held in a custodial or safekeeping relationship." Mem. at 37. And since these funds never belonged to Eurofed at all, the bank would suffer no injury from their forfeiture. Id.

In support of these assertions, the plaintiff furnishes several types of documents. Two are stray pages of unknown provenance: The first, as the Liquidators correctly characterize it, is "an unidentified, shorthand spreadsheet that does not even identify Lazarenko at all," Euro. Stmnt. ¶ 28, but merely is entitled "Fiduciary Account Balance and Investment Portfolio." Lewczyk Decl., Ex. S, at 1. Next is a similarly unidentified sheet of paper, apparently a copy of

a fax transmittal, containing a single paragraph that purports to be signed by Lazarenko and directs that his "deposit account" is "to be invested by the direction of" either Lazarenko himself or his associate Peter Kiritchenko. <u>Id.</u> at 2. The plaintiff also supplies six identical "Custodian Agreements," signed by representatives of each of Lazarenko's affiliated companies, which authorize Eurofed to open a "custodian account" for each company. <u>See id.</u>, Exs. Q, R, T; Declaration of John J. Truex, Exs. A-F. Finally, the plaintiff supplies additional documents executed by Lazarenko's affiliated companies appointing Eurofed as their banker and setting forth certain terms of their accounts. <u>See id.</u>, Exs. G-L. In addition to these documents, the plaintiff has submitted a declaration by an English lawyer which opines that, based on her review of the documents, "it appears to me from these records that the funds held in these accounts were assets held in a trust or fiduciary relationship for Lazarenko, and therefore did not become assets of Eurofed." Toube Decl. ¶ 19.

The plaintiff's evidence, while suggestive, is far too limited and ambiguous to support a judgment, without any further factual development, that Eurofed held the money of Lazarenko and his affiliated companies in a custodial or fiduciary capacity, rather than as traditional cash deposits. The Liquidators assert that, according to the records available to them, all of the Eurofed accounts at issue in this proceeding are indeed cash accounts, contrary to Ms. Toube's assessment. Suppl. Walwyn Decl. ¶ 4. In support, they provide accounting records of Eurofed from 1999 that, they say, show these deposits to have been recorded as assets of the bank, "rather than off balance-sheet assets that would be consistent with a custodial or trust relationship." <u>Id.</u>; <u>see id.</u>, Ex. A. They also note that even Lazarenko himself has never claimed that his deposits or those of his companies were held in trust or were anything other than standard cash deposits — a claim he presumably had strong incentive to make, as it may have

33

given him priority over regular depositors of Eurofed in the liquidation proceedings. See id., Ex. B, at 1 (copy of Lazarenko's claim in Eurofed liquidation, asserting that he and his six companies "are all *depositors* of Eurofed Bank" (emphasis added)).

As for the custodian agreements supplied by the plaintiff, those agreements by their terms refer only to "securities" that are "left with the Bank for safekeeping." See, e.g., Lewczyk Decl., Ex. Q. The plaintiff suggests that, despite this proviso, these custodian agreements are "broad enough to cover monies in accounts Lazarenko held in his own name or through his shell companies" and that these agreements therefore might actually govern the cash deposits made with Eurofed by Lazarenko's six companies. Reply at 11. As the plaintiff points out, the definition of "securities" in these custodian agreements appears curiously broad, encompassing "all securities and property." Lewczyk Decl., Ex. Q, at 1. Together with other terms of the custodian agreements and with some of the other account documentation provided by the plaintiff, this language may indeed indicate that these "custodian agreements" covered not only *bona fide* securities but also the cash that Eurofed received from its customers, which it "safeguarded" by depositing in the bank's overseas correspondent accounts. See Toube Decl. ¶¶ 20-25.[14]

At the summary judgment stage, however, "may," "might," and "it appears" do not cut it for the moving party. The evidence provided by the plaintiff is far from definitive and is woefully inadequate to support a ruling on this question as a matter of law. For one thing, the

---

[14] For instance, the custodian agreements govern not only securities that are stored in the bank's vault but also those kept "in the safekeeping of any agent or authorized depositary [sic] of the Bank." Lewczyk Decl., Ex. Q, at 1. Eurofed was required to "register in its own name or in the name of a nominee" all of the "securities" covered by the agreements, which, again, included "all securities and property." Id. Moreover, other agreements between Eurofed and the six Lazarenko companies describe Eurofed securities as being "held at foreign correspondents" and deposited there "in the name of the Bank but held for the account of a customer" — *i.e.*, similar to the manner in which Eurofed is known to have maintained the cash deposited by its customers. Truex Decl., Ex. G, at 2.

custodian agreements appear to be standard contracts drawn up by Eurofed without any obvious tailoring to Lazarenko's companies; the Liquidators assert that "[o]ther, non-Lazarenko, Eurofed depositors signed the same agreements as part of the account-opening process in the event they decided to place securities with Eurofed."  Supp. Walwyn Decl. ¶ 7.  What's more, the agreements are largely devoted to provisions that make sense only with respect to the custody of actual securities, including terms governing dividends, voting rights, payments and distributions, maturity and redemption, and contingencies in the event of a call, subscription, or conversion. See Lewczyk Decl., Ex. Q, ¶¶ 5-6.  Furthermore, it is known that Eurofed did in fact store bonds at the same overseas financial institutions where it maintained its correspondent cash accounts. See Order at 1, United States v. $1,379,879.09, No. 05-0946 (N.D. Cal. July 8, 2008) (describing the government's seizure, in pursuit of civil forfeiture, of "three accounts held by Bank of America in the name of Eurofed, containing approximately $1.7 million plus 923,000 Ukrainian bonds"); United States v. Liquidators of European Fed. Credit Bank, 630 F.3d 1139, 1142 (9th Cir. 2011).

    Given the state of the evidence, the plaintiff's speculation that the custodian agreements it has supplied governed Lazarenko's cash deposits as well as the storage of genuine securities is just that — speculation.  At this juncture, however, all justifiable inferences must be drawn in Eurofed's favor, Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, and judgment may be granted to the plaintiff only if "the record taken as a whole could not lead a rational trier of fact to find for" Eurofed.  Scott v. Harris, 550 U.S. at 380.  Rather than weighing the evidence, Czekalski v. Peters, 475 F.3d at 363, the Court's only task is to determine whether the plaintiff has shown that "there is no genuine dispute as to any material fact" and the plaintiff is entitled to judgment "as a matter of law."  FED. R. CIV. P. 56(a).  Because the question of whether

Eurofed's arrangements with Lazarenko and his companies rendered those parties' funds something other than general cash deposits — a question that has both factual and legal components — could "reasonably be resolved in favor of either party," Anderson v. Liberty Lobby, Inc., 477 U.S. at 250, summary judgment cannot be granted to the plaintiff on this basis. See United States v. $148,840 in U.S. Currency, 521 F.3d at 1277 (holding that district court erred by dismissing forfeiture claimant for lack of standing, because court was required to view evidence in the light most favorable to claimant, the non-moving party); United States v. 1998 BMW "I" Convertible, 235 F.3d at 400 (holding that summary judgment was inappropriate where "district court was presented with contradictory evidence bearing directly on the question of whether appellants had an ownership interest").[15]

