# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:04-cv-00798-PLF |
| | ) |
| | ) |
| ALL ASSETS HELD AT BANK JULIUS | ) **ORAL ARGUMENT REQUESTED** |
| BAER & COMPANY, LTD., GUERNSEY | ) |
| BRANCH, ACCOUNT NUMBER 121128, | ) |
| IN THE NAME OF PAVLO | ) |
| LAZARENKO, LAST VALUED AT | ) |
| APPROXIMATELY $2 MILLION IN | ) |
| UNITED STATES DOLLARS, *ET AL.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF CLAIMANT
## PAVEL LAZARENKO'S MOTION TO COMPEL

Ian M. Comisky (D.C. Bar No. 927608)
Matthew D. Lee (D.C. Bar No. 453529)
BLANK ROME LLP
One Logan Square, 130 N. 18th Street
Philadelphia PA  19103


David B. Smith (D.C. Bar No. 403068)
SMITH & ZIMMERMAN, PLLC
108 N. Alfred St.
Alexandria, VA 22314

# <u>TABLE OF CONTENTS</u>

**Page**

FACTUAL BACKGROUND ..................................................................................1

    **A.**    Claimant Lazarenko's Background ..........................................................2

    **B.**    The Criminal Charges Against Claimant Lazarenko ...............................3

        **1.**    The Extortion of Peter Kiritchenko ...........................................3

        **2.**    The Alleged Extortion of Ditiatkovsky ......................................4

        **3.**    Naukovy Farms .........................................................................4

        **4.**    Claimant Lazarenko's Involvement with the Ukrainian Energy Markets ....................................................................................5

        **5.**    The Ukrainian Housing "Scheme" (PMH/GHP) .........................6

    **C.**    Pretrial Discovery in the Criminal Case .................................................7

    **D.**    The Criminal Trial ...............................................................................13

    **E.**    The Civil Forfeiture Case.....................................................................14

    **F.**    The Status of Discovery Since Claimant Lazarenko Retained New Attorneys ...........................................................................................16

ARGUMENT .................................................................................................21

    **A.**    The Court Should Order the Government to Produce Non-Grand Jury Materials Collected During the Criminal Investigation.........................22

    **B.**    The Court Should Order the Government to Produce Grand Jury Materials Collected During the Criminal Investigation.........................24

    **C.**    The Court Should Order the Government to Produce All Communications With Foreign Governments About Its Investigation of Claimant Lazarenko..........................................................................................26

    **D.**    The Melnychenko Tapes and Anything Else Relevant Thereto Should Be Produced. ......................................................................................31

    **E.**    The Government Should Not be Permitted to Sandbag Claimant Lazarenko at his Deposition................................................................33

    **F.**    The Court Should Order the Government to Produce Relevant State

Department Records..................................................................................34

    **1.**    Documents used to Prepare the Human Rights Reports ...........................35

    **2.**    Reports About the Movement of Money by the Gromada Party ..............36

    **3.**    Other Records about Julia Tymoshenko .....................................................37

**G.**    Claimant Lazarenko is Entitled to Basic Impeachment Materials.........................38

**H.**    The FBI Evidence Log Should be Produced............................................................39

**I.**    The Government's Tepid Agreement to Produce the Other Remaining Category of Documents Needs to be Handled on a Reasonable Basis. .................40

    **1.**    Bank Records ................................................................................................40

    **2.**    Witness Interview Memoranda ...................................................................41

**J.**    Expedited Resolution of Some of these Matters is Essential.................................42

CONCLUSION.........................................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Callahan v. A.E.V., Inc.*,
  947 F. Supp. 175 (W.D. Pa. 1996)..........................................................................26

*Hickman v. Taylor*,
  329 U.S. 495 (1947)...............................................................................................21

*In re Folding Carton Antitrust Litig.*,
  83 F.R.D. 256 (N.D. Ill. 1979)..............................................................................21

*In re Grand Jury Proceedings, GJ-76-4 & GH-75-3*,
  800 F.2d 1293 (4th Cir. 1986) ...............................................................................25

*Morrison v. National Australia Bank*,
  561 U.S. 247 (2010)...............................................................................................15

*Newsome v. Penske Truck Leasing Corp.*,
  437 F. Supp. 2d 431 (D. Md. 2006) .......................................................................34

*Princess Lida of Thurns and Taxis v. Thompson*,
  305 U.S. 456 (1939)...............................................................................................29

*SEC v. Banner Fund Int'l*,
  211 F.3d 602 (D.C. Cir. 2000)...............................................................................29

*SEC v. Saad*,
  229 F.R.D. 90 (S.D.N.Y. 2005) .............................................................................21

*TIG Ins. Co. v. Firemen's Ins. Co.*,
  718 F. Supp. 2d 90 (D.D.C. 2010).........................................................................21

*United States v. All Assets Held at Bank Julius Baer & Co.*,
  772 F. Supp. 2d 205 (D.D.C. 2011).........................................................................4

*United States v. All Assets Held at Bank Julius Baer & Co.*,
  959 F. Supp. 2d 81 (D.D.C. 2013)...........................................................................4

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
  772 F. Supp. 2d 191 (D.D.C. 2011).........................................................................4

*United States v. BCCI Holdings (Lux.), S.A.*,
  46 F.3d 1185 (D.C. Cir. 1995).................................................................................4

*United States v. Lazarenko,*
   564 F.3d 1026 (9th Cir. 2009) ........................................................................1, 3

*United States v. Lazarenko,*
   624 F.3d 1247 (9th Cir. 2010) ..............................................................................3

*United States v. One Assortment of Seventy-Three Firearms,*
   352 F. Supp. 2d 2 (D. Me. 2005) .......................................................................21

*United States v. Sells Eng'r, Inc.,*
   463 U.S. 418 (1983).............................................................................................25

*United States v. Skilling,*
   561 U.S. 358 (2010).............................................................................................15

**STATUTES**

18 U.S.C. § 3322 .......................................................................................................25, 26

18 U.S.C. § 3663A .......................................................................................................3, 4

**OTHER AUTHORITIES**

Fed. R. Civ. P. 16......................................................................................................17

Fed. R. Civ. P. 26 *et seq.*.........................................................................................21

Fed. R. Crim. P. 6(e)............................................................................................25, 26

Fed. R. Crim. P. 15 ............................................................................................ *passim*

Fed. R. Crim. P. 16...................................................................................................22

Fed. R. Crim. P. 29 *et seq.* ................................................................................ *passim*

Claimant Lazarenko served the government with Requests for the Production of Documents on September 19, 2014.  Exhibit 1 (Requests for Production).  As of today, the government has only re-produced copies of its admitted exhibits from Claimant Lazarenko's criminal trial, the trial transcript and many, but not all, of the Rule 15 depositions (much of which are duplicative of the trial transcript) in response to these Requests for Production; it has provided eighty-six pages of objections.  Exhibit 2 (Responses to Requests for Production).[1]   In declining to produce responsive documents, the government has largely relied on its assertion that producing 413 exhibits from Claimant Lazarenko's criminal trial and a copy of the trial transcript (totaling 23,167 pages) is more than sufficient to meet its discovery obligations in this case.

Despite multiple requests that the government assist by furnishing the electronic records from the criminal case, which have been misplaced by Claimant Lazarenko and his criminal counsel in the intervening eleven years, as well as repeated requests that the government begin producing other plainly relevant records, the government has refused.  In light of the enormity of the government's investigation in the criminal proceedings against Claimant Lazarenko, the government's steadfast refusal to produce highly relevant documents with no legitimate explanation, and the complete, unfair disadvantage that Claimant Lazarenko faces in participating in this action without these records, Claimant Lazarenko now files this motion to compel.

## FACTUAL BACKGROUND

The Court is well aware at this point that Claimant Lazarenko was the former Prime Minister of the Ukraine in the 1990s.   The claims in this case arise out of criminal charges based

---

[1] Throughout the motion, we refer to a number of pleadings from the criminal case, *United States v. Lazarenko*, 00-

upon Claimant Lazarenko's activities as a regional leader, and subsequently, deputy Prime Minister and Prime Minister.

Claimant Lazarenko was indicted in the Northern District of California in 2000.  He proceeded to trial in March 2004.  Between district court rulings by the trial judge, the Honorable Martin J. Jenkins, and an appeal before the Ninth Circuit, only eight of the fifty-three counts charged in the second superseding indictment survived.  As a result, Claimant Lazarenko was only convicted of fifteen percent of the charges in the criminal proceeding, with all of the other counts dismissed pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  The government has represented that the activities at issue in this forfeiture action involve the same "schemes" as the prior criminal proceedings.

## A.    Claimant Lazarenko's Background

Claimant Lazarenko was a high-ranking official in the Communist Party in the 1980s and 1990s.  In 1993, with the fall of the Soviet Union, Claimant Lazarenko became the regional administrator of the Dnepropetrovsk, an oblast (*i.e.*, a state) in Eastern Ukraine.  In 1995, Claimant Lazarenko became a national leader serving as the Deputy Prime Minister of the Ukraine, whose responsibilities included the energy sector.  In 1996, he became Prime Minister.

From 1994 until 2005, the President of the Ukraine was Leonid Kuchma.  The structure of the Ukrainian government provided that President Kuchma ruled by decree, and the Prime Minister reported to the President.  In 1997, Claimant Lazarenko and Mr. Kuchma had a "falling out."  Claimant Lazarenko subsequently announced his intention to run for President as the candidate for the Gromada Party and began campaigning against Kuchma.  Exhibit 4 (*Wall Street Journal* article, dated March 27, 1998).  Claimant Lazarenko ultimately fled the Ukraine,

---

cr-284.  We attach a copy of the PACER report from that case.  Exhibit 3.

and after a brief stint in Greece, was arrested at JFK International Airport while traveling on a Panamanian passport in the United States.  He immediately requested asylum, and has remained in the United States since that time.

**B.      The Criminal Charges Against Claimant Lazarenko**

The indictment alleged a series of activities, which are well-summarized in the Ninth Circuit's opinion.  Exhibit 5 (*United States v. Lazarenko*, 564 F.3d 1026 (9th Cir. 2009)).  The activities are set out briefly below.

