```
                 UNITED STATES DISTRICT COURT
                     DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    .   Case No. 1:04-CV-00798
                             .   (GMH)
              Plaintiff,     .
                             .   Washington, D.C.
     v.                      .   May 19, 2015
                             .
ALL FUNDS ON DEPOSIT AT,     .
                             .
              Defendants.    .
. . . . . . . . . . . . . . .
```

```
                      DISCOVERY HEARING
           BEFORE THE HONORABLE G. MICHAEL HARVEY
                UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

```
For the Plaintiff:      U.S. Department of Justice
                        By:  DANIEL H. CLAMAN, AUSA
                             HECTOR BLADWELL
                             TERESA TURNER-JONES, AUSA
                             NALINA SOMBUNTHAM, AUSA
                        1400 New York Avenue, N.W.
                        Suite 10100
                        Washington, DC 20530

For the Defendants:     Blank Rome LLP
                        By:  IAN M. COMISKY, ESQ.
                             DAN RHYNHART, ESQ.
                             JED M. SILVERSMITH, ESQ.
                        One Logan Square
                        130 North 18th Street
                        Philadelphia, PATIENT 19103

                        Smith & Zimmerman, PLLC
                        By:  DAVID B. SMITH, ESQ.
                        108 North Alfred Street
                        Alexandria, VIRGINIA 22314