### b. Beneficial Ownership

As explained earlier, Eurofed has retained title to its assets during liquidation, but the bank no longer is the "beneficial owner" of those assets. In light of this rule, the plaintiff argues that "upon issuance of the winding up order, Claimant Eurofed Bank became, at most, a

---

[15] In a related argument, the plaintiff asserts that because Lazarenko allegedly "purchased a controlling interest" in Eurofed and "controlled the investment decisions regarding the funds he held at Eurofed," the bank "acted as a mere nominee and lacked control of the Defendant Assets." Therefore, as the plaintiff sees it, "the bank did not have an ownership interest in the Defendant Assets sufficient to confer standing." Mem. at 36. The plaintiff has not come close to demonstrating the factual predicates for this argument, however. Indeed, the district judge who presided over Lazarenko's criminal trial and subsequent ancillary proceedings expressed skepticism about a similar assertion made by the United States during a hearing: that Eurofed functioned as Lazarenko's *alter ego*: "I'm going to tell you, I sat through about a 10 or 12 week trial. I'm not sure I would be prepared to go as far as you have as to whether Eurofed is completely Mr. Lazarenko and they are coextensive. I'm not sure that my record reflects that. But that's for another day[.]" Levine Decl., Ex. 14, at 5. In a subsequent attorneys' fee dispute, the district judge who took over the case concluded that "[t]he government has not sufficiently demonstrated that Eurofed may be held accountable for Lazarenko's conviction as his *alter ego*" because "the trial record does not support the conclusion that Eurofed and Lazarenko are coextensive." Order at 6, United States v. $1,379,879.09, supra. The plaintiff certainly has not persuaded this Court of the absence of genuine issues of material fact on whether Eurofed acted as a mere nominee for Lazarenko.

mere title holder or nominee owner without rights of use or disposal of the property held at the Bank." Reply at 3. And because courts frequently deny standing to nominal owners who lack any "true" interest in the property that the government seeks to forfeit, the plaintiff argues, Eurofed should be treated accordingly.

The plaintiff relies heavily on the truism that, rather than legal ownership *per se*, "it is *injury* that is at the heart of the standing question," and that the inquiry into a claimant's ownership interests is often "a surrogate for an inquiry into whether there is injury direct enough and sufficient enough to sustain standing." United States v. Cambio Exacto, S.A., 166 F.3d 522, 527 (2d Cir. 1999); see id. (explaining that "we look to ownership and possession because they are often reliable indicators of injury that occurs when property is seized"). But, as a general matter, it is clear that "an owner of property seized in a forfeiture action . . . necessarily suffers an injury that can be redressed at least in part by the return of the seized property" and that therefore the owner "will normally have standing to challenge the forfeiture." Id. (quoting United States v. $515,060.42 in U.S. Currency, 152 F.3d 491, 497 (6th Cir. 1998)); accord United States v. Contents of Accounts Nos. 3034504504 and 144-07143, 971 F.2d 974, 985 (3d Cir. 1992)); United States v. U.S. Currency, $81,000.00, 189 F.3d at 35.

Although circumstances do arise in which an owner will be found to lack a genuine interest in its property for standing purposes, Eurofed's lack of beneficial ownership in the Antiguan assets does not make this one of those circumstances. The plaintiff likens Eurofed to a "nominee," *i.e.*, "one who holds bare legal title to property for the benefit of another," Scoville v. United States, 250 F.3d 1198, 1202 (8th Cir. 2001) (quoting BLACK'S LAW DICTIONARY (7th ed. 1999)), and who therefore "do[es] not . . . suffer an injury when the property is taken." United States v. Cambio Exacto, S.A., 166 F.3d at 527. But the defining

feature of nominees is that while they "do indeed 'own' the property," they "hold title to it for somebody else." Id. at 527. Such nominal ownership is of concern in the forfeiture context because it can be used "as a subterfuge" to evade forfeiture and benefit the criminal whose illegal conduct gave rise to the forfeiture. United States v. 5 S 351 Tuthill Rd., 233 F.3d at 1022. Therefore courts do not regard nominees as "a true owner of an interest in the property" and on that basis frequently deny them standing to contest forfeitures. United States v. Vacant Land Located at 10th St. & Challenger Way, 15 F.3d 128, 130 (9th Cir. 1993); see, e.g., United States v. Weiss, 467 F.3d 1300, 1308-09 (11th Cir. 2006); United States v. Premises Known as 526 Liscum Drive, Dayton, Montgomery Cnty., Ohio, 866 F.2d 213, 217 (6th Cir. 1989); United States v. One 1982 Porsche 928, 732 F. Supp. 447, 451 (S.D.N.Y. 1990).

An Antiguan company in liquidation, though it no longer enjoys beneficial ownership of its assets, is not a mere stand-in for another party — because during the liquidation *there is no beneficial owner* of the company's assets. See Buchler and another v. Talbot and others, [2004] UKHL 9, at ¶ 28 (opinion of Lord Hoffman) (explaining that while a liquidation order "divests the company of the beneficial interests in its assets," which "the company thereafter holds in trust" to discharge its liabilities, "[i]t is a special kind of trust because neither the creditors nor anyone else have a proprietary beneficial interest in the fund"). This attribute makes a company in liquidation like the executor of an estate, who under English law is the legal owner of the deceased's property but who may not "enjoy the fruits of it himself or dispose of it for his own benefit," even though "it [is] impossible to identify . . . a person or persons in whom the beneficial ownership in any particular property forming part of the estate [is] vested." Ayerst (Inspector of Taxes) v. C. & K. (Construction) Ltd., A.C. at 178. A trustee in bankruptcy, who similarly assumes legal but not beneficial ownership of the bankrupt's estate, likewise "cannot

enjoy the fruits of the estate himself," but "is under a duty to deal with it as directed by the statute for the benefit of all the creditors who come in to prove a valid claim." Id. at 178. The same is true of an Antiguan company in liquidation, which has no legal right to enjoy the benefit of its assets, and must instead dispose of them according to the dissolution scheme set forth in the liquidation provisions of the IBC Act.

The plaintiff's comparison of Eurofed to a nominee, based on the bank's lack of beneficial ownership of the defendant assets, thus is inapt. Although an Antiguan company in liquidation may no longer do with its assets whatever it wishes, that company is still an ongoing business concern, duty-bound under Antiguan law and court order to carry on its affairs as necessary while consolidating its assets and distributing them to its shareholders after paying off any debts. See IBC Act § 307. The Court therefore rejects the plaintiff's suggestion that the moment such a company enters liquidation, its assets are ripe for the plucking in a forfeiture action that the bank has no right to contest.