**1.      The Extortion of Peter Kiritchenko**

While Claimant Lazarenko was the governor of the Dnepropetrovsk region of Ukraine and in his other public roles, it was alleged that he required businesses to pay him fifty percent of their profits in exchange for his influence to make the businesses successful.  In 1990, Peter Kiritchenko, a businessman, formed a company known as Agrosnabsbyt, which was involved in agriculture and metals.  In 1992, Mr. Kiritchenko met with Claimant Lazarenko because, according to Mr. Kiritchenko, "to do any kind of serious trade one needed [Claimant Lazarenko's] agreement."  Exhibit 5 at p. 1030.  The two subsequently partnered.  Later, Claimant Lazarenko and Mr. Kiritchenko partnered to move Claimant Lazarenko's and Mr. Kiritchenko's money between accounts, and together, they purchased the European Federal Credit Bank ("EuroFed").

The only counts of conviction from the criminal proceedings that survived appeal involved money laundering counts from Claimant Lazarenko's extortion of Mr. Kiritchenko. Mr. Kiritchenko, however, was not the prototypical "victim."  Indeed, the Ninth Circuit denied Mr. Kiritchenko restitution under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, reasoning that the MVRA did not apply to individuals who were complicit in the criminal activity.  Exhibit 6 (*United States v. Lazarenko*, 624 F.3d 1247 (9th Cir. 2010)).

3

## 2.    The Alleged Extortion of Ditiatkovsky

Claimant Lazarenko established a relationship with Alexei Alexandrovich Ditiatkovsky. In 1993, Mr. Ditiatkovsky gave Claimant Lazarenko a fifty-percent interest in his company, Dneproneft, along with fifty percent of the profits.  Despite being named in the indictment and serving as the basis for specific counts, Mr. Ditiatkovsky did not testify at the criminal trial.  He was also denied restitution under the MVRA because the district court found that his alleged basis for restitution was not related to the counts of conviction.  Exhibit 7 (Docket Entry No. 1212 in the Criminal Case (Order Denying Alexei Ditiatkovsky's Petition Requesting Restitution)).  Mr. Ditiatkovksy has filed a claim in this case.  *See* Docket Entry No. 11 and 26. Despite clearly established precedent, the United States has not moved to strike Mr. Ditiatkovsky's claim for lack of standing.[2]  Mr. Ditiatkovsky withdrew his claim on January 12, 2015.  Docket Entry No. 335.

## 3.    Naukovy Farms

While Claimant Lazarenko was the governor of Dnepropetrovsk, he was also actively involved in the region's agricultural operations from 1993 through 1995.  The largest dairy operation was Naukovy State Farm ("Naukovy").  Naukovy secured the right to export metal products to the Netherlands to barter for cattle from a Dutch company, Van der Ploeg von Terpstra ("Van der Ploeg").  It is alleged that some payments from Van De Ploeg's Dutch account were transferred to Claimant Lazarenko.

---

[2] *United States v. BCCI Holdings (Lux.), S.A.*, 46 F.3d 1185, 1191 (D.C. Cir. 1995) ("We therefore disagree with those courts that have determined that a constructive trust can be interposed as superior to the government's forfeiture claim."); *see also United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 772 F. Supp. 2d 191, 204-05 (D.D.C. 2011) (dismissing claimant UTICO for lack of standing); *United States v. All Assets Held at Bank Julius Baer & Co.*, 772 F. Supp. 2d 205, 218 (D.D.C. 2011) (dismissing claim of RAO Gazprom for lack of standing), *United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 114-16 (D.D.C. 2013) (dismissing certain claims by the Liquidators of EuroFed).

**4.      Claimant Lazarenko's Involvement with the Ukrainian Energy Markets**

Claimant Lazarenko became the First Deputy Prime Minister of Ukraine in 1995, and was responsible for the energy section within the government.  During that time, the Ukrainian gas market was reorganized.  As part of that reorganization, Ukraine's primary gas provider, RAO Gazprom, agreed to provide natural gas through private intermediaries, rather than through Ukraine's publicly-owned gas marketing agency.

The United States alleges that Claimant Lazarenko placed United Energy Systems of Ukraine ("UESU") on the list of eleven approved intermediaries referred to as the "Consortium." UESU was held in large part by United Energy International, Ltd. ("UEIL"), a British company. UESU conveyed title to the gas to UEIL with the result that payments from Ukrainian customers for gas were paid directly to UEIL.  According to the government, UEIL did not use the money it received from customers to pay RAO Gazprom for the gas deliveries (UEIL and UESU have vigorously disputed these claims).  The government has also alleged that payments by UEIL to a Cypriot company, Somolli, which was controlled by Julia Tymoshenko, UESU's owner, were improperly diverted to Ms. Tymoshenko and Claimant Lazarenko.  Ms. Tymoshenko is identified by name in the Amended Complaint (¶¶37-38).

The evidence during the investigation was that Ms. Tymoshenko and Claimant Lazarenko were longtime associates and that the two were political allies who had formed the Gromada Party. The government identified Ms. Tymoshenko as a co-conspirator and sought to introduce her statements against Claimant Lazarenko in the criminal trial.  Exhibits 8 and 9 (Docket Entry No. 570 (Motion in Limine to admit statements of [J]ulia Tymoshenko as co-conspirator statements) and Docket Entry No. 707 (Supplemental motion *in limine* to admit statements of [J]ulia Tymoshenko as co-conspirator statements)).  Ms. Tymoshenko and her husband were

subsequently prosecuted in the Ukraine for allegedly bribing Claimant Lazarenko.  However, the

case was dismissed by the Ukrainian Supreme Court in 2005 due to a lack of evidence.  Exhibit

10 (Order of the Ukrainian Supreme Court, dated July 13, 2006).  Claimant Lazarenko also

received written confirmation that he is not being charged.  Exhibit 11 (Resolution from the

General Prosecutors Office, dated March 12, 2008).

       Ms. Tymoshenko then went on to serve as Prime Minister of the Ukraine, in 2005 and

2007 through 2010.  The case against the Tymoshenkos was reopened in 2011 (along with other

charges from the 2000 decade) by the General Prosecutors Office of Ukraine ("GPOU").  Exhibit

12 (*New York Times* article, dated October 14, 2011).  As a result, Ms. Tymoshenko was

incarcerated yet again on charges related to UESU.  The U.S. State Department had repeatedly

called for her release at the highest levels, alleging that these revisited charges were politically

motivated.  For example, Secretary of State Hillary Clinton wrote to Ms. Tymoshenko:

> I . . . want to reaffirm that the United States supports your
> immediate release. I hope the New year brings new prospects for
> your release and wish you a return to good health. [sic]

Exhibit 13 (Reuters article, dated January 22, 2013).  Ms. Tymoshenko was released from prison

in 2014 and all charges were dropped. *See* Exhibit 14 (NBC News wire story pertaining to face-

to-face meeting between Ms. Tymoshenko and Deputy Secretary of State Burns, dated October

10, 2014).  No additional charges have been lodged against Claimant Lazarenko in the Ukraine

pertaining to these activities.

### 5.      The Ukrainian Housing "Scheme" (PMH/GHP)

       During the time that Claimant Lazarenko was Prime Minister, the Ukrainian government

entered into a contract to purchase six prefabricated, high-end homes from GHP, a nominee

owned and operated by Mr. Kiritchenko.  The contract called for a payment of $1,416,000 per

home, with shipping costs.  The unrefuted testimony of those involved was that the contract price

6

was determined by solely objective measures (*i.e.*, the price per square foot for housing in Kiev), completely independent of Claimant Lazarenko.  Mr. Kiritchenko, through GHP, subsequently purchased the homes from a U.S. company, Pacific Modern Homes ("PMH"), for about $525,000.  To obtain payment from the Ukrainian government, a GHP employee fabricated an invoice from PMH to give the appearance that PMH had charged GHP $1,416,000, and that GHP was not earning any profit on the deal.[3]  There was disputed testimony during the criminal trial and depositions with respect to whether Claimant Lazarenko telephoned subordinates about the contract.  In any event, the contract between the Ukrainian government and GHP established the price GHP would receive for the homes, and was not dependent upon how much GHP paid for the homes.  It is alleged that Mr. Kiritchenko split the profits from the home sale with Claimant. Lazarenko.

### C.      Pretrial Discovery in the Criminal Case

For a trial of this complexity, discovery was – not surprisingly – voluminous.  The government's civil forfeiture team has repeatedly contended that it has (and produced) over 130,000 pages of records.  Exhibit 2, pp. 8, 12, 14, 17, 19, 24, 28, 33, 34, 35, 46, 49, 52, 55, 58, 61, 64, 68, 69, 70, 71, 73, 74, 78,  and 79, Exhibit 42, p. 26.[4]  The criminal trial team only produced about half of this to the defense in the criminal case.  Exhibit 15 (Docket Entry No. 219 (United States Status Conference Statement, dated January 3, 2003).  The production was done in piecemeal fashion, and the undersigned have been unable to locate complete indices of the documents produced.  Further, Claimant Lazarenko is missing the bulk of the production.  A

---

[3] The government now claims that Claimant Lazarenko, the sitting Prime Minister, created the fabricated invoice. Amended Complaint ¶ 48.  This is flatly contrary to testimony in which Dmitry Petrov-Kozmin admitted to having fabricated the invoice by himself.  Exhibit 26 at p. 121 and pp. 160-62.

[4] Exhibit 42 is a composite exhibit of all of the relevant correspondence between the parties.  The documents have

number of records were produced pursuant to at least one protective order requiring that the records be returned at the conclusion of the criminal proceedings.  *See, e.g.*, Exhibit 16 (*unsigned Protective Order*); Exhibit 49 (signed Protective Order) (filed under seal).

An important and unusual aspect of the criminal case is that the government engaged in a global dragnet of Fed. R. Cr. P. 15 depositions via the Mutual Legal Assistance Treaty ("MLAT") process.  In an early pleading, the United States requested permission to take over 100 depositions in eighteen foreign countries.  Exhibit 17 (Joint Stipulation of Depositions to be taken).   Ultimately, the parties took over 50 depositions in seven countries.

The bulk of the evidence – both document and deposition evidence – in the criminal case was obtained from the Ukraine.  Records were collected by the GPOU and then given to the FBI case agent.  Exhibit 48a (Tr. Testimony, FBI SA Bryan Earl).  The Ukrainian witnesses were deposed in front of prosecutors from the GPOU, over strenuous defense objections.  The GPOU reported directly to the President of Ukraine, Leonid Kuchma.