Transcribed by:         MS. AMY SHANKLETON-NOVESS
```

_____

**BOWLES REPORTING SERVICE**
**P.O. BOX 607**
**GALES FERRY, CONNECTICUT 06335**
brs-ct@sbcglobal.net

1          (Proceedings commenced at 1:06 p.m.)

2               THE CLERK:  This is Civil Case, Year 2004,

3     798, <u>United States v. All Funds On Deposit, et al.</u>.

4               This is a discovery hearing.

5               Will the parties please identify yourselves

6     for the record, beginning with the Plaintiff.

7               MR. CLAMAN:  Good morning, Your Honor.

8               I'm Daniel Claman on behalf of the United

9     States.

10              With me at counsel table are Nalina

11    Sombuntham, Hector Bladwell, and Teresa Turn-Jones.

12              Thank you.

13              THE COURT:  Good afternoon.

14              It's Clamant?  Is that right, Mr. Clamant?

15              MR. CLAMAN:  Correct.  Yes, sir.

16              MR. COMISKY:  Good afternoon, Your Honor.

17              Ian Comisky from Blank Rome in Philadelphia.

18              I have with me today, Jed Silversmith and Dan

19    Rhynhart, motions to pro hac them in.  Their admission

20    motions were granted, I think, yesterday.  You should

21    have them.  I'm delighted to have them down.

22              I also have David Smith, who is our co-

23    counsel with us today at table, and I'm delighted to

24    have them because I couldn't talk the last two days.

25              I just wanted to take a moment.  I had oral

1    surgery last week and I brought -- you know, I'm going

2    to ask them to do the laboring with the motion because

3    literally I could not talk 'til this morning again.  So

4    if I can say something at an appropriate time today,

5    but I was -- I'm going to try to save myself.

6              THE COURT:  Well, I'm glad to hear you're

7    doing better.

8              Your last name is Comisky?

9              MR. COMISKY:  Comisky, C-o-m-i-s-k-y.

10             THE COURT:  Okay.

11             So who will be addressing the Court on behalf

12   of the Claimant?

13             MR. RHYNHART:  Good afternoon, Your Honor,

14   Dan Rhynhart.

15             If it's okay with the Court, we were going to

16   divide it up where there are basically three motions

17   before the Court.

18             Mr. Silversmith is going to handle Claimant's

19   motion to compel and the response to the motion for a

20   protective order.

21             I was going to handle the response to the

22   Government's motion to compel if it's -- if it pleases

23   the Court.

24             THE COURT:  Certainly.

25             MR. RHYNHART:  Thank you.

1          MR. COMISKY:  Your Honor, if I may, there

2     were two other preliminary issues, if the Court would

3     entertain them?

4          THE COURT:  Sure.  Come right -- forward.

5          MR. COMISKY:  Number one, there's -- Let me

6     start with there is a lot of the pleadings that the

7     Court is aware are under seal, and there's -- there

8     were a number of sensitive issues, one in particular.

9          How would the Court like to treat the one

10    very sensitive issue which is laid out in our

11    pleadings?  It's going to come up a number of times.

12    You know, one thought is that the Court would close the

13    court the first time the issue arose, and we try to

14    treat as a high level after that, once the Court under

15    -- had the -- once the Court had heard the argument,

16    but whatever the Court's pleasure is on that.

17          And then second, while I'm up here, we sent a

18    letter in last night which had an error in it, and we

19    sent Mr. Claman a note this morning and told the Court

20    we would correct it.  The pleading which was filed on

21    Friday was consented to by our firm.  The letter was

22    incorrect in that regard, and we apologize for sending

23    that in without checking it more carefully.

24          THE COURT:  Okay.

25          Well, that's the first issue I wanted to

1    address between the parties today, with regard to that

2    letter, because I granted the motion because I believed

3    it was unopposed, and then I received --

4            MR. COMISKY:  It was unopposed, Your Honor.

5            THE COURT:  Okay.

6            MR. COMISKY:  I found out there's -- I found

7    out last time, when Mr. Claman sent me that note, that

8    it was unopposed, and we sent a letter to Mr. Claman

9    this morning acknowledging that, and said we would make

10   the Court aware, and we have done so.

11           THE COURT:  Okay.

12           As far as the other issue; that is, issues

13   that you think require the courtroom to be sealed, I

14   think it's important that we're clear on what those

15   issues are because I can only think of one, so all the

16   more reason we need to seal the courtroom so that you

17   can be clear for the Court on, you know, what these

18   issues are.

19           MR. COMISKY:  I think it is related to the

20   one issue, but there's a number of tentacles or

21   elements to it, and I can either -- we could go to

22   side-bar now, whatever the Court's pleasure is.

23           THE COURT:  Well, why don't we do that, just

24   so that -- if you can come forward and I can turn on

25   the husher, and you can identify what these issues are,

1    and we can figure out the best way to proceed.

2                           *      *      *

3              THE COURT:  Okay.

4              So, Madam Clerk, that portion of the

5    transcript should be sealed.

6              THE CLERK:  Okay.

7              THE COURT:  Okay.

8              Well, we have a number of pending motions and

9    I think it makes the most sense to deal first with the

10   United States motion for a protective order.

11             Also, I'm prepared to hear argument on that

12   first, and I'll hear from the Government.

13             And I'm sorry, sir, you are Mister?

14             MR. BLADWELL:  Bladwell.

15             THE COURT:  Bladwell.

16             MR. BLADWELL:  Good morning, Your Honor.

17   Again, my name is Hector Bladwell for Plaintiff, United

18   States of America.

19             And we -- The parties agree that a protective

20   order in this case should be entered to properly

21   safeguard the personally and identifying information of

22   third parties.

23             What's in dispute, or mostly in dispute, are

24   three changes that Claimant wants to make to the

25   agreed-upon protective order.

1           First, Claimant does not want the protective

2    order to apply to documents disclosed in a criminal

3    trial without a protective order.

4           Second, Claimant does not want the protective

5    order to apply to bank records and financial

6    information of entities over which he has "dominion and

7    control."

8           And third, Claimant wants the protective

9    order to specify that the producing party bears the

10   burden of showing that our records should be protected.

11          Now, the Court should --

12          THE COURT:  I think there's one additional

13   dispute, too, which is the definition of "PII."

14          MR. BLADWELL:  That is true, Your Honor.  I

15   think what I meant by this being the three main ones

16   are that Claimant has stated that he does not oppose

17   the protective order.  These changes have -- can be

18   included, but I don't think has made the protective

19   order contingent on that definition, --

20          THE COURT:  Okay.

21          MR. BLADWELL:  -- even though he, Claimant,

22   still criticizes the (unintelligible).

23          And the Court should reject these three

24   changes because, number one, they are -- they will

25   unnecessarily increase the burden of the parties in

conducting discovery;

two, they put at risk, the privacy of third-party information in these records; and

three, it will likely delay the discovery process and the proceedings in this litigation, therefore prejudicing Claimant himself, and the Government.

Now, it's important to remember that this protective order, as proposed by the Government, will not prejudice Claimant at all in his ability to litigate this case.  He -- Quite to the contrary, what the protective order does is allow the Government to comply with its obligations under the Privacy Act, and would allow Claimant to get records -- to get more information, to get it more quickly, and this case, to go forward to the merits.

Now, I'm going to address first, the criminal trial documents.  Like I -- As I said before, Claimant says the protective order should not apply to documents if there was no protective order in the criminal case.

Now, this change will create an unnecessary burden on the Government because it's not always clear when we are reviewing documents to produce, whether they were subject to a protective order in the criminal trial.  It's not clear, the circumstances under which

1   those documents were released.

2            We have seen in the litigation, that there

3   were sometimes side agreements where the Government

4   provided information but required the parties to enter

5   into a confidentiality agreement.

6            Now, it's not always clear when you're

7   looking at a document, that it is subject to some kind

8   of confidentiality agreement.

9            THE COURT:  So the documents weren't marked

10  in the criminal case that's being produced pursuant to

11  a protective order, like the documents in this case

12  would be marked if I entered the protective order?

13           MR. BLADWELL:  I think that's correct, Your

14  Honor.

15           There are some documents that we -- that were

16  turned over in the criminal trial, but the cover letter

17  stated that there were -- that the Government agreed to

18  provide them as long as there was a confidentiality

19  agreement, but I don't think there was necessarily a

20  marking on every single one of those, subject to those

21  agreement.

22           THE COURT:  Was there an official protective

23  order in that criminal case?

24           MR. BLADWELL:  You --

25           THE COURT:  I've seen the attachments.  They

1   sort of, if -- You call them "side agreements."  So

2   I've seen those, but was there a protective order

3   entered by, I think it's Judge Jenkins, in the criminal

4   case?

5            MR. BLADWELL:  Your Honor, I've seen a

6   reference to a protective order in the document, but I

7   don't think that that protective order covers

8   everything that was subject to some kind of a

9   confidentiality between the parties, so -- and just

10  to --

11           THE COURT:  But does the Government have a

12  copy of that protective order, because I've not seen

13  it?

14           MR. BLADWELL:  Okay.

15           I think certainly, Your Honor, we can try to

16  look for it.

17           We've also produced, in our exhibits, the

18  side agreements that we've been able to identify --

19           THE COURT:  Yeah.  No, I've seen those.

20           MR. BLADWELL:  -- as agreement of the

21  parties, but we're going to try to look for -- to see

22  if we can identify if there was a protective order

23  entered in the docket.

24           But this underscores the problem, Your Honor,

25  that case was -- it's very old, and I'm not -- we're

1    different counsel, and to require the Government to

2    conduct a mini-investigation every time he wants to

3    turn over a document, to see if it was subject to some

4    confidentiality agreement, it's unduly burdensome.  It

5    doesn't advance the case.  It's going to delay the

6    proceedings.

7          Now, there's no good reason to impose this

8    additional burden on the Government.

9          THE COURT:  Would you agree though, if the

10   document was actually on the public docket in the

11   criminal case, that it shouldn't be subject to a

12   protective order in this case?

13         MR. BLADWELL:  Certainly, Your Honor, --

14         THE COURT:  And that would include bank

15   record that might have, you know, you would otherwise

16   think would be sensitive information.

17         If they're on the public docket in that

18   criminal case, you would agree that they shouldn't be

19   protected in this case; is that right?

20         MR. BLADWELL:  There's no dispute about that.

21         The protective order that we proposed and

22   that Claimant has agreed to, contains a provision that

23   the documents are going to be subject to the protective

24   order if the party reasonably -- it would not be

25   subject to the protective order if the party reasonably

1    believes it's in the public domain.  So documents that

2    were in the docket would not be subject to a protective

3    order, and we've already turned over the criminal trial

4    exhibits and a host of other documents that were filed.

5         So we're not --

6         THE COURT:  I think their issue, I would -- I

7    mean, I'll hear from the Claimant in the case, but I

8    think the issue is really one of sort of where does the

9    burden lie with regard to trying to figure out what

10   should be protected, what's in the public domain,

11   what's not in the public domain.

12        So when the -- your protective order says

13   that, you know, a party will make reasonable efforts to

14   -- or if it has a -- I don't know exactly what it says,

15   but a, you know, a reasonable belief that the

16   information in a given document is -- should be

17   protected, or if it's the Government who's producing

18   that document, what is the Government going to do to

19   fulfill that burden under the protective order?

20        MR. BLADWELL:  Well certainly, like we said,

21   the documents that were filed in open court, you know,

22   we would not, you know, make those subject to the

23   protective order, and if we --

24        THE COURT:  So you're going to look and see

25   because, I mean, it's one thing to just look at the

1    documents and say, "Well," these look -- "these are

2    bank records, and bank records typically" are --

3    "contain sensitive information," and then if -- do you

4    believe that that would be sufficient under the

5    protective order, then produce them pursuant to the

6    protective order, or do you believe the Government has

7    an additional obligation to try and determine whether

8    or not that record was publically disclosed in the

9    underlying criminal case, or is it your view that

10   you're just going to give that to the Claimant and so

11   the Claimant has to go and figure out if it's on the

12   public docket or not?

13          So, it's like, who bears that burden, I think

14   is the issue?

15          MR. BLADWELL:  I think we would do all.

16   Initially, when we see a document, if we have reason to

17   believe that it's already in the public domain, we

18   would not designate it as protected, but if we don't

19   know or if we're not sure, and the document contains

20   third-party information, we would make it subject to

21   the protective order, and there are safeguards already

22   established in the protective order, for the person

23   receiving the document to challenge a designation if it

24   believes that the information is already in the public

25   domain, and the protective order puts the burden on

1    both parties to then come forth and do -- confer on

2    what to do with that designation.

3              THE COURT:  Okay.

4              The -- I think one of the provisions that

5    Claimant wants to add is to more clearly define what

6    the burdens are.  This is on page 8 of their proposed

7    protective order.  It says:

8              "In the event that the non-producing party

9              objects to the designation of a document or

10             other items protected, the burden to show

11             that the records need to be protected shall

12             remain with the producing party."

13             So does the Government agree that that would

14   be a fair statement of where the burdens should lie if

15   I were to sign the protective order?

16             MR. BLADWELL:  Well, that's certainly one of

17   the changes that Claimant wants to make.  We don't --

18             THE COURT:  Well, forget about whether it

19   should be in the protective order.  I just want to

20   know, you know, legally, because there's some case law

21   that supports this concept.

22             Does the Government agree that the burden

23   under the protective order, for figuring out whether or

24   not a document should be protected or not, remains with

25   the producing party?

1          MR. BLADWELL:  Definitely there are some

2     cases that say that, but --

3          THE COURT:  Okay.  I only (phonetic) know

4     what the Government's position is.

5          MR. BLADWELL:  I think our position is that

6     that -- it's not something that necessarily has to be

7     in the protective order, that's something that the

8     parties can negotiate, and I think that -- the

9     Government's position is that the best way to go

10    forward is not to put that whole burden on the

11    Government, but put it on both parties if there's a

12    dispute, to try to meet and confer, and I think that

13    the parties in the protective order, 99 percent of it

14    is already agreed upon, and we've been able to, up

15    until now, to agree on the language.  So, we can try to

16    resolve the dispute as to whether this document is in

17    the public domain or not.

18         Now, if we put that provision in there,

19    there's no corresponding burden on the Claimant to

20    establish the need for a public disclosure of third-

21    party information, and I think that it is our position

22    that putting that language in there is going to invite

23    the non-producing party to designate -- to challenge

24    every designation, and for the Government to have an

25    additional undue burden.

1          THE COURT:  You said something, the need for

2     the disclosure of that information.

3          I mean, how does that come into it at all,

4     whether or not there's a need out there for someone

5     else to see this document?

6          I mean, for me it's whether or not the

7     document contains confidential or Privacy Act protected

8     information that has not otherwise been placed on the

9     public record in that California case.  So, whether or

10    not, you know, the Claimant believes that there's some

11    -- you know, he has some need for this document around

12    the -- I don't see how that comes into it.

13         If there's going to be, you know, discussion

14    and hopefully resolution of this issue but, if not,

15    then argument about it, I think the issue is whether or

16    not the information in the documents are -- should

17    otherwise be protected, but are not in the public

18    domain.

19         MR. BLADWELL:  Correct.

20         THE COURT:  Do you agree with that?

21         MR. BLADWELL:  Yeah.  I mean -- Yes.

22         The reason that we made this protective

23    order, because both parties agree that there is third-

24    party information that needs to be protected, and the

25    Privacy Act requires the Government to seek that court

1    order.

2          THE COURT:  Right.  Yeah, I think that's

3    clear.  It's -- What's not clear is what the burden is,

4    and it seems the Government's position is that you want

5    the parties to share the burden, to determine --

6          MR. BLADWELL:  Correct.

7          THE COURT:  -- whether or not a given

8    document should be protected, and that would include

9    both, does it contain Privacy Act protected

10   information, otherwise confidential information; and

11   two, has that document nevertheless already appeared on

12   the public record out in California?

13         MR. BLADWELL:  Correct.

14         I think that both parties should come

15   together if there is a dispute, and try to resolve it

16   and, you know, if Claimant has information, or the

17   receiving party has information that the document is

18   public, then we can figure out a way to move forward

19   but not impose that additional burden now on the

20   Government, and that's something that can be left out

21   of the protective order or it can be included.  It's

22   not a requirement that it be included.

23         THE COURT:  Okay.

24         MR. BLADWELL:  So I'm going to, with respect

25   to the criminal trial records, and also dovetailing

1    into the financial records, it's important to remember

2    that the Government -- it's undue to impose this

3    additional burden for the Government to conduct a mini-

4    investigation of what was subject to a protective order

5    before, or what entities in the financial records are

6    under Claimant's dominion and control, because this is

7    -- both the criminal trial documents were provided to

8    Claimant before, and he failed to retain them, and the

9    Government has gone through the burden and expense to

10   provide -- re-produce all of those documents that

11   Claimant failed to maintain.

12        Similarly with the financial records, this is

13   information that should be on their -- the control of

14   Claimant if he claims that these assets are under his

15   dominion and control, so there's no good reason to try

16   to impose additional burdens on the Government in

17   discovery through the protective order.

18        Now, talking more clearly about the financial

19   documents, if the Court doesn't have anymore

20   questions --

21        THE COURT:  I understand.  I understand the

22   bank records, why that -- you might imagine burden

23   should be on the Claimant to determine whether or not a

24   certain bank account is an account that he has dominion

25   and control over.  I could see where that would make

1   sense because they're in a better position to do that,

2   but why are they in a better position than the

3   Government, to determine whether or not a given record

4   was in the -- already on the public docket in the

5   criminal case?

6           MR. BLADWELL:  Well, Your --

7           THE COURT:  I mean, they've indicated they

8   don't have those records anymore.  So, I mean, that's,

9   you know, what has led to that is -- it's not a good

10  thing, although it appears to me, from reading through

11  the papers, that the Government's retention of these

12  records has been imperfect, as well, but given that

13  they don't have direct access to all of the records in

14  that criminal case because they've been destroyed, why

15  should the burden be on them to determine whether or

16  not a given record produced by the Government in this

17  case is on the public docket in that case?

18          MR. BLADWELL:  Well, Your Honor, certainly

19  the -- every document that's in the docket is public,

20  and they can, you know, go get -- I mean, they --

21          THE COURT:  Well, I'm talking about the

22  exhibits.

23          At this point, --

24          MR. BLADWELL:  They have --

25          THE COURT:  -- have all the exhibits been

1    produced?

2            MR. BLADWELL:  I think we've produced all of

3    the criminal trial exhibits, the ones that were

4    produced, and we produced even some that were not

5    disclosed, so -- and we've also provided all the public

6    records.  So they, you know, they should -- they have

7    it, and they have the -- they have shown throughout

8    this litigation, that they have the ability to find

9    something in the documents that we produce when they

10   want to.

11           THE COURT:  Well, I guess it's just not as

12   simple -- as I think about it, that it's not just a

13   question of whether or not the documents were a trial

14   exhibit or placed in the public docket in the

15   California case.  The position of the Claimant is that

16   it's any document that was produced without being

17   produced under a protective order in the California

18   case should not be protected in this case.

19           MR. BLADWELL:  Right.

20           THE COURT:  Does the Government agree with

21   that?

22           Does the Government agree that that's

23   correct, that any document that was produced in the

24   criminal case, that was not produced pursuant to a

25   protective order or side agreement, should not be

1    protected in this case?

2           MR. BLADWELL:  I don't -- No, Your Honor, we

3    don't agree --

4           THE COURT:  You don't agree with that?

5           MR. BLADWELL:  We don't agree with that

6    because those documents are -- some of those documents

7    definitely contain third-party information, and others

8    that, as we go along and see the documents that were

9    produced, and produce them to them, might contain this

10   third-party information, and the Government --

11          THE COURT:  So even though the documents were

12   produced in the California case with third-party

13   information, and were produced without any side

14   agreement or protective order, it's the Government's

15   view that in this case they need to only be produced

16   pursuant to a protective order?

17          MR. BLADWELL:  I think that's the -- Yes.

18          THE COURT:  Why?

19          MR. BLADWELL:  Because that's the way that

20   would move this case forward more quickly.  That is the

21   way that the privacy act of -- of the privacy interests

22   of third parties can be protected more efficiently.

23          If we go about trying to determine now,

24   whether some document was produced subject to a

25   protective order before we produce it to Claimant,

1   that's going to unnecessarily -- that's going to take a

2   lot of time that doesn't need to be spent on these

3   issues, because there are provisions already in the

4   protective order that safeguard Claimant's concerns for

5   over-designation, and we can un-designate something.

6           The fact that something is designated as

7   subject to the protective order doesn't mean that

8   they're not going to get the information, it means that

9   they're going to get the information, and they're going

10  to get it mostly unredacted because the agencies, and

11  now I'm talking not only of the trial records but other

12  agency documents, we're going to have to go and --

13  through a line-by-line process and try to redact that

14  third-party information.  So that's what's going to

15  happen without the protective order.

16          So having this protective order the way that

17  we've written, it advances all of those concerns of

18  moving the case forward and protecting the privacy of

19  third parties more efficiently.

20          THE COURT:  Well, I mean, I think you're

21  conflating a few things.

22          One is, you know, where should the burden lie

23  if there's a dispute between the parties: the resource

24  issue, the efficiency issue, but for me it's just --

25  it's not clear to me now, given what you've said, that

1   the parties are even in agreement as to what should be

2   protected.

3            One, what I think I hear you say is that it's

4   only documents that were produced in the California

5   case that are either on the public docket or were

6   produced pursuant to a protective order or side

7   agreement.  I'm sorry, it's only the latter that should

8   be protected.

9            MR. BLADWELL:  We're -- Right.

10           The documents that were in the public

11   document (phonetic) were not -- we've already produced

12   those, and those -- and produced them without a

13   protective order, so we're not talking about these

14   documents.  We're talking about the next set of

15   documents that it might have been disclosed in the

16   criminal trial, but not necessarily in -- they're now

17   in the public docket.

18           THE COURT:  Okay.

19           MR. BLADWELL:  So that's -- those are the

20   documents that we're talking about, and what Claimant

21   wants us to do is say, "You go and do an investigation

22   of whether there was some protection over this

23   document, and if there wasn't, then now make it subject

24   to a protective order," and that's what we're

25   disputing, that we shouldn't have to do that to produce

1   a document to them subject to the protective order

2   because they're going to get the information.

3           So, it's not clear that that's a necessary

4   burden for the Government in this case.  It's not -- It

5   is not going to make them get the information fast,

6   it's going to delay the proceedings.  So that is why we

7   are opposed to that change that they want to make.

8           THE COURT:  Okay.

9           MR. BLADWELL:  And in terms of the -- Again,

10  Your Honor, you suggested, in terms of the burdens on

11  -- on who bears the burden when there's a dispute, I

12  think that the way to go forward is not to include that

13  change, and to make the parties meet and confer, and

14  that's going to give an incentive to both parties to

15  really bring forth disputes that are -- that have some

16  merit, and make them work together to try to resolve

17  this problem, if they arise.

18          THE COURT:  All right.

19          MR. BLADWELL:  So with respect to the

20  financial records, I don't think there's much dispute

21  here either.  They're -- We have agreed -- The

22  Government has agreed to produce the financial

23  information of accounts where Claimant Lazarenko is the

24  only signatory, without a protective order, and we've

25  already produced a lot of those documents.  Even --

1           THE COURT:  How many documents have you

2     produced so far in this case?

3           MR. BLADWELL:  We produced, I think, over

4     100,000 pages.

5           MR. CLAMAN:  Correct.

6           THE COURT:  And that's not pursuant to the

7     protective order?

8           MR. BLADWELL:  Yes, Your Honor, we -- the

9     criminal trial records, the public information, and

10    account -- and accounts that are held -- that it's

11    clear that Claimant is the only signatory, those we've

12    produced without a protective order.

13          Now, the change that they want to include is

14    that we shouldn't designate financial records of

15    accounts that are under Claimant's dominion and control

16    subject to the protective order, but they don't want to

17    specify which accounts are those.

18          THE COURT:  And you've asked them for that

19    information?

20          MR. BLADWELL:  Yeah.  Yes, Your Honor.

21          THE COURT:  And they haven't provided it?

22          MR. BLADWELL:  Yes, and they've even refused

23    to --

24          THE COURT:  How are you supposed to figure

25    that out?

1          MR. BLADWELL:  Exactly.  And we've even, like
2    -- we've even propounded interrogatories, which is the
3    subject of another motion, asking them to identify all
4    of the accounts over which they -- he claims an
5    ownership interest, and he's completely refused to
6    produce that information, saying that he cannot do so,
7    which is quite remarkable for someone coming into an in
8    rem proceeding claiming an ownership interest, and
9    refusing to identify the nature and extent of his
10   interests in the assets.
11          So, we definitely think that that provision
12   should not be included because it would lead to
13   confusion, it would lead to more undue burdens on the
14   Government.  They're in the best position to provide
15   that information, and they have the burden to do so in
16   this proceeding.
17          THE COURT:  Okay.  I just -- I understand
18   that -- the bank records point.  I'm just -- I'm still
19   confused just to the Government's position with regard
20   to what documents should be protected.
21          Forgetting about who bears the burden, you
22   know, what exactly should be in the protective order,
23   what shouldn't be but, I mean, do you agree with the
24   Plaintiff's, excuse me, the Claimant's assertion that
25   the protective order should not apply to any document

 1   produced in the criminal action, unless they were

 2   designated protected by a protective order in the

 3   criminal case or, I would add, some other side

 4   agreement regarding confidentiality?

 5        MR. BLADWELL:  I think what -- we would

 6   oppose that because the documents are going to contain

 7   third-party information that some type of, you know,

 8   regard -- We don't really know how vastly those

 9   documents that were not in the public record were

10   disseminated, and we know that some of them could

11   contain third-party information.

12        So the prudent course of action is to

13   designate them as protected, if we cannot readily

14   figure out that they're in the public domain, and then

15   if there is a dispute over that designation, the

16   parties can discuss it and bring it to the Court's

17   attention, if appropriate.

18        So I --

19        THE COURT:  So, the -- but when that dispute

20   arises, it will be the Government's position that it's

21   only documents that are in the public domain that

22   should not be protected under the protective order?

23        MR. BLADWELL:  Yes, Your Honor.

24        THE COURT:  So, there's not -- there's no --

25   Whether or not there was a protective order in the

1    criminal case, or side agreements, that's just

2    irrelevant, according to the Government?

3             MR. BLADWELL:  Well, I mean, it's relevant

4    but it's not controlling.  What controls it is how do

5    we protect the privacy of those people, and we -- of

6    course, we don't want to limit our Claimant's ability

7    to litigate this case, and the protective order doesn't

8    do that because they get the -- the whole point is that

9    they get the records and they get the records quicker

10   without us having to do these mini-investigations to

11   try to figure things that happened more than ten years

12   ago.

13            THE COURT:  Okay.

14            Anything else?

15            MR. BLADWELL:  I would like to touch on the

16   definition of -- just because Your Honor raised it, the

17   definition of the personally identifying information

18   that we included in the protective order.  That's a

19   definition that comes from the Office of Management and

20   Budget, and it's a definition that reflects the best

21   practices to protect personal information, so we think

22   that that should be included.

23            And I thinking -- I would reserve the rest of

24   my time for rebuttal, but in conclusion, Rule 26(c),

25   the whole purpose of Rule 26 is to protect parties from

1   undue burden and expense, and the changes that Claimant

2   wants to make, are changes that are going to be unduly

3   burdensome and unduly expensive for the Government.  So

4   therefore, our protective order as we've redacted,

5   should be entered.

6            THE COURT:  Okay.

7            MR. BLADWELL:  Thank you, Your Honor.

8            THE COURT:  And, sir, your name again is?

9            MR. SILVERSMITH:  Jed Silversmith.

10            THE COURT:  Silversmith.  Okay.

11            MR. SILVERSMITH:  Just a couple of issues.

12            You know, as we're standing here, we want to

13   move this case forward, and obviously, to the extent

14   we're quibbling over a protective order, we're not

15   doing that, but --

16            THE COURT:  Well, I've got to say, I am a

17   little frustrated that the parties were not able to

18   reach agreement on this, and now it has led to just a

19   whole series of discovery motions where both parties

20   are making arguments that, you know, had the protective

21   order been entered months ago, the Government would

22   have been prepared to produce these documents, and

23   you're saying that you need additional documents to be

24   responsive to the Government's interrogatories, so this

25   entire case has been delayed for months because the

1   parties weren't able to reach an agreement.

2          MR. SILVERSMITH:  I agree, although I would

3   point out to the Court that the Government didn't even

4   move for the protective order in February 2015, until

5   they had located a lot of the missing records, as they

6   acknowledge in their opposition to the motion to

7   compel.

8          Now, I mean, we could talk about, and I'm

9   prepared to talk about how, in our view, the Government

10  didn't move as quickly as they could have to get the

11  protective order before the Court, but I just want to

12  let you know what Mr. Lazarenko's concerns are, and

13  we've laid them out in our papers, but essentially,

14  when this case was initiated way back in 2000, he had

15  lawyers throughout the world, and as he was getting

16  discovery in this case, he was sharing the discovery

17  with other lawyers, and because this case had sort of a

18  political ring to it, it was being shared with other

19  people in the Ukraine, and his legitimate concern is at

20  the point now, that this stuff is well out in the

21  public domain, as it was his right to disseminate it

22  back then.

23         THE COURT:  Okay, but the issue is how -- I

24  mean, who's going to bear that burden?  And I -- For a

25  number of these issues, you know, which is his bank

account, I mean, you know, I agree he -- your client is
in the best position to figure out what his bank
account is, which bank accounts he has dominion and
control.  My understanding is the Government has sought
that information from the Claimant, and the Claimant's
not provided that information, so to say that that
should be the Government's burden doesn't make a lot of
sense to me.

        But similarly, this idea that your client
seems to know that a lot of this information is all out
there, and it may be in Ukranian, I don't know, but
that's certainly what's suggested in the papers.  So
again, to put that burden on the Government, to figure
out what's in the public domain, when it sounds like
your client's in the best position to figure that out,
so why shouldn't I go ahead and enter the order with
what the Government suggests, which is -- I don't think
we need to have any language in here at all about
burdens, but just have the parties try and work this
out, but get the documents out there so that the case
can move forward, so that you can have the documents
you need to respond to their interrogatories, and that
will be a large -- I think, go a large way to
responding to your motion to compel, that the
Government hasn't provided all the documents you want.

1              So it just seems like unfortunately, again,

2     we've wasted about four months here because of this

3     back and forth over who bears the burden but, you know,

4     as I look at the facts, regardless of what there's

5     prior case law out there that says, in this case, why

6     is it that your client shouldn't bear, or at least

7     share in the burden with the Government about

8     determining what is and is not, what is -- what should

9     and should not be protected, what is and is not in the

10    public domain?

11             MR. SILVERSMITH:  Well, I -- as we explained

12    in our papers, and we did attach a copy of the signed

13    protective order from the criminal case, it was filed

14    under seal.  I think it's --

15             THE COURT:  Do you have that?  Do you know

16    where it is?

17             MR. SILVERSMITH:  It's Exhibit 49.

18             THE COURT:  I'm sorry, Exhibit 49?

19             MR. SILVERSMITH:  Yes.

20             It's not the most descriptive document, but I

21    didn't draft it.

22             THE COURT:  I've found that with a lot of the

23    criminal case documents in this matter.