### c. Antiguan Restraining Orders

Even if all of the foregoing is correct, says the plaintiff, the particular funds at issue here have never actually been part of the Eurofed liquidation estate, and therefore Eurofed can claim no interest in them. The reason, according to the plaintiff, is the restraining order issued in 1999 by the High Court of Justice that froze all Lazarenko-related Eurofed funds. As described earlier, the court issued this order in October 1999, prohibiting Lazarenko, his associates, and his allegedly affiliated companies from removing any of their funds from Antigua or disposing of or diminishing those funds. Walwyn Decl., Ex. B, at 2. The restraining order was already in place when Eurofed's receivers, in late November 1999, transferred $76 million back to Antigua from the United States (where the money had been on deposit in correspondent

39

bank accounts) and placed it into their Eurofed trust account.  The restraining order was still in effect when Eurofed was ordered liquidated shortly thereafter, and the funds have remained subject to restraint ever since then.  Therefore, according to the plaintiff, because the defendant funds located in Antigua have at all times remained frozen and unavailable for use by the Liquidators, the funds "are not part of the liquidation estate of Eurofed Bank."  Mem. at 33.

This argument has two flaws.  First, it gets the facts wrong.  The October 1999 restraining order to which the plaintiff refers was invalidated as unlawful in April 2001.  See supra at 8-9; Walwyn Decl., Ex. H.   Although the High Court of Justice issued a new restraining order the next month, see Walwyn Decl., Ex. I, that was nearly a year and a half after Eurofed was ordered liquidated.  Thus, the Antiguan restraining order that is presently in force did not predate the liquidation or Eurofed's reacquisition of the funds — just the opposite.

More significantly, neither of the restraining orders had any effect on the legal ownership of the funds.  The restraining orders were merely that: precautionary measures to prevent parties from dissipating the money or moving it elsewhere, pending the resolution of the forfeiture action that was then being pursued by the Antiguan government.  Orders of this sort have no effect on ownership interests:  "A restraint order alters no rights; it merely freezes the property to which it is applied."  Janvey v. Wastell, [2010] EWCA Civ 137,  ¶ 179 (opinion of Lord Hughes); see id. ¶ 121 (opinion of Lady Arden) (stating that "a restraint order is simply a freezing order: it cannot of itself effect changes in the ownership of assets though it may prevent certain new interests from arising").  As the High Court of Justice put it, addressing these very funds: "Quite simply a restraining Order seeks to conserve the assets until it can be further dealt with according to Law."  Lewczyk Decl., Ex. K, ¶ 37.

Thus, neither the original restraining order of October 1999 nor its successor of May 2001 in any way undermines Eurofed's property interest in the defendant assets located in Antigua. The fact that those funds are presently frozen does not mean Eurofed or its Liquidators have lost their legal interest in the funds. Only a successful forfeiture action can accomplish that.

### d. Antiguan Court Orders Enforcing This Court's Restraining Order

The plaintiff offers a second reason why the funds at issue here are not part of the liquidation estate and why Eurofed therefore has no interest in them: according to the plaintiff, the Antiguan courts themselves have said so. Specifically, the plaintiff points to a 2010 order by the High Court of Justice that, over the Liquidators' objections, enforced a restraining order issued by this Court freezing the Eurofed assets located in Antigua, as well as a 2012 judgment from the Court of Appeal that, again over the Liquidators' objections, affirmed the High Court. As the plaintiff reads it, the Court of Appeal decision "held that, as a matter of law, the assets subject to this Court's Restraining Order are not considered part of the liquidation estate." Mem. at 31. Because this is a mischaracterization of the Antiguan courts' decisions, the Court rejects the plaintiff's argument.

In 2004, shortly after the plaintiff filed the original complaint in this action, this Court granted the plaintiff's *ex parte* motion for a restraining order covering all of the *in rem* assets named as defendants in the complaint. See Restraining Order (May 20, 2004). After the plaintiff filed an amended complaint in 2005, the Court issued an amended restraining order, which remains in force today. See Restraining Order (July 8, 2005). That order prohibits certain enumerated parties, including the Liquidators, from taking "any action that would affect the availability or value of the Defendants *In Rem* including, but not limited to, withdrawing, transferring, assigning, pledging, distributing, encumbering, wasting, secreting or otherwise

disposing of or diminishing the value of, by any means, all or any part of the Defendants *In Rem*." Id. at 7. The order further directs that any financial institutions holding any assets subject to the order must "maintain such assets so as to continue to preserve their value and, for such purposes, are authorized to invest them for purposes of capital appreciation and accrual of interest in the normal course of business and in accordance with generally accepted practices for the management of such assets." Id.

At the time the Court issued this restraining order, the defendant assets located in Antigua were already being held in an interest-bearing account in the name of the Registrar of the High Court of Antigua and Barbuda, pursuant to earlier orders of the Antiguan courts. See supra at 8. The High Court, by this point, already had released nearly $20 million of non-Lazarenko-related Eurofed funds from the Registrar's account to the Liquidators for the purpose of *pro rata* payments to innocent third-party depositors and creditors. See supra at 9-12; Walwyn Decl., Ex. K. The approximately $65 million designated as potentially Lazarenko-related, however, remained in the Registrar's account. Id.

In 2010, Antiguan law enforcement authorities moved the High Court of Justice for an order that would enforce this Court's 2005 Restraining Order within Antigua. The authorities, it appears, were acting pursuant to treaty obligations requiring the governments of Antigua and the United States to provide mutual assistance with respect to certain criminal matters, including forfeiture actions. See Lewczyk Decl., Ex. K, ¶¶ 1-5, 34. The Liquidators opposed the motion on several grounds, see id. ¶¶ 7-19, but in October 2010 the High Court granted the motion and ordered this Court's restraining order registered in the High Court of Justice and given full effect in Antigua. See id. ¶ 41; id. (Order of Oct. 18, 2010) ¶¶ 1-3.

The Liquidators appealed this order to the Court of Appeal for Antigua and Barbuda of the Eastern Caribbean Supreme Court, focusing their appeal on a single issue: the use of interest that had accrued on the funds being held in the Registrar's account. <u>See</u> Lewczyk Decl., Ex. L, ¶ 21. The problem, as the Liquidators saw it, was that the restraining order appeared to require that accrued interest be individually credited to the former bank accounts of Lazarenko, Milchenko, and their six affiliated companies, which were the source of the funds in the Registrar's account.[16] The Liquidators, however, wanted to use the interest that was accruing in the Registrar's account to fund the payment of innocent third-party depositors — rather than credit this interest to the Lazarenko-related accounts (which would mean leaving it frozen and untouched pending the forfeiture proceedings). Lewczyk Decl., Ex. K, ¶ 21. This Court's restraining order, which prevented them from doing so, conflicted with Antiguan law, according to the Liquidators: When an Antiguan bank goes into liquidation, they maintained, interest immediately stops accruing on individual accounts, and no depositor may recoup any interest accruing on such an account after the date of liquidation. The restraining order, by contrast, requires interest to accrue on frozen liquidated accounts and mandates that the interest be credited to those accounts. <u>Id</u>. ¶¶ 13-19.