The GPOU's dominant role in the case was part and parcel of a bigger problem.  Specifically, at the time that the GPOU was conducting this investigation with the Justice Department, the State Department expressed grave concerns about the politically motivated prosecutions of Claimant Lazarenko's political allies.  Claimant Lazarenko had been the leading opposition candidate in the country's 1999 presidential campaign and still was a sitting member of Parliament.

Nearly every witness who provided testimony favorable to the defense in the criminal proceedings was incarcerated, most without being charged, for months in prisons with utterly deplorable conditions.  The overly political nature of *these* prosecutions was cited by the U.S.

---

been bates labeled sequentially.  Silversmith Decl., ¶86.

State Department.  Exhibits 18, 19, 20, 21, and 22 (1999 to 2003 U.S. State Department Reports on the Ukraine).  We attach depositions from witnesses some of whom were also identified by name in the State Department Reports.  All of them describe the appalling prison conditions to which they were subjected.  Exhibits 23 at 90:15 to 95:3, Exhibit 24 at 71:15 to 72:6, Exhibit 25 at 37:25 to 38:18, Exhibit 26 at 100:8-14, Exhibit 27 at 135:2-7 & 196:7-18, and Exhibit 28 at 114:2-115:22 (Excerpts from the Depositions of Falvovich Feldman, Koval, Petrov-Kozmin, Shküdün and Sivulski).  Two witnesses described coercive questioning.  Exhibit 26 at pp. 121-22; Exhibit 27 at 142:20 to 141:14.  Two other witnesses were more blunt.  They stated that they were repeatedly asked to incriminate Claimant Lazarenko, and threatened if they did not they would be incarcerated longer.  Exhibit 25 at 120:7-18, Exhibit 28 at 117:23-118:6.  Messrs. Koval, Shküdün and Sivulski also stated that they were denied medical treatment for very significant medical conditions (*e.g.*, Mr. Koval had a stroke and was not taken to the hospital for three days).  *See* Exhibit 25 at 38:13-21, Exhibit 27 at 135:2-7 and Exhibit 28 at 114:2-115:22.

Profoundly exacerbating the problems, as part of the process of investigating Claimant Lazarenko in the Ukraine, witnesses actually met face-to-face with each other in so-called "confrontation protocols."  Exhibit 48b (Tr. Testimony, Vlaidimir Karpotsev).  In these interviews, witnesses, who made conflicting statements, were essentially required to argue out their differences before the GPOU.  For example, one government witness, Vladimir Karpotsev, had a "confrontation" with Peter Shküdün.  At the confrontation, Mr. Shküdün was brought up from custody, sending a not-so-subtle message to Mr. Karpotsev.  Given the number of defense witnesses who were incarcerated for months *without being charged*, the procedure was

inherently coercive.  Government witnesses directly observed that individuals who did not follow the "party line" would be incarcerated.[5]

The problems were not just limited to the witness interviews and depositions.  Claimant Lazarenko's U.S. attorneys were harassed while they were in the Ukraine.  Counsel's files were reviewed by Ukrainian authorities.   Exhibit 29 (Declaration of Harold Rosenthal).  Claimant Lazarenko's Ukrainian lawyers had similar problems.

Judge Jenkins did require – over the government's objection – that the United States make certain MLAT requests on behalf of Claimant Lazarenko, upon a showing under Rule 15.  Exhibit 30 (Letter by Harold Rosenthal to the Court, dated June 25, 2003).   Despite Judge Jenkins's order, MLAT deponents simply refused to appear in response to these MLAT requests.  The Ukrainian government did not enforce summons proceedings against any of Claimant Lazarenko's witnesses even though it possessed the authority to do so.  Exhibit 31 (Declaration of Maryna Petriva Dolhopola).  As an example, Judge Jenkins ordered Mykola Azarov, the head of the Ukrainian tax collecting agency, to testify.  Exhibit 30.  Mr. Azarov appeared at his deposition only to say that he had more important places to be, and then proceeded to leave.  Exhibit 32 at 9:21 to 10:4.  The GPOU made no attempt to require Mr. Azarov to stay and never ordered him to return.[6]   Exhibit 32 (Deposition of Mykola Azarov, dated November 5, 2003).  Judge Jenkins also ordered President Kuchma to sit for a deposition, but he did not even bother to show up.  Exhibit 33 (Transcript, dated October 8, 2003).

Claimant Lazarenko contended that the GPOU, under the control of President Kuchma,

---

[5] We understand that the GPOU has ceased this coercive practice.
[6] The government has made a lot of "hay" out of Claimant Lazarenko's tax declarations, which were actually campaign finance declarations.  Claimant Lazarenko has maintained that the forms were taken out of context – a fact, which Mr. Azarov could have confirmed.  *See also* Exhibit 4 (WSJ 3/27/1998 Article – "In Ukraine's Election – Money Really Talks; Ask Mr. Lazarenko").

consistently withheld evidence favorable to Claimant Lazarenko and coerced witnesses.  This

contention has significant support.  During the course of trial preparation, *The New York Times*

reported that President Kuchma's bodyguard, Mykola Melnychenko, had surreptitiously taped

about 700 hours of Kuchma's conversations.  Exhibit 34 (*New York Times* article, dated

September 24, 2002).[7]  *The New York Times* further reported that the U.S. government cancelled

a weapons sale to Ukraine after the tapes revealed that President Kuchma was secretly selling

one of the world's most advanced anti-aircraft systems, which was manufactured in the Ukraine,

to Saddam Hussein.

After reading *The New York Times* article, counsel for Claimant Lazarenko filed a

motion to compel production of the tapes.  Exhibit 35 (Docket Entry No. 348, Motion for

Evidence in Government's Control, filed July 11, 2003).  Based on earlier conversations with

third parties about the tapes, the motion set forth a series of explosive allegations of systematic

witness tampering, corroborating the findings in State Department reports.  For example:

o  In an April 14, 2000 conversation, Kuchma and the same Mykola Azarov, who refused to
   sit for a deposition, discuss the persecution of and the illegal fabrication of a case against
   Boris Feldman, President of Sloviansky Bank for the purpose of coercing testimony
   against Ms. Tymoshenko and Claimant Lazarenko.

o  In a conversation on May 24, 2000 between prospective defense witnesses Kuchma and
   Azarov, Kuchma demanded that Azarov organize the illegal persecution of Feldman.
   These recordings are directly connected to the government's forfeiture claims, as many of
   the deposits were made out of Bank Sloviansky accounts to accounts controlled by
   Claimant Lazarenko.  On the same tape, Kuchma gave instructions to Azarov to open a
   criminal case against Ms. Tymoshenko and immediately put her into custody.

o  Recordings of July 3, 2000 between Kuchma and Mr. Litvin discuss the organization of
   the murder of opposition journalist Georgy Gongadze.

---

[7] Portions of the tape were disseminated on the Internet.  Among the portions that were widely shared were portions
in which President Kuchma is heard ordering the execution of a journalist, Mr. Gongadze, who criticized him on
state-run television.  The journalist was later beheaded.  The release of these tapes caused a massive upheaval in the
Ukraine and ultimately led to the Orange Revolution in which Kuchma was swept from power, and Ms.
Tymoshenko ascended to power.

The list of obstructive acts continues for two full pages.  The prosecution team denied possessing

these tapes, stating:  "defendant fails to cite any evidence to show that these tapes exist or of

what they consist."  Exhibit 36 at pp. 3-4 (Docket Entry No. 356, Government Response to

Motion for Discovery, filed July 18, 2003).  Moreover, despite the request of Claimant

Lazarenko's defense lawyer, Melnychenko also refused to provide the relevant portions of the

tape to the defense team.  Exhibit 37 (Declaration of Dennis Riordan)(filed under seal).

However, Melnychenko did agree to meet with Dennis Riordan, one of Claimant Lazarenko's

lawyers.  At that meeting, Melnychenko told Riordan that his tapes contained additional

statements that established a wide-ranging conspiracy.  Melnychenko stated that his tapes

contained the following:

- o A conversation on May 29, 2000 between Kuchma and Prosecutor General Potebenko, in which Potebenko reported to Kuchma that it was necessary to manufacture a criminal case against Claimant Lazarenko, accusing him of organizing contract killings.

- o A conversation that took place in 2000 between Kuchma and First Deputy Prosecutor General Obikhod, in which *Obikhod reported that the GPOU was preparing the witnesses for the Lazarenko case, so they would testify exactly like the GPOU wanted them*.

- o Another conversation in 2000 between President Kuchma and Obikhod, in which Obikhod reported secret talks between Claimant Ditiatkovsky and the GPOU.  The GPOU promised to drop the charges against Mr. Ditiatkovsky if it could get false testimony from Mr. Ditiatkovsky that would allow the GPOU to bring additional charges against Claimant Lazarenko and forward these charges to the United States.

Exhibit 38 (Declaration of Mykola Melnychenko)(filed under seal).  He also confirmed that the

tapes were in the possession of the U.S. government.  *Id.*  After being confronted with

Melnychenko's own statement, the government conceded that it possessed the tapes.  The

government maintains that portions of the tape were produced nine months later and there is

some evidence that something was produced.  Exhibit 39 (Pretrial Conference, dated March 8,

2004).  We have checked with all three criminal trial attorneys, his translator, and Claimant

Lazarenko.  They have no recollection of receiving these tapes and we do not presently possess

the tapes.

### D. The Criminal Trial

The parties proceeded to trial in the spring of 2004.  The United States called fifteen live

witnesses and played thirteen depositions.  The FBI and IRS case agents did not testify.  At the

close of the government's case, Claimant Lazarenko's counsel moved for judgment of acquittal

under Rule 29.  The trial judge granted the motion with respect to several counts.  The import of

the trial judge's decision was that any counts involving the UESU and ITERA "schemes" were

dismissed.  With respect to the natural gas scheme, the trial court explained that there was

absolutely no evidence that Claimant Lazarenko took any official act on behalf of UESU.  The

Court also explained that the relationship between UESU and UEIL was fully disclosed.  Exhibit

40 (Docket Entry No. 774, Order Granting Rule 29 Motion, dated May7, 2004, at pp. 3-5).  The

Court also dismissed all counts relating to the PMH/GHP scheme.  Judge Jenkins reasoned that

the false invoice "did not impact the Ukrainian government's decision to enter into the contract

in the first instance."  He also explained that both undisclosed conflicts of interest did not violate

Ukrainian law.  *Id.*  The Court dismissed twenty-four counts in this order.[8]

Claimant Lazarenko then presented his defense case, which involved eight witnesses

including the FBI case agent.  Near the end of the trial, Mr. Melnychenko permitted the defense

to listen to some of the tapes for the first time.  However, the Court never admitted the tapes

because, by then, the Court had dismissed the charges relating to the UESU, the charges to which

the tapes provided were most directly relevant.  The defense sought to offer the tapes to establish

---

[8] The initial Rule 29 order did not reference Count 53.  Per the Ninth Circuit's opinion, Count 53 was dismissed as
well.  Exhibit 5 at 1033.

that the GPOU failed to produce certain records pertaining to Naukovy, which was not

specifically mentioned on the tapes.  The tapes were excluded and the issue was not appealed.