24             MR. SILVERSMITH:  But --

25             THE COURT:  So it's Exhibit 49 to your what?

1          MR. SILVERSMITH:  Motion to compel.

2          So we used all the consecutive --

3          THE COURT:  Yeah, I know.  I got it.  I --

4     Yes.

5          MR. SILVERSMITH:  So -- And if you -- When we

6     entered this case, we saw that protective order and we

7     began asking around, sort of what was produced pursuant

8     to the protective order, and we ultimately stumbled

9     upon a couple hearings from around the date of the

10    protective order, and it became clear that the only

11    thing that was produced pursuant to a protective order

12    were a handful, if you read Mr. Rosenthal's testimony,

13    or his statement to the Court, a big fat binder, and

14    the prosecutor says, "Well, it's not really that big

15    and fat," but a binder of witness statements.

16         Beyond that, the only other thing that we've

17    been told has been produced pursuant to a protective

18    order, and the only other protective order that we can

19    find that's signed, is the statements from Mr.

20    Ditiatkovsky.

21         So it's our view that if the Court would say,

22    "Those items can be designated as confidential, and

23    everything else that was produced in the criminal case

24    doesn't need to be designated" --

25         THE COURT:  The Government views it

1    differently, and why is it wrong to say that, "Well,

2    it's certainly one factor to consider, whether or not

3    the documents were produced in the criminal case

4    pursuant to a protective order or side confidentiality

5    agreement?"

6              It shouldn't be, you know, determinative in

7    this case.  The mere fact -- Certainly the fact that it

8    was put up on the public docket in the criminal case,

9    well, that would seem to resolve the issue.  If you can

10   demonstrate that there are other documents that are

11   just -- have gotten out there, well, then that

12   potentially could resolve the issue.

13             But why is it the mere fact that the

14   Government, in the criminal case, provided documents to

15   the criminal attorneys without any agreement about, you

16   know, confidentiality, but they've never made it into

17   the public domain, nevertheless, they do contain what

18   would otherwise be seen as Privacy Act protected

19   information.  Why shouldn't that information remain

20   protected?

21             So, it's not whether or not there was a

22   protective order in the criminal case, it's whether or

23   not it contains what would otherwise be considered

24   Privacy Act protected information, or confidential

25   information, and there are other issues in this case

1    that you're aware of, --

2              MR. SILVERSMITH:  Right.

3              THE COURT:  -- and -- whether it's in the

4    public domain.

5              Why isn't that the analysis?

6              MR. SILVERSMITH:  Well, I --

7              THE COURT:  You keep wanting to focus on

8    protective order and confidentiality agreement.

9              MR. SILVERSMITH:  Because, you know, Mr.

10   Lazarenko and his lawyers tell us that they did

11   disseminate this, and his concern is, and you can say

12   rightfully or wrongfully, is that he's on supervised

13   release, and now all of the sudden the document's going

14   to surface that's been designated by the Government as

15   confidential in this case, was not designated, and he's

16   going to have to explain that.

17             THE COURT:  Well, presumably that any

18   documents that are produced in this case under the

19   protective order would have the legend at the top and

20   the bottom, so the first question will be, if -- in the

21   unlikely scenario that we have some issue over what

22   you've just described, it's going to be whether or not

23   that document is stamped, or does it appear to have

24   come from the prior litigation, knowing that that's how

25   these documents were disclosed.  I mean, again, I don't

1  think that anyone is going to -- they're certainly

2  going to look closely at that before accusing your

3  client of doing something in violation of the Court's

4  protective order in this case, --

5          MR. SILVERSMITH:  I mean, I would hope --

6          THE COURT:   -- but nevertheless, beyond that,

7  and I hear you on that.  I mean, there are legitimate

8  concerns here, given the nature of these documents, and

9  why isn't the best approach what the Government

10  suggests, which is just to keep this case moving, let's

11  go ahead and designate what on its face appears to be

12  Privacy Act protected information.

13          If you all have some view, once you run it by

14  your client, that, "Look, this stuff is already out

15  there," then negotiate it.  I'm sure the Government

16  will be reasonable about that, and if you're not, then

17  bring it to the Court's attention and we'll resolve it

18  that way.

19          MR. SILVERSMITH:  And that's fine, but just

20  so the Court's aware, we didn't get a draft of the

21  protective order that allowed designation on a page-by-

22  page basis.  You know, it wasn't like someone was going

23  to have to sit there and stamp it in this electronic

24  era, I mean, you just put it in the Bates range, but

25  the Government wouldn't agree to do that until the end

1    of January.

2              THE COURT:  Yeah, but they did.

3              MR. SILVERSMITH:  But they did.  No, I agree,

4    but --

5              THE COURT:  No, we're not -- you're not going

6    to get anywhere on that.

7              MR. SILVERSMITH:  But I just wanted you to

8    know.

9              THE COURT:  I mean, ultimately there's

10   something that happened in January and February.  I

11   don't understand it, but it's unfortunate, and maybe

12   both parties should be blamed for it, but it's -- it is

13   unfortunate that here we are when -- in May, and we

14   just --

15             MR. SILVERSMITH:  In May, and we don't have

16   the records.

17             THE COURT:  We don't have -- You have a lot

18   of records.  You don't have all the records, but the

19   Government has been willing to produce them for some

20   time now, and it just has led to a whole series of

21   other, we'll see by the end of this hearing, I think

22   just other issues that this has caused, and I think

23   that's very unfortunate, and I would hope that the

24   parties, you know, will negotiate in good faith going

25   forward, especially about these issues, disputes about

1   whether or not something is in the public record, in

2   the public domain or not.

3          So, I mean, that's -- Again, I don't think

4   any of this needs to be in the protective order but,

5   you know, given our discussion here today, that is --

6   you know, what is and is not, you know, should be

7   marked by the Government.

8          You know, my view of it is that if it appears

9   to be Privacy Act protected, otherwise confidential

10  information, and the Government, you know, has no

11  reason to believe that it's not in the public domain,

12  then it should be marked as, you know, protected under

13  the protective order, and if you, the Claimant, your

14  client disagrees with that and has some basis for it,

15  then there's a provision in the agreement to deal with

16  that.

17         As for the burdens, I'll hear you on that.  I

18  mean, again, I see the cases.  There -- Certainly,

19  there are cases out there.  I don't think it's crystal

20  clear that -- exactly, that that issue has been decided

21  across the circuits, as to who bears the burden.  I

22  think the facts of this case suggest to me that there

23  should be a shared burden, given what's at issue.

24         Your client's own bank records, which, you

25  know, I mean, how is the Government ever going to

1    figure that out, and they've tried, and given your

2    client's knowledge of what's out in the public domain,

3    and possibly internationally, and in another language

4    that he speaks and the Government does not.

5             MR. SILVERSMITH:  Just with respect to the

6    bank records, and we did answer the interrogatories to

7    the best of our ability, but we can't sit there and say

8    every account number and every account he opened.

9             We filed a claim.  We've identified --

10            THE COURT:  We'll come to that.

11            MR. SILVERSMITH:  Okay.

12            THE COURT:  We'll come to that.  I don't want

13   you to speed ahead.  I mean, I don't -- I'll just give

14   you my quick, I mean, the Claimant's responses to the

15   interrogatories are, you know, not sufficient, so --

16   but it does appear that he wants to see all of his

17   records first, and I think that's a fair request, given

18   the complexity of these financial structures, given the

19   amount of time that has passed.  So I think ultimately

20   we're heading towards the schedule of we're going to

21   enter into (phonetic) this protective order, we're

22   going to have the Government produce the documents that

23   it's been trying to produce for months now, and then

24   we're going to have to have a do-over, effectively, on

25   some of this discovery.

1          We'll go through the Government's motion to

2     compel -- I'm sorry, your client's motion to compel,

3     because I think the Court will need to rule on that and

4     then give further guidance to the parties, as well, but

5     I think we need to move on to the other motions.  Just

6     -- I'll hear you.

7          Again, my view is that based on the hearing

8     here today, we don't need to further define what is and

9     is not protected.

10         Do you want to be heard on the OPM's

11    definition of PII?

12              MR. SILVERSMITH:  No, we're fine on that.

13              THE COURT:  You're fine with that, right?

14              Okay.  I would hope.  Okay.

15              MR. SILVERSMITH:  There is one other issue.

16    I assume this can ultimately be subsumed and taken up

17    at a later time, but because Mr. Lazarenko has

18    proceedings in the Ukraine, proceedings in Antigua and

19    so forth, I mean, there may come a time that he needs

20    the records.  I assume, given the way the Court's

21    ruling, I understand that we may have to come back,

22    that's just --

23              THE COURT:  Right.  I think you'll have to

24    come back.  I mean, I just think based on the record

25    right now, I mean, it's not -- I think the law says

1    that there's nothing that necessarily would preclude a

2    Court from allowing that to happen, but it's not a, you

3    know, a right that you have either.  So I -- It's just

4    -- There's not enough record here for the Court to

5    decide up front on the protective order, but if an

6    issue like that comes up and you can't get agreement

7    from the Government, then bring it to the Court and

8    we'll try to resolve it, because I understand he's got

9    other actions around the world.

10            MR. SILVERSMITH:  Thanks.

11            THE COURT:  Okay.

12            So I will hopefully, certainly by the end of

13   this week, will be entering in the protective order,

14   which will largely track the protective order which was

15   suggested by the Government.  I've got to make a few

16   changes, at least the version I've seen, there's some

17   paragraph issues, some changes that seem to have been

18   made that weren't carried through, so I'll make a few

19   minor changes to it, but -- and then we can talk once

20   -- at the end of the hearing, what that means for the

21   rest of the schedule.

22            So with that, let's go then to the Claimant's

23   motion to compel.  This is his first motion to compel.

24            MR. SILVERSMITH:  Thank you, Your Honor.

25            I think it would help if I clarify

 1     essentially what we've received so far.

 2               THE COURT:  Sure.

 3               MR. SILVERSMITH:  I know you've received some

 4     of our letters.

 5               THE COURT:  And let me just say, I mean, so

 6     you might have just an opening statement here, which it

 7     sounds like you're prepared to give and I'm happy to

 8     hear that but, I mean, I really do think that we're

 9     going to have to run through these one by one, and it

10     probably makes more sense to have some back and forth

11     with regard to each request, but if you have something

12     overall that you want to state, please do it now.

13               MR. SILVERSMITH:  Oh, sure.

14               I mean, we sent the Court a copy of exhibit

15     --  what's now Exhibit 112, it was our May 1st letter,

16     and essentially outlined all the records that had been

17     produced to date, and although there are 100,000 pages

18     of records, it should be clear, and we don't feel that

19     we have all the discovery from the criminal case,

20     30,000 pages were the trial transcript, which we

21     already had.  Another 30,000 pages were the deposition

22     transcripts, and the way they printed, actually it's

23     only about 15,000 pages, every other page is blank but,

24     you know, the Government gave them to us.  We had most

25     of those, as well.  We were missing two or three, and

1   evidently they're missing some, as well.

2          Then there was sort of this large production,

3   which appears to be essentially -- Well, then they gave

4   us the admitted trial exhibits.  You know, our concern

5   there is it appears that a few of the translated

6   exhibits have been pulled out.  Whether that was -- Why

7   that was done, I don't know, but some of the most

8   critical translated documents, like Directive 1033, if

9   you've read our third motion to compel, we talk about

10  that.  If you haven't, it's just -- it's an important

11  document that wasn't produced in English.

12         So, in addition, the Government --

13         THE COURT:  I mean, I'll hear the Government

14  on that, but my -- at least my initial view is that if

15  they have translations, they need to provide it to you.

16  They don't have any obligation to translate these

17  documents if they haven't done so already, but

18  preexisting translations, they should be providing to

19  you, --

20         MR. SILVERSMITH:  And that's our --

21         THE COURT:  -- but I'll hear them on that.

22         MR. SILVERSMITH:  -- position too.  It's just

23  that not all of the translations were there.

24         And then, as we've explained in our letter,

25  there were, you know, I guess, 500 trial exhibits, my

1   math might be off a little bit, and another 300 that,

2   you know, I called them "identified exhibits," things

3   that the Government attempted to introduce at trial but

4   the judge didn't let in.  The Government's only

5   produced about half of those.

6           And then sort of the last -- Well, there have

7   been a few more productions.  We got one production

8   that contained 60,000 records.  That was sort of the

9   first production made in the criminal case, and then we

10  received two additional productions of bank records.  I

11  think one we received and opened, and one came

12  yesterday, and it was encrypted, so I have to have my

13  security people unencrypt it for me.

14          The overriding concern we have with the way

15  the documents have been produced, is that they're not

16  being produced in the way they were produced in the

17  criminal case, which was single page .tif files that

18  were labeled by the Bates label.

19          So, in the criminal case, the Government used

20  what we thought was a pretty helpful Bates labeling

21  system.  So if records were from the Ukraine, they

22  began with an A, A-1 to A-100,000; B were records from

23  the United States; C was Switzerland; D was Poland, and

24  then once you move all the way out -- it goes all the

25  way up to X, and they got a lot of records from a lot

1  of places.

2          When they produced the records in the

3  criminal case, based on what we have, which is we have

4  sort of a skeleton of what was produced, it appears,

5  and we've talked to Ms. Tsykova, who is Mr. Lazarenko's

6  wife, who at that time was a paralegal on the team, the

7  Government produced single-paged .tif files, and each

8  .tif file had the Bates number, so, you know, A-1, A-2,

9  A-3, and it actually was pretty helpful because when

10  you read through the depositions, they're usually

11  referring to the deposition exhibits by the Bates

12  numbering that's used there.

13          In this case, I don't know why the Government

14  did it, I think they wanted their own internal tracking

15  system, they renumbered everything, and essentially

16  what they did --

17          THE COURT:  And the old Bates number is not

18  there?

19          MR. SILVERSMITH:  Well, it's there but it's

20  not searchable by that Bates number.

21          THE COURT:  Why not?

22          Because it's a .pdf?

23          What do you mean?

24          MR. SILVERSMITH:  It's a .pdf.  So instead of

25  giving us the single-page .tif files, and then there's

1      a --

2                    THE COURT:  I'm sorry.  You have to -- I

3      don't know what that is.

4                    MR. SILVERSMITH:  Okay.

5                    Single-page files.  Each page was a separate

6      part of the document.  So if it's a ten-page document,

7      it's ten single files, and then they give you what's

8      called a "load file."  It allows the computer to figure

9      out Document 1 starts here, Document 2 starts here --

10                   THE COURT:  They gave you .pdf's?

11                   MR. SILVERSMITH:  They gave us the .pdf's.

12                   THE COURT:  You can't convert the .pdf's into

13     .tif files?

14                   MR. SILVERSMITH:  No.

15                   And even if we could, we couldn't name them

16     -- use the same naming system that was used in the

17     original case.

18                   So what would really help us is if we could

19     just the records that were in the original .tif format,

20     and that would allow --

21                   THE COURT:  That's how they were originally

22     produced?

23                   MR. SILVERSMITH:  That's how they were

24     originally produced.

25                   THE COURT:  Well, they may not have them, but

1    I -- let's -- this is a good example.  Just so that

2    this issue, since it's important to you, is not lost,

3    I'd like to hear from the Government on that.

4                MR. SILVERSMITH:  And --

5                THE COURT:  Right now.

6                MR. SILVERSMITH:  Okay.

7                MR. CLAMAN:  Thank you, Your Honor.

8                And we agree that this is the kind of thing

9    that we can address in a kind of very practical way.

10               With regard to the -- their format that the

11   records were produced, we thought that we were

12   producing them in the format that they would want.  The

13   original documents came in, of course, in paper, you

14   know, the course of the criminal case, to a large

15   extent, and they were imaged as individual .tif files,

16   individual image files.

17               The Government has gone to great lengths to

18   try and unitize those records, to try and say, "Okay,

19   well, these are all the same document.  These five

20   pages are one document," and it's been a rather

21   complicated, burdensome process --

22               THE COURT:  But you have the .tif files?

23               MR. CLAMAN:  We do.  We're happy to --

24               THE COURT:  So you could produce the .tif

25   files?

1          MR. CLAMAN:  And we're happy to reproduce

2     them to them.  We're happy to produce them --

3          THE COURT:  Has there been a exchange of

4     communications on this, because I've got to tell you,

5     this is an issue that frankly shouldn't rise up to the

6     Court.

7          MR. CLAMAN:  And --

8          THE COURT:  I mean, this is something the

9     parties should be able to work out because it's just

10    that simple.  So I don't know what's going on here that

11    you're not communicating, that an issue like that can't

12    be resolved, and frankly, I don't want to get into it,

13    but that's an issue that should be resolved without

14    having that take up five minutes of this hearing.

15         MR. CLAMAN:  We agree --

16         THE COURT:  So I understand that you -- you

17    are prepared to reproduce the documents in .tif files?

18    Yes?

19         MR. CLAMAN:  Yes, Your Honor.

20         We're also willing to produce the load files.

21    We gave them one set of load files which would allow

22    them to match up to the DOJ production number, which is

23    the way we're being able to track what we've actually

24    given them, give them the record that they haven't,

25    over the years, been able to maintain some of the

 1  record.  We want to make sure that we know what we've

 2  given them so everybody knows what came from us, and

 3  we're -- we've talked with our IT people and we can

 4  give them the load files that will allow them to search

 5  by the A number or the B number.

 6       We do believe that given the optical

 7  recognition technology that's out there, any system

 8  that they would have loaded their .pdf's into today

 9  would have allowed them to do the same thing.

10            THE COURT:  Okay.

11            MR. CLAMAN:  So --

12            THE COURT:  In any event, --

13            MR. CLAMAN:  But we're happy to do that.

14            THE COURT:  -- you're prepared to produce the

15  .tif files and you'll do that, and the load files?

16            MR. CLAMAN:  Yes.

17            THE COURT:  Okay.  Thank you.

18            MR. SILVERSMITH:  And just so the Court

19  knows, we did bring this to the Government's

20  attention --

21            THE COURT:  Please come to the podium.

22       Again, I don't want to get into the back and

23  forth, but I've got to tell you, that's the kind of

24  thing that should just be resolved.

25            MR. SILVERSMITH:  We're --

1              THE COURT:  I mean -- Yes?

2              MR. SILVERSMITH:  So -- But that's fine.  I

3    mean, that's going to help us immeasurably.

4              THE COURT:  Okay.

5              MR. SILVERSMITH:  Second --

6              THE COURT:  And, I mean, resolved by just

7    calling on the phone.  I mean, I think you wrote a

8    whole letter about that.  How much -- You know, that

9    cost a lot of money.  Just pick up the phone and call

10   the Government and work this out.

11             And Government, be responsive.  When they

12   send a letter, respond to it.

13             MR. SILVERSMITH:  It's been our experience

14   that the phone conversations do not go as well as maybe

15   they should.

16             THE COURT:  Okay.  Well, hopefully after

17   today they will go better.

18             MR. SILVERSMITH:  And we appreciate that, and

19   we don't want to waste your time, so if the commitment

20   is there to produce the records, we're happy.

21             THE COURT:  Okay.

22             MR. SILVERSMITH:  So in terms of -- I mean,

23   they have produced a lot of records, but in terms of

24   the overall criminal discovery is we've explained -- As

25   an example, one of the documents we attached to our

opposition to their motion to compel, I think, is

Exhibit 118 or 119, which is a list of the missing

Suisse records.

So there are a lot of records that were

collected during the criminal case that we don't have.

Whether they were not produced in the criminal case

because they were deemed not to be Rule 16, or they

were simply not -- they were produced and lost, I don't

know.

THE COURT:  Could they be among the records

that they're still going to produce now, pursuant to

the protective order?

MR. SILVERSMITH:  They could be.

THE COURT:  Okay.  So it's --

MR. SILVERSMITH:  Right.

THE COURT:  Well, we can't -- Let's not waste

a lot of time until the Government has produced to you,

everything they think they have.

MR. SILVERSMITH:  So as we move through the

issues, I mean, the Government, in their discovery

pleadings to us, has repeatedly stressed, you know,

that Mr. Lazarenko was convicted of multiple counts,

and it's our view that the counts of conviction have a

small preclusive effect on this case, and we -- we've

briefed this, and I don't want to --

1          THE COURT:  Right.

2          MR. SILVERSMITH:  -- waste your time but, you

3    know, there is a case pending in the U.S. Supreme

4    Court, <u>Ocasio</u>, which could essentially invalidate the

5    remaining counts of Mr. Lazarenko's counts of

6    conviction.  We'd have to go back to the district court

7    in California to get a writ of coram nobis and, you

8    know, and we've said, for as many times as they've said

9    "collateral estoppel," we've said "85 percent," and

10   it's our view that there are a lot of open issues here

11   that, you know, Judge Jenkins issued a Rule 29 on a

12   number of these facts --

13         THE COURT:  You mean collateral estoppel

14   would be 15 percent?

15         MR. SILVERSMITH:  Right.

16         THE COURT:  Right.  I've got it.

17         MR. SILVERSMITH:  We're collaterally

18   estopped, arguably on 15.

19         THE COURT:  Right.  Right.  Right.

20         MR. SILVERSMITH:  And we would submit that

21   there's some issues we would want to explore to see

22   whether collateral estoppel should apply, but

23   nonetheless, certainly the Government has an argument,

24   and we'll see where we are.

25             But there's a lot of stuff that is --

1          THE COURT:  But the Claimant's not prepared

2     to enter into those sort of discussions right now with

3     the Government, over claim and issue preclusion in this

4     case, because I know the Government has attempted --

5          MR. SILVERSMITH:  Well, --

6          THE COURT:  -- and it sounds like you have

7     also, but you have different views about what there

8     should be claim and issue preclusion about.

9          MR. SILVERSMITH:  I think it's my Exhibit 47,

10    and I'll have to go check my notebook, but it lists the

11    list of stipulations the Government has given us, and

12    it's -- it really is incredibly bare-bones.  I mean, if

13    the Government would come to us with 60 pages of

14    stipulations and the back up to the records, we could

15    be in a position to stipulate but, I mean, the reality

16    is that the Claimant went to trial, he was Rule 29 mid-

17    trial.  I mean, I was a prosecutor for eight years.  I

18    never met anyone who was Rule 29 mid-trial, and the

19    Government's essentially trying to retry this case.

20          So, you know, it's our view that if we have

21    to retry the case at a lower burden with Mr.

22    Lazarenko's deposition, we should get all the discovery

23    we're entitled to in a civil case.  I mean, the term I

24    use around the office is that essentially what the

25    Government had done initially, and although now they're

being more responsive now that we filed our motion to

compel, was it seemed like they wanted to use the

criminal discovery, whatever was produced, because they

really didn't know what had been produced, depose Mr.

Lazarenko, enter into some stipulations, add water, and

boom, forfeit all his assets.

        And our feeling is we want to explore these

areas, particularly because there's a lot of other

facts outside of the criminal trial record, like the

things at the State Department, that suggest that there

are more exculpatory facts.

        THE COURT:  Has the Government actually

refused to produce documents on -- because of issue and

claim preclusion?

        I know that they've raised that issue, but

have they ever said, "Well, because of that issue

alone, we're not going to produce documents to you?"

        MR. SILVERSMITH:  Well, I think if you look

at their interrogatory responses and you look at their

request for production responses, they say that over

and over and over again.

        THE COURT:  Yeah, but I don't think that

they're actually refusing on that basis alone, to

produce anything.

        MR. SILVERSMITH:  They haven't --

1          THE COURT:  Maybe I'm wrong about that, you
2    tell me, but --
3          MR. SILVERSMITH:  In the --
4          THE COURT:  -- I haven't seen that.
5    They're --
6          MR. SILVERSMITH:  They haven't produced -- I
7    mean, they have produced a large number of records, --
8          THE COURT:  Yeah, they have.
9          MR. SILVERSMITH:  -- but they haven't
10   produced -- I mean, look, they gave us a copy of the
11   trial transcript when we already had it, is not -- and
12   we didn't have it the day we entered the case and they
13   sent it to us, but when we went out to California we
14   got a copy.
15         THE COURT:  Right.
16         MR. SILVERSMITH:  That -- I mean, on the one
17   hand we appreciate it.  On the other hand, that's not
18   all that helpful.  What we need are the records we
19   didn't get in the criminal case.  The difference -- The
20   space between the Rule 26 discovery and the Rule 16
21   criminal discovery, that's what we're looking for.
22         So, anyways --
23         THE COURT:  Well, I thought you were also
24   looking for the documents that were actually produced
25   in the criminal case, but were not used at trial, --

1              MR. SILVERSMITH:  And those, as well.

2              THE COURT:  -- and which, you know --

3              MR. SILVERSMITH:  Which is a substantial

4    number of documents.

5              THE COURT:  Right.

6              MR. SILVERSMITH:  But beyond that, there are

7    some criminal discovery records that were not produced

8    in the criminal case.

9              As an example, grand jury materials.  We

10   asked for the evidence log.  I realize that that's

11   slightly different, that's an evidentiary issue, but we

12   think that's going to help us sort of cipher through

13   the records.

14             We're asking for the MLATs.  We're asking for

15   certain records from the State Department, and

16   obviously it's very hard to sit here and define what

17   records are at the State Department, we can only do it

18   by topic, and we know the State Department doesn't move

19   fast because they have to review all of Hillary

20   Clinton's emails.  This has been in the paper.

21             But, you know, we're not asking -- The

22   Government keeps saying we're asking for a lot, but

23   we're actually asking for a lot less than was produced

24   in -- requested in the criminal case.  I know that may

25   sound strange, but in a criminal case, the Government

1    -- I'm sorry, the -- Mr. Lazarenko's defense team was

2    asking for a large number of records that dealt with

3    what he called "wealth-gathering" of other Ukrainian

4    political officials.  We haven't asked for any of that.

5         The Government -- Sorry, Mr. Lazarenko's team

6    in 2000, 2004 was asking for every communication

7    between the Ukrainian government and the U.S.

8    Government about Pavel's prosecution.

9         Now, we did put that in our request for

10   production, but we didn't motion to compel on it.

11        So, you know, we think that, yeah, we're

12   asking for a lot of information, but given the size of

13   this case, we're not asking for an unreasonable amount

14   of information.

15        Anyways, as we move on, with respect to the

16   various criminal discovery materials, I understand the

17   Government's going to produce those.

18        One item that they've refused to produce were

19   the grand jury materials --

20        THE COURT:  Okay.  I think we need to just go

21   through it.  I've just got them in order, so let's just

22   do it that way --

23        MR. SILVERSMITH:  That's --

24        THE COURT:  -- because we're going to talk

25   about each of these topics.

1          MR. SILVERSMITH:  Okay.

2          THE COURT:  If we do them in random order, we

3   won't cover everything.

4          MR. SILVERSMITH:  That's -- I mean, do you

5   want to direct me --

6          THE COURT:  So I have -- Well, I have your

7   Request Number 1, and it's not clear to me if this is

8   in dispute or not at this point.

9          Request Number 1, this is Document Request

10  Number 1, speaks of:

11              "All documents known to the Plaintiff which

12              in any way relate to the facts and

13              allegations asserted in the Amended

14              Complaint."

15          There's some statements in the briefs in the

16  case that Mr., you know, Lazarenko has limited this

17  request to all records obtained during the criminal

18  investigation but that have not been produced.  Also,

19  statements being made that these -- and provided that

20  the Government responds to all the rest of the

21  requests, that effectively that will satisfy this

22  request.

23          MR. SILVERSMITH:  That's our position, so --

24  and it sounds like we're moving in that direction, so.

25          THE COURT:  All right.

1              So I'm not going to spend anymore time on

2       this request then.  Let's get to the other ones that

3       seem to matter.

4                    I've got Request Number 2.  This request is:

5                    "All documents and exhibits Plaintiff intends

6                    to use at trial of this matter."

7              MR. SILVERSMITH:  You know, when we entered

8       this case --

9                    THE COURT:  It seems premature.

10             MR. SILVERSMITH:  It is except, as we've

11      said, we want to get the discovery before the close of

12      the trial.  We're -- So we're not asking them to mark

13      trial exhibits, but remember, when we entered this

14      case, they had sent us letters saying, "We've given you

15      130,000 records," and that was it, and they had -- that

16      was their response to our request for production.  So

17      they had not backtracked from that commitment, or they

18      have not backtracked from that statement, and it was

19      our view that we wanted to get all the discovery ahead

20      of time, so to the extent that this falls within that

21      request, and that's why we were requesting it.

22             You know, we know they don't have to identify

23      trial exhibits now, and we're not asking them to do

24      that.

25                   THE COURT:  But any -- That you don't want

1    later in time to be told there's a trial exhibit that

2    has not otherwise been produced in this case; is that

3    right?

4              MR. SILVERSMITH:  That's right.

5              THE COURT:  Okay.  All right.

6              Well, I don't --

7              MR. SILVERSMITH:  I mean, --

8              THE COURT:  I'll hear from the Government

9    real quick on that.  I don't know if they disagree with

10   that.

11             So it sounds like with regard to Number 2,

12   they're not requesting, you know, your trial exhibits

13   identified as such, that would be premature, but they

14   want to make sure that anything that the Government

15   intends upon using at trial is produced in discovery in

16   this case.  Doesn't have to be marked as a trial

17   exhibit.

18             MR. CLAMAN:  Right, Your Honor.  That's what

19   we understand as well, and that's what we understood

20   from our meet and confer session with them in December.

21   We understood that this one was essentially not a

22   subject that they were going to move to compel on, nor

23   do we think that it's appropriate for them to move to

24   compel on it now.

25             Frankly, as we indicated in our briefing, we

1    think the whole motion to compel was premature,

2    particularly in light of the December 16th meet and

3    confer where we did discuss some of these issues, and

4    which ones were ripe now, and which might be ripe later

5    on, and there are whole swaths of different document

6    requests that they essentially withdrew, or said they

7    were covered by other requests, and so we think that

8    this is -- this was -- this is also at a time when we

9    were negotiating the protective order, and when we were

10   putting forth drafts and not getting responses on the

11   drafts, and goal post seemed to us to be -- to moving

12   -- to be moving with respect to the protective order,

13   and it seemed that the motion to compel itself was, you

14   know, it was less than a month after -- or right around

15   a month after our meet and confer, and we had agreed,

16   you know, during the meet and confer, and frankly in

17   our responses to their request for production, to

18   produce a lot of materials, but we had to go through a

19   lot of it in order to produce it, and here we are

20   having produced now 100,000 pages, and something like

21   130 videos, and we're arguing about whether or not

22   we're going to some day in the future not have produced

23   something for a trial exhibit.

24            It seems that this exercise has only delayed

25   the process, but with respect to Number 2, we would

1    anticipate that we would provide documents in advance

2    of trial, in discovery.

3           THE COURT:  Well, there will be a time that

4    is set by the Court, probably by Judge Friedman, as to

5    when the trial exhibits will be identified in this

6    case, but I just wanted to make sure that it's clear

7    that my understanding from the Claimants is that what

8    they want to have happen is that they want to make sure

9    that anything that the Government intends to bring --

10   use as a trial exhibit in the case, is produced at some

11   point in discovery.

12          MR. CLAMAN:  I think at this point --

13          THE COURT:  That's what's the -- That's what

14   they're trying to capture with this request.  They

15   don't want to know 30 days before trial that, "Hey,

16   here are ten documents," they've never seen before,

17   because you'll come back and say, "Well, you just

18   didn't ask the right question."  They would say they

19   did ask the right question.

20          MR. CLAMAN:  Well, Your Honor, I --

21          THE COURT:  So, to just agree with that, that

22   you -- the Government agrees that they will produce the

23   documents that they anticipate using as exhibits at

24   trial at some point in discovery.  Again, they don't

25   have to be marked as such, --

1          MR. CLAMAN:  Uh-huh.

2          THE COURT:  -- but that -- you understand

3    that that's what this request is trying to get at?

4          MR. CLAMAN:  We do understand that that's

5    what the request is.

6          At the same time, if they don't ask for it,

7    and they're asking for it in sort of a very vague and

8    sweeping way, and it -- and we come across impeaching

9    evidence of one of their witnesses, that they provide

10   to us, --

11         THE COURT:  Well,  I don't think it

12   includes --

13         MR. CLAMAN:  -- it's kind of hard for us

14   to --

15         THE COURT:  I don't think it includes

16   impeachment material.  So if you're thinking about

17   impeachment material, I don't read this -- when they're

18   talking about trial exhibits, I would not include in

19   that, impeachment material, which you don't have to,

20   you know, produce under Rule 26, at least early in the

21   case.

22         MR. CLAMAN:  Okay.

23         THE COURT:  So with the exception of that

24   though, documents that the Government's intent, as it

25   stands here today, to use as affirmative evidence at