The Court of Appeal agreed with the Liquidators that, as a general matter, "any interest which may accrue in this case is for the benefit of and use in liquidation proceedings as a whole and cannot be credited to a specific creditor or depositor." Lewczyk Decl., Ex. L, ¶ 23. But the court concluded that the importance of forfeiture proceedings trumped the general

---

[16]    Those bank accounts are individually enumerated in this Court's restraining order, as they are in the amended complaint, and the restraining order directs that financial institutions holding the frozen funds "shall continue to credit to the accounts in which the Defendants In Rem may be found any . . . interest . . . or other credits in the normal course of business and such . . . interest . . . shall be subject to this Order." Restraining Order at 7 (July 8, 2005). The order of the High Court of Justice that enforced this Court's restraining order included identical language. Lewczyk Decl., Ex. K (Order of Oct. 18, 2010), ¶ 3(b).

principles of liquidation law that otherwise would govern the status of this interest.  As the court

explained, the potentially Lazarenko-related funds are alleged to be the proceeds of crime, and

"not only the principal but the interest thereon as well could be the proceeds of crime."  Id. ¶ 39.

Therefore, because "[t]he interest is as much a part of the alleged proceeds of crime as the

principal sum," the interest "cannot be alienated from the principal to make the interest a part of

funds available to liquidators," and "such principal and interests thereon that are proved, at the

enforcement stage, to be the proceeds of criminal activity, are subject to be forfeited."  Id.  The

court therefore rejected the Liquidators' appeal and affirmed the High Court's decision to

enforce this Court's restraining order:  "In this case principal and interest will remain frozen,

unless otherwise ordered, pending the outcome of forfeiture proceedings."  Id.  This result, the

court explained, was also justified on public policy grounds, because allowing third-party

depositors and creditors to reap the interest accrued on funds that might be the proceeds of crime

would entitle them "to share in the benefit of criminally tainted money."  Id. ¶ 40.  In sum, the

court held that "in effect, the restraint order takes precedence over the winding up order."  Id.

¶ 33.

      The Court of Appeal's decision clearly addressed only the question of whether

interest on the funds in the Registrar's account would remain frozen pending forfeiture

proceedings.  Yet the plaintiff insists that the decision is much broader.  According to the

plaintiff, the decision held that Eurofed's Liquidators have no legal interest in any of the still-

frozen Eurofed funds in the Registrar's account.  The plaintiff emphasizes the court's statement

that "the restraint order requires that the principal funds, which may be the proceeds of crime, is

[sic] not to be considered a part of the liquidation corpus of assets.  By extension, the interest

accrued on the principal funds cannot be caught by the liquidation."  Lewczyk Decl., Ex. L, ¶ 33.

In support of its interpretation that the Court of Appeal thereby repudiated any legal interest of Eurofed in the frozen money, the plaintiff submits an expert declaration from a member of the Antiguan bar averring that the "*ratio decidende*" of the court's decision "was that such funds frozen or restrained do not form part of the corpus of assets subject to liquidation," and therefore "if such funds are confiscated, the bank in liquidation suffers no injury." Declaration of Stephen A. Singh ¶¶ 5-6.

With all due respect to the plaintiff's expert, this interpretation represents a misreading of the Court of Appeal's opinion. The court's discussion is focused on the narrow issue of whether accrued interest deriving from potentially Lazarenko-related Eurofed accounts could be segregated from the principal amounts and immediately used to fund the liquidation claims of other depositors. In determining that the money could not be used in this way, the court did not conclude that Eurofed has no legal interest in that interest or the principal funds. The fact that the court stated that "the principal funds, which may be the proceeds of crime," are "not to be considered a part of the liquidation corpus of assets," Lewczyk Decl., Ex. L, ¶ 33, does not change this. The plaintiff once again is confusing a restraining order — which merely "seeks to conserve the assets until it can be further dealt with according to Law," according to the very order that the Court of Appeal affirmed, see Lewczyk Decl., Ex. K, ¶ 37 — with the ultimate determination of forfeitability. The latter has not occurred yet, which is why the Court of Appeal stated that "principal and interest will remain frozen, unless otherwise ordered, *pending the outcome of forfeiture proceedings*." Lewczyk Decl., Ex. L, ¶ 39 (emphasis added); see id., Ex. K, ¶ 37 ("At the forfeiture proceedings all relevant issues can be ventilated including the issue of the legal status of the interest referred to by the respondent in this application.").

One only has to think for a moment about the plaintiff's position to appreciate its circularity:  First, the plaintiff obtains a restraining order from this Court freezing the defendant assets, pending a determination of their forfeitability.  Next, an Antiguan court enforces that order domestically, ruling that the assets cannot be used for the liquidation pending the forfeiture proceedings.  Finally, the plaintiff uses the order of the Antiguan court to obtain an order from this Court that the Liquidators have no right to challenge the forfeiture at all — because an Antiguan court has prevented them from using the assets in the liquidation.  One can readily appreciate why this scenario, in which a simple freeze order is transformed into a weapon disposing of all parties who claim ownership of the frozen assets, is appealing to the plaintiff.  Such alchemy, however, contradicts the decisions of the Antiguan courts, which acknowledge that the purpose of this Court's restraining order, and of their enforcement of that order, is merely to preserve the defendant assets pending the determination of whether they are subject to forfeiture.  See Lewczyk Decl., Ex. K, ¶ 37; id., Ex. L, ¶ 39.

### e.  Surplus of Funds

The plaintiff also argues that Eurofed would suffer no injury from the forfeiture of the defendant funds because the Liquidators already have more than enough money available to fund the liquidation to its completion.  See Mem. at 39-40.

As noted, the Liquidators report that they have validated approximately 74 claims submitted by Eurofed depositors and creditors unrelated to Lazarenko and have distributed over $14 million to these claimants.  Because the funds presently available to the Liquidators are limited, however, and because an additional 107 claims have not yet been validated, the Liquidators have paid the validated claimants on a *pro rata* basis.  They report that the balance still owed to these 74 validated claimants is $3,180,171.  They also report that the "potential

claims" of the unvalidated claimants add up to $6,966,692. "Thus . . . the total potential remaining amount due to third party depositors and creditors unrelated to Lazarenko is $10,146,823," while the "total unrestrained funds in the Liquidators' possession . . . is $4,347,542, and therefore, there is a deficit in the liquidation estate of at least $5,799,280." Walwyn Decl. ¶¶ 16-17.

The Liquidators acknowledge, in other words, that they have enough money on hand to compensate in full all 74 validated claimants, who so far have received only partial payment on their claims. Paying the balance on those validated claims, however, would leave only around $1 million remaining for the payment of any successful claims among the 107 claims that are still unvalidated, the total value of which could approach $7 million. And according to the Liquidators, they "may not pay verified claims in full as long as there are outstanding potential claims that exceed the assets available for distribution." Walwyn Decl. ¶ 17; see IBC Act § 289(3) ("When the amount available to pay the claims of any class of claimant . . . is not sufficient to provide payment in full to claimants in that class, the amount available shall be distributed on a pro rata basis among the claimants in that class.").

The plaintiff responds that "after twelve and a half years of liquidation proceedings, it strains credulity to believe that the Liquidators — long standing partners of PricewaterhouseCoopers — still have not completed the validation process." Mem. at 40. The Court, however, does not make credibility determinations or weigh the evidence on a motion for summary judgment. Czekalski v. Peters, 475 F.3d at 363. For the plaintiff to obtain summary judgment against Eurofed on the basis of this argument, it must demonstrate the absence of any genuine issue of material fact about the lack of any remaining bona fide Eurofed liquidation claims that have not yet been validated. That showing is not made by expressing incredulity.