An additional fifteen counts relating to the Naukovy "scheme" were dismissed after the jury

returned its verdict.  Exhibit 41 (Docket Entry No. 877, Second Order Granting Rule 29 Motion,

dated May 20, 2005).

On appeal, the Ninth Circuit dismissed six additional counts of conviction.  The Ninth

Circuit reasoned that the use of the wires in the wire fraud counts pertaining to Naukovy were

not in furtherance of the scheme because the wires occurred years later.  The court of appeals

also concluded that, pursuant to Rule 29, the United States did not possess sufficient records to

trace any proceeds from the Naukovy scheme.  Exhibit 5 at p. 1040 ("but the glaring gap is that

there are no records from PostaBank at all.  The government was unable to produce

any documents from PostaBank itself.").   Ultimately, the only counts that withstood appeal were

Counts One through Eight; the money laundering counts stemming from the extortion of Mr.

Kiritchenko.  After appeal, Claimant Lazarenko was resentenced on November 18, 2009 to a

term of 97 months.  He was given credit for time served in pretrial custody.  Claimant Lazarenko

was released from ICE custody on May 9, 2013.

### E.      The Civil Forfeiture Case

This civil forfeiture action was filed on May 10, 2004 – less than one week after Judge

Jenkins's first Rule 29 ruling in the criminal case.  The initial complaint identified bank accounts

in Antigua and Guernsey.  It laid out the same schemes that were alleged in the criminal case:

the Kiritchenko/Ditiatkovksy extortion "schemes," (Complaint ¶¶ 20-30); the Naukovy Farm

"scheme" (*Id*. ¶¶ 31-33); the PHM/GHP housing "scheme" (*Id*. ¶¶ 43-47); and the natural gas

"scheme" (*Id*. ¶¶ 48-52).  The complaint further alleged that Claimant Lazarenko received

$237,261,000 in "scheme" proceeds (including $201,000,000 in proceeds from the acquitted

natural gas, PMH/GHP, and Naukovy Farm "schemes").

On April 26, 2005, the United States filed a motion for leave to amend the complaint. The amended complaint sought forfeiture of four accounts in two countries. Unlike the criminal case, the government now seeks forfeiture of all funds wherever held, without even attempting to connect much of the funds to predicate criminal acts. The Amended Complaint contained the same references to the Kiritchenko/Ditiatkovksy extortion "scheme" (¶¶ 20-30), the Naukovy Farm "scheme" (¶¶ 31-33), the PHM/GHP housing "scheme" (¶¶ 43-47), and the natural gas "scheme" (¶¶ 48-52). The Amended Complaint identified more proceeds from new sources, specifically:

- o $42,000,000 from L.I.T.A.T. Offshore, Limited;
- o $30,000,000 from DAVRiga; and
- o $15,600,000 from SB Corp.

Amended Complaint ¶ 50. LITAT, DAVRiga, and SB Corp. appear to be unrelated to the "schemes" discussed in ¶¶ 20-52 of the Amended Complaint. None of the depositions or the criminal trial testimony addresses the sources of these funds, or how they are connected to the alleged "schemes."

On July 9, 2008, the Court denied a motion to dismiss filed by Claimant Lazarenko. Docket Entry No. 72. Subsequently, the Ninth Circuit issued its decision vacating several of Claimant Lazarenko's counts of conviction, which impacts this case. Exhibit 5. The U.S. Supreme Court later issued two decisions, one of which severely limited the scope of honest services fraud (*United States v. Skilling*, 561 U.S. 358 (2010)); and the other of which provided substantial guidance on the need to scrutinize any extraterritorial application of U.S. laws (*Morrison v. National Australia Bank*, 561 U.S. 247 (2010)). The latter decision casts serious doubt on whether many of the specified unlawful decisions apply to events that occurred solely

in the Ukraine or otherwise outside of the United States.

      **F.**      **The Status of Discovery Since Claimant Lazarenko Retained New Attorneys**

      Prior to our entering the case, neither Claimant Lazarenko, nor Mr. Ditiatkovsky, had filed any discovery requests.  The Liquidators of Eurofed Bank filed a discovery request and moved to compel, but their request was subsequently stayed.  Docket Entry Nos. 218-222; District Court Minute Order dated 6/6/2011.  A review of Magistrate Judge Robinson's order confirms that discovery is no longer stayed.  Docket Entry No. 253 at 13; *see also* District Court Minute Order dated 12/21/2011.

      Blank Rome LLP and Smith & Zimmerman, PLLC entered this case on July 9, 2014.  Jed Silversmith, an attorney with Blank Rome, spoke with the government on July 17, 2014.  During that conversation, Mr. Silversmith was advised that discovery had not yet commenced.  The civil forfeiture attorneys suggested that the parties work from the same set of exhibits, as criminal trial exhibits would likely be the jumping-off point for purposes of discovery.  Mr. Silversmith explained that with a case of this age, using paper copies of documents could be a problem.  Mr. Silversmith expressed concern that with certain large document exhibits, pages could get lost and that missing documents might not be noticed.  Mr. Claman volunteered to provide Claimant Lazarenko's team with a full set of government exhibits from the criminal trial.  Silversmith Decl., ¶ 7.

      Counsel from Blank Rome also travelled to San Francisco and reviewed Claimant Lazarenko's files, which were incomplete.  Claimant Lazarenko possessed very few electronic records.  Rather, all that Claimant Lazarenko possessed was an incomplete set of the identified trial exhibits, totaling 23 banker's boxes for the government and two bankers boxes for the defense.  The 23 banker's boxes of records are worn, with some documents and binders plainly missing from the set.  Counsel from Blank Rome could not locate the CDs on which the

documents in the banker's boxes were originally furnished.  None of Claimant Lazarenko's three prior counsel could locate the electronic files either.  Counsel also located several boxes of pleadings, in which a handful of FBI 302s were discovered.  Other records, such as MLAT requests furnished by the United States, were also missing.  Claimant Lazarenko, through his counsel, has since contacted all six of Claimant Lazarenko's "lead" attorneys, Joseph Russoniello, Christina Arguedas, Harold Rosenthal, Dennis Riordan, Doron Weinberg, and Dan Horowitz.  Counsel has also checked with the IT technician who assisted with the criminal trial. None of these individuals could locate the missing electronic records.  Silversmith Decl., ¶ 4.

In a subsequent conversation on July 23, 2014, Mr. Silversmith raised the issue of obtaining additional discovery.  Counsel for the United States advised Mr. Silversmith to wait until he had received the trial exhibits and stated that formal discovery was not appropriate because the parties had not yet had a Rule 16 scheduling conference.  Exhibit 42, p. 1.

On August 8, 2014, the government produced a copy of the trial transcript and an incomplete list of Rule 15 depositions.  The documents were bates labeled DOJ_0000001 to DOJ_0004610.  *See* Silversmith Decl., ¶ 8.  On September 4, 2014, counsel for the United States provided the undersigned with a digital copy of the government's admitted trial exhibits appendix, which consisted of 413 trial exhibits.  In what was clearly a misunderstanding, the government did not provide copies of (1) deposition exhibits that were not admitted at trial; or (2) trial exhibits that were not admitted at trial.  The government only provided a copy of what appears to be the government's admitted trial exhibits.  This plainly also did not contain evidence sufficient to trace all of the *in rem* accounts the government seeks to forfeit in this case.  The files were bates labeled DOJ_0004611 to DOJ_0023167.

The parties spoke again in early September 2014.  Exhibit 42, pp. 15-25.  In both this

second conversation and subsequent conversations, Mr. Silversmith repeatedly raised discovery issues.  The government again refused to furnish any information informally other than the admitted criminal trial exhibits.  Specifically, Mr. Silversmith asked for copies of all law enforcement memoranda of interview, but the government bristled, claiming that it had not yet collected the records from the FBI, and that such a collection would be too onerous.  Claimant Lazarenko's counsel has also asked for additional bank records because the trial exhibits provided did not contain the bank records necessary to trace the *in rem* defendants in this case. The government denied that request until Claimant Lazarenko served written requests for production.

Recognizing the futility of working informally, on September 19, 2014, Claimant Lazarenko served his first set of Requests for Production.  The only response from the government was to serve its own requests for the production of documents and a letter stating that it would not be producing any responsive documents on time.  Since that date, the only additional records produced were many, but not all, of the Rule 15 deposition transcripts. Exhibit 42 at pp. 86-87.

On October 3, 2014, the government wrote a letter stating that it had produced 130,000 documents and repeated its formal responses eighteen times.  Exhibit 2; Exhibit 42, p. 26 (This was simply not true – a fact which the government has now acknowledged three months later. Exhibit 42, p. 86).  On October 16, 2014, one business day before the government's response was due, the government contacted Claimant's counsel and requested an extension.  Exhibit 42, pp. 31-32.  The government demanded an immediate response.  Counsel for Claimant Lazarenko responded on the following day as requested.  Exhibit 42, p. 33.

The parties subsequently had a face-to-face meet and confer session in Washington, D.C.

on October 29, 2014.  During this session, the United States agreed to furnish a formal response

to Claimant Lazarenko's Requests for Production by November 30, 2014.

At the meeting, the government had stated that its lawyers needed to travel to San

Francisco to review records and meet with persons knowledgeable about the case.  Silversmith

Decl., ¶ 14.  This is dramatically different from the government's representations to the Court on

June 6, 2006.  At that time, in response to a motion to transfer filed by the Liquidators of

EuroFed, the United States opposed transfer because:  "[m]uch of the documentation obtained in

the course of the investigation in California has been scanned into digital form [and] is readily

moveable from one location to another.").   Docket Entry No. 57 at p. 18.