```
 1    trial, should be produced during discovery.

 2            MR. CLAMAN:  We don't have a --

 3            THE COURT:  They should not wait until Judge

 4    Friedman sets a date for identification of trial

 5    exhibits.

 6            MR. CLAMAN:  We don't have a problem with

 7    that, Your Honor.

 8            THE COURT:  Okay.  Thank you  All right.

 9            Let's go on to Number 3.  My understanding,

10    this one has been withdrawn.  This deals with any

11    depositions that Plaintiff plans to introduce at trial.

12    So I think that one has been withdrawn --

13            MR. CLAMAN:  Yes.

14            THE COURT:  -- and you're attempting to

15    negotiate, narrow, or something.

16            MR. SILVERSMITH:  I mean, essentially this

17    will come up again, so we can address it --

18            THE COURT:  All right.

19            If it's withdrawn?

20            MR. SILVERSMITH:  This specific request is

21    withdrawn.

22            THE COURT:  Okay.  Great.  Let's then move

23    on.

24            Number 4.  Now:

25            "Grand jury transcripts for any witness
```

1          testifying about the subject matter of the

2          Amended Complaint."

3          You also have a related request:

4          "All records that Plaintiff obtained by the

5          grand jury subpoena, as part of the

6          Government's criminal investigation."

7          MR. SILVERSMITH:  Mr. Comisky is going to

8   argue this.

9          THE COURT:  That's fine, I'm just -- but I

10  think there are a number of related requests here, so I

11  see this as covering Number 4, Number 5 --

12         MR. COMISKY:  Your Honor, can I --

13         THE COURT:  Those two.  So essentially

14  it's --

15         MR. COMISKY:  Can we -- Can we do --

16         THE COURT:  -- grand jury documents,

17  including transcripts and documents obtained by --

18  through the grand jury process.

19         MR. COMISKY:  I asked to speak on this

20  because we just briefed this in another case, as well,

21  so I'm somewhat familiar with this issue.

22         So, the issue here is a little different than

23  normal, Your Honor.  The grand jury material, to a

24  large extent, has already been turned over.  It's been

25  turned over to the Government pursuant to a statute

1    that doesn't get used very much, called "18 U.S.C.

2    3322."

3            THE COURT:  Right.

4            MR. COMISKY:  That statute's got a lower

5    burden than particularized need, and in another case

6    where we just filed pleadings on Friday, the Government

7    -- subject to confidentiality orders, the Government

8    turned over the documents they got pursuant to 3320 --

9    some of the documents they got pursuant to 3322.

10           THE COURT:  Without going back to the --

11           MR. COMISKY:  Without going back to the grand

12   jury --

13           THE COURT:  -- the Court --

14           MR. COMISKY:  Right.

15           THE COURT:  -- that's responsible for that

16   grand jury.

17           MR. COMISKY:  And the Government's taking a

18   different position here.  We don't read --

19           THE COURT:  What -- When you say "the

20   Government," who -- Was that an asset forfeiture case?

21           MR. COMISKY:  No, it was a case involving a

22   different -- 3322(b) as opposed to 3322(a).

23           THE COURT:  Okay.

24           MR. COMISKY:  There's two pieces of the

25   statute.  (b) covers financial regulatory agencies,

1    purportedly.

2              THE COURT:  So which part of the Government

3    provided your client with those records in that case?

4              MR. COMISKY:  It was a Government agency

5    which is being represented by Assistant U.S. Attorney's

6    Office, Southern District of New York.

7              THE COURT:  Okay.  What was the -- Oh, I'm

8    sorry.

9              Can you not tell me what the Government

10   agency was?

11             MR. COMISKY:  Financial Crimes Enforcement

12   Network.

13             THE COURT:  Okay.

14             MR. COMISKY:  And they got a 3322(b) order,

15   not an (a) order, and again, this document is pursuant

16   to a confidentiality agreement in that.

17             The Government's reading of 3322 here, is

18   that they can get it, they can use it, but they can't

19   give it to us.  That doesn't make a lot of sense to us.

20   It seems to be whatever they got on their 3320, they

21   got pursuant to the forfeiture disclosure, and whatever

22   they've used pursuant to the forfeiture disclosure,

23   which is grand jury material, ought to be available to

24   us.  We shouldn't have to go back to the grand jury

25   judge to get it.  That's the -- The position is that

1    simple for the grand jury material they have at the

2    moment.

3           If they had -- If there's material they

4    didn't get out of the grand jury, or they -- it's

5    different, but anything they got under 3322, it should

6    -- I -- we don't read that -- There's no legislative

7    history.  There's very little case law.

8           THE COURT:  Well, that's my question.

9           Do you have any case that says that?

10          MR. COMISKY:  There's no case law in this.

11   It's going to get litigated in the other case, and

12   happily, we're bringing it up here.  There is not case

13   law on this.

14          In fact, the Government has -- in their asset

15   forfeiture manual, it's not clear even if they could

16   use the material, and the manual by the prior director

17   of the asset forfeiture section took the position since

18   there's nothing around -- but whether we can use it, it

19   makes sense that we can use it because why would they

20   give it to us, we can't use it?

21          So I didn't --

22          THE COURT:  But it also indicates that they

23   -- I thought -- Isn't it in there, that it's not as if

24   they can turn it over to, well, --

25          MR. COMISKY:  I think that's --

1          THE COURT:  -- someone like in the position

2    of your client --

3          MR. COMISKY:  But the --

4          THE COURT:  -- without seeking --

5          MR. COMISKY:  No, because it's an asset

6    forfeiture manual.  It's something for -- that they

7    drafted for the, you know, for the department.

8          You know, they took, in my view, an

9    especially aggressive position that, "We can use it.

10   We can keep it.  We don't have to give it to anybody."

11   But it's not -- It doesn't seem that the statute

12   supports that.  It seems to me if an agency gets grand

13   -- material out of the grand jury and they can use it

14   publically to support an asset forfeiture complaint,

15   which is what, you know, we assume happened here, and

16   the -- and certainly by the Amended Complaint, and

17   maybe before they had information released, it ought to

18   be available to us without going back to the grand jury

19   judge.

20         Again, we have found no case law covering

21   this.

22         THE COURT:  Well, there's one case from Judge

23   Cooper, Landis.

24         MR. COMISKY:  It didn't really --

25         THE COURT:  I don't know if it's the same

 1    statute, but I thought Landis certainly has at least a

 2    comparable factual scenario where the Government had

 3    certain grand jury records which it had received in a

 4    civil case, and though, and we'll get the position from

 5    the Government here, didn't really, you know, wasn't

 6    going to stand in the way --

 7              MR. COMISKY:  Right.

 8              THE COURT:  -- of the Claimant in that case

 9    getting those records, but the question is, "Does this

10    Court have power to just make that happen?", and Judge

11    Cooper was of the view that, no, it does not, that the

12    Claimant in the case, who sought access to those

13    records, needs to go back to the jurisdiction where the

14    grand jury is sitting and seek permission from the

15    court.

16              Judge Cooper also stated on the record in

17    that case, and in that decision, his view that

18    certainly you should have everything that the

19    Government has, and that would be my view, as well, but

20    I just don't think I have the power to allow that to

21    happen.  I think that that's a question that you have

22    to address to the court in California.

23              I want to get the Government's view here. I

24    don't -- I want to find out --

25              MR. COMISKY:  Let me get the --

1            THE COURT:  -- if they will oppose you in any

2    way if you seek relief from the court out in

3    California, but I think that's where you need to go.

4            MR. COMISKY:  Let me, if I may, just finish

5    up, please.

6            The Second Circuit insider trading case

7    involving the Galleon Enterprise Hedge Fund, the Second

8    Circuit has a recent decision which we cited, which is

9    in our papers, at least I believe it's in our papers,

10   I'll check in a minute, which said that -- there, it

11   was wiretap information, and it was wiretap information

12   turned over -- it was the opposite.

13           The information was turned over by the

14   Government to the defense, and the SEC wanted it, and

15   despite the fact that it was confidential information

16   on a wiretap, which would not otherwise be disclosable,

17   the Second Circuit held once it got disclosed once, the

18   SEC could get it.

19           We think this is analogous.  They got it.

20   They used it.  We don't think we have to go back to the

21   grand jury judge, but if they're not going to oppose a

22   Rule 16 motion, that might be the shortcut answer to

23   get this done.

24           THE COURT:  Tell me, I would love to get the

25   name of that case because I'll look at it after the

1    hearing.

2              MR. COMISKY:  It's R-A-J-A-R-A-T-N-A-M.

3              THE COURT:  Do you have the cite?

4              MR. RHYNHART:  It's cited in our reply.

5              MR. COMISKY:  Do you have it?

6              MR. RHYNHART:  I'll pull it up.

7              THE COURT:  If you could, get me the cite

8    before you leave.

9              MR. COMISKY:  Yeah, we'll give you the cite.

10             THE COURT:  Okay.

11             MR. COMISKY:  It's in our reply brief.

12             THE COURT:  Can I just --

13             MR. COMISKY:  Yes.

14             THE COURT:  Can I just hear from Government

15   counsel, because we may be able to resolve this

16   question quickly if the Government is not --

17             MR. CLAMAN:  Yes, Your Honor, I --

18             THE COURT:  -- going to oppose your motion in

19   California.

20             MR. CLAMAN:  I'm sorry.  Yes, Your Honor, and

21   I apologize.  I was trying to -- We haven't really had

22   a whole -- much of an opening in our -- We objected to

23   this, consistent with the tail end -- or a case that

24   Your Honor cited.  We did tell the Claimants that they

25   needed to go to California to make their showing and to

1      -- and then -- and that was what they should do.  They

2      agreed to do that.  Nevertheless, less than a month

3      later they moved to compel, and then here we are.

4              We have since gone back, and even just

5      yesterday were able to confirm with the U.S. Attorney's

6      Office out in California, whether the scope of the --

7      of an existing order would allow us to disclose matters

8      to the Claimants, and we believe that we can withdraw

9      our objection on a grand jury basis, with respect to

10     this issue.

11             So, with apologies to the Court for not

12     getting this before you earlier, we do think that

13     subject to a protective order, and we believe a

14     protective order is necessary, particularly with

15     respect to grand jury testimony, because it goes to the

16     core function of the grand jury, that that should be

17     turned -- that would be something that we can turn over

18     to them without further order of the California Court,

19     but we do think it should be subject to a protective

20     order here.

21             THE COURT:  Okay.  So let me understand.

22             So you've spoken to the prosecutors in

23     California and what is this based on?  Do they have an

24     order from the Court in California --

25             MR. CLAMAN:  There is an --

1          THE COURT:  -- regarding grand jury material,

2    or what?

3          MR. CLAMAN:  There's an order for disclosure

4    to contractors that also includes sufficient -- that

5    order itself is under seal, but it includes sufficient

6    language so that we think we can disclose to the

7    Claimants in discovery here, and so we do think that

8    this is some -- an issue that we can take off the table

9    and move forward on without a further order out there.

10          We do think that there's going to be -- as

11    Claimants had indicated, that there's -- they have

12    received the vast majority of this stuff already.

13    Certainly during the course of the criminal trial,

14    people who testified in the grand jury, that also

15    testified at trial, would have -- they would have

16    received those statements, but we think that --

17          THE COURT:  Well, but there might be

18    statements in transcripts of individuals who did not

19    testify at trial, --

20          MR. CLAMAN:  That's true.

21          THE COURT:  -- that would not have been

22    Jencks, and it might not have been produced, and what

23    they're asking for is everything.

24          UNIDENTIFIED SPEAKER:  (Inaudible.)

25          MR. CLAMAN:  And --

1            THE COURT:  Right.  Okay.

2            UNIDENTIFIED SPEAKER:  (Inaudible.)

3            MR. CLAMAN:  And so --

4            UNIDENTIFIED SPEAKER:  (Inaudible.)

5            THE COURT:  Okay.

6            MR. CLAMAN:  And so we think that if it's

7    relevant to the issues in this case, that we can

8    produce it.

9            THE COURT:  Well, I just want to make sure

10   that they -- that the folks in California understand

11   the breadth of their request, which is -- I mean, they

12   want everything that you have, but if it -- if what you

13   have doesn't include the entirety of all the grand jury

14   transcripts, my understanding is that that's what they

15   want.

16           MR. CLAMAN:  And I guess, Your Honor, that is

17   a good point, and one of the challenges for us, in

18   responding to the breadth of their request, is they

19   don't ask for information that's related to the natural

20   gas scheme, they don't ask for information that's

21   related to EuroFed Bank, what they say is, "Give us

22   everything you've got in the grand jury" --

23           THE COURT:  No, about the subject matter --

24           MR. CLAMAN:  -- "Give us everything" --

25           THE COURT:  -- of the Amended Complaint.

1    That's what the request says.

2            So why is that unfair?

3            MR. CLAMAN:  Well, because it -- again,

4    they're trying to sweep the entire case, and --

5            THE COURT:  I don't -- You say that a few

6    times in your brief.  I don't -- You didn't cite a case

7    for that.  I don't know what you mean by "sweep the

8    entire case."

9            MR. CLAMAN:  I --

10            THE COURT:  I don't know if there's case law

11    that says you can't submit a discovery request that

12    sweeps the entire case.  I don't know that.

13            It's not unusual for people to say, "Provide

14    me with the," you know, "the documents that underlie

15    the allegations made in your Complaint."  That's not an

16    unusual request, --

17            MR. CLAMAN:  At the same time --

18            THE COURT:  -- and it might arguably sweep

19    the case, whatever that means.

20            MR. CLAMAN:  I guess what they are -- what

21    they're doing in their sort of very broad, "Where did

22    you get it from?" type of request, is that they are

23    seeking to uncover stuff that may not even be relevant

24    to the allegations in the Complaint.

25            A grand jury investigation --

1          THE COURT:  Well, let's just focus on this

2     one, because this one says:

3               "All grand jury transcripts for any witness

4               who testified about the subject matter of the

5               Amended Complaint."

6               It's hard to argue with that as being

7     overbroad.

8          MR. CLAMAN:  Okay.

9               Well, with that limitation certainly, you

10    know, if there's information in there --

11         THE COURT:  Well, that's the request.

12         MR. CLAMAN:  -- that it doesn't relate to --

13    There are other people that were investigated in the

14    course of this grand jury investigation, and if there

15    are other people in there, that are not -- that

16    wouldn't relate to the --

17         THE COURT:  Well, --

18         MR. CLAMAN:  -- subject matter --

19         THE COURT:  -- if its --

20         THE COURT:  -- of the Amended Complaint --

21         THE COURT:  Well, if it's -- if it relates to

22    the subject matter of the Amended Complaint --

23         MR. CLAMAN:  Uh-huh.

24         THE COURT:  -- that's their request, so

25    you'll have to make that decision.

1          MR. CLAMAN:  Uh-huh.

2          THE COURT:  But it's not just -- I don't know

3     what grand jury material you've received, but it's not

4     just the transcripts of everyone who testified at

5     trial, which frequently prosecutors --

6          MR. CLAMAN:  Right.

7          THE COURT:  -- have an obligation, and always

8     have an obligation to produce as <u>Jencks</u>, but then

9     there's always the situation where there might be some

10    witness who testified in grand jury but who never

11    testified at trial, but certainly they testified about

12    the subject matter of the investigation, and the

13    Claimant wants that material, as well.

14         So I'm just letting you know that that's the

15    breadth of the request and you should produce -- (a),

16    check with California and that you are authorized to

17    provide all of it, and make sure that you have all of

18    it because they want all of it, and I don't see why, if

19    you can have access to it, they can't, but I don't --

20    also don't believe I'm authorized to provide it to

21    them.

22         What you're saying is that you're taking it

23    off the table because you believe you are authorized,

24    given what happened out in California, to provide that

25    material to the Claimant in this case.

1          MR. CLAMAN:  Yes, Your Honor.

2          With respect to the issue of your authority

3    to disclose it, or order us to produce it, we do think

4    that that issue is off the table.

5          The other --

6          THE COURT:  Right, because I'm not ordering

7    that.  So if, in fact, you're wrong, --

8          MR. CLAMAN:  Uh-huh.

9          THE COURT:  -- I'm not authorizing that.  My

10   view is that you've got to go out to the Court in

11   California -- and one of the parties have to go out to

12   the Court in California to get authorization.

13          If you believe that you have otherwise

14   authorization to provide them to them, well, that's up

15   to you to decide.

16          MR. CLAMAN:  Okay, and --

17          THE COURT:  Okay?

18          You're taking it off the table so I'll leave

19   it at that.

20          Let's just quickly move to --

21          MR. COMISKY:  Your Honor, if I just

22   (unintelligible).  I just have one (unintelligible).  I

23   don't know if you can answer this.  The question is --

24          THE COURT:  If you'd just come to a mic

25   because nothing --

1           MR. COMISKY:  Yeah, I'm sorry.

2           Do you believe you've gotten -- you have

3    everything out of that grand jury, or do we need to go

4    to the grand jury judge separately, to make sure we're

5    getting everything?  That's what I need -- we really

6    need an answer to.

7           THE COURT:  Right.  I hear you.  That's what

8    I was trying to get at.

9           MR. COMISKY:  I don't know if you know the

10   answer to that.

11          MR. CLAMAN:  And, Your Honor, we don't.

12          In particular, with regard to transcripts, we

13   may not have had everything transcribed because of the

14   cost of transcription or something else, and so it may

15   not be that we actually have everything.  We can

16   produce what we have, but we can't produce what we

17   don't have, and so if --

18          THE COURT:  Okay.

19          Well, right now I see their request as

20   encompassing everything.  As I sit here now, I don't

21   see why they wouldn't be entitled to it.

22          MR. CLAMAN:  Uh-huh.

23          THE COURT:  I'm not ruling that, and right

24   now the position of the parties is this is off the

25   table, but you should speak to each other and figure

1    out the answer to that, and you may have to go out to

2    California to confirm whether or not everything has

3    been produced to you, and to the extent it hasn't,

4    well, then you've got to figure out, well, can you get

5    a copy of that, can the Government get a copy of that

6    and provide it to the defense under whatever authority

7    it's referring to, and if not, letting the defense

8    know, excuse me, the Claimant know that that's the

9    situation so that they can seek relief out in

10   California, oksy, which I believe is where -- I mean,

11   again, not ruling on it, but my view is that that's who

12   -- what needs to happen, is that if you want it, go out

13   to California and get it if you can't get it from the

14   Government.

15        MR. COMISKY:  That's why we (unintelligible)

16   today, that if we have to go out to California, is the

17   Government going to oppose our 6(e) motion?

18        MR. CLAMAN:  I would not anticipate that we

19   would.  You know, it depends -- If you're asking for

20   information that is not within the scope of the Amended

21   Complaint, if you're asking for, you know, a grand jury

22   vote and that sort of thing, certainly we would oppose

23   it.

24        MR. COMISKY:  I don't think we need a grand

25   jury --

1          MR. CLAMAN:  We don't think we're going to

2     get there, but I think we'll --

3          THE COURT:  I think you're going to be able

4     to work it out.

5          MR. CLAMAN:  I agree, Your Honor.

6          THE COURT:  Okay?  So then -- But why --

7     Well, you can have your seat, sir.  Let me just ask the

8     Government while you're sitting here.

9          So the next one deals with all documents

10    obtained by grand jury subpoena.  I assume that would

11    be encompassed within what we've just discussed.  I

12    mean, if you've got authorization to provide them with

13    transcripts, you believe you also have authorization to

14    provide them with all documents received in response to

15    the grand jury subpoenas in California; is that

16    correct?

17         MR. CLAMAN:  That's -- We believe so.  Again,

18    I'm going back to the language of their request, --

19         THE COURT:  It says, "All records that" --

20         MR. CLAMAN:  -- "that this is not limited" --

21         THE COURT:  -- "Plaintiff obtained by grand

22    jury subpoena as part of the Government's criminal

23    investigation of Mr. Lazarenko."

24         Okay.

25         MR. CLAMAN:  This, Your Honor, may be subject

1    to other objections as to relevance to our particular

2    Complaint.

3             THE COURT:  Well, okay.  What's -- You did

4    have an overbreadth objection.  Let's talk about that,

5    but before we do, assuming that we're able to resolve

6    that, you believe that the -- whatever authority you

7    have out in California provides you with the authority

8    to produce not only the transcripts, but documents that

9    were received in response to grand jury subpoenas; is

10   that correct?

11            MR. CLAMAN:  That's correct, based on my

12   conversations with the U.S. Attorney's Office out

13   there.  If -- I will take Your Honor's suggestion that

14   we go back and clarify with the U.S. Attorney's Office,

15   exactly the status of where we are here, and so if --

16   with your permission, I would like the caveat that if

17   that -- if, after that discussion, they think it's

18   insufficient, we would be willing to join in a consent

19   motion to try and clarify anything for the Court out in

20   California, with regard to our discovery obligations

21   concerning the facts in the Amended Complaint.

22            THE COURT:  Okay.

23            So let's just speak about the -- your

24   argument in Number 5 might be overbroad.

25            Would you be satisfied if there was an

1    additional clause to Number 5, which says something

2    like Number 4, about the subject matter of the Amended

3    Complaint?  Like, "And which are related to the

4    allegations in the First Amended Complaint"?

5            Some language to that extent?

6            MR. CLAMAN:  Yes, Your Honor.

7            THE COURT:  Okay.

8            Mr. --

9            MR. COMISKY:  Well, we're happy to

10   (unintelligible) in that fashion (unintelligible).

11           THE COURT:  Okay.  All right.

12           With that narrowing, does the Government have

13   any further objections to producing these records?

14           MR. CLAMAN:  I don't think so, Your Honor,

15   and we believe that we have produced the vast majority

16   of these records already.

17           THE COURT:  Right.  I would think you would

18   have already.

19           MR. CLAMAN:  And we -- Like I said, we've

20   produced 100,000 pages, --

21           THE COURT:  Okay.

22           MR. CLAMAN:  -- and the trial record really

23   consisted of about 30,000.

24           I guess to the extent that there are

25   transcription issues that come up with respect to the

1    grand jury testimony, or other costs associated with

2    that, we would expect that the Claimants would bear

3    those costs, if they're asking us to produce something

4    that we don't already have.

5            MR. COMISKY:  Let's find out (unintelligible)

6    some of the questions --

7            THE COURT:  So the --

8            MR. COMISKY:  -- (unintelligible) suggestion

9    that --

10           THE COURT:  -- the question is the cost of

11   transcription.  If there are additional transcripts

12   which the Government doesn't already possess, so it's

13   not just a copying fee, which the Government would

14   cover, but if there are transcription fees, and it's --

15   you know, grand jury transcripts are expensive, that

16   your client is prepared to pay for those?

17           MR. COMISKY:  They had to be -- They had to

18   have this stuff transcribed to use it in the criminal

19   case.

20           THE COURT:  Well, I don't --

21           MR. COMISKY:  It was transcribed.

22           THE COURT:  That's -- No, we're talking

23   about --

24           MR. COMISKY:  I know, but they

25   (unintelligible) lost it.  They lost the

 1  transcriptions.

 2          THE COURT:  No, no, no, no.  We're talking

 3  about, and we don't even know if this is what happened,

 4  but hypothetically, if there are transcripts of

 5  witnesses who were not called at trial, meaning grand

 6  jury witnesses who didn't show up as witnesses at

 7  trial, so the Government never transcribed their grand

 8  jury testimony, --

 9          MR. COMISKY:  Oh, no.  No.  (Unintelligible).

10          THE COURT:  -- and you want everything, then

11  you may have to pay the cost of transcribing those

12  records, those grand jury transcripts, which is not

13  inexpensive.

14          MR. COMISKY:  I understand.  They find

15  something that didn't get transcribed, --

16          THE COURT:  Right.  Right.

17          MR. COMISKY:  -- we're prepared to discuss

18  with them.

19          THE COURT:  Okay.  That's fine.

20          So now let's go on to Number 6, and while

21  you're standing here, let me just ask you regarding

22  that one, which is -- this is:

23              "All records that the Plaintiff obtained by

24              other process as part of the Government's

25              criminal investigation of Mr. Lazarenko."

1          So this is not really a grand jury issue.  I

2    think the Government is concerned of the overbreadth of

3    this.

4          Would the Government be satisfied if, like

5    with regard to Number 5, we add in an additional clause

6    that said, "And which are related to the allegations in

7    the First Amended Complaint"?

8          MR. CLAMAN:  I guess, Your Honor, with regard

9    to Number 6, and it's sort of similarly related to

10   Number 7, it's going to be very difficult for us to be

11   able to respond to these interrogatories because they

12   are so ill-defined.

13         There were, I think, something along the

14   order of 256 FBI 302s that were in the case.

15         There were all sorts of other communications,

16   I imagine, to set up interviews.  There -- For us to go

17   back and say every time we talked to somebody during

18   the course of that time period, that we necessarily

19   have everything that was ever talked about, whether

20   it's relevant to the facts of the case or not, I think

21   would be just an extraordinary burden.

22         We don't -- If we got records that we would

23   use as evidence in the case, we would certainly be

24   willing to turn that over.  If we obtained records that

25   were attached to an FBI 302, or as a part of a

 1   deposition, we would certainly be happy to turn those

 2   over.  It's just that given the sort of the very wide

 3   net that the Claimants have cast here, it's going to

 4   make it very difficult for us to respond, and it's

 5   going to potentially open us up to having to say,

 6   "Okay, well, we're going to comply," and then not.

 7           The -- I think this ultimately is something

 8   that should be narrowed.

 9           THE COURT:  Why do I have to narrow it, other

10   than, "all records"?  I mean, they're asking for

11   records obtained by other process, this is Number 6, so

12   search warrants perhaps, non-grand jury process.

13           MR. CLAMAN:  Uh-huh.

14           THE COURT:  But legal process is what they're

15   referring to here.

16           So search warrants, for example, that were

17   obtained as part of the Government's criminal

18   investigation of Mr. Lazarenko, and which relate to the

19   allegations in the First Amended Complaint, that's my

20   addition, which I think I'll get them to agree to.

21           How is that -- I mean, if such a document

22   exists and you know of it, --

23           MR. CLAMAN:  Uh-huh.

24           THE COURT:  -- why would you not have an

25   obligation to produce that?

1          MR. CLAMAN:  Well, if we know of it --

2          THE COURT:  Well, I know, that's a different

3     issue, but just -- you would agree with me that if it

4     exists and you know of it, you should provide it to the

5     Claimant; isn't that correct?

6          MR. CLAMAN:  I think so.  I --

7          THE COURT:  So then let's just talk about

8     sort of the burden here, that --

9          MR. CLAMAN:  Uh-huh.

10          THE COURT:  -- this places on the Government.

11    I mean, I don't fully understand it.  I know it was a

12    long time ago, I know the AUSAs have left, but in a

13    sense, it's less of an AUSA issue than an FBI issue,

14    and the FBI are -- they have a robust record-keeping

15    system, when the U.S. Attorney's Office and the

16    Department of Justice may not.

17          I can tell from your declarations that one of

18    those agents, or maybe a number of them have been

19    looking back through the files, they've found a lot of

20    the 302s, but those 302s are part of, I'm sure, boxes

21    and boxes of other documents related to this very large

22    investigation of Mr. Lazarenko.

23          I mean, I -- Understanding that if those --

24    if a document exists that was received as part of legal

25    process so, I mean, if the Government had to make some

1  showing, whether it's a search warrant or 2703(d)

2  order, some showing that what they were seeking were

3  documents relevant to that investigation, and which,

4  you know, are relevant or related to the allegations of

5  the First Amended Complaint, I mean, I think you've got

6  to produce it, the question -- but with that comes an

7  obligation to look for it, and this one, I think, is a

8  little bit different than some of the others, and we'll

9  get to them, MLATs and all the rest of it, which I

10  think the Government has a stronger argument as to

11  burden that that may place, but for this one, it's

12  telling the FBI to go back through all of its files and

13  start producing everything, you know, subject to any

14  privilege that may exist, which should be limited at

15  this point, given we're however many years out.

16      So I hear you that that may take some doing,

17  and I know it's always -- you're worried and, "Can I

18  ever say the response is complete?"  Well, you're going

19  to have to do your level best to look through the files

20  and make sure that the defense has received -- defense,

21  I'm sorry, I'm going to keep doing that, the Claimant

22  has received all of the documents that the Government

23  has made a prior showing are somehow, you know,

24  relevant to its investigation of Mr. Lazarenko, and

25  which are related to the allegations in the First

1    Amended Complaint.

2         My advice to you would be to have the FBI go

3    through and -- the entire file or files, and start

4    producing, if they haven't done so already.

5         MR. CLAMAN:  Your Honor, I think a couple of

6    helpful clarifications that you added were to emphasize

7    that it -- through legal process, not just any old

8    process, and so --

9         THE COURT:  Well, I --

10        MR. CLAMAN:  -- such as search warrants and

11   the like, that would make it easier for us to make sure

12   what the scope of that request for production is.

13        THE COURT:  Well, another process that's big

14   in this case is an MLAT.  There is a dispute about

15   whether or not the Claimant should also get a copy of

16   the actual MLATs themselves but, you know, my view is

17   those documents that were requested pursuant to an MLAT

18   would be documents that they are requesting, again, as

19   long as it's related to the allegations in the First

20   Amended Complaint, and that they should receive.

21        Now, we'll talk about whether they should get

22   all sorts of communications between foreign governments

23   and the United States, and should they get the MLATs

24   themselves, but the actual documents, I would think

25   that that would fall within Number 6.  It is other

1    process as part of the Government's investigation, but

2    they've got a more specific request that deals with

3    that directly, --

4            MR. CLAMAN:  That's right.

5            THE COURT:  -- so -- But again, I would

6    expect all of that information to make it into the

7    FBI's file.  So hopefully, unlike some of these other

8    requests for information that would not be in the FBI's

9    file, there should be a locus where you could go --

10           MR. CLAMAN:  Uh-huh.

11           THE COURT:  -- and look for it, and start

12   producing it, if you haven't already.

13           MR. CLAMAN:  Yes, Your Honor, and I think

14   with respect to whether it's the documents we received

15   through the Mutual Legal Assistance Treaty or COAS,

16   (phonetic) or through other processes out in

17   California, we have produced a good chunk of that.

18           We are willing to go back to FBI and have

19   them undertake this exercise, as Your Honor is

20   describing.

21           We are cognizant of the time and expense

22   that's involved in that, as we've indicated with

23   respect to the 302s that we've agreed, long before

24   their motion to compel to produce.

25           the declaration of Debra Crumb indicates the

1  great lengths and expense that the Government had to go

2  through in order to properly review and -- those

3  records.

4           We do think that we are going to need time to