This line of attack, therefore, does not support the plaintiff's request for judgment as a matter of law on the existing record.[17]

The plaintiff also suggests that the Court should simply discount the significance of Eurofed's unvalidated liquidation claims. As noted, the Liquidators' estimates show that even if all *potential* claims were found to be valid and require payment from the liquidation estate, the deficit facing the estate would be less than $7 million. The plaintiff argues that the "hypothetical, future validation" of claims that will not exceed this figure is "an insufficient basis for the Court to find that the Claimant Liquidators have constitutional standing to contest the forfeiture of all of the assets held for the benefit of Lazarenko and Milchenko and involved in their crimes." Mem. at 40. That is particularly so, according to the plaintiff, because the unvalidated claimants in question "have so far been unable or unwilling to do what is necessary to finalize their claims in the liquidation." Id.

As far as the Court can tell, the plaintiff seems to be suggesting that the standing inquiry incorporate some amorphous type of proportionality analysis, under which claimants with a relatively small stake in a forfeiture ("small" here meaning potentially seven million

---

[17]     Perhaps lending some justification to the plaintiff's skepticism, in June 2010 the Liquidators reported to the High Court of Justice that, among the unvalidated claimants (who numbered 111 at the time of the report), 70 claimants had not responded to any of the Liquidators' attempts to contact them, 17 had submitted only a portion of the information required to validate their claims, and the remaining 24 all had their Eurofed deposits frozen by the Antiguan money-laundering authorities. Lewczyk Decl., Ex. V, at 2. With respect to the 70 claimants who had not responded at all, the Liquidators proposed to the High Court that, after a final attempt to reach these claimants, the Liquidators would "allocate these funds on a pro rata basis to the other claimants." Id. In reporting to this Court about the 107 claimants allegedly still awaiting validation, nothing in the Liquidators' filings or statement of facts mentions these 70 wayward claimants. The Court also notes that between the Liquidators' completion of their most recent special interrogatory responses and the filing of their memorandum opposing summary judgment — two years later — the Liquidators, by their own reckoning, validated at most a single claim. See id., Ex. P, at 26 (reporting that "approximately 73" claims were validated); Walwyn Decl. ¶ 16 (reporting that "approximately 74" claims were validated).

dollars) be denied the right to contest the outcome of the forfeiture on that basis. No analysis or authority of any kind is offered in support of this proposition, however.

More fundamentally, the plaintiff's argument rests on the false premise that Eurofed's legal interest in the defendant assets is limited to whatever amount of money is necessary to compensate the non-Lazarenko-related depositors and creditors who have made claims in the liquidation. As explained above, however, Eurofed has a colorable ownership interest in *all* of the funds being held in Antigua, along with a possessory interest in those funds and a financial stake in their disposition. See supra at 23-31. Although Eurofed, thus far, has been permitted by the courts only to pay off the claims of depositors and creditors who undeniably have no relationship with Lazarenko, no court has yet determined that the $65 million in the Registrar's account is traceable to or proceeds of Lazarenko's crimes. Until that happens, Eurofed has an interest in the fate of that money.

### f. Distinction Between Eurofed and its Liquidators

Even if Eurofed has standing to contest the forfeiture of the defendant assets, the plaintiff argues, this does not necessarily mean that its Liquidators may participate in these proceedings on the bank's behalf. Maintaining that "liquidators are not coextensive with the company that they are liquidating," and that "the interests of a liquidator and a company in liquidation necessarily are different," the plaintiff asserts that "Claimant Liquidators and Claimant Eurofed Bank are, simply put, two distinct entities each advancing its own distinct purported interests." Moreover, by "conflating these two interests," the Liquidators have "confuse[d] the litigation and hamper[ed] . . . the Court's ability to adjudicate[] the legal basis for their participation in this action." Mem. at 19, 21-22.

Part of the plaintiff's argument here is that the Liquidators' court filings and discovery responses have obscured whether they are acting exclusively as Eurofed's agents, pressing the bank's interests on the bank's behalf, or whether they are asserting their own, distinct legal interests in the defendant assets. See Mem. at 19-25. This contention is essentially a variant on the plaintiff's procedural argument for the dismissal of Eurofed's claim, discussed below. See infra at 56-61.

The other aspect of the plaintiff's argument presents a substantive question: whether the liquidator of an Antiguan corporation is entitled to appear on behalf of the corporation to contest the forfeiture of its assets, or whether the liquidator's distinct legal identity means that he or she can only pursue whatever separate right he or she has, as a liquidator, to the corporation's assets. Basically, the plaintiff is challenging the very notion that Eurofed may contest this forfeiture "by and through" its Liquidators. Euro. Cl. at 3. To address the questions raised by the plaintiff, one must engage in a two-step inquiry because, as noted above, "[s]tate law defines and classifies property interests for purposes of the forfeiture statutes, while federal law determines the effect of the property interest on the claimant's standing." United States v. 5 S 351 Tuthill Rd., 233 F.3d at 1021.

With respect to Antiguan property interests, the matter is fairly straightforward. As explained earlier, title to Eurofed's assets remains with the bank during liquidation and does not transfer to its liquidators. See supra at 27. Nevertheless, the IBC Act commands a liquidator to "take into his custody and control the property of the corporation" and empowers him or her to "bring, defend or take part in any civil, criminal or administrative action or proceeding in the name of and on behalf of the corporation." IBC Act §§ 307(c), (d), 308(1)(b). Thus, Antiguan law expressly provides that Eurofed's Liquidators will take control of the bank's assets and

represent Eurofed's interests in legal proceedings.  Even the plaintiff acknowledges that a liquidator "has the ability to act on the entity's behalf."  Toube Decl. ¶ 27.  The mere fact that a liquidator is "an agent" of the corporation, and thus a separate legal personage with his own distinct identity, as emphasized by the plaintiff, see Mem. at 19 (citing Knowles v. Scott, [1891] 1 Ch 717, 723), does not diminish the liquidator's entitlement to act on behalf of the company and assert its interests in court.  See Ayerst (Inspector of Taxes) v. C. & K. (Construction) Ltd., A.C. at 180 (explaining that during liquidation "the actual custody, control, realisation and distribution of the proceeds of the property which is subject to the statutory scheme are taken out of the hands of the legal owner of the property, the company, and vested in a third party, the liquidator, over whom the company has no control").

Turning to the second part of the inquiry — the effect of these state-defined property interests on the federal standing analysis — the Court disagrees that the Liquidators' separate legal identity from Eurofed deprives them of the right to challenge the forfeiture of Eurofed's assets on the bank's behalf.  Mr. Walwyn and Mr. Wilkinson have not sought to appear in their personal capacities in this action, but only in their official roles as liquidators of Eurofed.  "Acts performed by the same person in two different capacities 'are generally treated as the transactions of two different legal personages.'"  Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 543 (1986) (quoting F. JAMES & G. HAZARD, CIVIL PROCEDURE § 11.6, at 594 (3d ed. 1985)).  And where a corporation's liquidators appear in their official capacities, federal courts have permitted them to participate in forfeiture proceedings or intervene in civil actions on behalf of their corporations.  See United States v. $7,599,358.09, --- F. Supp. 2d ----, 2013 WL 3086107, at *4-5 (D.N.J. June 18, 2013) (holding that liquidator of Illinois company had standing to challenge civil forfeiture); Zurich Capital Markets Inc. v. Coglianese, 236 F.R.D.