Following the meeting, the parties exchanged additional letters.  Exhibit 42, pp. 36-50.

The government, citing the erroneous assertion that it had produced 130,000 pages in the last 120

days, continued to push for a stay of discovery, which Claimant Lazarenko resisted.  The parties

also attempted to negotiate a protective order, but the protective order demanded by the

government contained unnecessary provisions aimed at preventing Claimant Lazarenko's

effective use of information contained in discovery.  Counsel asked the government for a second

draft on December 2, 2014.  Counsel received a draft back at 5:40 pm on January 9, 2015, which

did not incorporate all of the requested changes.

On December 4, 2014, counsel for Claimant Lazarenko sent a meet and confer request by

email.  Exhibit 42, pp. 58-60.  The government made itself available for a meet and confer on the

last possible day listed in counsel for Claimant Lazarenko's request.  Exhibit 42, pp 58-60.[9]  The

parties participated in a meet and confer on Tuesday, December 16, 2014 at 10:00 a.m.  During

the three and a half hours of discussion, the government made some notable admissions:

_____

[9] Initially, the government demanded that we provide a detailed series of written objections before they would speak

- o   They were unaware that they had only produced 23,167 pages in this action, but when confronted with this fact they did not deny it.

- o   They could not locate the electronic copies of the discovery that the government produced in the criminal case.

- o   They had not even bothered to contact anyone at the State Department for responsive records even though Claimant Lazarenko's requests had been pending for 90 days and the case was over 10 years old.

- o   They had no record of what discovery was produced in the criminal case and repeatedly asked us to recreate the production.

- o   Despite their steadfast insistence that we should stipulate to the entire criminal trial record, they acknowledged that they had not yet produced the bank records for the *in rem* defendants.  They would likely get around to finishing this production in March 2015 at the earliest.

Silversmith Decl., ¶ 17.  The ultimate resolution was that Claimant Lazarenko would – at his expense – ship hard copies of his *23 boxes* of records to Philadelphia, duplicate the records, return the originals to San Francisco, index the records, identify the missing documents, and let the government know what was missing.  Claimant Lazarenko also agreed that, once written instructions were received from the United States, he would produce records electronically, saving the government the expense that we have to bear.  Claimant Lazarenko furnished his first production on December 31, 2014.[10]

The parties have reached a total impasse on all but one issue.  The government has agreed to furnish electronic copies of the videotaped depositions.  On most issues, the government has refused to produce any records.  On a handful of issues, the government has agreed to produce some records, but has not committed to any timetable for their production.  The government has produced most of the Rule 15 depositions.[11]

---

with us.  Exhibit 42, p. 58-60.
[10] The package was returned as undeliverable and was resent on January 5, 2014.
[11] The government has not produced any of the depositions conducted for the GPOU pursuant to Title 28, Section 1782.

**ARGUMENT**

Federal Rule of Civil Procedure 26 permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). "[R]elevance is construed liberally, and there is no need to assure that the information requested is itself admissible, merely that the discovery request is reasonably calculated to lead to admissible evidence." *TIG Ins. Co. v. Firemen's Ins. Co.*, 718 F. Supp. 2d 90, 96 (D.D.C. 2010). Such a broad construction of relevance "ensures that litigation proceeds with 'the fullest possible knowledge of the issues and facts before trial.'" *Id.* at 96 (quoting *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). Civil discovery, including discovery in a civil forfeiture suit, is broader than the discovery in a criminal case. *United States v. One Assortment of Seventy-Three Firearms*, 352 F. Supp. 2d 2, 4 (D. Me. 2005); *SEC v. Saad*, 229 F.R.D. 90, 92 (S.D.N.Y. 2005).

The government's discovery responses in this action make clear that it is seeking to avoid basic discovery obligations on the grounds that providing discovery in this unusual case is too onerous. That is a baseless position. *In re Folding Carton Antitrust Litig.*, 83 F.R.D. 256, 260 (N.D. Ill. 1979) (holding that information about a company's practices over a 15-year period was relevant to the allegations and should be provided despite the burden and expense).

There is simply no basis for permitting the government to produce only 413 exhibits, a copy of the transcript of Claimant Lazarenko's criminal trial, and a few depositions. The government brought an extremely broad case – a $280,000,000 civil forfeiture suit against the former Prime Minister of a foreign nation, who was acquitted of 85 percent of the charges brought against him – and cannot be excused from backing that claim up. The government brought this case and Claimant Lazarenko is entitled to full discovery in defending against the forfeiture of his assets. Even now, the government's "we'll fill in the gaps" approach is

extremely burdensome on Claimant Lazarenko and will only sow confusion.

Ironically, even though discovery has been open for three years, Claimant Lazarenko now has fewer records than he had on the eve of his criminal trial.[12]  Claimant Lazarenko is entitled to substantially more documents in this civil case than he received at the criminal trial, not substantially less, because the parties are now operating under the Federal Rules of Civil Procedure, which provide for far broader discovery.  The government has averred no applicable exception to the civil discovery rules in this case – because there is none.

After exhausting the meet and confer process, Claimant Lazarenko now files this motion to compel.  He requests a court order requiring the government to produce records responsive to his discovery requests as these documents are plainly relevant and subject to no viable privilege claim.

## A.   The Court Should Order the Government to Produce Non-Grand Jury Materials Collected During the Criminal Investigation.

At the outset, counsel for Claimant Lazarenko requested that the United States produce:

1.   *All documents known to Plaintiff which in any way relate to the facts and allegations asserted in the Amended Complaint.*
2.   *All documents and exhibits Plaintiff intends to use at the trial of this matter.*
3.   *Any depositions that you plan to introduce at trial.*
5.   *All records that You obtained by grand jury subpoena as part of the government's criminal investigation of Mr. Lazarenko.*
6.   *All records that you obtained by other process as part of the government's criminal investigation of Mr. Lazarenko.*
7.   *Any records you obtained voluntarily during the government's criminal investigation of Mr. Lazarenko.*
11.  *All documents that refer or relate to any searches and seizures connected with this case.*

Notwithstanding the self-evident relevance of these requests, the government made numerous

---

[12] From 2001 through 2004, the United States made a number of productions of records in the criminal case pursuant to Fed. R. Crim. P. 16 and the *Jencks* Act.  In 2003 and 2004, prior to depositions and on the eve of trial, the government made *Jencks* Act disclosures.  Many documents had to be returned to the United States after the conclusion of the trial.

objections ranging from the banal to the absurd.  The government first claims that it should not

be required to produce "documents concerning facts he has already admitted in this litigation or

crimes for which Claimant has already been convicted" because Claimant Lazarenko cannot re-

litigate these issues.   Exhibit 2, passim.  But issue and claim preclusion are irrelevant given the

broad nature of civil discovery.  Moreover, Claimant Lazarenko was only convicted of 15 percent of

charges in the criminal proceedings.  He was acquitted of 85 percent.  This case seeks forfeiture of

many more assets than the criminal case.  Any documents related to the convicted counts fall well

within the "reasonably calculated to lead to the discovery of admissible evidence" standard.  So,

obviously, do documents that serve as the basis for 45 counts for which Claimant Lazarenko was

acquitted.

The government claims that these requests are not reasonably calculated to lead to the

discovery of admissible evidence because "Claimant fails to fashion his request to obtain information

specifically tied to the relevant claims and defenses set forth in the First Amended Complaint."

Exhibit 2 at 23 (Request No. 11).  This claim is disingenuous.  This request seeks the discovery of

records obtained from the criminal investigation of Claimant Lazarenko.  It is unquestionable that the

government's entire forfeiture case is premised on the criminal proceedings.

The government's response has been dilatory at best.  In multiple letters the government

inaccurately represented that it produced 130,000 pages in the last four months.  The government has

produced a fraction of that amount -- 23,167 pages as of December 31, 2014.  Furthermore, by its

own admission, the United States possesses 130,000 documents.  The United States only produced

about 70,000 in the criminal case.  This Court should order everything to be produced.

To push the case along from this anemic pace, Claimant Lazarenko volunteered to ship hard

copies of *23 boxes* of records to Philadelphia.  The Claimant agreed to duplicate the records, return

the originals to the client in San Francisco, index the records, and identify what is missing from the

100-page exhibit list the government provided.  In contrast, the government could have produced the seven floppy discs that they identified in their status reports in the criminal case.  We note that six years earlier, the civil forfeiture team previously represented to the Court that they possessed these digital records and, hence, urged this Court not to transfer this action.  Docket Entry No. 57, p. 18. That statement now appears to be untrue.

Even if Claimant Lazarenko was obligated to duplicate records from the prior criminal action, by the government's own admission, it only produced about half of the records in the possession of the criminal trial team.  Claimant Lazarenko is entitled to the rest.  The reproduction of records previously produced in the criminal matter may be burdensome.  However, the government took on this burden when it brought this wide-ranging forfeiture case – one week after a major part of its criminal case was dismissed under Fed. R. Crim. P. 29 based upon a lack of evidence.  The Court should compel the government to speedily produce all documents responsive to the above requests not subject to a claim of privilege, and a privilege log for any documents being withheld.

On a final note, the government also objected to the production of its trial exhibits. Claimant Lazarenko is not asking that these items be delineated as such.  He is simply asking that they be produced in the ordinary course of discovery.  Presently, the government has stated that it will not produce these documents as this request seeks insight into the government's trial strategies.  Exhibit 2, p. 19-20.  The Court should order production of the trial exhibits in the ordinary course of discovery.

**B.     The Court Should Order the Government to Produce Grand Jury Materials Collected During the Criminal Investigation.**

Counsel for Claimant Lazarenko has also requested grand jury transcripts relating to this matter:

      *4.      Copies of all grand jury transcripts for any witness who testified about the subject matter of the Amended Complaint.*

Again, the relevancy of these requests to this matter is self-evident.  The government objects to

their production claiming grand jury secrecy.  However, civil forfeiture attorneys may obtain

access to these records pursuant to 18 U.S.C. § 3322.  That statute provides in pertinent part:

> Any person who is privy to grand jury information . . . received in the
> course of duty as an attorney for the government . . . may disclose that
> information to [a government] attorney … for use in connection with any
> civil forfeiture provision of Federal law.