5  go through the FBI file, and frankly, this, I know

6  we're on the Claimant's motion at this juncture, but we

7  are concerned that the two motions to compel have some

8  symmetry.

9           Mr. Lazarenko has essentially said, "I don't

10  have anything.  My prior lawyers lost it all.

11  Government, you have to give me everything you already

12  gave me years ago, and you have to do it now, and you

13  have to do it without a protective order," and in a

14  kind of a very aggressive fashion, when what we're

15  trying to do, whether it's through the protective order

16  or otherwise, is make sure that we comply with our

17  obligations, and produce it in a coherent way in trying

18  to understand what was produced previously, and that's

19  why we were able to determine that we could produce the

20  60,000 pages of additional records that we produced in

21  April, or maybe we're up to around 70,000 in April or

22  May, because we were able to locate what was produced

23  before, and identify, while we may have had the records

24  before, we didn't necessarily know what had been

25  already produced before, and taking the time to do that

1    allowed us to produce that information.

2            Now we're at a point where we've sent out

3    nine relatively straightforward interrogatories saying,

4    you know, "What's the nature of your claim?  how did

5    you get the -- whatever interest you had in the

6    property?  And who gave it to you?  And what's your

7    income?", basic questions that come up in any

8    forfeiture case as normal special interrogatories, and

9    Mr. Lazarenko, while at the one hand saying,

10   "Government, Government, Government, you have to

11   produce, produce, produce all this stuff that we didn't

12   keep, or our prior lawyers didn't keep."

13           On the other hand, they're unwilling to even

14   identify the nature of their interest in the Defendant

15   properties --

16           THE COURT:  I (unintelligible) chance it's

17   because, you know, because wants to review the

18   documents first, you know?  He wants to see the bank

19   records.

20           MR. CLAMAN:  And --

21           THE COURT:  He wants to see his prior

22   statements.

23           I look at his responses and my reaction is

24   they're deficient, they're going to have to do much

25   better before discovery is over in this case, but can I

1    say given the complexity of the financial structures

2    and accounts that seem to be at issue in this case,

3    that he could, ten years out, off the top of his head,

4    without the benefit of all of his records, and knowing

5    that he, I'm sure -- given the complexity of this and

6    prior statements that were made closer in time, that he

7    would want to review those first before giving some

8    verified response in this case.  I can understand that.

9          So, you know, the key, I think, to getting a

10   full response to those requests, is to get him the

11   documents that he needs -- that he claims he needs to

12   refresh his recollection, but as soon as he receives

13   them, he will have to have the time to review them as

14   well, but then, you know, it will be the Court's

15   expectation that he's going to provide a much more

16   fulsome response to your interrogatories, but

17   unfortunately, one thing has got to come in front of

18   the other because, I mean, he's filed an affidavit or

19   declaration that says that he just doesn't remember,

20   you know.

21         The Government isn't, other than saying he

22   must remember something more, doesn't really give me --

23   provide me with any sort of evidence saying that what

24   he's saying is untrue, and from my own experience, if

25   someone was to telling me to, you know, what was my

1    bank account, my financial situation in my life, it

2    sounds a lot less complicated than Mr. Lazarenko's, you

3    know, back in the 1990s, I'd be hard pressed to tell

4    you.  I'd want to look at the records first.

5              MR. CLAMAN:  Your Honor, --

6              MR. COMISKY:  (Unintelligible.)

7              MR. CLAMAN:  Your Honor, we appreciate that,

8    however, at the same time, what we have put in the

9    record is quite clear, that he has had access to a lot

10   of the records since August and September when we

11   reproduced the criminal trial to him, including the

12   exhibits that we've identified at the Exhibit P, I

13   think it was, that we filed yesterday --

14             THE COURT:  Does he have all of his

15   statements, the 302s?

16             MR. CLAMAN:  It doesn't have all of his

17   statements, --

18             THE COURT:  Okay.  Well, I think that's

19   pretty key.

20             MR. CLAMAN:  -- but it does have other

21   financial movements, --

22             THE COURT:  Okay, I know.  Well, --

23             MR. CLAMAN:  -- and it shows all of these

24   structures --

25             THE COURT:  -- I mean, do you want a

1    piecemeal response or just let -- have him -- I mean, I

2    think the way to approach this is get the protective

3    order filed, start producing the records that you've

4    been waiting to produce for a long time, have a

5    resolution as we -- and we need to continue to march

6    through.  I don't want to be arguing back and forth

7    about this.

8              Get the Court's resolution of the motion to

9    compel, address the other motion to compel, and then

10   set some dates.  Set some dates for further production

11   by the Government.  Set some dates for then, a response

12   -- further response by Mr. Lazarenko, and I hear you,

13   the Government's going to need some time to find some

14   of these records, and I'm prepared to give the

15   Government some time to do that, but I think it's got

16   to go in order.

17             MR. CLAMAN:  I --

18             THE COURT:  I do.  And it's unfortunate that,

19   again, I don't know who -- who's to blame that -- where

20   we've lost four months because there's been this fight

21   over the protective order, which I just --

22             MR. CLAMAN:  Your --

23             MR. COMISKY:  Your Honor?  Just a moment,

24   sir.

25             Look, we have no problem giving the

1    Government sufficient time, but I have to note that the

2    case wasn't filed yesterday.

3              THE COURT:  Uh-huh.

4              MR. COMISKY:  The case was filed in 2004 --

5              THE COURT:  I know, but see, that's the --

6    but I've got to tell you, I mean, look, and had you had

7    all of your records you would have been in a much

8    better position --

9              MR. COMISKY:  Right.

10             THE COURT:  -- to do whatever it is that you

11   want to do, which is file some motion for summary

12   judgment, or whatever it is that you want to do to be

13   -- to assert your client's rights in this case, but you

14   don't because of errors made on your side of the fence.

15             So, you know, talking about the fact that the

16   Government doesn't seem to have all of its ducks in a

17   row, it's not going to get very far with me because the

18   defense -- the Claimant has got, you know, just as much

19   egg on its face.

20             MR. COMISKY:  I --

21             MR. CLAMAN:  Your Honor, I would add that

22   with respect to the Interrogatories that we propounded,

23   it does go to their standing, and they have to have

24   standing to each of the individual defendants --

25             THE COURT:  Were those Rule G interrogatories

 1   that you served?

 2         MR. CLAMAN:  We propounded them as regular

 3   interrogatories --

 4         THE COURT:  Right.

 5         MR. CLAMAN:  -- and --

 6         THE COURT:  They weren't the Rule G ones.

 7         MR. CLAMAN:  Right.  They do still call into

 8   question, the -- their standing by their responses, and

 9   they -- and the Government has, under Rule G, authority

10   and -- to challenge the standing of a claimant's --

11   challenge a claimant's standing at any time during the

12   litigation.

13         THE COURT:  Okay.  Well, you could do it

14   right now.

15         MR. COMISKY:  Uh-huh.

16         THE COURT:  And I think what they'll say is

17   that they need discovery.

18         MR. CLAMAN:  And I --

19         THE COURT:  And that motion will go to Judge

20   Friedman.

21         MR. COMISKY:  Your Honor, --

22         MR. CLAMAN:  And, Your Honor, we don't

23   disagree.  We're happy to produce records that go to

24   their standing, that we have.  We're happy to produce

25   his -- There were a couple of statements that he made

1    pursuant to Mutual Legal Assistance requests from other

2    countries, that type of thing.  We can produce those

3    now, and we can produce the financial records that are

4    related to the Defendant properties.

5            I guess what we're asking is that we don't go

6    into full blown, the Government must produce yesterday,

7    everything that was related to the grand jury,

8    everything that was related to, you know, any account

9    Mr. Lazarenko may have had, every statement any

10   possible other third-party witness could have made

11   prior to getting to the threshold questions of what's

12   his interest in" --

13           THE COURT:  Well, let me just talk about --

14   Just have a seat.  I'll give you a chance.

15           MR. COMISKY:  Yeah, I'm ready for --

16           THE COURT:  I'll give you a chance.

17           MR. COMISKY:  This is not a standing issue,

18   Your Honor.

19           THE COURT:  No.  Well, I mean, I've got to

20   tell you, I -- you have a lot of experience in this

21   area and I do not, but when you file an Amended

22   Complaint that's filled with allegations regarding the

23   Defendant property and Mr. Lazarenko's relation to it,

24   and its relation to criminal activities that he was

25   involved in, and you believe you're ready to prove all

1    of that at trial, I understand why, when other

2    claimants come along who have some collateral claim to

3    this property, why the Government would defend against

4    those claims, and has done so successfully in this

5    case.

6           I'm just surprised, and maybe you can educate

7    me on this, as to the Government's belief that it would

8    quickly file a motion to strike Mr. Lazarenko's claim

9    to this property, and then, I guess, move for default

10   if you were successful in doing so.

11          Does that happen in every one of these?  Is

12   that what asset forfeiture does?  They file an Amended

13   Complaint saying this stuff is his property and he --

14   and it's the proceeds of crimes that he committed, and

15   then when he shows up to contest that, you say he

16   doesn't have enough an interest in the case, move to

17   strike, and then you default against him? Is that what

18   asset forfeiture is about?

19          MR. CLAMAN:  No, Your Honor.  It's certainly

20   not.

21          I do think though, that it's clear that it is

22   an in rem proceeding, and as such, we have to ensure

23   that the proper parties are before the Court, and that

24   the people who are litigating do have an interest in

25   the property.

1            If Mr. Lazarenko has alienated his interest

2     in some of the properties, he doesn't have a claim to

3     that property, even if he was the person who acquired

4     the criminal -- the proceeds in the first place, and

5     then deposited it into an account.  If he gave those

6     accounts to somebody else, as we believe is the case

7     with respect to some of the assets, such as the funds

8     in Liechtenstein, and as -- and we think there's an

9     open question with regard to the assets in Guernsey,

10    and even the accounts that were held in Antigua, they

11    were held by Inbarisure Corporation (phonetic).

12            So if he turned around and gave those

13    companies to somebody else, he may not have a present

14    interest in that property.  It's incumbent upon him to

15    tell us what his interest is in the property, he's --

16    but the limited answers that he has provided with

17    respect to, for example, EuroFed Bank itself, is that

18    he said he doesn't have -- he didn't have any control

19    over the day-to-day operations of the bank.

20            Of course he's -- most of his answers with

21    respect to EurFed are in his brief and not in his

22    responses to the interrogatories, but if he doesn't

23    have any control over the bank, doesn't own the assets

24    of the bank, then he may not have standing to contest

25    the forfeiture of some of those assets.

1          So they're -- I think -- We do believe that

2     the assets were generated in -- through his criminal

3     conduct, and watered through his criminal conduct with

4     -- in conjunction with other co-conspirators.  However,

5     it doesn't necessarily mean that he has a present

6     interest in the property, and the Government is

7     legitimately entitled to discover what he believes his

8     interest is, which may be limited, or may not exist at

9     all, and he's simply refused to answer those questions,

10    and --

11          THE COURT:  No, I think he's refused because

12    he wants -- he needs -- I mean, what he says is that he

13    doesn't remember --

14          MR. CLAMAN:  And, Your Honor, we're --

15          THE COURT:  -- and that he needs something to

16    refresh his recollection.

17          MR. CLAMAN:  And, Your Honor, we're prepared

18    to provide that limited discovery.

19          I guess what I'm concerned about is, is what

20    we end up with here is a situation of one-way

21    discovery.  He gets everything --

22          THE COURT:  Yeah, well, you didn't file --

23    you did not send Rule G interrogatories.  I mean,

24    that's not what you did in this case.

25          MR. CLAMAN:  Your Honor, we do think that

1    discovery needs to be reciprocal in this case, and at

2    this point we're the only ones producing.

3           They've produced a limited number of

4    documents in response to our request, that we don't --

5    which we believe would -- is going to be the subject of

6    another dispute coming down the line, unless we can

7    work it out with the Claimant, but we do believe that

8    they do need to articulate what their interest is in

9    the property, so that we can determine whether, in

10   fact, that really exists.

11          For the Guernsey assets, which are the bulk

12   of the assets, are held in an irrevocable trust.  He's

13   been equivocal in -- about what his position is, first

14   in response to the Amended Complaint.

15          When he finally did file an Answer, his

16   Answer took no position as to what his interest was.

17   His claim said that he had a reversionary interest.

18   There's no reference to a reversionary interest in the

19   trust documents.

20          So it's important for us to determine whether

21   or not he actually alienated that property or not, in

22   order to --

23          THE COURT:  Okay.  Well, I think that that's

24   where this is headed, but --

25          MR. CLAMAN:  And --

1          THE COURT:  -- they've indicated they need

2     the discovery to do that, so.

3          MR. CLAMAN:  And jurisdictional discovery or

4     discovery with respect to those accounts that are the

5     subject of the Amended Complaint, and statements, as

6     Your Honor has indicated.  we're happy to provide that

7     subject --

8          THE COURT:  Well, I --

9          MR. CLAMAN:  -- subject to a protective

10    order.  It's just, we're concerned about the Government

11    going to great lengths over months of producing

12    records, and we're going to end up in the same position

13    of --

14         THE COURT:  All those one -- those assets

15    that you have questions about, --

16         MR. CLAMAN:  Uh-huh.

17         THE COURT:  -- whether or not he has,

18    whatever the word was you used, attenuated his

19    interest, gotten rid of his interest in this case, does

20    that cover all the ten assets in this case?

21         MR. CLAMAN:  It's going to cover, certainly,

22    the Guernsey assets, the Liechtenstein assets --

23         THE COURT:  Right.

24         There are like ten, right?

25         MR. CLAMAN:  Well, it's -- the Antigua

1    probably not.  Antigua, it's kind of in an odd position

2    because the funds were in a -- held in shell companies

3    mainly, and then the bank went into liquidation, and so

4    the funds are -- the funds of the bank, and that's what

5    Judge Friedman ruled upon in August of 2013, and so,

6    again, the nature of that interest is probably a little

7    bit stronger for them, but I don't --

8              THE COURT:  So it's not going to get rid of

9    this entire case?

10             MR. CLAMAN:  No, it's certainly not going to

11   be --

12             THE COURT:  All right.

13             MR. CLAMAN:  But it's --

14             THE COURT:  So that -- But that goes back to

15   discovery.

16             MR. CLAMAN:  And --

17             THE COURT:  I mean, and again, trying to

18   figure out, "Well," does this question go to -- "do

19   these documents they're seeking go to the Antigua

20   assets; the Suisse?", I mean, we'll never figure that

21   out.  We'll be clogged up for forever trying to figure

22   that out.  I think we've just got to do discovery.

23             MR. CLAMAN:  And I agree, Your Honor, and I

24   guess that's what I'm saying is that we need them to

25   fully respond because what they concede and -- in

1   response to the interrogatories, is going to

2   necessarily shape the areas where there is no dispute,

3   there's not -- there isn't -- and identify where there

4   is still a dispute, because this is not a case where

5   there's an empty record.  This is a case where there's

6   an extensive criminal record that both parties helped

7   develop back in the day, and that we've now produced a

8   substantial portion of, and reproduced to them, and

9   they -- and he knows what he did or didn't do, and what

10   he had and what he didn't have.

11          It's certainly -- You know, he's admitted in

12   the Amended Complaint, for example, that in response to

13   the Amended Complaint, he's admitted that in a two-year

14   period he received 196 million dollars into two

15   accounts that he controlled while he was prime

16   minister.  You know, from a common sense perspective, I

17   would have -- if it were me, I would have at least some

18   inkling as to where that money came from, without

19   discovery from the Government, that's what we're asking

20   for, and so far he's refused to answer any of those

21   basic questions which, if he --

22          THE COURT:  But he will answer them.  I mean,

23   he's going to answer them in this case.

24          So I'm just -- Pull back the curtain for me.

25   What's -- What is your real concern here, --

1              MR. CLAMAN:  My real --

2              THE COURT:  -- is that he will structure

3      answers -- you want to catch him now, in an answer that

4      you can later --

5              MR. CLAMAN:  No.  No.

6              THE COURT:  -- use later, like that that's

7      inconsistent, or what?

8              I mean, what's the -- Why not give him the

9      documents so that he can provide a full and robust

10     answer, which I will require of them.

11             MR. CLAMAN:  Your Honor, I've already --

12     we've already agreed to do that.  We're happy --

13             THE COURT:  Okay.

14             MR. CLAMAN:  -- to provide that.

15             What we're concerned about is full-on, one-

16     sided discovery where we have to produce everything

17     that we ever got from a Mutual Legal Assistance

18     request, everything we got from searches, everything --

19             THE COURT:  Well, we're going to have to keep

20     going through each one because you're -- it's not going

21     to be everything.

22             MR. CLAMAN:  Okay.

23             THE COURT:  But it's unfortunately, just

24     because of the way this has worked out, he was in jail

25     for ten years and he has no records, and that's a

1    problem because they should have more records but they

2    do not, and you have access to a lot of the records

3    that --

4                MR. CLAMAN:  Okay.

5                THE COURT:  It's going to be a flow this way

6    at first, but after that you're -- we're going to have

7    to get, and he's going to be required to produce, a

8    fulsome response to your interrogatories, and at that

9    point I think the parties will be in a position where

10   you can seek a motion to strike if you think that's

11   wise in this case.  They may seek a motion for summary

12   judgment on certain counts, but that's after discovery.

13                I want to hear from you, sir, and then we

14   have to keep marching through because you're --

15                MR. COMISKY:  Let me just -- I'll be brief,

16   Your Honor.

17                THE COURT:  -- I think some of your requests

18   are overly broad and I want to get to those.

19                MR. COMISKY:  I'll be brief on this.

20                This is not an issue about standing.  The

21   entire -- Your Court noted the entire Complaint is

22   based on our client's conduct.  The Government has

23   already taken the position that every asset they've

24   restrained is Mr. Lazarenko's.

25                This is an effort -- And there's other --

1    They've done this with a number of other Claimants,

2    they try to structure it so they don't have to provide

3    the discovery 'til they file a motion to strike, but

4    the interrogatories they're objecting to, that we

5    haven't answered, really don't go to standing, they go

6    to the merits.

7          The standing issue is you assert an interest

8    in the property, the case law is pretty clear.  Doesn't

9    have to be much of an interest, and you know what, it's

10   not a merits issue.  Most of these interrogatories,

11   almost all of them, are merits issues.  They're trying

12   to fill -- tracing holes where they can't trace the

13   money themselves, and they want us to make the case for

14   them.  We don't mind helping the case --

15          THE COURT:  Well, you might have to.

16          MR. COMISKY:  Yeah, I may have to.

17          THE COURT:  Once you get your documents --

18          MR. COMISKY:  Right, but it's --

19          THE COURT:  -- you're going to have to.  I

20   mean, that's a fair question.  So --

21          MR. COMISKY:  I understand, but it's --

22          THE COURT:  -- be prepared to answer it.

23          MR. COMISKY:  -- it's -- I think that it's --

24          THE COURT:  But I'm going to let you see the

25   documents first.

1          MR. COMISKY:  I understand, Your Honor, but

2     it's not a standing issue.  It's not whether it's his

3     property, it's whether there were holes in the tracing

4     where they can prove the case.  I just want to set the

5     ground rules because those interrogatories, "All the

6     income you ever made," you know, if we get into their

7     motion to compel, every -- why -- every income you've

8     -- "Every dollar of income you've made since 1992,"

9     that's not a standing issue, that's a merits issue,

10    just so we're clear.

11          I'm not going to belabor it because I think

12    the Court has the point that we need the discovery.  If

13    they want to file a motion to strike on the numbers

14    (unintelligible), let's say 280 million dollars, and

15    say that everybody forgot they had an interest in it,

16    nobody has an interest in the 280 million dollars, God

17    bless them, but give us the discovery first.

18          THE COURT:  Well, here's the question I have.

19    I was saving it for later but I'll ask it now.

20          I understand that he needs to get the

21    records.  He needs records.  He wants to review those

22    records, given the complexity of this financial

23    structure and structures that are at issue in the case,

24    and length of time, but what have you done and what has

25    he done to try and go get these records?

1              The Government has some records, but if he

2      is, in fact, the account holder of some of these

3      accounts, then he would have -- he could go and get

4      these records from those financial institutions, --

5              MR. COMISKY:  If these --

6              THE COURT:  -- and your obligation under the

7      Federal Rules is to not only pull from your client's

8      head, what he remembers, and he claims he doesn't

9      remember much, but also to go and collect information

10     that's within his control, and if I received a document

11     request or an interrogatory wanting to know about what

12     my bank account was in 1995, I probably wouldn't be

13     able to tell you, but I would probably be able to say

14     it's one of two banks, and I'm going to pick up the

15     phone and try and figure it out, and get some

16     statements, --

17             MR. COMISKY:  Except --

18             THE COURT:  -- and then answer that question

19     for the Government.

20             MR. COMISKY:  Except if you're back in --

21             THE COURT:  So what have you done?

22             MR. COMISKY:  Except if you're back in 1995,

23     the records aren't going to exist.  That's the problem.

24             THE COURT:  Well, that's -- But I -- My

25     question for you is, has the Claimant done anything,

1    anything to go and try and answer the Government's

2    questions based on the power that he has as the account

3    holder, to get statements, to get the documents that he

4    needs to provide something more than the responses that

5    you have provided.

6           MR. COMISKY:  I'm going to turn this over to

7    Mr. Silversmith to answer that particular question.

8           THE COURT:  Okay.

9           MR. SILVERSMITH:  So look, in terms of

10   tracing the specific assets, a lot of these records are

11   in the criminal case, and the criminal case sort of

12   followed the money within the United States.

13          The civil forfeiture case now sort of goes

14   across the water's edge.

15          When you break down the specific assets,

16   (unintelligible) the Government gave us the records.

17   We didn't go to the bank because we knew they had the

18   records and we knew they could give them to us.

19          THE COURT:  But you could have gone to the

20   bank.

21          MR. SILVERSMITH:  We could have gone to the

22   bank but in our experience, because we do a lot of

23   other non-forfeiture cases with foreign bank accounts,

24   foreign bank account -- individuals who possess foreign

25   bank accounts, the banks make it awfully difficult to

1    produce the records, they charge exorbitant fees, and

2    they tend not to go back very far, and it was our hope

3    when we entered this, you know, and we were starting to

4    request records, and initially there was some movement,

5    that we just get the records.

6           The money in Antigua, I don't think the issue

7    is really tracing the funds to Antigua, it's tracing

8    them within the United States because, this is probably

9    more detail than you need to know, but what happened

10   was the money was pooled in the United States, pooled,

11   deposited.  The bank went into liquidation and the

12   liquidators moved the money to Antigua.

13          Based on what the Government gave us, we can

14   now -- we should be able to figure out what those

15   assets are.

16          The Suisse assets are bank records for

17   EuroFed.  The Government gave us some of those records.

18   The other records aren't really in our name.  I mean,

19   he's not EuroFed.  He's Pavel Lazarenko.  The EuroFed

20   is represented by the liquidators.

21          The remaining asset is the Guernsey asset.

22   Again, we were hoping just to get the records on the

23   Guernsey account, but we can trace the money to sort of

24   -- to Guernsey, we just don't have the Guernsey

25   statements and the backup for Guernsey.

1          THE COURT:  But he is the record holder.

2          MR. SILVERSMITH:  He's the protector of the

3     trust.

4          THE COURT:  So why couldn't he go and get

5     those trust documents, and documents related to that

6     account?

7          MR. SILVERSMITH:  One, it took us an

8     incredibly long time to find someone at Credit Suisse

9     who would help us, --

10          THE COURT:  Okay.

11          MR. SILVERSMITH:  -- and we finally did about

12     three weeks ago.

13          THE COURT:  Okay.  Great.

14          MR. SILVERSMITH:  But it was always our hope

15     that, you know, the Government has these --

16          THE COURT:  Okay, but you have your own

17     obligation here, and this idea that you can just wait

18     and get everything from the Government when, again, the

19     reason that we're in this situation is because Mr.

20     Lazarenko's attorneys, for whatever reason, got rid of

21     all of these documents, which is crazy, and so because

22     of that, the Government has to reproduce them to you,

23     and this idea that you're just going to sit there and

24     wait for the Government to produce these records

25     doesn't sit well with the Court.

1              I think you have an independent obligation,

2     and so when we set this date for your further response

3     to the motion for -- to the interrogatories, I'm going

4     to want to get from you, an affidavit indicating all

5     the steps that you took to try and receive from third

6     parties, those records which your client would have the

7     right to get because of his account holder ownership of

8     these accounts, and so it may turn out that you're

9     right, that they don't have the records, that they

10    refuse to give you the records, but you're going to

11    have to go through that exercise for all ten of these

12    pieces of property, and I'm sure the Government will

13    ask you for what it is that you found.

14              MR. SILVERSMITH:  And then one other rem

15    (phonetic) that I didn't mention, Liechtenstein, that's

16    actually sort of a more contentious piece.

17              The lawyers -- Liechtenstein, there are these

18    business trusts to hold the account.  The lawyers who

19    represent the business trust have told us that they

20    won't help us until they get paid, and they claim

21    they're owed a quarter of a million dollars.  So, we're

22    sort of at a dead end there.

23              THE COURT:  Well, again, --

24              MR. SILVERSMITH:  If I --

25              THE COURT:  -- you can put that in the

1    affidavit.

2            MR. SILVERSMITH:  Okay.

3            MR. COMISKY:  There's one additional overlay,

4    Your Honor.

5            I -- We -- Again, we hadn't -- We've started

6    it in this case.  We haven't done it to every location,

7    every rem in this case.  Once the bank accounts, the

8    rems, are frozen, more often than not, or at least a

9    fair amount of time, they won't respond to you at all.

10   They say, "You don't have control.  The Government has

11   restrained the asset.  Go deal with the Government,"

12   and some of these assets are subject to multiple

13   restraints.

14           We're not suggesting we shouldn't -- there's

15   not things we can't continue to do, but I think a lot

16   of it's going to end up they have to -- the Government

17   has to produce the records.

18           THE COURT:  All right.

19           Well, you're going to try.

20           MR. SILVERSMITH:  Yes, sir.

21           THE COURT:  And you will report back to the

22   Court, because again, you're not trying to get the

23   assets, you're just trying to get information about

24   them, which you would think, as an account holder and

25   the owner of the account, that he could get.  If you

1    need statements, then that's what I'd do, I'd call my

2    bank and get the statements, go online and get the

3    statements.  I'm sure it's --

4              MR. SILVERSMITH:  I'll say we've had --

5              THE COURT:  I'm sure it's more complicated

6    than that.

7              MR. SILVERSMITH:  Yeah.  Yeah.

8              MR. COMISKY:  We'll pass on that for the

9    moment.  We hear the Court.

10              THE COURT:  Okay.

11              So we are now onto number -- what was Number

12    6, all records -- Oh, that's regarding received as --

13    obtained as a result of other legal process or other

14    process in the case.  You know, based on the

15    conversation here, I'm going to -- I will -- I'm going

16    to grant the motion to compel with regard to Number 6.

17    We'll have to set a schedule for further production of

18    that information, and there'll be something in writing

19    as well, where I memorialize this, but with the

20    limitations that we've described herein, including that

21    it has to be related to the allegations in the First

22    Amended Complaint.

23              That brings us on to Number 7:

24              "All records Plaintiff obtained voluntarily

25              during the Government's criminal

1          investigation of Mr. Lazarenko."

2          MR. COMISKY:  Your Honor, I'm sorry, can I

3   impose upon the Court for say a five-minute break, no

4   more than that?

5          THE COURT:  Sure, happy to do it.

6          MR. COMISKY:  We -- You've been -- We've been

7   at it for a couple hours.  No more than five minutes.

8          THE COURT:  Okay.

9          MR. COMISKY:  Thank you, Your Honor.

10          THE CLERK:  Court stands in recess for five

11   minutes.

12      (Recess at 3:13 p.m., until 3:22 p.m.)

13                     AFTER RECESS

14          THE CLERK:  Judge, we're back on the record.

15          THE COURT:  Thank you.  Okay.

16          I want to talk about Document Request Number

17   7, any records Plaintiff obtained voluntarily during

18   the Government's criminal investigation of Mr.

19   Lazarenko.  I would add again, and which related to the

20   allegations in the First Amended Complaint.

21          Government, I mean, for me that is like the

22   other allegations, and is going to require the

23   Government to look through its investigatory files to

24   find all such documents.

25          MR. CLAMAN:  Your Honor, we're happy to treat

1     that in the same manner.

2                THE COURT:  Okay.

3                MR. CLAMAN:  Again, one of the challenges for

4     us is the breadth of their request, the breadth of

5     which they define who the "United States" is, and if

6     it's related to the criminal investigation of Mr.

7     Lazarenko, or the, you know, information concerning the

8     Amended Complaint, that's fine.

9                THE COURT:  Okay.

10               MR. CLAMAN:  If it's searching, you know, in

11    the Department of Energy, which was in part of their

12    definition, you know, we think that would just grind us

13    to a halt.

14               THE COURT:  Well, I see this -- all of these

15    series of requests as being requests related to

16    documents received either through grand jury subpoena,

17    other legal process, or just voluntarily during the

18    Government's criminal investigation, and which are

19    related to the allegations in the First Amended

20    Complaint.

21               Is that correct?

22               MR. SILVERSMITH:  Yes.

23               THE COURT:  Okay.

24               MR. CLAMAN:  So FBI, IRS --

25               THE COURT:  Right.  The -- Those agencies

1    that were part of the criminal investigation.

2           Okay?

3           MR. CLAMAN:  Thank you.

4           THE COURT:  So -- But that's important now.

5    I've been focusing on the FBI, and that's -- I only put

6    that out there as just an example.  You know the

7    investigatory units that were engaged in this

8    investigation.  If it's the IRS, then the IRS' files

9    need to be checked.

10          MR. CLAMAN:  The lead agency was FBI.  There

11   was some involvement of the IRS, and Claimants are well

12   aware of that, as well, but it's -- it was primarily

13   FBI, and that's where the bulk of the records are going