379, 383-87 (N.D. Ill. 2006) (holding that liquidator of Bahamian company could intervene as of right in action that threatened assets of the company).[18]  These decisions are borne out of a recognition that, during liquidation, there is no functional difference between the corporation and its liquidators insofar as the liquidators are acting in their roles as agents and representatives of that corporation.  See United States v. BCCI Holdings (Luxembourg), S.A., 48 F.3d 551, 554 (D.C. Cir. 1995) (assessing standing of bank liquidators to contest forfeiture "in their capacities as branch liquidators").

        The plaintiff cites no cases holding that a liquidator — or any similarly appointed representative such as a receiver, trustee, or estate administrator — lacks standing to contest a forfeiture because of the legal distinction between the appointed representative and the entity or estate he or she represents.  Indeed, where our own court of appeals has denied liquidators standing to challenge a forfeiture, the court did so precisely because the interests of the liquidators were indistinguishable from those of the banks on whose behalf they acted.  While these banks had already been found to lack standing, their liquidators "assert[ed] that, as legally authorized liquidators, they ha[d] interests separate from the institutions they represent[d]," an assertion that the court rejected: "A bank liquidator, however, stands in the shoes of the bank it represents and enjoys precisely the same rights and interests."  United States v. BCCI Holdings (Luxembourg), S.A., 48 F.3d at 554.[19]

_____

        [18]     Although United States v. $7,599,358.09 involved a liquidator who held title to the assets of his company under state law, nothing marks this factor as critical to the court's analysis.  See 2013 WL 3086107, at *5.

        [19]     As authority for the proposition that a bank liquidator "stands in the shoes of the bank it represents and enjoys precisely the same rights and interests," the court of appeals in BCCI cited decisions that involved the rights of liquidators and receivers appointed pursuant to federal statutes or under the laws of individual states.  See United States v. BCCI Holdings (Luxembourg), S.A., 48 F.3d at 554.  The property interests in this case, by contrast, are governed by Antiguan law, under which liquidators do not become the owners of their

The Court therefore concludes that Eurofed's Liquidators have every right to appear in their official capacity on behalf of the bank and challenge the forfeiture, presenting all of the claims and defenses that Eurofed may possess. Or, to put it another way, Eurofed may appear in this action "by and through" its Liquidators.[20]

It bears emphasis, however, that the Liquidators are entitled to participate here only on behalf of Eurofed. Apparently unable to help themselves from adding one more argument to bolster their standing, even if it contradicts their otherwise consistent insistence that they exclusively represent Eurofed's interests, the Liquidators briefly argue that because they "owe the depositors and creditors of Eurofed certain statutory fiduciary duties," they "are exposed to personal liability under Antiguan law if they fail to fulfill those duties." Opp. at 34. But the Court reiterates that any personal interests of Mr. Walwyn or Mr. Wilkinson, and any injuries that they might suffer from the outcome of this action in their personal capacities, are irrelevant. Likewise, Eurofed may not vicariously represent the legal interests of its individual depositors and creditors in this action, and its standing rests solely on its own institutional interests in complying with the IBC Act and completing the liquidation. As the Liquidators themselves make clear, they "are not asserting the rights of others," but have "filed a claim on behalf of Eurofed so that they would be able to fulfill their continuing statutory and fiduciary

---

corporation's assets. The Court therefore emphasizes that it does *not* accept two arguments advanced here by the Liquidators: that title to Eurofed's assets passed to the Liquidators upon their appointment, see Opp. at 21, or that the Liquidators enjoy "*all* of the same rights and interests" as Eurofed. Id. at 22 (emphasis added). The relevant point is that the distinction between Eurofed and its Liquidators is immaterial *for purposes of standing to contest the forfeiture of Eurofed's assets*.

[20] The plaintiff's contention that counsel for the Liquidators, in a status conference held before Magistrate Judge Robinson in June 2011, admitted that the Liquidators "have no interest in the Defendants *In Rem*," Mem. at 29, is a mischaracterization of counsel's comments. See Levine Decl., Ex. 22, at 12-15; id., Ex. 23, at 17-18, 40-42; Opp. at 34-35.

duties." Opp. at 44-45.  The only claimant here is Eurofed, acting by and through its

Liquidators.  See Euro. Cl. at 3.

### B.  Defendant Funds Held on Deposit in Lithuania and Switzerland in Eurofed's Correspondent Accounts

The foregoing discussion has addressed only two of the five *in rem* defendants in

which Eurofed claims an interest: the assets located in Antigua and held at the Bank of Nova

Scotia in the account of the Registrar of the High Court of Justice.  The remaining three *in rem*

defendants are all located in bank accounts that Eurofed formerly maintained in its own name

with financial institutions in Lithuania and Switzerland.  Specifically, these three defendants

comprise funds held on Eurofed's behalf at Vilniaus Bankas (Vilniaus, Lithuania), last valued at

approximately $29.3 million; Credit Suisse (Geneva, Switzerland), last valued at approximately

$4.8 million; and Banque SCS Alliance S.A. (Geneva, Switzerland), last valued at approximately

$484,000.  See Am. Compl. ¶ 5(f)-(h); Euro. Cl. at 3-4.

As a result of freeze orders issued in Lithuania and Switzerland, the Liquidators

have never been able to transfer these funds out of the countries and financial institutions where

they are located back to Antigua and into their own control.  See Lewczyk Decl., Ex. I (first

report of the receivers), at 2-3; id. (supplemental affidavit), at 1; id., Ex. V, at 2; Declaration of

Marlee Engel ¶ 5; Supplemental Declaration of Marlee Engel ¶ 6.

Although Eurofed bears the burden of establishing its standing to contest the

forfeiture of these assets, it does not even attempt to show that the laws of Lithuania or

Switzerland give it a property interest in the funds located in those countries.  As discussed

earlier, Antiguan law provides that a customer's financial deposits with a bank generally become

assets of the bank; consequently, the customer is no longer the owner of the money.  See supra

at 24. This principle endowed Eurofed with title to the funds that its customers deposited. But once Eurofed itself, now acting as a customer, deposited some of these funds with financial institutions in Lithuania and Switzerland, application of the same rule would suggest that Eurofed in turn lost title to those funds — unless, perhaps, the laws of Lithuania and Switzerland provide differently for the property rights of bank depositors.

Eurofed has not argued that this is the case or presented any evidence supporting such an argument. The Court therefore has no basis from which to infer that Eurofed, as a depositor of Vilniaus Bankas, Credit Suisse, and Banque SCS Alliance, is anything other than a general, unsecured creditor of those banks. And the federal courts "have consistently held that unsecured creditors do not have standing to challenge the civil forfeiture of their debtors' property." All Assets IV, 772 F. Supp. at 212 (quoting United States v. One-Sixth Share, 326 F.3d at 41); see United States v. BCCI Holdings (Luxembourg), S.A., 46 F.3d 1185, 1191 (D.C. Cir. 1995) (holding that "a general creditor can never have an interest in specific forfeited property").