There is nothing in § 3322 that says that the United States has an exclusive and indefinite license

to these materials.  The Supreme Court, in the Rule 6(e) disclosure context, has commented on

the right of a civil party to access the same grand jury records that the government already

possesses.  "In civil litigation as in criminal, it is rarely justifiable for the [Government] to have

exclusive access to a storehouse of relevant fact."  *United States v. Sells Eng'r, Inc.*, 463 U.S.

418, 433-34 (1983).  The Fourth Circuit emphasized this point when it upheld a grand jury

disclosure order in a Virginia case.  It noted that the need for secrecy is "seriously eroded if the

grand jury materials have already been disclosed."  *In re Grand Jury Proceedings, GJ-76-4 &*

*GH-75-3*, 800 F.2d 1293, 1301 (4th Cir. 1986).   Although not legally dispositive, we also note

that the criminal case concluded ten years ago.  "If the grand jury investigation not only has

terminated but, in addition, the resulting criminal proceedings themselves have been concluded

without any threat of other prosecutions, the reasons for secrecy are weakened further."  *Id.* at

1301 (internal citation omitted).  "Lapse of time between the grand jury proceedings and the

motion for disclosure is likewise a factor to be considered."  *Id.*; *see also Callahan v. A.E.V.,*

*Inc.*, 947 F. Supp. 175, 178 (W.D. Pa. 1996) (applying federal principles to Pennsylvania law).

      In this case, the government has told counsel for Claimant that they need to file a motion

in California.  Exhibit 42, p. 71.  The DOJ Asset Forfeiture Manual suggests otherwise.  Based

on the Justice Department's own policy manual, the civil forfeiture team is again simply refusing

to honor its discovery obligations.  The Manual states:

> But the amendment to section 3322 did not make clear whether the "use" that the civil
> AUSA could make of the disclosed information included further disclosure to the public
> in the course of the litigation of a civil forfeiture case without obtaining a court order.
>
> One interpretation of section 3322(a) is that it only permits one AUSA to disclose grand
> jury information to another AUSA, but still requires the second AUSA to obtain a court
> order before disclosing the information to the public in the course of civil litigation.

Exhibit 43 (DOJ Asset Forfeiture Manual (2013 ed.) at p. 119).  Accordingly, the onus is on the

government to produce this information.  Although the Manual is ambiguous as to whether these

records need to be produced with or without a court order, it is unambiguous that the obligation

to produce the records rests solely with the Plaintiff.  The Manual does not state that a claimant

needs to return to the judge supervising the grand jury and ask for a Rule 6(e) order.  Despite

that, the government has insisted that Claimant file a motion with the district court in California.

Claimant submits that he is entitled to obtain the grand jury information in this proceeding.

Based upon the foregoing, we submit that any grand jury transcript, to which the United

States civil forfeiture team has access pursuant to § 3322, should be produced as no viable claim

to secrecy remains.  The Department's own policy manual dictates that this information be

disclosed.  In fact, we assume that some grand jury transcripts were provided to criminal trial

counsel.[13]  The Court should order everything to be produced.

### C.   The Court Should Order the Government to Produce All Communications With Foreign Governments About Its Investigation of Claimant Lazarenko.

Claimant Lazarenko also requested correspondence between the United States and

foreign governments, whether they be formal MLATs or informal communications.  Specifically,

Claimant Lazarenko asked for:

> 12.   *Copies of all Mutual Litigation Assistance Treaty ("MLAT") requests made to obtain any evidence in this case or the criminal prosecution of Mr. Lazarenko.*
> 13.   *Copies of all MLAT requests received by You pertaining to Mr. Lazarenko or Mr. Peter Kiritchenko.*
> 14.   *Any documents that you received as a result of the MLAT requests referenced in ¶ 12.*
> 15.   *Translations of any documents that you received from the MLAT requests in ¶ 12.*
> 16.   *Any communication between You and the representatives of any foreign government about the subject matter of this Amended Complaint.*
> 17.   *Any communication between You and the representatives of any foreign government about Mr. Lazarenko.*

The government seeks to avoid the production of MLAT requests made to, and received from, foreign governments in connection with this matter and/or the criminal investigation, making various broad and unsupported claims of privilege.[14]  Exhibit 2, pp. 24-39.  This Court previously held, however, in response to a motion filed by the Liquidators, that the MLAT records are discoverable and not protected by privilege.  Magistrate Judge Robinson wrote:

> The undersigned finds that Plaintiff has not fully responded to these inter-rogatories, and has not demonstrated the applicability of the work product privilege.

Docket Entry No. 253 at 10 (276 F.R.D. at 401).

At the outset, the prosecutors in the criminal action produced MLAT requests, namely from Ukraine and Switzerland; Claimant Lazarenko now only possess a fraction of them.  They are relevant, and they are needed.  Merely by way of example of the relevance of these documents, Claimant Lazarenko believes that forfeiture of the funds in Lithuania may be barred by the statute of limitations.[15]  According to a newspaper article, Special Agent Bryan Earl received an MLAT request pertaining to Peter Kiritchenko in September 1997.  This request

---

[13] In light of the clear confusion with respect to what documents Claimant Lazarenko possesses from the criminal trial, we are entitled to a clean copy.

[14] The government previously represented to the Liquidators of EuroFed that it had made 179 evidentiary requests in this investigation.  Docket Entry No. 218-9.

likely put the United States on inquiry notice, which commences the running of the statute of limitations. Claimant Lazarenko also notes that a supplemental MLAT request made to Switzerland contains a number of admissions which could be used to support a motion for summary judgment on statute of limitations grounds.  Exhibit 44 (Docket Entry No. 111 in the criminal case, Opposition to motion to dismiss based on statute of limitations grounds filed by the United States).

Non-Swiss and Ukrainian MLAT requests are relevant for a number of reasons.  First, given that the vast majority of evidence obtained in the criminal investigation of Claimant Lazarenko was obtained abroad, the above requests for information from foreign countries would identify significant facts including the names of pertinent witnesses, digests of their testimony, the identity of bank accounts, and other responsive records.

Second, the MLATs will also help counsel for Claimant Lazarenko to identify documents received in response to those requests.  Third, the documents will assist Claimant Lazarenko because they will also show what records do not exist.  If an MLAT request was made and records were not produced, the only evidence that a search was made would be the MLAT request and its response.  Here, Claimant Lazarenko maintains that a number of requested records were not produced by the Ukrainian government.  Of note, Claimant Lazarenko maintained that there were a large number of documents that the GPOU did not produce to the United States – a fact corroborated by President Kuchma's own statements to the GPOU. MLATs, and in particular MLATs to the Ukraine, are relevant to show that a search was requested for these records.  The absence of the records coupled with the statements on the Melnychenko tapes suggest that the searches were deliberately not done – certainly a significant

---

[15] The government disagrees, so it claims it need not give us discovery on this issue.

issue for trial.  The absence of these records is probative in light of this powerful extrinsic evidence.

The MLATs and correspondence are not protected by work-product privilege for another reason, namely some of the requests were made on Claimant. Lazarenko's behalf.  As noted above, Judge Jenkins ordered the government to make certain MLAT requests for Claimant Lazarenko.  (The GPOU completely disregarded Judge Jenkins's order.)  Communications between the government and the GPOU on this issue are plainly relevant.

Similarly, the government indicated in 2001 that it planned to take Rule 15 depositions in Russia.  These depositions never occurred.  As a result, the government presented a custodian of records about the ITERA "scheme" whom Judge Jenkins described as totally unresponsive. Exhibit 48c (Trial Tr., Judge Jenkins).  The charges were dismissed, pursuant to Rule 29(a), mid-trial; one week later this action was filed.  Given the diminished state of relations between Russia and the United States, we believe it is unrealistic to assume that Russian oligarchs will sit for depositions to assist the U.S. government or Claimant Lazarenko.  Claimant Lazarenko believes that these communications will confirm this.  Even if they do not confirm this, the communications will help us identify the location of relevant witnesses in Russia.[16]

Despite this Magistrate Judge Robinson's earlier finding and the plain relevance of these records, the government makes so many assertions in its attempt to avoid the discovery of MLAT materials that its responses border on frivolous.  For example, the government states: "mutual legal assistance treaties by their terms generally anticipate that the fact of the request,

_____

[16] Claimant Lazarenko also note that there are pending forfeiture actions in Liechtenstein and Antigua, both of which pre-date this action.  Under the *Princess Lida* doctrine, this Court does not possess jurisdiction because there cannot be two *in rem* actions pending in different courts with respect to the same assets at the same time.  The court that files the first *in rem* action assumes jurisdiction.  *Princess Lida of Thurns and Taxis v. Thompson*, 305 U.S. 456 (1939); *SEC v. Banner Fund Int'l*, 211 F.3d 602, 612 (D.C. Cir. 2000).  Obviously, communications between the United States and these foreign governments are discoverable as it will help us flesh out the nature of these actions.

information contained therein, any associated communications would not be disclosed publicly

in the course of responding to and executing a request." Exhibit 2, p. 26. Such language does

not appear in any treaty. In fact, the government attached an MLAT request to a publicly filed

document in the criminal case, completely contradicting the government's assertion. Exhibit 44.

Claimant Lazarenko asks the government to identify each treaty that contains a confidentiality

clause in its opposition (it has not in our conversations). Last month, the criminal prosecution

team in San Francisco furnished an MLAT from Panama in a related proceeding, which

Claimant Lazarenko's criminal attorney subsequently filed on PACER without any objection.

Exhibit 45 (Panamanian MLAT).

 In response to our request for other communications with foreign governments, the

government refused, responding that staff working on MLAT requests "may communicate about

multiple requests during the same communication." Exhibit 2 at pp. 36, 41 (Request Nos. 16 &

17). Claimant Lazarenko notes that he has received communications between foreign

governments and the United States, from foreign governments. In short, the government's

response is purely a delay tactic and, in any event, communications about other requests can be

redacted.

 The government also claims that because the investigation of Claimant Lazarenko has

spanned at least twelve years and involved numerous law enforcement agents, attorneys, and

agencies, "the United States cannot and is not required to identify communications from every

attorney, law enforcement agent, and/or government entity possibly involved in any criminal

investigation of Lazarenko that could conceivably touch upon the subject matter of the Amended

Complaint." Exhibit 2, p. 40 (Request No. 17). There is no authority for this claim. That this

case is broad in scope does not narrow the government's discovery obligations. The burden

imposed by our request is not disproportionate given the amount of money at stake.