14   to be, but yes, responding to this, --

15          THE COURT:  Well, I see this as being a --

16          MR. CLAMAN:  -- we would include IRS, as

17   well.

18          THE COURT:  Exactly.

19          Are there any other investigatory agencies

20   that the Claimant is aware of?

21          MR. SILVERSMITH:  Within the United States,

22   no.

23          THE COURT:  Okay.  That's fine.  So I think

24   it's the IRS and the FBI, all right?

25          Okay.  So now Document Request Number 8:

1          "All documents that Plaintiff intends to use

2          at Mr. Lazarenko's deposition."

3          Who is going to respond to that?

4          I mean, for this one, this one's an easy one,

5    right?

6          MR. SILVERSMITH:  It's just what we've said

7    with the trial exhibits.  You know, there'd been a lot

8    of discussion early on about deposing Mr. Lazarenko in

9    short order.  We really didn't have any records.  There

10   kept being more discussion about the depositions, so we

11   just want to get the production of the records in the

12   ordinary course.  We'll go through them.  You know,

13   we'll get Mr. Lazarenko ready for his deposition.

14         We don't need their deposition exhibit list,

15   but we also don't want to see documents for the first

16   time at his deposition.

17         THE COURT:  Okay.

18         Does the Government agree with that?

19         MR. CLAMAN:  Your Honor, we already have

20   agreed with that.  I don't know why they moved to

21   compel on it.

22         THE COURT:  Okay, great.  Thank you.

23         Number 11:

24         "All documents that refer or relate to any

25          searches and seizures connected with this

1           case."

2                So, if we were to further limit that to be

3      related to the, again, like the prior ones, the

4      criminal investigation of Mr. Lazarenko, and which

5      related the allegations in the First Amended Complaint,

6      would the Government have any objection to producing

7      those records?

8                As I read it, it's duplicative, frankly, of

9      Request Number 6.

10               MR. SILVERSMITH:  I mean, I just viewed other

11     processes, things like summons --

12               THE COURT:  Right.

13               MR. SILVERSMITH:  -- and search warrants, but

14     yes, I mean, if you view a search warrant as a process,

15     then yes.

16               THE COURT:  Okay.

17               So with those limitations, does the

18     Government agree to produce documents?

19               MR. CLAMAN:  We're fine with that, again,

20     confined to what's in our control and what's in the

21     United States.  If they conducted a search in, you

22     know, some other country, we're not --

23               THE COURT:  Well, and if the United States

24     doesn't have records --

25               MR. CLAMAN:  Right.

1          THE COURT:  I mean, if the United States has

2     provided those records in response to some

3     international request for assistance, then it would be

4     produced.

5          MR. CLAMAN:  Right, and we expect to get that

6     -- to that with regard to, I think it's Number 14.

7          THE COURT:  Okay.

8          So now we're on Number 12.  Well, that's a

9     better way to approach it.  Why don't we skip to Number

10    14 and then we'll come back to Number 12.

11         Number 14 is:

12         "All documents that Plaintiff received as a

13         result of MLAT request referenced in Number

14         12."

15         Number 12 is:

16         "Copies of all MLAT requests made to obtain

17         any evidence in this case, or the criminal

18         prosecution of Mr. Lazarenko."

19         So essentially they want all the documents

20    that were received by the United States in response to

21    MLAT requests made to obtain any evidence in this case,

22    or the criminal prosecution of Mr. Lazarenko.

23         Let me just ask you, were there any MLAT

24    requests made just with regard to the asset forfeiture

25    case, as separate and apart from the criminal

1    investigation?

2           MR. CLAMAN:  Yes, Your Honor, there were some

3    additional ones.

4           THE COURT:  Okay.  All right.

5           Well, that's news to me.  All right.

6           So this is a request -- Number 14 is a

7    request for all documents responsive to any MLAT

8    request made as part of this asset forfeiture case, or

9    the criminal prosecution of Mr. Lazarenko.

10          What's the Government's issue with producing

11   the documents that it has received?

12          MR. CLAMAN:  We have -- We, again, have

13   agreed to produce the documents we received.  We

14   believe that that's the evidence that's going to be

15   most probative here.

16          Again, we don't understand why they moved to

17   compel on this issue.  We have agreed to produce the

18   documents.  Again, there is an issue of volume and

19   there is an addition -- an issue of, you know, of

20   volume and priority, in terms of producing things to

21   the Claimants.

22          In the course of our discussions with them,

23   they've identified to us, financial records and witness

24   statements as being a priority interest, that's what we

25   took onboard and that's what we focused on.

1          We haven't -- We have not gone through every

2     record that was received in this case so far, and we

3     would request the Court's indulgence to allow us to be

4     able to -- the time and space to be able to produce in

5     response to those requests.

6          THE COURT:  Okay.  All right.

7          Well, we'll talk about timing at the end, but

8     I believe that request is resolved.

9          MR. SILVERSMITH:  It is.  I mean, the only

10    request we'd make is that they designate MLAT requests

11    as separate from the criminal requests.  I guess we'll

12    figure that out when we see the privilege log and the

13    MLATs themselves, but if you were getting records from

14    the MLAT requests -- from civil forfeiture, if you

15    could designate the civil forfeiture documents, civil

16    forfeiture MLATs separately from the criminal MLATs.

17         THE COURT:  Can you do that?

18         MR. CLAMAN:  Your Honor, the requests in this

19    case are part of the same investigation, and so to the

20    extent that -- I would say the bulk of the evidence

21    that we obtained from foreign authorities did come in

22    through the -- during the time period of the criminal

23    investigation.

24         The additional records that we have obtained

25    for Tampo (phonetic) records from Guernsey were

1    requested in accordance with the civil forfeiture

2    action, but they're part of the same investigation.

3              THE COURT:  Okay.

4              But what he wants --

5              MR. CLAMAN:  And so --

6              THE COURT:  -- is he just wants some -- in

7    the cover letter where you're producing these

8    documents, for it to be clear that the following Bates

9    range was received in response to an MLAT request

10   issued as part of the asset forfeiture action versus

11   the criminal investigation.

12             Is that something you can do?

13             MR. CLAMAN:  I think we can probably do it

14   with respect to most of the records.  We don't think

15   it's relevant though --

16             THE COURT:  Okay.  Well --- But if you can do

17   it.

18             MR. CLAMAN:  -- because it has no -- I mean,

19   this goes to the question that Mr. Silversmith has

20   raised before, which is essentially suggesting that

21   records we obtained through Mutual Legal Assistance

22   Treaty request, in accordance with a civil forfeiture

23   matter, are not properly using the Mutual Legal

24   Assistance Treaty.  That's not, in fact, the case, and

25   I think that -- I think if we start to go down that

1  road it's just going to be a distraction.

2          THE COURT:  Okay.

3          Well, let me hear from Claimant's counsel on

4  that issue.

5          Why is it relevant?

6          MR. SILVERSMITH:  Well, I think just one, for

7  purposes of our -- what Mr. Claman said, if I could

8  just sort of tweak his argument a little bit.  I think

9  he misconstrued my argument slightly.

10         Our position is that certain records

11 collected during the criminal case shouldn't be used in

12 the asset forfeiture case, and the Government actually

13 raised this issue indirectly, in their opposition to

14 our motion to compel.

15         THE COURT:  They should or should not be?

16         MR. SILVERSMITH:  Should not be, because if

17 you read some of these treaties, and I brought a couple

18 that I can pass up, such -- and we're not going to

19 litigate that issue today, such as the Ukranian treaty,

20 it's very clear under the plain language of the treaty,

21 that certain records are only to be used in a criminal

22 action, and that if they are publically disseminated in

23 that criminal action, they cannot then be used in a

24 civil, or they can then be used in a civil action, but

25 only if they're publically disseminated.

1          Now, why that becomes important is if you

2    look at, you know, the Government had 10,000 pages of

3    their admitted exhibits, and ten depositions of

4    Ukrainian witnesses.  The reality is though, they went

5    to the Ukraine and they deposed 40 witnesses, or maybe

6    30 witnesses, and they collected 100,000 records.

7          So it's our position, it's our belief that

8    under the treaty, they shouldn't be using the

9    additional 90,000 records and 30 or 40 depositions.

10         The same thing with the Suisse deposition,

11   sorry, the Suisse treaty requests.  The Suisse treaty,

12   and actually some of the correspondence that we got on

13   that 60,000 document disc, the letters, the treaty, and

14   so forth, all say that these records are only to be

15   used in a criminal action or in a civil damages action,

16   which this isn't.  In fact, when the Suisse treaty was

17   enacted, there was no civil forfeiture statute.

18         Now, it's our view that the Government should

19   be using the Suisse records, they shouldn't be using

20   the Ukrainian records.  We're not going to litigate

21   that today, but that's why we're interested.

22         The irony is though, in their opposition to

23   our motion to compel on an MLAT issue, they cite to

24   these limitations of use provisions as a reason why

25   they shouldn't produce the MLATs and underlying records

1    -- perhaps some underlying records, and so there is

2    some irony that they're using it as essentially a sword

3    to avoid production, but a shield to -- You see the

4    point.  I mean, essentially they want their cake and

5    eat it to, I think, is the term I used in our brief.

6             THE COURT:  Okay.  Well, we're not going to

7    decide that issue today.

8             MR. SILVERSMITH:  I know that.

9             THE COURT:  I mean, the way I view it, it

10   seems like it's not much of a burden.  They have a

11   belief as to why it's relevant to them.  If they're

12   wrong about that, that can be litigated later, but to

13   just identify which of your -- of the documents were

14   received as part of the asset forfeiture case versus

15   the criminal investigation doesn't seem to be a heavy

16   lift for the Government.

17            MR. CLAMAN:  Your Honor, (inaudible) I would

18   say that the treaties do not provide a private right --

19   rights to any third parties, and the treaties, contrary

20   to what Mr. Silversmith has been saying, very clearly

21   state that related proceedings to a criminal

22   investigation, such as forfeiture actions, are

23   permissible under that, and they've even taken it, at

24   least in correspondence with us, taken the extreme

25   position that the documents admitted into evidence in

1    the criminal trial in California would be things that

2    we couldn't use here, and we just think that that just

3    goes far away from the Court's interest in getting to

4    the truth of the matter, but we can certainly designate

5    -- tell them what our designations are.

6         THE COURT:  Okay.  Let me -- While you're

7    standing there, let's go to Number 15, which is

8    translations of any documents that were received in

9    response to MLAT requests.

10        Why are you refusing to produce those?

11        MR. CLAMAN:  Your Honor, if we have

12   translations we're happy to provide them.  We don't

13   feel like we need to go out an translate records,

14   though it has been an issue that Mr. Silversmith has

15   identified to us, what he believes, and that some of

16   the translations were not provided in the records that

17   we provided to them.

18        That may -- That is something that we're

19   addressing with our IT folks because the way they --

20   the records were Bates stamped, or at least the

21   original ones, were Bates stamped with both a prefix

22   and a T at the end, when it was a translated document,

23   and when we reproduced documents to them, as they

24   requested, with additional load files, we can make sure

25   that the T documents that correspond to the

1   untranslated version are included in there, so we don't

2   think that that's an issue.

3            THE COURT:  Okay.  Great.  All right.

4            So then let's go back to the MLATs

5   themselves.  There's a request for copies of all MLATs

6   reflecting requests made by the United States, and then

7   also copies of all incoming MLATs received by the

8   United States pertaining to, well, Mr. Lazarenko and

9   Mr. Kiritchenko.

10           MR. CLAMAN:  He was the cooperator --

11           THE COURT:  Yeah, I know who he is, I just

12   don't know how to say his name.

13           Number -- that's Number 13.  So I'll hear

14   from the Claimant first on this, because I think

15   there's an issue here.

16           MR. SILVERSMITH:  First of all, Judge

17   Robinson looked at this issue five years ago now, and

18   she ruled for the Claimant liquidators and -- although

19   her opinion is not very detailed.

20           It's our position that the documents are

21   relevant and they're discoverable.  The Government did

22   tell us that they would give us a list of the MLATs in

23   January and we still haven't gotten the list, so as a

24   practical matter, we probably don't need every MLAT

25   from every country, because I'm sure there were a

1    number of requests that were incredibly tangential.

2         THE COURT:  So why -- what's your basis for

3    requesting an MLAT?

4         My understanding is you've got a response to

5    the statute of limitations argument.  The Government

6    believes there is no statute of limitations issue in

7    this case.

8         MR. SILVERSMITH:  That's right, and

9    actually --

10        THE COURT:  You believe there is.

11        MR. SILVERSMITH:  That MLAT was produced on

12   the 60,000 document disc.

13        THE COURT:  So you do have that one then?

14        MR. SILVERSMITH:  So that one we got.  We got

15   it --

16        THE COURT:  Because I would think you'd only

17   need one of like the early one, like the earliest one

18   to set the clock running if you're right -- legally

19   you're right.

20        MR. SILVERSMITH:  Well, it's one of these

21   things where --

22        THE COURT:  I mean, if you are right.  I'm

23   not saying you are right.  Okay.

24        MR. SILVERSMITH:  I understand that.  I mean,

25   it's an open issue.

1            THE COURT:  Right.  Right.

2            MR. SILVERSMITH:  It's one of these things

3    though, where there's a number of different MLATs that

4    ultimately tie the issue down.

5            To the Ukrainian MLAT which I have, I can

6    pass up if you want to see a copy.  I don't think you

7    do.

8            THE COURT:  No.  No, I just want to know on

9    the statute of limitations issue, because I know you

10   have a few other issues as to why you believe these

11   MLATs are important, but on the statute of limitations

12   issue, are you saying that you've received what you

13   think you need, if you're right on the law, to start

14   the clock running?

15           MR. SILVERSMITH:  I would say that there are

16   a few additional MLATs out there that we don't have.

17           As an example, we attached to our brief, the

18   supplemental Suisse MLAT that talked about disclosures

19   made during a 1997 audit, that would also start the

20   clock, and we would like the first Suisse MLAT, not

21   just the supplemental Suisse MLAT, and again,

22   additional MLATs may tie the issue down further.

23           Now, this is an area where, you know, the

24   Government talks about stipulations.  Maybe if we can

25   reach a set of stipulations as to the statute of

1    limitations, the balances in the account and so forth,

2    we could just litigate the summary judgment issue.

3            THE COURT:  Right.

4            How about that, Government?

5            Not saying who is right on the law, why not,

6    to resolve this issue, doesn't the Government just

7    agree when it first sought or received a MLAT request

8    which would have put it on notice of the criminal,

9    however you would define it, the criminal acts that are

10   at issue in this case?

11           MR. CLAMAN:  Well, Your Honor, I think it's a

12   little bit more complicated than the Claimant has set

13   forth.  The statute of limitations is governed not by

14   an inquiry notice standard or it's -- it's when the

15   Government knew that the property was traceable to a

16   crime, within two years of that, or when the Government

17   knew of the commission of the offense.  That's going to

18   be a little bit more complicated inquiry with respect

19   to whether or not -- when, exactly, we knew it, but we

20   didn't believe that we could stipulate --

21           THE COURT:  Okay, but --

22           MR. CLAMAN:  -- rather than --

23           THE COURT:  -- you stipulate to that --

24           MR. CLAMAN:  Right.

25           THE COURT:  -- rather than -- However you

1    define it, however it's defined under the law, why

2    wouldn't you just stipulate to that?

3              You don't think there's any legal argument

4    here at all --

5              MR. CLAMAN:  Right.

6              THE COURT:  -- so just stipulate to that --

7              MR. CLAMAN:  And we believe --

8              THE COURT:  -- and avoid this whole issue.

9              MR. CLAMAN:  We believe that we can --

10             THE COURT:  Okay.

11             MR. CLAMAN:  -- stipulate to that.

12             THE COURT:  All right.

13             Well, that's a -- Then have a seat for a

14   second, if you could, please.

15             So then I -- So it sounds like you can reach

16   an agreement on that.

17             MR. SILVERSMITH:  On that issue.

18             THE COURT:  All right.

19             MR. SILVERSMITH:  And that would actually

20   move the case forward because that could dispose of one

21   of the in rem defendants, but there are another --

22   number of --

23             THE COURT:  If you win on the statute of

24   limitations.

25             MR. SILVERSMITH:  Right.

1          THE COURT:  Right.  Okay.

2          Well, that needs to be litigated.

3          So -- But are there other reasons that you

4    believe certain MLATs are relevant in the case, other

5    than the statute of limitations?

6          MR. SILVERSMITH:  Yes.

7          THE COURT:  What are those?

8          MR. SILVERSMITH:  For example, there's a

9    rule, we call it the "Princess Lida rule."

10         THE COURT:  The Princess who?

11         MR. SILVERSMITH:  Lida of Taxis and Thurn.

12   Princess Lida is probably sufficient, and we cite to

13   the Princess Lida case on our motion and our reply.

14         THE COURT:  That there's some preexisting

15   foreign in rem action out there?

16         MR. SILVERSMITH:  That's exactly right, and

17   it's our view that perhaps --

18         THE COURT:  That's pretty good.

19         MR. SILVERSMITH:  -- could be a civil

20   forfeiture attorney.

21         THE COURT:  I will be at the end of this.

22         MR. SILVERSMITH:  The Liechtenstein

23   proceedings and the Antiguan proceedings were filed

24   first in time, and therefore, U.S. court doesn't

25   possess jurisdiction over those res, or rem, or

1   whatever you want to call them.  So the MLAT requests
2   could go to that issue.
3             One of the big issues in the criminal case
4   was the absence of witnesses from Russia.  I talk --
5             THE COURT:  All right, well let's just focus
6   on that first one --
7             MR. SILVERSMITH:  Okay.
8             THE COURT:  -- because I think the absence of
9   witnesses in Russia, that's a different issue entirely.
10            MR. SILVERSMITH:  Right.
11            THE COURT:  So, I mean, what would you need,
12  in terms of like either an MLAT or a stipulation just
13  to resolve factually, that issue?
14            MR. SILVERSMITH:  Well, I'm pretty sure the
15  Government's not going to stipulate that there's a --
16  preexisting in rem actions in those other countries, so
17  I think --
18            THE COURT:  Okay.
19            So what -- So now walk me through it.  So the
20  MLAT is going to show -- but isn't it -- wouldn't a
21  request be not for every MLAT in the world, but the
22  first MLAT the Government received from Antigua, --
23            MR. SILVERSMITH:  It's hard to say.
24            THE COURT:  -- which would say -- or the
25  first MLAT received from Antigua that acknowledged that

1   Antigua had an in rem action against that same piece of

2   property?

3                MR. SILVERSMITH:  I mean, it's hard to say

4   because, you know, the Antiguans were more involved

5   than other governments, and there was a lot of

6   communication with the Antiguans.  So I can't say it's

7   going to be the first MLAT or the third MLAT.

8                THE COURT:  I know, but what would you -- how

9   could you say it?

10               It's not the first one, but it's the one

11  that, what --

12               MR. SILVERSMITH:  That deals with --

13               THE COURT:  -- that identified the Antiguan

14  --

15               MR. SILVERSMITH:  The nature of any

16  proceeding in Antigua --

17               THE COURT:  Okay.

18               MR. SILVERSMITH:  -- as to these res, and

19  that's the best way to put it.  What --

20               THE COURT:  Because, I mean, that would be a

21  far smaller group of MLATs than the request right now,

22  and I -- I mean, I'm concerned.  I'm concerned.

23               I've read Judge Robinson's decision and I

24  think some of the assertions made by the Government

25  are, you know, not well taken in this area, but just

 1   that the notion of the sensitivity of these documents,

 2   especially the documents coming in from foreign

 3   countries, less so the Government's requests to foreign

 4   countries, but requests coming in from foreign

 5   countries, I can certainly appreciate the sensitivity

 6   of it.  I don't know what box to put it in but, you

 7   know, the requests for every last MLAT request from

 8   however many company -- countries were looking at your

 9   client ten years ago in this massive, world-wide

10   investigation, --

11            MR. SILVERSMITH:  I think --

12            THE COURT:  -- could be seen as overbroad.

13            MR. SILVERSMITH:  It could be, and we -- the

14   Government did promise to give us a list of the MLATs

15   which would allow us to narrow the request, but we

16   haven't gotten that.

17            I mean, as a practical matter, right, a lot

18   of these requests to these countries are just, they're

19   completely tangential.  They were to collect some

20   random record, or some random, you know, range for a

21   deposition.  I mean, --

22            THE COURT:  So you don't care about this?

23            MR. SILVERSMITH:  Right, but what I need to

24   see is a list of what exists.  I mean, I can tell you

25   off the top of my head, Antigua, Guernsey,

1    Liechtenstein, Ukraine, and the Ukraine they've

2    produced.  I feel like I'm missing one or two --

3              THE COURT:  Okay.

4              MR. SILVERSMITH:  -- that are more important.

5              THE COURT:  Well, that's a much narrower

6    request, but I think you can also articulate what it is

7    that you're looking for too, to the Government, because

8    that would, you know, address this Princess Lida rule

9    so that they can then go and search, find those MLATs,

10   and then figure out, well, is there some way it can be

11   produced to you, give you what you need, and still be

12   protective of the interests that they've asserted in

13   their opposition.

14             So maybe it'll -- some of it's going to be

15   redacted, but what you really need will not be, and

16   they can go and get permission, or notify those

17   countries that in this case, in this very narrow area

18   on -- for these two MLATs, or whatever it's going to

19   be, the Government has to produce it and resolve the

20   question that way.

21             MR. SILVERSMITH:  I mean, our view, or my

22   view is that we can take it sort of on a country-by-

23   country basis, but it would really help to get a list

24   of the MLATs, and then we can say, "Well, these

25   countries we need."  I mean, the reality is we don't

1    need every country.  We need a few, and they -- I think

2    they've given us everyone from the Ukraine, which is

3    going to be obviously one of the more important

4    countries.

5           And then as we move down the list,

6    Switzerland is important.  I think the Government even

7    conceded that there was no protection in Switzerland,

8    there's really no privilege that could exist there.

9           Antigua is important, but we've attached some

10   correspondence from Antigua that suggests that the

11   Antiguans, in fact, share these records.

12          Liechtenstein is important.  We don't have

13   any records from Liechtenstein.

14          You know, we're happy to meet and confer, but

15   we need a list or something and, you know, if you look

16   back, not that you don't have enough things to look at

17   already, but the Government's response, I think it's

18   224-3 to the liquidator's request, interrogatories on

19   this issue, I mean, they just gave them a list of dates

20   that requests were made.  They didn't give them a list

21   of the countries, a list of the topics.

22          I believe it's 224-3.  It's the response to

23   liquidators' motion to compel, and what we need is the

24   rest of that list, which is going to list the

25   countries, and maybe a one-sentence topic as to each of

1    these MLATs, and then we can take off and we can

2    probably narrow it down to 30 or 40, but we're not

3    asking to shut down OIA, contrary to the affidavit of

4    the OIA attorney but, you know, the Government --

5              THE COURT:  Well, there's another issue here,

6    and that's all communications, which again, I'm not --

7    I'm pretty cold to that request, I'll tell you, but

8    just focusing on MLATs, and I'd hope it would be much

9    less than 40.

10             Let me hear from the Government as to what

11   can be done.

12             MR. CLAMAN:  Your Honor, we think that a

13   stipulation with regard to our knowledge issue on --

14   we'll address the -- what we believe is frivolous, the

15   statute of limitations argument.

16             We also think that their argument on the in

17   rem jurisdiction issues is not going to be affected by

18   the disclosure of Mutual Legal Assistance requests,

19   either incoming or outgoing.  The --

20             THE COURT:  Why is that?

21             MR. CLAMAN:  Because the line of cases that

22   they're contending would have --

23             THE COURT:  Okay.  Okay.  But I know you have

24   a legal argument.  They have a different legal

25   argument.  So I -- We're not going to resolve this

1    based on legal argument.

2         MR. CLAMAN:  I understand, Your Honor.

3         THE COURT:  They have -- They want -- Sounds

4    like they're prepared to meet and confer with you to

5    try and narrow significantly, their request with regard

6    to MLATs, and would you be prepared to do that?

7         MR. CLAMAN:  Not on this issue, Your Honor,

8    because we don't believe that there's any facts

9    contained in the Mutual Legal Assistance request that

10   would affect that argument whatsoever, because it's an

11   issue of whether or not the other country has or has

12   not executed our request, or believes that there's a

13   conflict in jurisdiction.

14        The jurisdictional issues that arose in

15   forfeiture between the state and federal government,

16   and in other in rem cases, is a first in time issue.

17   Only one court can have jurisdiction over the res at

18   the time, but that was in an effort to try and avoid

19   conflicts, where we have, as in this case, had foreign

20   governments execute our requests, notwithstanding the

21   fact that they may have other proceedings that may also

22   affect the assets, means that their government, both

23   those receiving the request and brining it to their

24   courts for execution, and their courts that have issued

25   the orders, do not see a conflict, and since there is

1    no conflict, we don't see how -- what exactly they're

2    asking.

3           They're just -- This seems to be a mechanism

4    purely to get discovery of Mutual Legal Assistance

5    Treaty requests, which really they -- what they

6    identify are what the Mutual Legal Assistance drafter,

7    the attorney that was writing the request, believed was

8    the state of the facts at the time of that -- of the

9    request, and what they asked for.  It's not going to

10   reveal something related to this in rem jurisdiction

11   argument that they make.

12          And so it seems to me that this is a poor

13   excuse on their part, for getting broader discovery

14   than is necessary.  We've already conceded that the

15   evidence that we obtained through the Mutual Legal

16   Assistance process is stuff that we would and have

17   provided to them, and so we don't see that there's a

18   rationale for them to inquire into this necessary

19   process between governments, in order to combat

20   transnational crime.  I mean, --

21          THE COURT:  Well, I don't -- I mean, I don't

22   begin to understand it, but this Princess Lydia

23   (phonetic) argument, I thought, was trying to establish

24   which country had jurisdiction over the property first.

25          Isn't that correct?

1          MR. CLAMAN:  Your Honor, it doesn't matter.

2     If -- We've had -- The Antiguan authorities have, I

3     think, at least two different types of proceedings that

4     affects assets in Antigua.

5          Antigua executed our request to --

6          THE COURT:  Well, if it doesn't matter, then

7     why don't you just stipulate to whatever the facts are?

8          MR. CLAMAN:  It's unclear to us, what the --

9          THE COURT:  If you're -- You're worried about

10    your MLATs, I get that.  So just stipulate to what

11    you're willing to stipulate as to what the facts are.

12         MR. CLAMAN:  But it's unclear to us, what the

13    facts are that they --

14         THE COURT:  Well, we'll hear --

15         MR. CLAMAN:  -- that they actually want.

16         THE COURT:  -- we'll hear from the Claimant's

17    counsel now.

18         MR. SILVERSMITH:  Essentially, the issue is

19    whether there's two in rem proceedings, and what it's

20    going to boil down to is what is the nature of the

21    proceeding there?

22         I mean, we would submit that you can't really

23    say that the fact that the Antiguan government honored

24    an MLAT request for the United States confers

25    jurisdiction on the Federal District Court.  In fact,

1    if anything, right, you're putting the chicken before

2    the egg because this Court didn't even have

3    jurisdiction to send them the order under the <u>Princess</u>

4    <u>Lida</u> theory.

5            So, you know, we want to litigate the issue

6    of --

7            THE COURT:  So what would you want to know?

8    I mean, what facts would you want the Government to

9    stipulate to?

10           If you could speak into the microphone,

11   please.

12           MR. SILVERSMITH:  Sorry.  Sorry.

13           What proceeding -- What statutes are they

14   proceeding under?  Well, some of this we'll get in

15   terms of the documents they've collected, but what

16   statutes are they proceeding under?  What are the

17   nature of the proceedings?

18           I mean, I can't -- I'm not an expert on

19   Antiguan law, and I can't tell you, sitting here today,

20   if it's brought under this provision it's in rem, but

21   there's probably something in there that talks about

22   the provisions that it's being brought under.

23           The Antiguan court file is not as easy to

24   follow as the U.S. court file, from what we've

25   collected.

1            THE COURT:  Doesn't it matter, too, what

2    order they come in?

3            MR. SILVERSMITH:  Yes.

4            THE COURT:  Okay.

5            So, I mean, why then wouldn't -- again, you

6    don't want to give them the MLAT, I got it, so why

7    wouldn't you go back through the MLATs and base it in

8    the information that's available to you, and it might

9    be right, might be wrong, and you can couch it in

10   whatever caveats you want to, say that, "Based on the

11   MLATs that we received, in 1997 the Antiguan government

12   had a criminal investigation regarding this in rem

13   piece of property involving the following statutes

14   under Antiguan law?

15           Why couldn't you provide them with that sort

16   of basic amount of information so that then they could

17   make their argument, you believe that there's no basis

18   in the law for it, but that's for a later date to

19   decide, but provide them with the information that they

20   need to advance their argument, and not provide them

21   with the MLATs.  I get it.  You don't want to give them

22   the MLATs.

23           So go through them, stipulate to the facts

24   that they need.  You don't think it matters, so just do

25   it.

1          MR. CLAMAN:  Again, we're happy to provide --

2  but it, again, seems a little bit strange for us to be

3  able -- to have to sift through a bunch of Mutual Legal

4  Assistance requests on the hope that they might

5  reveal --

6          THE COURT:  Well, they're happy to sift

7  through them.  That's the request, --

8          MR. CLAMAN:  No, but --

9          THE COURT:  -- and I'm -- You say that

10  there's an issue with producing them --

11          MR. CLAMAN:  But, Your Honor, --

12          THE COURT:  -- so, sensitive to that, I'm

13  trying to figure out a way through.

14          MR. CLAMAN:  No, and I'm grateful for that,

15  Your Honor.

16          I think though, what -- in response to your

17  question, what Mr. Silversmith said was that the reason

18  he needs the MLATs is because he needs to know what

19  statute is proceeding under Antigua, but Mr. Lazarenko

20  has counsel in Antigua.  He's filed a claim in the

21  liquidation proceedings in Antigua, and so it seems

22  strange for him to come to us to try and figure out if

23  we even know what the statutes are that are -- they're

24  proceeding under there, and it seems like they should

25  do their own legal research, and so --

1          THE COURT:  If you have this information,

2     it's within your control, then you've got to give it

3     up.  So, to the mere fact that counsel has some other

4     means to go get it, they should be pursuing that as

5     well.  If you've served them with a interrogatory

6     request, maybe they will because they've got some

7     obligation because he is a Defendant in those action --

8     or a Claimant in those actions, I don't know.

9          Right now they've made the request of you.

10         MR. CLAMAN:  Uh-huh.

11         THE COURT:  And the response that, "Well,