Nor has Eurofed shown any other way that it could have an ownership interest in these particular *in rem* defendants. Since the date that Eurofed deposited these funds overseas, neither the bank nor its Liquidators have ever regained possession of the funds or exerted any dominion or control over them. That puts these defendant assets in a fundamentally different position from those located in Antigua: the Liquidators secured the return of those assets from the United States and held them for months in their own trust account before turning them over to the Registrar of the High Court of Justice. Not so for the assets in Lithuania and Switzerland. Moreover, Eurofed has not demonstrated that it has any financial stake in these particular funds.

Rather, it appears that the bank, at most, has a damages claim against the three financial institutions holding those funds if they unlawfully refuse to return them.

Thus, Eurofed has not established a colorable ownership interest in the defendant assets named in paragraph 5(f), 5(g), and 5(h) of the amended complaint, and thus it has not carried its burden of demonstrating its standing to contest their forfeiture. As a practical matter, this determination may not have much effect on Eurofed's pursuit of its interests here, because the Lithuania and Switzerland assets are allegedly derived from the same funds as those in Antigua, the forfeitability of which Eurofed has the right to contest.

### C. Procedural Objections

Apart from the question of whether Eurofed and its Liquidators have a sufficient interest in the defendant assets to contest their forfeiture, the plaintiff argues that neither Eurofed nor the Liquidators have complied with the procedural requirements governing asset forfeiture claims and that Eurofed's claim should be dismissed on this basis. See Mem. at 18-25. This argument represents a procedural counterpoint to the plaintiff's substantive effort to separate Eurofed from its Liquidators on the basis of their ostensibly distinct legal interests. The Court finds this variant equally unpersuasive.

"To contest the forfeiture of property that has been named as a defendant in a civil forfeiture action, a claimant must proceed 'in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims [and Asset Forfeiture Actions.]'" All Assets II, 664 F. Supp. 2d at 101 (quoting 18 U.S.C. § 983(a)(4)(A)). A would-be claimant "must file with the court presiding over the forfeiture action a claim that (1) 'identif[ies] the specific property claimed,' (2) 'identif[ies] the claimant and state[s] the claimant's interest in the property,' and (3) is 'signed by the claimant under penalty of perjury.'" Id. (quoting SUPP. R.

G(5)(a)(i)(A)-(C)). "She or he must also file either a motion to dismiss the government's complaint or an answer to that complaint[.]" Id. (citing SUPP. R. G(5)(b)).

Eurofed intervened in these proceedings by filing a timely claim asserting an interest in the Eurofed-related defendant assets. See Euro. Cl. Eurofed's verified statement identifies the claimant as "Eurofed Bank Limited (in liquidation), *by and through its Receivers, Robert J. Wilkinson and Charles Walwyn (collectively 'Eurofed')*." Id. at 3 (emphasis added). Leaving no doubt of the claimant's identity, the document is titled "Eurofed Bank Limited's (In Liquidation) Rule C(6)(A) Verified Statement," see id. at 1, and the counsel who signed it are identified as "Attorneys for Claimant Eurofed Bank Limited, In Liquidation." Id. at 5.

A timely answer to the complaint was later filed by the same counsel, but this answer consistently identifies the "claimants" as the "Liquidators of European Federal Credit Bank (In Liquidation)," Euro. Ans. at 1; see id. at 2 (same); id. at 27 (same), rather than Eurofed itself, acting "by and through" its liquidators.

As a result of the discrepancy between these two filings, the plaintiff argues that "two claimants are appearing in this action with respect to Eurofed Bank Limited" — the bank itself and the Liquidators. Mem. at 18. And because, as the plaintiff sees it, the Liquidators did not file a claim, while Eurofed did not file an answer, both claimants should be dismissed. See id. at 18-22.

As the Court has explained, the Liquidators have been empowered by Antiguan statute and court order to "bring, defend or take part in any civil, criminal or administrative action or proceeding in the name of and on behalf of" Eurofed. IBC Act § 308(1)(b). Indeed, since the powers of Eurofed's directors and shareholders have ceased and "are vested in the liquidator," id. § 305(1)(a), the *only* way that Eurofed can proceed through this or any other legal

action is through its Liquidators. Reflecting this state of affairs, Eurofed's verified claim indicates that the bank is appearing "by and through" its liquidators. Euro. Cl. at 2. But the statement clearly identifies "Eurofed" as the claimant, asserting that the bank is "the legal owner of the accounts and/or funds" in question, and that "[b]y virtue of [this] legal ownership . . . Eurofed declares its right to defend this action." Id. at 4.

Subsequent filings, it is true, have freely interchanged "Eurofed" with "the Liquidators of Eurofed" in identifying the claimant, beginning with the answer. But these filings make clear that the Liquidators are acting in their roles as representatives of Eurofed, and the filings reflect an implicit understanding that there is no difference between the bank and its liquidators as far as their participation in this action is concerned. See, e.g., Dkt. No. 223 at 1 (identifying the claimant as "'the Liquidators' or 'Eurofed'"); Lewczyk Decl., Ex. P, at 1 (identifying the claimant as "'the Liquidators' or 'the Bank'"). That the plaintiff itself has never been confused by this inconsistency, or believed that Eurofed and its Liquidators were separate claimants, is clear from the special interrogatories that the plaintiff served on the Liquidators, which provide: "The term 'you' or 'your' means both Eurofed and the Liquidators of Eurofed." Lewczyk Decl., Ex. U, at 2.

Given all this, it cannot seriously be argued that "Eurofed Bank has not filed an Answer in this action," Mem. at 7, or that Eurofed's claim should be stricken because the Liquidators chose to identify themselves as the "claimants" in their answer to the complaint. The purpose of an answer, in civil forfeiture actions, as elsewhere, "is to give reasonable notice of the allegations in the complaint sought to be placed in issue." United States v. 1866.75 Board Feet and 11 Doors and Casings, No. 07-1100, 2008 WL 839792, at *2 (E.D. Va. Mar. 25, 2008) (citing 5 CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE

§ 1261 (3d ed. 2004)).  The answer filed by the Liquidators does just that, admitting some of the complaint's allegations, denying others, and setting forth a host of affirmative defenses.  See Euro. Ans.  Thus, the inconsistency in identification of the "claimant" between the claim and the answer has by no means left "the Government and the court guessing as to which allegations in the complaint are admitted and which will require proof at trial."  Reply at 13.[21]

The plaintiff's real gripe is with the Liquidators' responses to the plaintiff's special interrogatories.  Such interrogatories play an important role in civil forfeiture actions, because they allow the government "to gather information that bears on the claimant's standing," SUPP. R. G(6)(a), Advisory Committee Notes, 2006 Adoption, and promptly move to dismiss from the proceedings claimants who lack such standing.  See supra at 15.  The plaintiff argues that the Liquidators have responded to these special interrogatories only by addressing their own relationship, as appointed liquidators, to the assets claimed by Eurofed, rather than responding on behalf of Eurofed itself and explaining the nature of *the bank's* legal interest in those assets.  See Mem. at 22-23.