In sum, the government has provided no basis to withhold production of these records. There is also no basis to agree to produce the records subject to a protective order, as some of the records have been attached to publicly filed court documents, eviscerating any claim of confidentiality. The government should be required to produce documents responsive to the above requests. On December 23, 2014, the government agreed to furnish "a list" of MLATs that were previously produced. Exhibit 42, p. 72-73. This is completely insufficient.

### D. The Melnychenko Tapes and Anything Else Relevant Thereto Should Be Produced.

Claimant Lazarenko also requested records pertaining to Mr. Melnychenko's tape recordings and personal knowledge. Specifically, he requested:

> 30.  *All tapes provided to the U.S. Department of State by Mykola Melnychenko.*
> 31.  *All documents analyzing the tapes provided by Melnychenko (including any translations).*
> 32.  *Any interview memorandum of meetings with Melnychenko.*

As noted above, reliable information indicates President Kuchma and the head of the GPOU made numerous statements (caught on tape) that constitute obstruction of justice and demonstrate a desire to suborn perjury in order to railroad Claimant Lazarenko. *Statements made by the head of the GPOU about efforts to suborn perjury in the depositions in the criminal proceeding are discoverable under Rule 26(b).* Mr. Melnychenko testified before the grand jury investigating Claimant Lazarenko and was interviewed on multiple occasions about this topic.[17] Moreover, Mr. Melnychenko's statements about the tapes are also relevant and discoverable as they relate to authentication and may help Claimant Lazarenko locate the relevant portions of the

---

[17] The government contended at our December 16 meeting that because the grand jury was being supervised by a different judge, the matter is unrelated. Mr. Melnychenko's affidavit suggests otherwise. Exhibit 38. On January 6, 2015, Claimant attorney Jed Silversmith also spoke with Scott Horton, Mr. Melnychenko's former attorney. He stated that the assigned AUSA, Martha Boersch, met with Mr. Melnychenko more than once in Washington DC

tapes.  Mr. Melnychenko provided excerpts of his tapes pertaining to Claimant Lazarenko to the Justice Department and the State Department.  Exhibit 38; Silversmith Decl., ¶ 41.  The information provided to the Justice and State Departments is within the possession, custody or control of the United States.

At the parties' October 2014 meeting, the government stated that it would not produce these records.  Claimant Lazarenko subsequently followed up with a letter stating that he had exhausted the meet and confer process with respect to this item.  In their response to Claimant Lazarenko's Requests for Production, the government attorneys claimed that, with the exception of certain, possibly irrelevant audio files, this information is not in their possession, and that they wish to meet and confer more with respect to the audio files.  Exhibit 2 at pp. 70-74.  The parties spoke on the telephone on December 16, 2014, and the government again refused to commit to producing any of these records.  This time, the government asserted that these tapes were produced in the criminal case.  The government subsequently cited to an opaque reference in the pretrial transcript.  Exhibit 39.

In response, counsel has checked with Claimant Lazarenko, all three of his criminal defense attorneys, and the criminal defense team's Ukrainian translator.  None of them had any recollection of receiving these tapes.  None of them possess the tapes now.  Counsel for Claimant Lazarenko cannot locate correspondence acknowledging receipt of the tapes.  Counsel has not located a protective order pertaining to the tapes.  Silversmith Decl., ¶ 38.  And, most importantly, the tapes are not in our files.  Despite our representations to the government on this issue, they simply ignore us.   In their most recent letter, they asked that the undersigned check with criminal trial counsel again.  However, counsel for Claimant has repeatedly told the

about Claimant Lazarenko.  Silversmith Decl., ¶ 35.

32

government that they do not possess these tapes.

The government also cites to a defense motion made during the criminal trial in which the tapes were discussed.  Counsel explained that Mr. Melnychenko never relinquished his control to the criminal defense team.  Rather, he played the tapes in the presence of the defense team.  As noted throughout, Mr. Menlynchenko only produced the tapes to the United States.

Reputable published media reports state that the government analyzed these tapes and based significant policy decisions on their contents.  Exhibit 38 at p. 42.  We have checked with Claimant Lazarenko, his criminal defense attorney, and the criminal defense team's Ukrainian translator.  None of them possess these tapes.  Counsel in the civil forfeiture team does not possess the tapes either.

The government cannot avoid its discovery obligations by simply pretending that it has no control over its own agencies or just ignore what we tell them.  The tapes need to be produced.  Moreover, any documents analyzing the tapes need to be produced as well as any memorandum of interview or grand jury transcripts relating to the tapes.

### E.    The Government Should Not be Permitted to Sandbag Claimant Lazarenko at his Deposition.

The government has repeatedly raised the issue about scheduling Claimant Lazarenko's deposition.  Exhibit 42, pp.  23, 26.  Given that the government has failed to produce any documents other than the trial transcript and the exhibits admitted at the criminal trial, it would be utterly unreasonable to require the deposition at this time.  Counsel for Claimant Lazarenko requested:

> 8.    *All documents that you intend to use at Mr. Lazarenko's deposition.*

To be clear, the Claimant is not asking the government to delineate these specific records, but they must be produced in its production of records.  Because the government has completely

33

failed to meet its most basic discovery obligations, it should not be permitted to blindside

Claimant Lazarenko with records he has no familiarity with, or has not seen in over a decade.

Similarly, he should be entitled to review any interview notes of Claimant Lazarenko well before

any deposition, as well as interview notes of anyone that spoke with the Claimant.  Claimant

Lazarenko requested these documents in September, asked for them again in November, and the

government responded by serving interrogatories seeking the same information in the 302s,

which we no longer possess.

> **F.     The Court Should Order the Government to Produce Relevant State
>          Department Records**

Claimant Lazarenko seeks records that deal with the repression by the Kuchma regime

against his political opposition generally and all of his witnesses in particular.  He also seeks all

State Department records that pertain to any co-conspirators.  He requested:

> 33.     *All documents used to produce the State Department Reports as they relate to Mr.
>         Lazarenko or the specified political dissidents.*
> 34.     *All documents relating to the arrest and prosecution of specified political
>         dissidents.*
> 36.     *English translations of the documents referenced in ¶ 35.*

The information that we seek is plainly discoverable on a number of grounds.  First, the evidence

is relevant to show bias.  "A party must disclose impeachment evidence in response to a specific

discovery request."  *Newsome v. Penske Truck Leasing Corp.*, 437 F. Supp. 2d 431, 436 (D. Md.

2006).  The U.S. State Department reported that "pervasiveness of corruption, connections

between government officials and organized crime, and the political activities of organized crime

figures often blurred the distinction between political and criminal acts."  Exhibit 18 at p. 2.  The

five attached State Department Reports corroborate the six witnesses who testified about

inhumane prison conditions, regular deprivation of basic medical services, and coercive

questioning.  The evidence is relevant and should be produced.

### 1.    Documents used to Prepare the Human Rights Reports

The government has refused to produce any records pertaining to the preparation of these

Country reports.  The government has asserted a host of non-responsive objections.  For

example, in one pleading, the government described the State Department Reports as legal

conclusions.  Exhibit 2, p. 75.  The government subsequently stated that Claimant Lazarenko's

request was too expansive.  Exhibit 42, p. 75.  A review of the attached deposition transcripts

shows that there were systematic allegations of witness tampering by the GPOU.  Witnesses

were detained for months without charges.  Witnesses testified that they were guaranteed release

from custody *if* they would inculpate Lazarenko or Tymoshenko.  Exhibit 25 at 120:7-18,

Exhibit 27 at 140:20 to 141:14, Exhibit 28 at 117:23-118:6.

*The U.S. State Department gave these specific claims credence*.   In its Country Reports

on Human Rights Practices for the Ukraine from at least 1999 through 2003, the State

Department repeatedly criticized the Ukrainian government for using the criminal process to

attack political opponents of President Kuchma *including the witnesses in this case*.  For

example, the 1999 State Department Report states:

> Yefremov was charged with abuse of office for alleged financial improprieties that
> reportedly came to light during a spot check on the newspaper's financial activities.
> Observers believe the arrest to have been politically motivated since the oblast council
> was headed by presidential rival Pavlo Lazarenko before he became prime minister, and
> Lazarenko was known to have contributed substantially to the newspaper's finances.

The 2001 State Department Report also contains references to claims of politically motivated

prosecutions.

> In January the Prosecutor General announced the filing of criminal charges against [Julia]
> Tymoshenko, Deputy Prime Minister for Energy.  The charges led to her dismissal and
> her arrest in February.  Deputy Prime Minister's Tymoshenko's efforts to reform the
> energy sector had drawn strong opposition, most notably from powerful business persons
> closely tied to the Government.

Exhibit 20 (2001 State Department Report).  *See also* Exhibit 19 (2000 State Department Report) ("The Government occasionally charges persons who are openly critical of the Government (usually opposition politicians …) with criminal libel or tax evasion charges … Former government officials Petro Shküdün, Mykola Syvulski, and Vasyl Koval claimed that their cases were motivated politically due to their links to Lazarenko.").  Subsequent State Department reports made similar claims.  Exhibit 21 (2002 State Department Report); and Exhibit 22 (2003 State Department Report).

The documents used to prepare these sections of the reports that relate to our witnesses as well as documents sufficient to identify Embassy staff with knowledge of this information are relevant and must be produced.  This request is not overly broad.

### 2.    Reports About the Movement of Money by the Gromada Party

Immediately preceding the criminal trial, a State Department Report was revealed *in camera* suggesting that a significant part of the funds at issue were actually payments from Ms. Tymoshenko to Claimant Lazarenko to support the Gromada Party.  Exhibit 39.  As such, Claimant Lazarenko requested:

*43.    Any reports about the movement of money internationally by the Gromada Party.*

The State Department prepared at least one memorandum stating that Claimant Lazarenko was moving large sums of money on behalf of the Gromada Party, Claimant Lazarenko's and Ms. Tymoshenko's political party.  Claimant Lazarenko has consistently contended as part of his defense that a sizable portion of the funds from Ms. Tymoshenko were to be used for joint political purposes, namely funding the Gromada Party.  The State Department's reports appear to bear that out.  Such a contention would obviously provide a defense against the charge that Claimant Lazarenko acquired funds illegally and was laundering

them.  Based on our December conversation with government counsel, they had not even

bothered to review the criminal trial transcripts, ask the criminal prosecutors, or contact the State

Department.  This is completely unacceptable.