12    they can go find it themselves," doesn't typically cut

13    it in federal court.  So you have -- they have --

14    they're happy, they're happy, give them everything and

15    they will go through and cull out the information they

16    need.  You've indicated that that raises some

17    significant concerns.

18         MR. CLAMAN:  Uh-huh.

19         THE COURT:  I cannot believe that given the

20    narrow band of information that they're looking for,

21    that you can't figure out a way through, to provide

22    them with some statement, some stipulation concerning

23    the first MLAT, or series of MLATs received from these

24    three different company -- countries, the in rem

25    property that was identified, and the statute that the

1    investigation was proceeding on.

2            MR. CLAMAN:  Okay.

3            THE COURT:  It may not be worth anything to

4    them ultimately, when the issue is finally litigated in

5    this case, but that would avoid the production of all

6    of the documents, which there are some part of them

7    which they've made an argument, is relevant to their

8    case and the arguments they want to make.

9            MR. CLAMAN:  Thank you, Your Honor.

10           I think your identification of what it is

11   that they're looking for is very helpful to us because

12   frankly, it was not clear to me exactly what they're

13   looking for, but within the boundaries that you've set

14   and identified, we can certainly go through the MLATs

15   and try and identify if we have responsive information

16   in --

17           THE COURT:  Right.

18           MR. CLAMAN:  -- response to those questions,

19   so thank you, Your Honor.

20           THE COURT:  How about as a starting point,

21   they also made the request just to get a list of the

22   MLATs.

23           Why is that a problem?

24           MR. CLAMAN:  We're happy to provide that.

25           THE COURT:  Okay.  Great.

1           So I think the parties should continue to

2     discuss this issue, and I'm going to hold this one in

3     abeyance for both -- Well, you had one final issue,

4     Russia.

5                 MR. SILVERSMITH:  I was going to --

6                 THE COURT:  Russia.

7                 MR. SILVERSMITH:  -- put it on the record and

8     say, "Look, there were some countries where the

9     Government couldn't collect evidence."

10                THE COURT:  Some what?

11                MR. SILVERSMITH:  Countries.

12                THE COURT:  Countries.

13                MR. SILVERSMITH:  Nations, --

14                THE COURT:  Yes.

15                MR. SILVERSMITH:  -- where the Government

16    couldn't collect evidence.  The big one was Russia.

17    You know, these MLATs can help us identify the location

18    of documents and witnesses, and we think to that extent

19    that the information is discoverable.

20                I can't tell you, other than Russia, off the

21    top of my head, of any other countries, but that's the

22    one that --

23                THE COURT:  So I -- I guess I -- This is --

24    Of your arguments --

25                MR. SILVERSMITH:  Uh-huh.

1          THE COURT:  -- and your papers, I found this

2    one to be the most attenuated, so walk me through it

3    again.

4          MR. SILVERSMITH:  Sure.

5          In the criminal case there were payments by a

6    company called "Itera," to Claimant, in the amounts of

7    about 28 million dollars.

8          The only real evidence at trial involving --

9    and Itera is a Russian company -- at trial was

10   essentially that there was money wired into his

11   account.  There was no evidence of a crime, no evidence

12   of a bribe, and the Government wanted to argue the

13   inference, and Judge Jenkins properly dismissed it

14   pursuant to Rule 29.

15         I don't know this, but based on the tenor of

16   the discussions in a lot of the pretrial transcripts,

17   the Government had made requests to Russia to depose or

18   interview.  I suppose they wanted to depose the

19   individuals who were making these payments, to find out

20   why they were making the payments.

21         I mean, as a practical matter, given the

22   state of affairs with Russia now, given that this is a

23   civil action, not a criminal action, it seems very

24   unlikely that these people are going to be deposed in

25   this case.

1          With that said, to the extent these records
2   can help us identify witnesses that we might want to
3   interview, or documents that we might need, we think
4   they're probative of that.
5          THE COURT:  So what's your suggestion to deal
6   with that?
7          MR. SILVERSMITH:  I mean, our request would
8   be, one, if the Government could provide us with a list
9   of --
10         THE COURT:  Of what?
11         MR. SILVERSMITH:  -- of the MLATs.
12         THE COURT:  Okay.
13         MR. SILVERSMITH:  And then we can go back and
14  say, "You know, it's these two or three countries."
15         Russia is the one I know where we need
16  records, but I suspect that there may be one or two
17  others.  As I said, we don't want every MLAT, but we
18  don't have a list of what's there, and it's hard to
19  focus without any guidance from the other side.
20         THE COURT:  But you're looking for witnesses
21  who may have been identified in MLATs, but who were
22  never deposed?
23         MR. SILVERSMITH:  Well, that's right.  So,
24  you know, the U.S. Government served an MLAT request on
25  the Russians, and I don't think the Russians ever

1  responded or, if the Russians did respond, they said,

2  you know, "We're not" --

3              THE COURT:  Okay.

4              MR. SILVERSMITH:  -- "making those witnesses

5  available."

6              THE COURT:  Okay.

7              How about -- So that's -- It's that way, and

8  again, I think that issues regarding U.S. MLATs are

9  less sensitive than the MLATs coming in from countries

10 abroad, but -- so they want to know individuals who the

11 Government, as part of this criminal investigation,

12 sought to interview around the world, whether, in fact,

13 they were interviewed or not.  They just want the list

14 of individuals.

15             So you don't have to produce the MLATs to do

16 that.  You can say, "We sought to interview the

17 following individuals as part of this investigation."

18             MR. CLAMAN:  Uh-huh.

19             THE COURT:  "And in 1998, MLAT sent to

20 Russia."  Done.

21             How is that an issue?

22             MR. CLAMAN:  I think we can do that, Your

23 Honor.

24             THE COURT:  Okay.

25             MR. CLAMAN:  I do think that this, again,

1   goes to the fishing expedition nature of their

2   discovery requests --

3            THE COURT:  Well, I'm sorry.  If you put a

4   list of individuals you want to -- you want Russia to

5   go through the -- all the steps you've got to go

6   through to set up an international deposition as part

7   of a criminal investigation, obviously that person

8   meant something to the Government when they sent out

9   that MLAT request.

10           MR. CLAMAN:  Well, it --

11           THE COURT:  So I don't think that -- I mean,

12  you made the request as part of the investigation;

13  that's what we're talking about, MLATs that were a part

14  of this investigation.  So if the Government put them

15  on the list, I don't know if that's a fishing

16  expedition for the Claimant to say, "Who did the

17  Government have on that list?"

18           MR. CLAMAN:  I guess what I was trying to say

19  is that I think trying to identify every person we ever

20  asked about in connection with the investigation,

21  whether or not we ever got a statement from them, and

22  whether or not we ever got any evidence back from them

23  from that request, isn't necessarily going to be

24  probative of the issues --

25           THE COURT:  That depends on the person, --

1        MR. CLAMAN:  -- in the case.

2        Exactly, and --

3        THE COURT:  -- and right now, what they're

4   asking for is the list of names of witnesses who the

5   Government sought to interview around the world,

6   wherever, in any MLAT, and my understanding of reading

7   through the exhibits attached to your opposition is

8   that OIA has collected all of the U.S. MLATs.

9        MR. CLAMAN:  Uh-huh.

10       THE COURT:  I'm not clear that they've

11   collected all of the incoming ones, but at the very

12   least, the U.S. MLATs related to this investigation

13   have been collected.  So it'd be a fairly

14   straightforward process to go through those MLATs and

15   provide the claimants -- the Claimant with a list of

16   those individuals who the United States sought to

17   interview as part of the investigation.

18       MR. CLAMAN:  We can do that, Your Honor.

19       THE COURT:  Okay.

20       So with that, the parties will need to meet

21   and confer on the other issues.  The starting point is

22   to provide them with a copy of the list of MLATs.

23       You're going to provide them with the

24   witnesses that were identified in the U.S. outgoing

25   MLATs to be interviewed as part of this investigation,

1   and you will try to reach an agreement with regard to

2   statute of limitations, Princess Lida, you know, facts

3   that can be derived from those MLATs to provide the

4   Claimants with what they need, but not the MLATs

5   themselves.

6          That's how I see this as being resolved.

7          MR. SILVERSMITH:  And just one quick

8   clarification with respect to the list of MLATs.  If

9   the Government can give us some kind of, I mean, almost

10  like a log index, a short blurb as to what each MLAT

11  was about, I mean, just -- some countries we can guess,

12  but other countries, you know, maybe we can't, so just

13  requesting bank records, requesting --

14         THE COURT:  Witnesses interviews

15         MR. SILVERSMITH:  -- witnesses.

16         Yes, something that's somewhat descriptive,

17  not just a list of countries and dates.

18         THE COURT:  Right.

19         Would that be a problem, with the end goal

20  being to not produce the MLATs?

21         MR. CLAMAN:  Yes, we can do that.

22         THE COURT:  Okay.  Great.  So let's move on

23  then.

24         So I think that resolves Number 12, at least

25  for today, until you indicate to the Court in the

1   future, that there are additional issues to be

2   resolved.

3            I think that resolves 12, 13, 14, 15, so now

4   we're to 16:

5            "Any communication between the Plaintiff and

6            representatives of any foreign government

7            about the subject matter of this Amended

8            Complaint."

9            MR. SILVERSMITH:  I mean, I realize that

10  that's an incredibly broad request, and so, --

11           THE COURT:  It is.

12           MR. SILVERSMITH:  -- you know, again, the

13  problem is that when you're drafting requests like

14  this, it's incredibly hard to narrow, I think, because

15  you can't say what's out there.

16           Now, the one thing we know -- So there's sort

17  of two areas that this is divided into, one on which we

18  really did not move to compel involves sort of the

19  high-level communications, right.  So we know, as an

20  example, that at the time that Pavel was taken into

21  custody in the United States, this was a hot issue in

22  the Ukraine, obviously.

23           It was also somewhat of an important issue in

24  the United States because they were such strong

25  bilateral partners.  We're not asking for any of those

1    records.

2           That said, throughout the course of the

3    proceedings, the Government has received

4    communications; that is, the litigation teams, from

5    these foreign countries --

6           THE COURT:  I'm sorry, "litigation" what?

7           MR. SILVERSMITH:  Teams.

8           THE COURT:  Oh.

9           MR. SILVERSMITH:  You know, the civil

10   forfeiture team.

11          THE COURT:  Yeah.  Yeah.

12          MR. SILVERSMITH:  The criminal prosecution

13   team.

14          THE COURT:  Uh-huh.

15          MR. SILVERSMITH:  And we are requesting those

16   documents, and the reason I make that request is we

17   attached several documents to our reply to the motion

18   to compel and our motion to compel, showing that the

19   Government uses these records and produces them when

20   they want to use them.

21          In addition to the ones that we've attached

22   to the motion to compel is, as I was preparing for this

23   hearing, and really in response --

24          THE COURT:  Which one are you referring to?

25          Is this the -- I remember there was a --

1                  MR. SILVERSMITH:   As an example --

2                  THE COURT:   -- a Suisse embassy seeking to

3        facilitate the sharing of information --

4                  MR. SILVERSMITH:   No, actually that's not

5        one.

6                  THE COURT:   -- with the FBI.

7                  MR. SILVERSMITH:   That was a State Department

8        record.

9                  THE COURT:   State Department.

10                 All right.   Right.   That's right.

11                 MR. SILVERSMITH:   So what I'm referring to,

12       and I don't have the exhibit numbers handy, if you want

13       to give me a minute I can find them, but they're cited

14       in our motion and in our reply, and I have a few more

15       here I can pass up.

16                 You know, periodically throughout the case,

17       the Government needs to make some point, and to do that

18       they attach a declaration, or not a declaration, a

19       letter from a foreign country, to establish that point,

20       and it, you know, invariably it helps them.

21                 As an example, in their opposition, or in

22       their dispositive motion litigation revolving the --

23       involving the -- I'm tongue-tied, excuse me, involving

24       the liquidators, the Government attached a series of

25       letters from the Suisse government and from the

1    Lithuanian government, too many countries with L's, and

2    I'd refer the Court to Docket Entry 282-16, and I think

3    it's 282-17.

4         You know, so here the Government has

5    documents in their possession that they find to be

6    probative of facts at issue, and they're using them.

7         Well, we want to see the documents that are

8    probative of the facts at issue that help us, and we

9    think may advance our cause.  So, to that extent we

10   think documents that the civil forfeiture team, OIA,

11   sort of an adjunct to the civil forfeiture team, and

12   the criminal prosecutors have received from these

13   countries is relevant, and they should be disclosed

14   and, as I said, we attach other letters that we've

15   received throughout the fifteen years that this case

16   has gone on, from Antigua; from Liechtenstein, I

17   believe, and so forth; the Ukraine.

18        And so, the communications between the

19   prosecutors and the foreign law enforcement agencies

20   are being produced and are being provided by the

21   Government in some cases, and we think they should be

22   provided in all cases.

23        MR. CLAMAN:  Your Honor, we think that this

24   goes to the very core of our international cooperation.

25   Trying to discover what the Government attorneys who

1    can't act directly in Antigua, or Lithuania, or

2    Switzerland, or whatever other country, what advice

3    they're getting from foreign counsel for the

4    Government, in execution of a Mutual Legal Assistance

5    request, or how to structure a Mutual Legal Assistance

6    request to fit the differences between the legal

7    systems, this goes to the core of our Mutual Legal

8    Assistance practice, and frankly, we share -- as we've

9    laid out in our papers and in our responses, we share a

10   common interest with our law enforcement partners, in

11   executing our obligations under the Mutual Legal

12   Assistance Treaties --

13          THE COURT:  Has any court ever held that?

14          MR. CLAMAN:  No, I'm not aware that they

15   have.  However, Your Honor, I think it's -- I -- for us

16   to suddenly be in a position where every communication

17   with a foreign authority is open to discovery is going

18   to make it impossible for us to litigate transnational

19   cases.  It's going to have a huge chilling effect, and

20   it's going to make it difficult for us to understand

21   what the requirements of foreign law are.

22          Here, I don't know the particular documents

23   that Mr. Silversmith is referring to, but what I

24   believe they are, were probably records indicating that

25   the foreign country had actually restrained property

1   for us, and so we will get a document back oftentimes,

2   or that they had served notice, and so -- just as we

3   would provide a return of service, and if the marshals

4   go out and execute something, oftentimes we'll do that

5   when the foreign authorities will do that, but to say

6   that because we attached a document to evidence that a

7   foreign authority took some action on our behalf,

8   whether it's executing our request --

9           THE COURT:  I know, but you see their point.

10  That's helpful to the Government.  That document is

11  helpful to the Government establishing its claim that

12  the property was properly attached in that foreign

13  country.

14          So that, the Government will produce, but if

15  there's something else that the Government has that may

16  not be helpful from their perspective, then they don't

17  get it.

18          MR. CLAMAN:  Your Honor, I think a return of

19  service document is very different from all

20  communications between the United States and any other

21  government, just the shear breadth of what they're

22  asking for, and it -- you know, it -- one of the

23  problems and one of the things we were criticized for

24  by Judge Robinson in the liquidator litigation, was for

25  not providing the context for what the Mutual Legal

1   Assistance concerns are, and I think we've laid that

2   out quite extensively in our objections, but also in

3   our papers, and what we really have here is a situation

4   where, unlike the Claimants who can go out and hire

5   counsel in Antigua, or in Liechtenstein, or wherever

6   they feel like it, the United States can't act directly

7   in another country in a law enforcement matter.  We

8   have to go through our treaty partners or our law

9   enforcement partners, and those law enforcement

10  colleagues in Switzerland or in Lithuania that have to

11  advise us on what the contours of their law are, and

12  need to inquire of us, what does our law require, that

13  doesn't seem in any way related to their --

14          THE COURT:  Well, what about just one way, as

15  we're trying to think of ways to limit this?  I mean,

16  they've offered up a few.

17          One is to focus just on communications with

18  the prosecution, the civil forfeiture team.  I mean, I

19  imagine there are not that many, and OIA.  So that's

20  one limitation.

21          What about just, could you say "outgoing

22  requests," meaning, again, your communications with

23  foreign law enforcement pursuant to requests that the

24  United States is making, trying to facilitate the

25  gathering of evidence on -- to help the U.S.

1   investigation, why not that, versus requests be coming

2   from say, Ukraine, pursuant to some Ukrainian criminal

3   investigation related to Mr. Lazarenko?

4           I mean, again, still sensitive, but I would

5   think less sensitive than the communications coming

6   from a foreign government making a request.

7           MR. CLAMAN:  Well, I guess I think there are

8   practical and legal problems with that.

9           First of all, I think this goes beyond the

10   normal confines of civil discovery, in the sense that

11   it's -- it would be in no way related to a claim or

12   defense that they have.  Discovery into every

13   communication that the U.S. Government has had with the

14   Lithuanian government or with the Swiss government

15   concerning this case, is going to be -- it doesn't

16   point to a claim or defense.

17           Second of all, it's going to be

18   extraordinarily burdensome, and it's going to have, as

19   I indicated, a chilling affect on our ability to

20   communicate freely with our law enforcement partners

21   and people who, while it's not a direct agency

22   relationship in the sense of sort of Fourth Amendment

23   analysis, or something like that, as I indicated, you

24   know, ordinarily the United States can't act directly

25   in another, excuse me, in another country and, as such,

1    we have to go through our Mutual Legal Assistance

2    partners and through our law enforcement partners, and

3    if we have to then consider --

4              THE COURT:  I don't know which way that cuts

5    that -- meaning if this was a legal process that you

6    were using right here in the United States, you would

7    go do it and you would produce it to the Claimant.

8    They've asked for it and you've indicated you'd produce

9    it.

10             So why is it different -- The only thing

11   that's different is, well, you've got to ask someone

12   else to help you to do it, but you're still taking

13   steps to try and advance the investigation, and they've

14   requested all of that because it may well be relevant.

15             I agree they need to answer some more

16   questions about what makes this relevant, but I don't

17   know which way it cuts, the fact that, you know, you

18   have to go through foreign countries to advance parts

19   of this investigation because you're still working to

20   advance this investigation.

21             MR. CLAMAN:  Except that, Your Honor, I think

22   that it's different from the situation that Your Honor

23   described because it would be more akin to us going to

24   an attorney and saying, "Get this for us," and asking

25   our attorney to act for us, or to try and strategize

1   with the attorney about how best to figure out what the

2   request should say, and so it seems that this is an

3   intrusion into what we're thinking at the time, and so

4   our deliberative process, and work product, and

5   defining what it is that we need for the investigation.

6          It's also an intrusion into the

7   attorney/client relationship, to the extent that that

8   can be extended in a sort of common interest analysis,

9   to the people who can act for us in the other country;

10  and frankly, it's also, as I think is laid out in some

11  detail by the affidavit from Ken Harris, it would be

12  extraordinarily burdensome, and given the volume of

13  requests in this case, and communications over the past

14  number of years, the fact that there's little to no

15  probative value is vastly outweighed by the expense and

16  burden and intrusion into private communications that

17  really are based, in large measure, on our foreign

18  relations principles that are -- you know, that the

19  executive foreign relations with other governments is

20  derived from our foreign relations powers of the

21  executive, and so it seems to be an unnecessary

22  intrusion in this case, that doesn't seem to be defined

23  by the Claimants, that would be extraordinarily

24  burdensome, and would be -- it would be too intrusive,

25  and frankly, undermine our ability to communicate

1   effectively with our partners around the world.

2          THE COURT:  Okay, let me hear -- I just want

3   to hear on the relevance point.

4          What is the relevance of this?  What are you

5   trying to get?

6          I would agree.  It seems like a very -- still

7   a very broad and burdensome request.

8          MR. SILVERSMITH:  Well again, this is the

9   kind of thing that we can take on a country-by-country

10  request, but I'm sure you remember reading the first

11  few pages of our motion to compel, where we talk about

12  the role that the Ukrainian prosecutors played in

13  assisting with the collection of evidence.

14          The reality is that the entire investigation

15  took place in the Ukraine, with U.S. prosecutors and

16  U.S. law enforcement agents.  These communications

17  clearly get to the point to establish that this is a

18  joint prosecution between the United States and the

19  Ukraine, and to that end --

20          THE COURT:  Not helpful to you if there are

21  certain common interests that therefore it's all

22  privileged.

23          MR. SILVERSMITH:  Well, we would submit an

24  instance where there's essentially agreed-upon, based

25  on the State Department, pervasive misuse of the

1    judicial bodies in that country.  There is an argument

2    that a due process violation could be made in this case

3    because frankly, you know, you look at this case and

4    you think, all of these witnesses were deposed there,

5    we talked about the coercive nature of the witness

6    testimony, the fact that witnesses were brought in, in

7    cuffs, and other witnesses had to make statements while

8    they sat and watched these handcuffed witnesses.  I

9    talk about the confrontation protocols.  I mean, this

10   is clearly relevant to whether or not there is a joint

11   defense between the Ukraine and the United States, and

12   it goes to the heart of a due process violation.

13           Now, beyond that, in some of these other

14   countries, for example Russia, Switzerland, and so

15   forth, there were relevant records requested, and the

16   response that the U.S. Government may have gotten back

17   may not have been in the form of an MLAT.

18           I can't sit here and tell you which letters

19   we need and which ones we don't, so unfortunately, we

20   have to cast a wide net, but it's certainly more likely

21   than not that these records are going to help us

22   identify witnesses and identify documents --

23           THE COURT:  Well, I think the vast majority

24   will not help you at all.

25           MR. SILVERSMITH:  I mean, we can't -- You --

1  No one can know.

2         THE COURT:  Well, as defined.  You know, "any

3  communication"?  Come on, --

4         MR. SILVERSMITH:  Well, --

5         THE COURT:  -- it's incredibly broad.

6         MR. SILVERSMITH:  And even still, with

7  respect --

8         THE COURT:  So the vast majority will not

9  help you, I believe that, and I do believe it will be

10  burdensome.

11         So, I mean, I think you've got to come up

12  with a better way of articulating what it is that

13  you're looking for.

14         I mean, what are you looking for?

15         MR. SILVERSMITH:  Well, as I said,

16  identifying the locations of documents and witnesses

17  because not every request is made by an MLAT when you

18  deal with a foreign country.

19         THE COURT:  I think it's a pretty good

20  substitute.  I do.  I mean, because that is how they

21  make requests.

22         MR. SILVERSMITH:  I mean, I did that for

23  eight years.  I was a prosecutor.

24         THE COURT:  I did it for many years -- seven.

25         MR. SILVERSMITH:  And we would send letters

1    sometimes.  I mean, you know, you dealt with OIA.  I

2    never sent the letter but -- so we can't say that every

3    request was an MLAT, but beyond that, the issue with

4    the Ukraine really is probative to a due process

5    violation.

6            I mean, the prosecutors and the Ukrainian

7    prosecutors worked hand in glove --

8            THE COURT:  So, I -- Yeah, you're the --

9    Well, spell that out for me.

10           MR. SILVERSMITH:  So --

11           THE COURT:  So you're looking -- What is the

12   best communication that would help you?  What would it

13   look like?

14           MR. SILVERSMITH:  I mean, essentially

15   documents that discuss the coordination of the

16   deposition -- the collection of deposition documents

17   and witness interviews.

18           THE COURT:  But why is that?

19           I mean, so --

20           MR. SILVERSMITH:  Because that makes it a

21   joint prosecution.

22           MR. SMITH:  Judge, joint prosecution is very

23   relevant to this case for a number of reasons.  One of

24   the most important is it's an exception to the rule

25   that you can't take the Fifth Amendment privilege

1    because of fear of foreign prosecution.

2            And this is going to come up in this case.

3    The Government's going to seek Lazarenko's deposition

4    and we're going to oppose that strenuously, and one of

5    the many grounds we have for opposing it is that

6    there's -- there was a joint prosecution, and --

7            THE COURT:   And I'm sorry, so -- and that

8    would mean what?

9            MR. SMITH:   That would mean -- In the Supreme

10   Court decision that record that -- on the issue of when

11   you can invoke the Fifth Amendment privilege for fear

12   of foreign prosecution, they make an exception for

13   joint prosecutions.

14           In other words, normally you cannot invoke

15   the Fifth Amendment privilege based on your fear of

16   foreign prosecution, but you -- but the court said,

17   "We're not deciding today, whether you can invoke it."

18   Maybe you can invoke it if it's a joint prosecution

19   with the United States and a foreign country."  This is

20   the --

21           THE COURT:   So fear of a foreign -- This is

22   new to me.

23           MR. SMITH:   This is in Ukraine.

24           THE COURT:   So fear of a foreign prosecution

25   is --

1          MR. SMITH:  In the Ukraine.

2          THE COURT:  -- is protected under the United

3     States Fifth Amendment?

4          MR. SMITH:  Absolutely.  That's in the

5     leading Supreme Court case on the Fifth Amendment

6     privilege --

7          THE COURT:  Well, it sounded like they hadn't

8     decided that issue.

9          MR. SMITH:  No, they didn't --  They decided

10    you --

11         THE COURT:  That's an open issue, yes?

12         MR. SMITH:  They decided that in the ordinary

13    case, where the U.S. Government is not involved in the

14    foreign prosecution, --

15         THE COURT:  Okay.

16         MR. SMITH:  -- you cannot invoke the Fifth

17    Amendment privilege.

18         THE COURT:  But they didn't decide the other

19    issue either, what you've described.

20         MR. SMITH:  Exactly, but --

21         THE COURT:  Has any court held that?  Has any

22    court held that you have a Fifth Amendment right --

23         MR. SMITH:  With a joint prosecution?

24         THE COURT:  Even -- Well sure, worst facts,

25    best facts for you, that --

1           MR. SMITH:  Well, a number of -- Many courts

2     have held that before the Supreme Court decision,

3     but --

4           THE COURT:  No.  No.  Okay.

5           MR. SMITH:  -- but --

6           THE COURT:  But a fear of a foreign

7     prosecution?

8           MR. SMITH:  Many courts have held that before

9     the Supreme Court decision.  The courts were divided on

10    that, and that's why the Supreme Court took that case,

11    which I can't remember the name of the case, but we --

12    it's in our papers, but the court recognized that if

13    the United States Government was involved in that

14    foreign prosecution, or instigated it, it would be a

15    different story, and that's one of the arguments we're

16    going to make.

17          THE COURT:  Oh, no, but -- Okay.  I

18    understand.

19          I mean, if you are overseas and the United

20    States is acting in a joint venture with foreign law

21    enforcement, yeah, the Fifth Amendment can kick in --

22          MR. SMITH:  Right.

23          THE COURT:  -- but that's because the United

24    States can't turn around and seek charges against you

25    based on that confession, that interview conducted in

1  the Ukraine, that was done at the behest, or with the

2  joint involvement of the United States, okay?

3           That, I understand.

4           MR. SMITH:  Well, if the Ukrainian Government

5  is going to prosecute you -- By the way, he's been

6  granted C8, you know, convention against torture refuge

7  in the United States based on the United States

8  Government finding that if he was ever returned to the

9  Ukraine he would be tortured --

10          THE COURT:  Yeah.  No, I -- Look, I just --

11  I'll go look at it.  I'm surprised to hear, and maybe

12  you're absolutely right, that the U.S. Constitution,

13  under the Fifth Amendment, can be invoked to stop a

14  civil proceeding in this country because of fear of a

15  criminal proceeding brought in a foreign country, even

16  one that we have assisted.

17          MR. SMITH:  Well, I'm not saying that you can

18  stop the civil case.  I'm just saying it would give him

19  a right to invoke the Fifth Amendment privilege --

20          THE COURT:  Yeah.  I can't imagine, but you

21  might be right.

22          MR. SMITH:  We'll cite you the case and you

23  can read it yourself.

24          THE COURT:  Okay.

25          MR. SMITH:  But that's a small issue in this

1   case, compared to the issue, you know, Mr. Silversmith

2   was mentioning about due process.  That's going to

3   pervade the entire defense of this case.  We  -- I

4   mean, this was -- The Ukrainian Government -- There's a

5   little of this -- a taste of this in the papers -- in

6   the motion to compel.

7          The Ukraine Government was a dictatorship.

8   Imagine just -- I'll give you a hypothetical.  Imagine

9   if this was a case investigated not by the Ukrainian

10  Secret Police, which is what it was, the GPOU, in a --

11  what if this was a case investigated by the Nazi

12  Gestapo and the defendant was a Jew, okay?  Take that

13  for your hypothetical.

14         Mr. Lazarenko was Public Enemy Number 1 of

15  the Kuchma regime, which was -- instigated this entire

16  prosecution, did all the investigation for the

17  prosecution, acted as the investigative agents for this

18  prosecution in San Francisco and, of course, this is

19  just the -- this is just like the tail of the

20  prosecution.

21         This case has a huge due process problem.  It

22  was mentioned throughout the criminal case, although

23  the district judge did, you know, and we think this is

24  that he most serious mistake in the criminal case, the

25  district judge in San Francisco did not let the defense

1    make a frontal assault on the prosecution on this

2    ground, and he never explained his decision.

3          We're certainly going to try to make a

4    frontal assault on the prosecution in this case, and we

5    need the communications between the United States law

6    enforcement agencies and the Ukrainian law enforcement

7    agencies, and I think they're going to reveal a

8    revolting pattern of the United States, because we've

9    seen evidence of this already, United States

10   cooperating with the Ukrainian authorities in violating

11   every conceivable due process right of Mr. Lazarenko.

12         If we can't get those communications between

13   the two governments, how are we going to show that?

14         We think in the San -- Looking at the

15   evidence in the San Francisco case, it's pretty -- I

16   strongly believe that the United States Government

17   suppressed a huge amount of dirty evidence in that

18   case, and the defense never -- the criminal defense

19   never got it.  We want it in this civil case, and

20   that's a darn good reason for getting the -- and I'm --

21   notice I'm limiting my argument here, to the Ukrainian

22   -- There's many countries, as Your Honor pointed out,

23   that there are these communications with.  If you deny

24   all the rest, at least give us the Ukrainian

25   communications because -- and I would ask for them both

1   ways, not just our communications to them, but their --

2   even more important perhaps, are their communications

3   to us, because I think it will reveal how insidious

4   this entire prosecution was.

5          THE COURT:  So would it be Ukrainian

6   communications with OIA, prosecution, and asset

7   forfeiture team --

8          MR. SMITH:  Yes.

9          THE COURT:  -- that reflect what?

10          MR. SMITH:  That --

11          THE COURT:  How would you describe it?