The plaintiff has a point.  For instance, in response to a question asking for "the date on which you acquired . . . an interest" in certain assets, the Liquidators' response cites only the facts surrounding the commencement of the liquidation and their own appointment as liquidators, saying nothing about when *Eurofed's* interest in the property arose.  See Lewczyk Decl., Ex. P, at 4-6.  In response to an inquiry about "the ownership or other nature of your

---

[21]     The plaintiff spends considerable time belaboring portions of the Liquidators' answer that disclaim knowledge about certain assertions made in the complaint — apparently to suggest that the answer does not actually speak for Eurofed (because the bank presumably would have knowledge of the matters in question).  As the Liquidators have explained, however, much of the plaintiff's discussion to this effect is misleading: the denials in question do not simply deny awareness of undisputed facts that Eurofed itself must surely know, but rather dispute specific characterizations about the defendant assets with which the Liquidators disagree.  Identifying such points of disagreement is one function of an answer.

interest and all facts and legal bases that support your claim," the Liquidators' brief response is confined to the nature of their own relationship to the property, saying not a whit about the nature of *Eurofed's* interest in the property or what facts or legal bases support that alleged interest. <u>Id</u>. This pattern pervades the Liquidators' interrogatory responses.

The solution to this deficiency, however, would have been to move to compel more complete responses from Eurofed. Instead, as recounted earlier, the plaintiff took the more aggressive step of moving to dismiss Eurofed's claim entirely under Supplemental Rule G(8)(c)(i)(A) — which permits dismissal for certain procedural noncompliance — based upon the inadequacy of these discovery responses. <u>See</u> <u>supra</u> at 16-17. Only in the alternative did the plaintiff request that the Liquidators be compelled to supplement their responses. <u>See</u> Dkt. No. 244. In arguing for dismissal under Supplemental Rule G(8)(c)(i)(A), however, the plaintiff mixed its discussion with direct attacks on the Liquidators' standing — a challenge properly brought through a motion to dismiss for lack of standing under Supplemental Rule G(8)(c)(i)(B). After receiving a clear indication from the Court that it was not likely to dismiss Eurofed's claim based on inadequate interrogatory responses, the plaintiff agreed to brief the question of Eurofed's standing on the existing record without further discovery, rather than have the Court address its objections to the interrogatory responses. <u>See</u> <u>supra</u> at 17-18. But now, having filed a motion challenging Eurofed's standing as a substantive matter, the plaintiff is attempting to revive its procedural objections. It simply couches its argument in new terms — by suggesting that it is not objecting to the *inadequacy* of the interrogatory responses, as before, but to "Eurofed Bank's failure to respond *at all*" to the interrogatories. Mem. at 3.

Simply put, this will not fly. Whatever deficiency exists in the interrogatory responses, insofar as they fail to adequately address questions about Eurofed's interest in the

defendant assets, the Court does not agree that Eurofed has "failed to respond at all" to those interrogatories, and it will not strike Eurofed's claim on this basis.

## D. Prudential Standing

Finally, the plaintiff argues that Eurofed's claim should be dismissed as a matter of "prudential standing," because the bank's asserted interest in the defendant assets purportedly does not satisfy the definition of an "owner" under 18 U.S.C. § 983(d)(6). That definition is part of the "innocent owner defense," which allows claimants to defeat a civil forfeiture by proving their innocent ownership of the *res* by a preponderance of the evidence. Id. § 983(d)(1).

Eurofed need not prove at this juncture that it is an innocent owner under Section 983(d)(6), and any suggestion to the contrary "conflates the requirements of standing with the ultimate merits of the Liquidator[s'] affirmative defense to defeat forfeiture." United States v. $7,599,358.09, --- F. Supp. 2d ----, 2013 WL 3086107, at *4. "The jurisprudence on civil forfeiture cases makes clear that the threshold requirement of a claimant's standing is not rigorous and does not depend on proof of the underlying merits of the claim." Id. (citing United States v. One Lincoln Navigator, 328 F.3d at 1013); see United States v. 1100 Peeler Ave., Lakeland, Lanier Cnty., Georgia, 2007 WL 4289692, at *4 ("This Court has scoured the civil forfeiture statutes and relevant cases and has been unable to find anything that supports the notion that a claimant can only pursue a claim to defendant property if [it] proves both standing and ownership.").

Even the decisions cited by the plaintiff acknowledge that a claimant "need not prove that he is in fact an innocent owner of the property" in order to have standing, United States v. $746,198 in U.S. Currency, More or Less, 299 F. Supp. 2d 923, 933 (S.D. Iowa 2004), and that the claimant's satisfaction of Section 983(d)(6) is "an element of the innocent owner's

claim on the merits." United States v. $165,580 in U.S. Currency, 502 F. Supp. 2d 114, 122 (D. Me. 2007) (quoting United States v. One Lincoln Navigator, 328 F.3d at 1014).  Innocent ownership "remains an affirmative defense," which the claimant must prove only after the government first meets its own burden of "proving by a preponderance of the evidence that the property is subject to forfeiture."  United States v. 2000 Toyota Celica, No. 04-3063, 2005 WL 1502902, at *4 (E.D. Wash. June 23, 2005) (citing 18 U.S.C. § 983(c)(1)).

        None of the decisions relied upon by the plaintiff in support of this argument actually discuss prudential standing.  These decisions all hinge on a claimant's lack of *statutory* standing, where there is no possibility that the claimant can prove innocent ownership of the defendant property — either because the facts pled by the claimant do not support any ownership interest satisfying the criteria of Section 983(d)(6), or because the evidence unequivocally shows that the claimant lacks such an ownership interest.  See, e.g., United States v. 8 Gilcrease Lane, 641 F. Supp. 2d 1, 5 (D.D.C. 2009);  United States v. $165,580, 502 F. Supp. 2d at 123; United States v. 74.05 Acres of Land, 428 F. Supp. 2d 57, 62-65 (D. Conn. 2006); United States v. $746,198, 299 F. Supp. 2d at 933; United States v. One 2004 Land Rover Range Rover, No. 07-818S, 2009 WL 909669, at *5-6 (W.D.N.Y. Mar. 31, 2009).  But that is not the case here. Section 983(d)(6)(A) defines an "owner" as "a person with an ownership interest in the specific property sought to be forfeited," and Eurofed has made a colorable showing of such an interest. See supra at 23-31.  While Section 983(d)(6)(B) excludes unsecured creditors, bailees, and nominees from the definition of "owner," none of these categories encompasses the ownership interest that Eurofed has asserted and that it has supported with evidence.  This final bid to dismiss Eurofed's claim therefore fails as well.

## V. CONCLUSION

While the plaintiff's myriad arguments have put Eurofed through its paces, not one of these arguments carries the day. Eurofed, acting by and through its Liquidators, has demonstrated that it has a colorable ownership interest in the defendant assets located in Antigua. It therefore has standing to contest the forfeiture of those assets, and its claim to them will survive the plaintiff's motion for summary judgment. That Eurofed has satisfied the criteria necessary to establish standing at the summary judgment stage, however, does not mean that the Court "may not revisit the issue at later stages in the litigation." United States v. $148,840 in U.S. Currency, 521 F.3d at 1278.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN

DATE: August 12, 2013                    United States District Judge