### 3.      Other Records about Julia Tymoshenko

The government likely has a warehouse of information that suggest that Ms. Tymoshenko

– the alleged "briber" –  was, in fact, a reformer who was able to earn hundreds of millions of

dollars through the Ukrainian energy market legitimately.  The State Department records are

probative of whether or not Claimant Lazarenko violated Ukrainian law since Tymoshenko's

criminal activity is the same criminal activity that the government needs to prove in this case.

The information is plainly discoverable.

These statements will be admissible for two reasons.  A number of witnesses at the

criminal trial testified solely about their interaction with Ms. Tymoshenko (*e.g.*, Andreas Petrou,

Donco Stojanovski).  Claimant should be permitted to impeach Ms. Tymoshenko, a "co-

conspirator," under FRE 806.  To that end, it is probative beyond words that Secretary of State

Clinton wrote to Ms. Tymoshenko calling for her immediate release.  Second, because officials

from the State Department at the highest level (*e.g.*, Secretary Clinton, Deputy Secretary Burns)

have stated  that Ms. Tymoshenko is innocent of any wrongdoing ***pertaining to these very***

***payments***, the Court may consider these admissions by the government.

The parties met and conferred on this issue on December 16, 2014.  Although certainly

not obligated to do so, counsel for Claimant Lazarenko agreed to limit this request to Lazarenko-

related issues with the understanding that we could re-raise the general issue later.  In turn, the

government committed to calling the State Department to see if they possess any records.

Exhibit 42, pp. 64-65.  In a complete reversal, on December 23, 2014, counsel for the

government wrote to Claimant Lazarenko's attorneys stating that it would not even conduct a

search, stating: "Ms. Tymoshenko was charged for different alleged violations for different times in the Ukraine, including in recent years. The inconsistency of your clarification underscores the confusing nature of these requests and their dubious relevance to the forfeiture allegations at issue in this action." Exhibit 42, p. 75.

There is nothing confusing here. Ms. Tymoshenko was alleged to have bribed Claimant Lazarenko. In the early 2000s, the U.S. State Department called the charges a sham. After Claimant Lazarenko was acquitted of this conduct, a Ukrainian court dismissed all charges against Ms. Tymoshenko due to a lack of evidence. Exhibit 10. Criminal charges in the Ukraine (based on the same evidence) were dropped against Claimant Lazarenko in the Ukraine as well. Exhibit 11. Subsequently, after a falling out with the Ukrainian leadership, Ms. Tymoshenko was charged with these crimes again. Exhibit 13. The U.S. State Department recognized these charges were totally baseless and issued repeated and strenuous calls for Ms. Tymoshenko's release.

The reality is that the government knows exactly what we are seeking and is simply refusing to honor its most basic discovery obligations. The government's unilateral decision to disregard highly exculpatory records is a blatant disregard of its discovery obligations. ***We have not even received all of the discovery on this case that was furnished in the criminal case on this topic***. The Court should order a production of all relevant records.

### G.    Claimant Lazarenko is Entitled to Basic Impeachment Materials.

In addition to the witness statements that the government has stated it would produce, Claimant Lazarenko is entitled to other impeachment materials. To that end, he requested:

37.    *Any documents that relate to impeachment material of any witness you intend to call at trial.*

38.    *English translations of the documents referenced in ¶ 37.*

Judge Jenkins remarked upon the significant role bias plays in this case. Exhibit 48d (Trial Tr., Judge Jenkins). The government should be required to produce the requested information. Recognizing that the request may be difficult to narrow in this case, Claimant Lazarenko limited this request for impeachment materials to *Giglio* and *Jencks* for the witnesses that each party identified in the criminal case, plus the assigned case agents. Claimant Lazarenko recognized that the government need only produce *Giglio* materials in its custody and control.

Claimant Lazarenko also requested:

> 39.   *Any communications between You and any witness who testified at the criminal trial.*

The government again refused this very basic request. The government made numerous inapplicable objections to this request, and has indicated that it will not produce any responsive documents. Exhibit 2, pp. 80-81. Statements made by the government to any witness who testified at the criminal trial are discoverable and should be produced. The government recently told counsel that they do not possess this information and are refusing to produce it. Exhibit 42, p. 76.

### H.   The FBI Evidence Log Should be Produced

Claimant Lazarenko also seeks a copy of the evidence log maintained by the FBI. Request No. 25. The government refuses to produce the evidence log absurdly claiming that "there is no document labeled 'FBI evidence log' pertaining to the investigation of Claimant Lazarenko." Exhibit 2 at 65.

While the FBI may not use the moniker "Evidence Log", it is common knowledge that when FBI agents receive evidence, they place it in an Envelope 1A and then log the information into a database, commonly referred to as the "Evidence Log." The FBI Manual of Administrative Operations and Procedures, Part II, Section 2-4.1.1 requires each document to be

placed in an investigative file.  Exhibit 46.  A list of each document placed in the investigative file of Claimant Lazarenko (and Mr. Kiritchenko) exists and could easily be printed from a database.  A list of what was collected by the FBI is discoverable and highly relevant.  This list would identify additional documents that will be needed in discovery and will also have substantial bearing on Claimant Lazarenko's statute of limitations defense.  The government has implausibly stated that it has no written record of what physical evidence was collected.   The FBI evidence log should be produced.

### I.      The Government's Tepid Agreement to Produce the Other Remaining Category of Documents Needs to be Handled on a Reasonable Basis.

There are a number of categories of documents for which the government has simply delayed its production endlessly.

### 1.      Bank Records

At trial, the government produced testimony from an IRS Revenue Agent who traced Claimant Lazarenko's alleged proceeds.  In this case, Claimant Lazarenko also requested that the government produce records relating to their summary witness at trial:

> 27.    *Any documents reviewed by Revenue Agent Charles Tonna to prepare his summary charts.*

This request refers to the 90 bank accounts that Revenue Agent Tonna testified that he reviewed. Exhibit 48e (Trial Tr., Charles Tonna).  Counsel for the government has been informed that Claimant Lazarenko does not possess the bank statements for many of the *in rem* defendants (*e.g.*, many of the Eurofed records, the Julius Baer & Co. records, the records from Liechtenstein, and the records from Lithuania).  Tonna testified that he reviewed these records. They are the *in rem* defendants in this case.  The government's unwillingness to commit to a reasonable timeframe for their production is not acceptable.  Their production should be compelled.

Furthermore, we note that the government has stated that it needs a protective order first. While that may be justifiable for some of the Eurofed bank records as well as for the records from the correspondent bank accounts, it is not an excuse for the production of Claimant Lazarenko's own bank records.

### 2.    Witness Interview Memoranda

Claimant Lazarenko requested that the government produce witness interview memoranda (Requests Nos. 18 through 24).  The government objects to these requests, repeating the litany of baseless  objections it has raised with respect to other requests, agreeing only to produce FBI 302s "pertaining to the allegations set forth in the First Amended Verified Complaint for Forfeiture In Rem," to the extent not produced in the criminal action.  Exhibit 2. These objections are baseless.

The Court's page limitation prohibits us from detailing the truly outlandish games that the government has played in refusing to furnish these documents. See Silversmith Decl., ¶¶ 20-33.  It is beyond dispute that these documents are relevant. The government will now only produce the records pursuant to a protective order, for which we have waited patiently for over six weeks.  And, it has agreed to *begin* furnishing this information in February 2015.  Exhibit 42, p. 5.  The government has not committed to a timetable to complete this production.  In light of the government's earlier representation to the Court (which it now disclaims) that "[m]uch of the documentation obtained in the course of the investigation in California has been scanned into digital form [and] is readily moveable from one location to another," the over 150-day delay in producing these documents is totally untenable. See Docket Entry No. 57, p. 18 (Opposition to Motion to Transfer).  Like the bank records, the government also appears to be planning to over designate records.  We do not believe that every foreign witness interview was provided pursuant to a protective order during the criminal discovery.  We see no reason that – ten years later – the

41

records should now be produced subject to a protective order.

We also specifically requested Claimant Lazarenko's own statements to the United States.  The government has pointedly refused to provide these documents or even expedite this request.  We note that the government did serve interrogatories which refer back to the information discussed in these statements.  Silversmith Decl., ¶ 33.  There is no basis for this refusal.

## J.      Expedited Resolution of Some of these Matters is Essential

The government in this action has restrained roughly $280 million, but identified $326 million in "scheme proceeds."  Despite requests, it has refused to release any money to permit Claimant Lazarenko to pay his judgment from the criminal case.  The government asserts that all $280 million is subject to forfeiture in addition to his duplicative money judgment in the San Francisco case.[18]  To support this claim, the Amended Complaint identified proceeds from certain sources, specifically:

- o       $42,000,000 from L.I.T.A.T. Offshore, Limited;
- o       $30,000,000 from DAVRiga; and
- o       $15,600,000 from SB Corp.

Claimant Lazarenko possesses almost no discovery whatsoever on the "schemes" to which these funds relate.  The literally few lines of information, which Claimant Lazarenko possesses, demonstrate that these payments are unrelated to the four "schemes" in the Amended Complaint.  At the very minimum, the Court should order the government to expedite production of these materials so Claimant. Lazarenko can litigate the merits of these *in rem* issues.

## CONCLUSION

Claimant Lazarenko respectfully requests that this Court enter an order compelling the

---

[18] The $20 million money judgment stems from the same forfeiture theories and same facts.  It is axiomatic that the United States cannot collect twice.

government to meet its basic discovery obligations and produce the records requested above. The

government has consistently refused to produce responsive records.  What's worse, the

government continues to refuse to conduct basic searches for records.  An order compelling the

production of the most basic discovery is warranted.

WHEREFORE, Claimant Lazarenko respectfully requests that the Court enter an order

granting this motion to compel.


Dated:  January 14, 2015.


**BLANK ROME LLP**

By: /s/ Ian M. Comisky

Ian M. Comisky (D.C. Bar No. 927608)
Matthew D. Lee (D.C. Bar No. 453529)
One Logan Square, 130 N. 18th Street
Philadelphia PA  19103
Phone:  (215) 569-5646
Fax:  (215) 832-5646
Comisky-i@blankrome.com
Lee-m@blankrome.com

**SMITH & ZIMMERMAN, PLLC**

By:  /s/ David B. Smith

David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:  (703) 548-8911
Fax: (703) 548-8935
Dsmith@smithzimmerman.com