12          MR. SMITH:  Well, that reflect United --

13          THE COURT:  A joint venture?

14          MR. SMITH:  That reflect --

15          THE COURT:  A what?

16          MR. SMITH:  A joint venture, absolutely, and

17   also acts that obviously are violative of due process,

18   which we've provided many examples of already in --

19   which are in the record.

20          THE COURT:  Violate due process where, in

21   this country or --

22          MR. SMITH:  Well, in the --

23          THE COURT:  -- in the Ukraine?

24          MR. SMITH:  -- Ukraine and --

25          THE COURT:  Not in this country?

1          MR. SMITH:  Well, in this country, too.  If

2     the United -- That's why we need these communications.

3     If the United States Government is aware, and they

4     certainly were aware of many of these things, we know

5     already, if the United States is aware that Lazarenko's

6     due process rights have been violated every which way

7     in the Ukraine, they can't use that -- our position is

8     they cannot use the evidence obtained that way.  The

9     depositions that were -- Time after time every one of

10    Lazarenko's witnesses was afraid, they were

11    intimidated, they were very brave to even come forward

12    and be deposed, but many of his witnesses --

13         THE COURT:  See, that's -- I have to tell

14    you, when I look through the, you know, the documents

15    that were attached that try to show this, I was a

16    little underwhelmed in that all the people that you

17    identified as being coerced, all came and testified,

18    and testified, from what I could tell, --

19         MR. SMITH:  Well, --

20         THE COURT:  -- in favor of your client.

21         MR. SMITH:  Well, but they --

22         THE COURT:  So, I mean, the three that you

23    listed, they, in fact, did come forward, and they

24    said, --

25         MR. SMITH:  They were very brave.

1          THE COURT:  -- "They tried to put pressure on

2     us, and here we are to tell you that we're not

3     coerced," --

4          MR. SMITH:  Well, --

5          THE COURT:  -- "and we're here to help you

6     out."

7          MR. SMITH:  And those are the -- those are

8     those brave people we were -- I was just talking about,

9     but there were others who would -- never appeared at

10    their depositions.  They were scheduled for a

11    deposition and we, I think this is in the papers we

12    submitted, they -- and they -- we learned at the last

13    minute they didn't appear, this is in the criminal

14    record, and no explanation was offered as to why they

15    weren't there, nor was any effort made by the Ukrainian

16    authorities to get them to appear.  In other words,

17    they weren't -- unlike the Government witnesses which

18    -- who always appear, and if they didn't appear, they

19    were threatened with dire consequences.

20         So -- And there's -- We have a lot.  There's

21    a lot of stuff in the criminal record about witnesses

22    being intimidated, both our witnesses and the

23    Government's own witnesses, and we don't know how much

24    they slanted their testimony but, I mean, this is not

25    just a phantasm we're creating.  This is in the

1   criminal record itself, and the Judge just didn't want

2   to hear about it.

3            THE COURT:  No, what's the evidence you have

4   that the United States was involved in any of that?

5            MR. SMITH:  That's exactly what we're looking

6   for.  We don't.

7            THE COURT:  But you don't have that yet?

8            MR. SMITH:  Well, we -- I mean, a lot of this

9   stuff, it was mentioned in the criminal case, so the

10  Government was aware of what -- the allegations that

11  were being made --

12           THE COURT:  Right.  It's got to be --

13           MR. SMITH:  -- and they just kind of

14  shrugged --

15           THE COURT:  -- more than aware of the

16  allegations.

17           Well, what are you going to do?

18           MR. SMITH:  Well, it wasn't just allegations.

19  They would say, "Well look," you know, "we're trying

20  our best," you know.  "We're" -- They mumbled the right

21  words but they did not -- you know, we have -- there

22  was no discovery about this in the criminal case.

23           THE COURT:  It sounds like you got discovery

24  about it.  I've read depositions where they sat and

25  told you about all the coercion that was going on, and

1    the Government -- the United States was sitting right

2    there when they told you all about it, so --

3             MR. SMITH:  We got --

4             THE COURT:  -- it's not like they said, "Be

5    quiet."

6             MR. SMITH:  I understand.

7             THE COURT:  "Don't tell them about our joint

8    venture with the Ukrainians."

9             MR. SMITH:  Well, if they -- It was intended

10   to -- They knew the depositions were going to be used

11   in the criminal trial.  They couldn't -- They could

12   hardly say on the record of the deposition -- We're

13   talking about communications between the Ukrainian

14   Government and the United States Government which would

15   reveal, I am confident, a lot of bad things going on,

16   and the --

17            THE COURT:  All right.  Well, I think that

18   you're going to have to better articulate what it is

19   that you're looking for, but I'll hear from the

20   Government.

21            Go ahead.

22            MR. CLAMAN:  Thank you, Your Honor.

23            Just very briefly, we certainly would take

24   great exception to the suggestion that the United

25   States either violated Mr. Lazarenko's rights or was

1    duped into violating his rights by the Ukrainian

2    authorities.

3           We think that this tired argument that

4    they're turning out is a a goose chase of -- more than

5    a fishing expedition, it's a goose chase, and to a

6    certain extent, they did try and raise this in the

7    criminal trial, this notion that somehow the United

8    States was being fooled by the Ukrainian government at

9    the time, and Judge Jenkins didn't hear it.

10          Their opportunity to raise this argument

11   about some kind of malicious prosecution or conspiracy

12   amongst prosecutors to get Mr. Lazarenko for some

13   reason should have been raised, if it wasn't, on appeal

14   in the criminal case.  It's --

15          THE COURT:  It wasn't?

16          MR. CLAMAN:  I don't know the extent to which

17   they raised these issues -- all the issues on appeal,

18   but that was the forum for that.  This expedition ten,

19   twelve years later, to try and suggest that the United

20   States prosecution team was somehow tainted by their

21   relationship with the prosecution in Ukraine, we think,

22   is really just unfounded.

23          And, you know, I would just add that, you

24   know, Mr. Smith mentioned a dictatorship in Ukraine.  I

25   would point out that Mr. Lazarenko was appointed by Mr.

1    Kuchma in 1996 as vice prime minister, and then as

2    prime minister in 1997.  That's when he earned all this

3    money.  The financial records show that he received

4    this money, and the investigation was much broader than

5    just the evidence collected in Ukraine.  I think this

6    -- their argument demonstrates why this overbroad

7    fishing expedition really just makes no sense and is

8    completely unfounded.

9             THE COURT:  Okay.

10            Yes, sir?

11            MR. SILVERSMITH:  I want to move on, --

12            THE COURT:  Yeah.

13            MR. SILVERSMITH:  -- but there are a few

14   things that -- I don't even know if the Court wants to

15   address them today but, you know, our view is that

16   every count involving testimony in the Ukraine was

17   ultimately dismissed pursuant to Rule 29, by either

18   Judge Jenkins or the Ninth Circuit.  To sit here to say

19   that these issues were conclusively resolved against

20   Mr. Lazarenko, it's not accurate or fair.

21            The only thing that he was convicted of

22   involved the testimony --

23            THE COURT:  You need to come to the

24   microphone.

25            MR. SILVERSMITH:  Sorry -- of a witness who

1    came to court, Peter Kiritchenko.

2         Beyond that, you know, there were a number of

3    witnesses who testified essentially, we argued, you

4    know, in fear of what would happen.

5         So it's not the witnesses whose testimony who

6    we would say were credible that said they were forced

7    or coerced to testify against Mr. Lazarenko and did

8    not, it's everyone else.

9         And on a final point, and then I'm going to

10   sit down, the prosecutors and the FBI sat in on dozens

11   and dozens, perhaps hundreds of interviews in the

12   Ukraine.  So the idea that somehow the, you know, that

13   this is your normal case where the OIA attorney sends

14   an MLAT request and the Government sets up a

15   deposition, that was not quite what happened.  There

16   was a full-blown investigation in the Ukraine, and the

17   United States was a part of that investigation.

18        THE COURT:  Okay.  I do think we have to move

19   on.

20        I mean, my view of this MLAT is that it is --

21   this request, sorry, it's incredibly overbroad and

22   burdensome for the United States so, I mean, as

23   drafted, you know, I'm going to deny the motion to

24   compel for this one.  If you can think of a better way

25   to articulate it to focus on what it is that you want

1    to get, I would try to first negotiate that with the

2    Government, and if you can't reach an agreement, you

3    can bring it back to the Court, but as drafted, and

4    given the record presented by the Government as to the

5    burdensomeness of this request, I'm going to deny it.

6             "Any law enforcement memorandum prepared

7             about the subjects of the Amended Complaint."

8             My understanding is that the Government is

9    prepared to produce material in response to this

10   request, and has already collected a lot of it, and has

11   just been waiting to enter the protective order; is

12   that correct?

13            MR. CLAMAN:  Yes, Your Honor, that's correct.

14            With respect to the FBI 302s, we do have some

15   work -- additional work to do with respect to -- to

16   make sure that there aren't additional statements that

17   may have been obtained by the IRS, but we are prepared,

18   with a protective order, to produce the material that

19   was prepared by FBI.

20            We do note that there are specific objections

21   that the FBI has interposed to different -- to pieces

22   and, in some cases, large pieces of some of the FD-

23   302s, and so -- but we were -- are prepared to produce

24   that.

25            We'll have specific identification --

1   additional reservations we have with respect to

2   disclosure of portions of those statements.

3         THE COURT:  Okay, but, I mean you're looking

4   for 302s, you're looking for anything else that is --

5   would be a witness interview, even though it might not

6   be called a "302," correct?

7         MR. CLAMAN:  Yes, Your Honor.  We are looking

8   for those --

9         THE COURT:  Because I know you've got the,

10  who else?  IRS, and they don't use 302s.

11        MR. CLAMAN:  Right.  Right, and that's what I

12  indicated we're still working on that, Your Honor, and

13  we are pleased to produce, subject to a protective

14  order, law enforcement memoranda of witness interviews

15  that are related to the Amended Complaint.

16        We think that the -- some of the other

17  requests, 19 through 20, what is it, 24, are either

18  subsumed within 18, or they are -- or maybe they're not

19  related to this case, and so we don't think that 19

20  through 24 are appropriate because if there's a law

21  enforcement memorandum about somebody else, related to

22  some other investigation, it just -- it's not pertinent

23  to the facts --

24        THE COURT:  Understood, but if we were to

25  limit 19 through 24, like we've limited a number of the

1    other requests to, you know, "and related to the

2    allegations in the Amended Complaint," you would comply

3    with that request?

4              MR. CLAMAN:  Yes, Your Honor.

5              THE COURT:  Okay.

6              Is that acceptable?

7              MR. COMISKY:  Can we just take a minute of

8    what -- what big chunk -- I can't think if it's a 302

9    interview for Mr. Lazarenko, just the -- name

10   something.

11             THE COURT:  Can you come to the microphone?

12             We really do have to --

13             MR. COMISKY:  If the 302 interview

14   (unintelligible) Tymoshenko, what would they be carving

15   out if it's -- you know, if it's related to the -- if

16   it's within -- the scope is limited now by the Court,

17   what -- I just have an idea, what were they going to be

18   pointing out so we know whether we're going to have to

19   come back here?

20             What big chunks -- I can't even conceptualize

21   what they'd be pulling out that they wouldn't want us

22   to see.

23             THE COURT:  Well, I mean, I don't know if he

24   can answer that question.

25             MR. COMISKY:  I don't know (inaudible).

1          Can you answer that, what they're concerned

2    about?

3          MR. CLAMAN:  Your Honor, we did go through it

4    in some length in the declaration.  It's going to be

5    things like confidential sources.  There may be other

6    privileged material.  There's some classified, and so

7    there's going to be -- it's set out in our declaration,

8    and certainly the Claimants, when they see the

9    production, will be able to identify --

10          THE COURT:  Well, how are you going to mark

11    it --

12          MR. CLAMAN:  -- what the basis is.

13          THE COURT:  For that information that you're

14    going to redact, what are you going to tell Claimant

15    about it?  Are you going to give him a privilege log,

16    or something that looks like a privilege log?

17          MR. CLAMAN:  It's effectively the same way.

18    The way they've marked it is they have a coding system,

19    and --

20          THE COURT:  Uh-huh.

21          MR. CLAMAN:  -- they say we've redacted this

22    piece for --

23          THE COURT:  Everyone that's an A, it's this.

24          MR. CLAMAN:  It's this and --

25          THE COURT:  Everything that's a B, it's a --

1   So they'll have some information as to what it is, and

2   then if you dispute, you can try to negotiate, and if

3   not, come back to the Court.

4          Does anyone have a security clearance on the

5   Claimant's side?

6          MR. SMITH:  I was in tax.  I don't think I

7   went up to security clearance.  I think I just went up

8   to confidential.  It's still good, but I don't think

9   that's enough.

10          THE COURT:  Anyone else?

11          UNIDENTIFIED SPEAKER:  (Inaudible.)

12          THE COURT:  Okay.

13          MR. SILVERSMITH:  There are going to be SEPA

14   issues that come up in a moment, --

15          THE COURT:  I can't wait.

16          MR. SILVERSMITH:  -- so.

17          THE COURT:  Okay.]

18          So 19 through 24, I think, have been resolved

19   with the added scope of, "has to be related to the

20   Amended Complaint."

21          MR. SILVERSMITH:  With one other caveat,

22   which is we -- the definition include foreign witness

23   interviews, and we just want to make sure that it falls

24   within some other ambit of the production.  So if they

25   got it through an MLAT, fine, but if the FBI -- I don't

1    know, but foreign witness interviews are something we

2    want because --

3            THE COURT:  Oh, I always understood that that

4    would be inclusive.  I mean, if it's a witness

5    interview, memoranda, or 302, it doesn't matter if

6    they're a U.S. citizen or if they're a foreign

7    interview, you're going to produce that, right?

8            MR. CLAMAN:  Yes, Your Honor, subject to a

9    protective order.

10           THE COURT:  Right.  Understood.  Yeah.  Okay.

11           Is that okay?

12           MR. SILVERSMITH:  (Inaudible) if the Dutch

13   law enforcement agency goes and interviews someone,

14   we're getting that?

15           THE COURT:  Well, that's -- Okay.  Good

16   point.  I focused on the IRS, but if you've received a

17   witness interview memoranda from the Dutch Government,

18   the Dutch law enforcement, whatever it happens to be

19   called, you're going to produce that subject to a

20   protective order.

21           MR. SILVERSMITH:  And it's not just Dutch,

22   it's every foreign country, --

23           THE COURT:  Right.

24           MR. SILVERSMITH:  -- but there are a lot of

25   them.

1           THE COURT:  That was an example.

2           MR. CLAMAN:  So, Your Honor, we understand

3     that if there is a witness statement for -- that was

4     taken by another government that we've received,

5     whether it's through Mutual Legal Assistance or because

6     they handed it to us and we have it, and it's a witness

7     statement, that subject to a protective order, we would

8     produce that.

9           THE COURT:  That's -- Okay.  Understood.

10    Okay.

11          Number 25 is the evidence log.  My review of

12    the briefs is that there, at least in this case, was no

13    such thing as an FBI evidence log, but that they have

14    gone ahead and created something like it that would

15    indicate all the -- the 1As that were collected in the

16    case, and that you're prepared to produce that if you

17    haven't done so already.

18          Is that correct, Government?

19          MR. CLAMAN:  Yes, Your Honor.  There was a --

20    we've been provided, again, in redacted form, the 1A

21    inventory that FBI has.

22          THE COURT:  So you've not provided that yet

23    though?

24          MR. CLAMAN:  No, we haven't because we're

25    waiting for the protective order.

1       THE COURT:  Okay.

2       MR. SILVERSMITH:  Well, I guess the question

3   is if they're redacting, what is it that needs to be

4   covered by the protective order if they're -- I mean,

5   if they gave us without a -- without redaction, that

6   makes sense, but what is it that's being redacted?  I

7   mean, you know, that --

8       THE COURT:  Well, I don't know, but I'm not

9   going to have him go through all that.  I assume that

10  they are going to comply with the protective order and

11  not mark something if it shouldn't -- doesn't fall

12  under the protective order, but you can imagine

13  something in a 1A envelope that might contain personal

14  identifying information.  So it's going to be produced

15  pursuant to the protective order.

16      The other option is they go through and

17  redact all of that and you get none of it.

18      MR. SILVERSMITH:  Right.

19      THE COURT:  Which you don't want.

20      MR. SILVERSMITH:  No, I agree.  It's just, if

21  they're redact -- they said they're giving it to us in

22  redacted form and --

23      THE COURT:  Well, no, the redactions go to

24  something else.  There's some other privileged

25  material, whether it's classified, whether it's law

1    enforcement privilege, whether it's a confidential

2    informant, that they're not going to give to you, and

3    they're going to give something that looks like a

4    privileged log so that you can challenge that, to the

5    extent you think you've got a basis to do that.

6              MR. SILVERSMITH:  That's fine.

7              THE COURT:  Okay.

8              MR. SILVERSMITH:  That just hasn't been made

9    clear.

10             THE COURT:  All right.

11             Is that correct, what I just said?

12             MR. CLAMAN:  Yes, Your Honor.  I think it's

13   even simpler than a privilege log in that it's on the

14   page.

15             THE COURT:  Right, and it's -- There's going

16   to be a key, Yes?  Just for the record?

17             MR. CLAMAN:  Yes, Your Honor.

18             THE COURT:  Okay.  So now we're on Number 27.

19             Again, my understanding is that the

20   Government is prepared to produce all these documents

21   related to the Revenue Agent Charles Tona as soon as

22   the protective order has been entered, and we'll have

23   that entered shortly.

24             Is that correct, Government?

25             MR. CLAMAN:  Our understanding is that they

1    are looking for the financial records that Mr. Tona

2    reviewed.  If that's the case, we'll -- they would be

3    subsumed within the financial records that would be

4    covered by the protective order.

5            If he reviewed other documents, I don't know,

6    but just to be clear, we're going to give them the

7    financial records in the case, subject to the

8    protective order.

9            MR. SILVERSMITH:  That's all we're asking

10   for.

11           THE COURT:  Okay.

12           MR. COMISKY:  What we're asking for are the

13   records which ended up in -- I'm sorry -- In the

14   summary charts at the criminal trial, not just a pile

15   of records that we have to go figure out what he used

16   in the summary charts.  He was the Government's summary

17   witness in the criminal case and he has a series of

18   charts.  Some were attached, I think, to the

19   Government's papers, which are tracing money --

20           THE COURT:  Okay.

21           So what do you want?

22           MR. COMISKY:  so we want to know what he

23   reviewed to prepare the summary charts.  We want these

24   -- the records designated so we can tie them to the

25   charts which -- if you just get a pile of records

1    you're never going to be able to tie them to the

2    charts.  You're not going to know what he used or what

3    he didn't use, and we'll have to start from scratch

4    before we give this stuff to our summary witness, you

5    know, our expert who is going to analyze first, what

6    Tona did.

7         The goal here is to save everybody time to

8    see what he relied, especially us, but everybody time,

9    and see what he relied on when -- in back of those

10   summary charts, to see if what he summarized was

11   accurate based on what he was looking at, so we have a

12   starting point.

13        MR. CLAMAN:  Your Honor, with all respect,

14   they already have that.  Mr. Tona's charts, which are

15   Exhibit P that we filed under seal because of the

16   number of accounts and things on Friday, have not just

17   the chart that shows the overall flow of funds, but

18   they have specific schedules underneath, that identify

19   the specific Bates number for the records that prove

20   the transaction, and identify all of the records that

21   were admitted into the criminal trial, which we gave

22   them back already, months and months ago, and so they

23   have this information.

24        If they just look at the schedules, they can

25   look at C00126 or whatever the number is, and they can

1    go and pull that number -- document, and it's not going

2    to be an issue for them.  They have those.

3              THE COURT:  Okay.

4              MR. SILVERSMITH:  Tona testified, we attached

5    his testimony -- Stand close to the mic.  He reviewed

6    90 bank accounts to prepare those charts.  They do have

7    the backup for the specific transactions on those -- on

8    the accounts where there are charts, but he reviewed

9    additional bank accounts to prepare his entire tracing

10   report.

11             We'd ask for all 90 accounts that he

12   reviewed, and he specifically states 90 accounts --

13   roughly 90 accounts.

14             THE COURT:  But you've received those.

15             MR. SILVERSMITH:  Maybe with what's coming in

16   under the protective order, but we have not received it

17   in the criminal admitted discovery.  That is -- There

18   are only about 15 or 20 accounts that were produced in

19   the criminal admitted discovery.

20             MR. CLAMAN:  Your Honor, what Mr. Comisky was

21   talking about is the summary charts that were produced

22   in the criminal trial.  Those clearly lay out what the

23   records are that Mr. Tona relied upon for his

24   testimony.  Those records, they do have.

25             The additional records that Mr. Silversmith

1   is asking about, other financial records that we

2   obtained in the course of the criminal investigation,

3   if they pertain to the allegations in the Amended

4   Complaint, subject to the protective order, we will

5   produce that.

6               THE COURT:  Okay.

7               MR. CLAMAN:  We don't think this is an issue.

8               THE COURT:  All right.  I do want to move on.

9               So then we have a series of requests about

10  the tapes.  We have ten minutes left.  I don't think

11  we're going to get through everything, so I think we're

12  going to have to set another date to complete this.

13              Are the parties available Thursday afternoon,

14  1 o'clock?  Is the Government available?

15              MR. CLAMAN:  The Government is available,

16  Your Honor.

17              MR. SILVERSMITH:  We'll be available.

18              THE COURT:  Okay.  So why don't we plan on

19  coming back at 1 p.m. on Thursday, May 21st, but let's

20  not waste the ten minutes that we have.  So let's talk

21  about the tapes.

22              Where are we on the tapes, just in terms of

23  what has been found, what has been produced, what is

24  the Government ready to produce, because I've read the

25  affidavit and I'm confused?

1          MR. CLAMAN:  Your Honor, the -- first of all,

2     we believe this is a red herring, and it's information

3     that was produced during the course of the criminal

4     trial, as one of our --

5          THE COURT:  I know, but that -- for me that's

6     sort of just full stop.  If they produced it in the

7     criminal trial, then if you still have it now, they're

8     going to get it.

9          So, I understand you've got arguments later,

10    as to its authentication, its admissibility, and all

11    the rest of it, but the criminal prosecutors produced

12    that material in the criminal trial.  So I think, and

13    especially reading through the affidavit, it sounds

14    like you've been able to identify the, I don't know if

15    the discs or the tapes, or whatever it is that you

16    believe was produced in the criminal trial.

17         So it's pretty easy to copy a disc and

18    provide it to them.

19         MR. CLAMAN:  Your Honor, we have identified

20    the correspondence from the criminal trial.  We've

21    identified where in the criminal record, one of Mr.

22    Lazarenko's attorneys read extensive excerpts into the

23    trial, and we believe that we have identified some of

24    the recordings, but I would request your indulgence to

25    make sure that I don't get it wrong, that since we're

1   coming back on Thursday, I'm going to consult back with

2   FBI and make sure that -- exactly what we do have and

3   what we don't have.

4        THE COURT:  My recollection, in the

5   affidavit, is that the FBI found some material that

6   they believe is no relation to this case whatsoever.

7   The FBI found some other material that they sent to the

8   lab, related -- that may have been related to this

9   case.

10        But better yet, someone in California found,

11   I thought, discs that contained this material.  Maybe

12   I'm confusing that with the other discovery.

13        MR. CLAMAN:  The discs that were discovered

14   really did relate to the production from 2003, I

15   believe it was.

16        THE COURT:  I said, "Tapes found in the

17   Northern District of California."  This is in your

18   opposition on page 52.  So I think that's related to

19   these tapes.  They found the tapes.

20        MR. CLAMAN:  So the other thing with respect

21   to what's related and what's not related to the case,

22   as my -- my understanding is that there's 6 or 700

23   hours of spliced-together tapes, and so to -- that

24   these have any bearing on the case, I think, is what

25   Mr. Earl's (phonetic) declaration goes to, and it just

1    seems like this is completely unrelated to the facts at

2    issue in this case.

3           But again, so I don't misspeak, after the

4    length of the -- of our process here today, to make

5    sure that we go through all of these things, since we

6    are coming back on Thursday, I would appreciate the

7    Court's indulgence so that I get my facts right, on

8    exactly what we do and we don't have.

9           THE COURT:  Okay, because it's my

10   understanding that there were -- they've identified

11   tapes that were produced in the criminal case.  So for

12   me, that's good enough.  If they had them before,

13   they're going to get them again.

14          MR. CLAMAN:  Okay.

15          THE COURT:  But I personally think that could

16   resolve the issue.  You all may disagree, but at the

17   very least, let's start with the tapes that were

18   produced.  You can review them.  If you think there's

19   something else that might be out there that's not

20   already publically available, my understanding is that

21   these tapes are publically available, then we can cross

22   that bridge when we come to it, but I think the

23   resolution now, is the Government produce the tapes

24   that it's found, which it believes are previously

25   produced in the criminal case, and you guys take a look

1    at them.  See if that doesn't satisfy whatever it is

2    that you're looking for in these tapes.

3            MR. SILVERSMITH:  We'd also ask that the

4    Court order the Government to produce the translation.

5            THE COURT:  Yeah, I agree with that, as well.

6    Why -- I think at some point in your brief you asserted

7    work product.  I don't understand that with regard to

8    translations, but maybe it's not at this point.

9            MR. CLAMAN:  So, Your Honor, there was only a

10   slight portion of the tapes that we reviewed, is my

11   understanding from the criminal case, and if Your Honor

12   wants us to turn that over, I guess we can do that.

13           THE COURT:  I think you need to turn over

14   translations, even if they're partial, if you have

15   them, so.

16       (Counsel confer.)

17           MR. COMISKY:  As soon as you said 1:00 I was

18   -- This is much more important than what I was doing.

19   I was -- I had a bar meeting out of state, but the --

20   the actual committee that I run, if I can't make the

21   meeting, which I'm not going to make now, has a

22   conference call where I could use 'til say 1:30 before

23   we commence, because the call is scheduled at 1:00.  I

24   could lose --

25           THE COURT:  So when are you -- What -- You

1    want to come in at 2:00?

2            MR. COMISKY:  At 1:30 or 2:00, whatever the

3    Court's pleasure is, but just give me half an hour --

4            THE COURT:  All right.

5            Let's say 2:00 on Thursday.

6            MR. COMISKY:  That's fine, Your Honor.

7            THE COURT:  Does that still work for

8    everybody?

9            MR. COMISKY:  Yes.

10           THE COURT:  All right.

11           Two o'clock on Thursday is fine with the

12   Court.

13           MR. COMISKY:  Thank you.

14           THE COURT:  Okay.

15           So I think that that resolves Number 30 and

16   31.  Still have five minutes.

17               "Any interview memoranda of meetings with

18               Milichenko."

19           Number 32.  I think the Government's

20   affidavit also suggested that the FBI had found these

21   memoranda and the Government was prepared to produce

22   them pursuant to -- Well, I don't even know if it's

23   pursuant to a protective order or not, but the

24   Government is prepared to produce them.  That's at page

25   53 of your opposition.

1        Government, is that correct?  You found three

2   302s?

3        MR. CLAMAN:  Yes, Your Honor, this would be

4   within the same confines of the other 302s related to

5   the criminal case.

6        THE COURT:  Might be some privileged

7   material?

8        MR. CLAMAN:  Might be privileged material,

9   subject to the protective order.  This, we think, is

10  subsumed within the other 302 requests.

11       THE COURT:  Okay.

12       Well, but I think that should satisfy, at

13  least as an initial matter, your Request Number 32; is

14  that correct?

15       MR. SMITH:  It is, and then I understand Mr.

16  Milichenko testified in front of the grand jury, so is

17  it the Government's position that they're going to hand

18  over his grand jury transcript?

19       THE COURT:  I'll let them respond, but if he

20  testified as part of this criminal investigation, then

21  I would think yes, provided that they have the

22  authorization from California to do so.

23       MR. CLAMAN:  Your Honor, that is something we

24  have to confirm because we've been told that it's --

25  wasn't related to this investigation.

1          THE COURT:  Okay.

2          MR. CLAMAN:  If he has been -- If he did

3    testify in connection with the investigation in this

4    matter, in front of the grand jury, it would be subject

5    to the other grand jury testimony that we discussed

6    earlier today.

7          THE COURT:  Okay.

8          Well, that's if it's -- only if it's related

9    to this investigation, and you're not confirming that

10   he testified in any other grand jury investigation?

11         MR. CLAMAN:  That's correct, Your Honor.

12         THE COURT:  Okay.

13         MR. SILVERSMITH:  And just for the Court's

14   reference, we'd refer the Government to Mr.

15   Milichenko's affidavit on the issue.

16         THE COURT:  What did that say?  Why don't you

17   help us out?

18         MR. SILVERSMITH:  He said he testified in the

19   grand jury.

20         THE COURT:  In this case?

21         MR. SILVERSMITH:  In this case.

22         THE COURT:  Okay.

23         MR. SILVERSMITH:  I believe he -- that's what

24   it said.  I'd like to double-check it, but he attached

25   a grand jury subpoena, showed that it was litigated,

1    and he ultimately testified, actually after the

2    indictment was returned.

3            MR. CLAMAN:  It would seem to indicate that

4    it wouldn't be this case, Your Honor.

5            MR. SILVERSMITH:  Or that the Government put

6    witnesses in the grand jury after they'd returned an

7    indictment, which they did on another occasion in the

8    case which, I mean, we're not complaining about that,

9    but it is a matter of public record that Ms. Schwiff

10   (phonetic) testified in the grand jury in 2002, and the

11   Indictment, the Second Superceding Indictment was

12   returned in 2001.

13           THE COURT:  Okay.  We have two minutes.

14           And State Department reports, I think that's

15   going to take longer than two minutes.  So I think

16   that's a good stopping point.

17           MR. COMISKY:  Your Honor, (unintelligible) we

18   have a copy of the -- that Second Circuit case.

19           THE COURT:  You need to come to the --

20           MR. COMISKY:  Oh.

21           THE COURT:  -- microphone, please.

22           MR. COMISKY:  If the Court (inaudible) and I

23   actually have an extra copy of the Second Circuit case

24   we referred to, which is, I'm going to mispronounce the

25   name, it's Rajaratnam.

```
 1              THE COURT:  And what does this case relate
 2    to?
 3              MR. COMISKY:  This is the issue on the 3322.
 4    I think we resolved it, but the Court was interested in
 5    reading the case.
 6              THE COURT:  Yeah, I think we're close to
 7    resolving that one, but I'm happy to read it.
 8              MR. COMISKY:  All right.  It's at 622 F.3d
 9    159.
10              UNIDENTIFIED SPEAKER:  Could you repeat the
11    citation?
12              THE COURT:  I'll give it to you again.  For
13    the record, the citation is 622 F.3d 159.
14              Okay, with that, I'll see the parties back
15    here Thursday, May 21st at 2 o'clock.
16              Thank you all.
17         (Proceedings concluded at 4:59 p.m.)
18
19
20
21
22
23
24
25
```

CERTIFICATE

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.


_____              May 30, 2015
STEPHEN C. BOWLES