UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
UNITED STATES OF AMERICA,                     )
                                              )
                 Plaintiff,                   )
                                              )
         v.                                   )         Civil Action No. 04-0798 (PLF)
                                              )
ALL ASSETS HELD AT BANK JULIUS,               )
Baer & Company, Ltd., Guernsey                )
Branch, account number 121128, in the         )
Name of Pavlo Lazarenko <u>et al</u>.,        )
                                              )
                 Defendants <u>In Rem</u>.    )
_____)


OPINION

        This is a civil <u>in rem</u> action in which the United States seeks forfeiture of over

$250 million scattered throughout bank accounts located in Guernsey, Liechtenstein, Lithuania,

Switzerland, and Antigua and Barbuda.  The United States alleges that this money is the

proceeds of violations of certain criminal statutes and therefore is subject to forfeiture.  Based on

recent Supreme Court precedent regarding the extraterritorial reach of certain U.S. statutes,

Claimant Pavel Lazarenko, also known as Pavlo Lazarenko, argues that this forfeiture action is

an impermissible application of U.S. law to foreign conduct.  He seeks a partial judgment on the

pleadings or, in the alternative, partial summary judgment.  Upon consideration of the parties'

papers, the relevant legal authorities, and the arguments of counsel in open court on January 25,

2017, the Court will grant in part and deny in part Lazarenko's motion for partial judgment on

the pleadings.  The Court concludes that it would be inappropriate at this stage in the litigation to consider this motion as a motion for partial summary judgment.[1]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The Court's prior opinions summarize the factual and procedural history of this case, starting with the criminal prosecution of Lazarenko and continuing through this long-running civil forfeiture proceeding.  See, e.g., United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 307 F.R.D. 249, 250-51 (D.D.C. 2014); United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 959 F. Supp. 2d 81, 84-94 (D.D.C. 2013); United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 772 F. Supp. 2d 205, 207-08 (D.D.C. 2011); United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 571 F. Supp. 2d 1, 3-6 (D.D.C. 2008) ("All Assets I").  In brief, Lazarenko was "a prominent Ukrainian politician who, with the aid of various associates, was 'able to acquire hundreds of millions of United States dollars through a

---

[1]     The documents reviewed in connection with the pending motion include:  the Amended Complaint ("Am. Compl.") [Dkt. 20]; Claimant Pavel Lazarenko's Verified Answer to First Amended Verified Complaint For Forfeiture In Rem ("Answer") [Dkt. 268]; Claimant Pavel Lazarenko's Motion for Partial Judgment on the Pleadings and Partial Summary Judgment ("Mot.") [Dkt. 539]; Claimant Pavel Lazarenko's Memorandum of Law in Support of Motion for Partial Judgment on the Pleadings or, in the Alternative, for Partial Summary Judgment ("Mem.") [Dkt. 539-2]; United States' Opposition to Claimant Pavel Lazarenko's Motion for Partial Judgment on the Pleadings and Partial Summary Judgment ("Opp.") [Dkt. 599]; Claimant Lazarenko's Reply in Support of his Motion for Partial Judgment on the Pleadings or, in the Alternative, for Partial Summary Judgment ("Reply") [Dkt. 668]; Claimant Lazarenko's Supplemental Brief in Support of Motion for Partial Judgment on the Pleadings or, in the Alternative, for Partial Summary Judgment ("Claimant's Suppl. Br.") [Dkt. 741]; United States' Response to Claimant Pavel Lazarenko's Supplement Brief in Support of Motion for Partial Judgment on the Pleadings and Partial Summary Judgment ("Pl.'s Suppl. Br.") [Dkt. 823]; Claimant Pavel Lazarenko's Reply in Further Support of his Supplemental Authorities ("Suppl. Reply") [Dkt. 841]; Status Report Regarding Extraterritorial Reach Motion ("Claimant's Status Report") [Dkt. 875]; United States' Status Report in Response to Claimant's Status Report on Assets at Issue in his Extraterritoriality Motion ("Pl.'s Status Report") [Dkt. 885]; and Reply to Plaintiff's Status Report ("Reply Report") [Dkt. 890].

variety of acts of fraud, extortion, bribery, misappropriation and/or embezzlement' committed during the 1990s." United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 959 F. Supp. 2d at 85 (quoting Am. Compl. ¶¶ 1, 10).

When Lazarenko filed a motion to dismiss this case for lack of subject matter jurisdiction and for failure to state a claim under Rule 12(b) of the Federal Rules of Civil Procedure, he argued in part that the Court lacked jurisdiction over the alleged conduct abroad. See All Assets I, 571 F. Supp. 2d at 10 n.8, 12-13. In 2008, the Court denied Lazarenko's motion, briefly discussing extraterritoriality. Id. at 10 n.8. Lazarenko now argues that recent Supreme Court precedent requires the Court to dismiss or narrow all of the United States' alleged claims. Mot. at 1-2. Lazarenko filed this motion in light of the Supreme Court's decisions in Morrison v. National Australian Bank Ltd., 561 U.S. 247 (2010), which announced a new framework for determining whether a federal statute applies extraterritorially, and Skilling v. United States, 561 U.S. 358, 408 (2010), which held that 18 U.S.C. § 1346, the honest services fraud statute, prohibits only bribery-and-kickback schemes and not conflict-of-interest schemes. The Court permitted supplemental briefing after the Supreme Court issued its decision in RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090, 2102 (2016), in which the Supreme Court concluded that the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies extraterritorially in limited circumstances.

*A. Overview of Claims*

The United States brings eight claims for forfeiture under two general categories. The First, Second, Third, and Fourth Claims allege direct forfeiture of criminal proceeds pursuant to 18 U.S.C. § 981(a)(1)(C), which provides for the direct forfeiture of proceeds from the violation of certain enumerated criminal statutes or "any offense constituting 'specified

unlawful activity'" as defined by 18 U.S.C. § 1956(c)(7). See Am. Compl. ¶¶ 120-39. The Fifth, Sixth, Seventh, and Eighth Claims allege forfeiture of property involved in money laundering violations pursuant to 18 U.S.C. § 981(a)(1)(A), which provides for, among other things, the forfeiture of any real or personal property involved in or traceable to a violation of 18 U.S.C. §§ 1956 and 1957. See Am. Compl. ¶¶ 140-55. The United States alleges that all defendants in rem are subject to forfeiture under any of the alleged claims. See id. ¶¶ 124, 129, 134, 139, 143, 147, 151, 155.

### 1. Section 981(a)(1)(C) Direct Forfeiture Claims

The direct forfeiture claims allege that the defendant properties constitute or are derived from proceeds traceable to violations of four offenses that are considered "specified unlawful activity" under 18 U.S.C. § 1956(c)(7). See 18 U.S.C. § 981(a)(1)(C). The three offenses for which a part of the criminal conduct allegedly occurred in the United States are: interstate transportation and receipt of property stolen or taken by fraud, in violation of 18 U.S.C. §§ 2314 and 2315 (First Claim); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Second Claim); and wire fraud, including property and honest services fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Third Claim). The two foreign offenses for which direct forfeiture is alleged and authorized by law are: an offense against a foreign nation of extortion and an offense against a foreign nation of bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; these offenses are specifically enumerated in 18 U.S.C. §§ 1956(c)(7)(B)(ii) and (iv) (Fourth Claim).

## 2. Section 981(a)(1)(A) Money Laundering Forfeiture Claims

The money laundering claims allege that the defendant properties were involved in or traceable to money laundering transactions or attempted money laundering transactions. The violations of money laundering law alleged in the Amended Complaint include: conduct designed to conceal the nature, location, source, ownership, or control of proceeds of a specified unlawful activity under 18 U.S.C. § 1956(a)(1)(B)(i) (Fifth Claim); international transportation, transmission, or transfer of proceeds of a specified unlawful activity under 18 U.S.C. § 1956(a)(2)(B)(i) (Sixth Claim); engaging in or attempting to engage in monetary transactions affecting interstate or foreign commerce with more than $10,000 in proceeds of a specified unlawful activity under 18 U.S.C. § 1957 (Seventh Claim); and conspiracy to engage in money laundering under 18 U.S.C. § 1956(h) (Eighth Claim). The United States alleges the same four predicate offenses occurring in part in the United States and the same foreign extortion predicate as in its direct forfeiture claims as a basis for the money laundering allegations. Foreign official bribery, misappropriation, theft, or embezzlement, as enumerated under 18 U.S.C. § 1956(c)(7)(B)(iv), is not alleged as a basis for the money laundering claims.[2]

### B. Overview of Alleged Conduct

In the Amended Complaint, the United States alleges that the defendant properties are traceable to four criminal schemes. See Am. Compl. ¶¶ 1, 21-54. These schemes allege largely foreign conduct in which Lazarenko, through his position as a public official, and his

---

[2] As the government notes, "the money laundering counts do not rely on foreign theft, bribery, embezzlement, or misappropriation as predicates, as those offenses were not added" as specified unlawful activity to 18 U.S.C. § 1956(c)(7)(B) "until the passage of the Patriot Act of 2001, after the conduct charged in the [c]omplaint was complete." Opp. at 32 n.17.

associates diverted millions of dollars for his personal use.  <u>See</u>, <u>e.g.</u>, <u>id</u>. ¶¶ 6-14.  The United

States alleges that some negotiations took place in the United States, <u>id</u>. ¶ 14, and that some

corporations incorporated in the United States made payments to Lazarenko and his associates,

<u>id</u>. ¶¶ 41-42.  But the primary bases for the alleged domestic conduct are numerous financial

transactions to, from, and through the United States.  <u>See</u>, <u>e.g.</u>, <u>id</u>. ¶¶ 56, 64, 72, 74, 80, 83-84,

106, 111-13, 115.  There are two types of transactions alleged:  (1) transfers to or from accounts

in the United States and (2) electronic funds transfers, or EFTs, which are routed through U.S.

financial institutions.

## II.  LEGAL STANDARD

Lazarenko seeks a partial judgment on the pleadings or, in the alternative, partial

summary judgment.  Mot. at 1.  The United States argues that the Court should construe

Lazarenko's motion as a motion for reconsideration because these issues were presented in

Lazarenko's original motion to dismiss, which the Court denied in <u>All Assets I</u>.  Opp. at 1.  The

Court will consider Lazarenko's motion as a motion for partial judgment on the pleadings under

Rule 12(c) of the Federal Rules of Civil Procedure, not as a motion for reconsideration or for

summary judgment, for two reasons.  First, although the Court discussed issues regarding

extraterritoriality in <u>All Assets I</u>, the Supreme Court has fundamentally changed the framework

for considering extraterritoriality issues.  To treat the pending motion as a motion for

reconsideration would be inappropriate after the Supreme Court's decisions in <u>Morrison v.</u>

<u>National Australian Bank Ltd.</u>, 561 U.S. 247, and <u>RJR Nabisco, Inc. v. European Community</u>,

136 S. Ct. 2090.  Second, "summary judgment is premature unless all the parties have 'had a full

opportunity to conduct discovery.'"  <u>Convertino v. U.S. Dep't of Justice</u>, 684 F.3d 93, 99 (D.C.

Cir. 2012) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986)).  The parties

submitted all of their substantive briefing on this motion before fact discovery had closed, and summary judgment therefore is inappropriate at this time. The Court will consider Lazarenko's motion as a motion for partial judgment on the pleadings.

Rule 12(c) states that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c); see also Hill v. U.S. Dep't of Defense, 70 F. Supp. 3d 17, 19 (D.D.C. 2014). Although a motion for judgment on the pleadings "is functionally identical to a Rule 12(b)(6) motion to dismiss for failure to state a claim," Hill v. U.S. Dep't of Defense, 70 F. Supp. 3d at 19 (citation omitted), the standard under Rule 12(c) is slightly different in terms of its focus. "The granting of a Rule 12(b) motion typically merely means that the plaintiff has failed to satisfy one of the procedural prerequisites for asserting his claim for relief. A motion for judgment on the pleadings, however, theoretically is directed towards a determination of the substantive merits of the controversy . . . ." 5C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1369 (3d ed. 2017). A court therefore grants partial judgment if "it is clear that the merits of the controversy can be fairly and fully decided in this summary manner." Id.

"To survive a motion for judgment on the pleadings, a complaint need only provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what . . . the claim is and the grounds upon which it rests.'" Hill v. U.S. Dep't of Defense, 70 F. Supp. 3d at 19 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).[3] "'Detailed factual allegations' are unnecessary so long as the

_____

[3]     Because this is an in rem forfeiture action, Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions also governs the United States'

allegations contain sufficient facts, 'accepted as true, to state a claim for relief that is plausible on its face.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

On a motion for judgment on the pleadings, the Court construes the complaint liberally in the plaintiff's favor and grants the plaintiff "the benefit of all inferences that can be derived from the facts alleged." United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 772 F. Supp. 2d at 197 (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). "Nevertheless, the Court need not accept inferences drawn by the [plaintiff] if those inferences are unsupported by facts alleged in the claim and answer, nor must the Court accept the [plaintiff's] legal conclusions." Id. (citing Kowal v. MCI Commc'ns Corp., 16 F.3d at 1276). As with a motion to dismiss for a failure to state a claim under Rule 12(b)(6), the Court may grant judgment on the pleadings only if the facts alleged in the claim and answer do not "raise a right to relief above the speculative level," Bell Atl. Corp. v. Twombly, 550 U.S. at 555, or fail to "state a claim to relief that is plausible on its face." Id. at 570.

In deciding the motion for judgment on the pleadings, "a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice." Allen v. U.S. Dep't of Educ., 755 F. Supp. 2d 122, 125 (D.D.C. 2010) (citing Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007)); see also 5C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY

_____

pleading requirements. See generally SUPPLEMENTAL RULES FOR ADMIRALTY OR MARITIME CLAIMS AND ASSET FORFEITURE ACTIONS [hereinafter SUPP. R.], Rule G. The complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial," SUPP. R. G(2)(f), but "the complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." SUPP. R. G(8)(b)(ii). Lazarenko does not dispute the Court's determination that the United States has met its burden under Rule G. See All Assets I, 571 F. Supp. 2d at 16-17.

KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1367 (3d ed. 2017).  The Court will rely on

the Amended Complaint and Lazarenko's First Amended Answer.[4]

## III.  DISCUSSION

### A.  Determining the Extraterritorial Reach of Section 981(a)(1)(A) and (C)

#### 1.  Extraterritoriality Analysis Post-Morrison

"Absent clearly expressed congressional intent to the contrary, federal laws will

be construed to have only domestic application."  RJR Nabisco, Inc. v. European Cmty., 136 S.

Ct. at 2100 (citing Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 255).  This principle is known

as the presumption against extraterritoriality.  Id. (citing Morrison v. Nat'l Austl. Bank Ltd., 561

U.S. at 255).  When a complaint alleges conduct that occurred in whole or in part abroad, the

Court must determine whether "Congress has affirmatively and unmistakably" instructed that the

statute at issue applies to foreign conduct.  Id. (citing Morrison v. Nat'l Austl. Bank Ltd., 561

U.S. at 261).  "When a statute gives no clear indication of an extraterritorial application, it has

none."  Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 255; see also EEOC v. Arabian Am. Oil

Co., 499 U.S. 244, 248 (1991).

The Supreme Court has developed a two-step framework for analyzing

extraterritoriality issues.  First, the Court must ask "whether the presumption against

extraterritoriality has been rebutted — that is, whether the statute gives a clear, affirmative

_____

[4]  At oral argument, Lazarenko suggested that his motion was limited to "assets one, two, and nine."  Mot. Hr'g Tr. (Jan. 25, 2017) at 40 [Dkt. 886].  The Court ordered the parties to file status reports to clarify Lazarenko's statement at oral argument and confirm "which assets and their corresponding accounts are 'assets one, two and nine' and which paragraphs in the Amended Complaint . . . relate to those assets."  Order (Jan. 26, 2017) at 1 [Dkt. 870].  The Court will consider those status reports only to the extent that the reports reference paragraphs in the Amended Complaint.  The Court will not consider facts submitted in the reports that are not included in the pleadings.

indication that it applies extraterritorially." <u>RJR Nabisco, Inc. v. European Cmty.</u>, 136 S. Ct. at 2101. Courts must address this first step of the extraterritoriality inquiry "regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction." <u>Id</u>. "If the statute is not extraterritorial, then at the second step [the court] determine[s] whether the case involves a domestic application of the statute, and [does] this by looking to the statute's 'focus.'" <u>Id</u>. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." <u>Id</u>. Although the Supreme Court has noted that courts typically should start with the first step because it may "obviate step two's 'focus' inquiry," courts are not precluded from "starting at step two in appropriate cases." <u>Id</u>. at 2101 n.5.

Few courts have considered the extraterritorial application of the civil forfeiture statute, 18 U.S.C. § 981, after <u>Morrison</u>. <u>See</u>, <u>e.g.</u>, <u>United States v. Prevezon Holdings Ltd.</u>, 122 F. Supp. 3d 57 (S.D.N.Y. 2015). Furthermore, the structure of the civil forfeiture statute presents a threshold question of where the Court should begin its extraterritoriality analysis. Like the RICO statute at issue in <u>RJR Nabisco</u>, the civil forfeiture statute references and incorporates other statutes. Section 981(a)(1)(C) incorporates other criminal statutes — the criminal violations that permit direct forfeiture. Section 981(a)(1)(A) incorporates three money laundering statutes, which prohibit the money laundering of proceeds of other specified unlawful activity, enumerated in other criminal statutes.

For this reason, the parties offer two potential analytical frameworks for determining the extraterritoriality issues in this case — (1) by starting with the civil forfeiture

provision itself, 18 U.S.C. § 981, or (2) instead by focusing on the underlying criminal statutes — or predicates — that subject the property to civil forfeiture. In <u>RJR Nabisco</u>, the Supreme Court first considered the statute at issue, 18 U.S.C. § 1962, before turning to any incorporated statutes. 136 S. Ct. at 2101. The same analysis is necessary here because if 18 U.S.C. § 981 rebuts the presumption against extraterritoriality by its own terms, there is no need to look at the underlying criminal statutes. In addition, the two civil forfeiture provisions at issue here — 18 U.S.C. § 981(a)(1)(A) and (C) — operate differently, so the Court must address each provision separately.

2. Whether 18 U.S.C. § 981(a)(1)(A) and (C)
Rebut the Presumption Against Extraterritoriality

There is no question that Congress has authorized the United States to seize property located abroad. <u>See</u> 28 U.S.C. § 1355. At issue here, however, is whether the civil forfeiture statute permits the United States to seize property — in this case, money — that is derived from or traceable to crimes that allegedly were committed in whole or in part abroad. As previously noted, the Court must first determine whether the presumption against extraterritoriality has been rebutted — that is, whether 18 U.S.C. § 981 "gives a clear, affirmative indication that it applies extraterritorially." <u>RJR Nabisco, Inc. v. European Cmty.</u>, 136 S. Ct. at 2101.[5] The Supreme Court has instructed that to determine whether a particular

---

[5]     The United States argues that Congress intended some of the criminal statutes at issue in this case — wire fraud, interstate transportation and receipt of property stolen or taken by fraud, Hobbs Act extortion, and money laundering — to apply extraterritorially because these are criminal statutes "'which are, as a class, not logically dependent on their locality for the government's jurisdiction' because 'to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds.'" Opp. at 11 n.5 (quoting <u>United States v. Bowman</u>, 260 U.S. 94, 98 (1922)). The United States reads <u>United States v. Bowman</u> too broadly. In <u>Bowman</u>, the

statute rebuts the presumption against extraterritoriality, courts may look to the text, context, and structure of the statute.  Id. at 2102-03; see also Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 265 ("[C]ontext can be consulted as well.")

The text of 18 U.S.C. § 981(a)(1)(A) and (C) provides little indication that the two provisions apply extraterritorially.  Section 981(a)(1)(A) states that any real or personal property is subject to forfeiture to the United States if it is "involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of [Title 18], or any property traceable to such property."  Section 981(a)(1)(C) states that any real or personal property is subject to forfeiture if it "constitutes or is derived from proceeds traceable" to a violation of one of certain enumerated statutes or "any offense constituting 'specified unlawful activity' (as defined by section 1956(c)(7))."  Nothing in this language shows a clear intent from Congress that the civil forfeiture statute applies to conduct abroad.

The structure of Section 981, however, is similar to the RICO statute at issue in RJR Nabisco, Inc. v. European Community, which leads the Court to conclude that the civil forfeiture statute applies extraterritorially in certain circumstances.  In RJR Nabisco, the Supreme Court considered whether 18 U.S.C. § 1962 (the substantive RICO statute) applies to conduct abroad and whether Section 1964(c) (RICO's civil private right of action) applies to injuries abroad.  136 S. Ct. at 2099-2100.  Section 1962 prohibits certain activities that are

Supreme Court concluded that the presumption against extraterritoriality does not apply to criminal statutes that "are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents."  260 U.S. at 98.  Although Bowman "has not been overruled or explicitly limited" by Morrison or any other subsequent Supreme Court decisions, courts have adhered to this limitation, stating that Bowman applies only to a narrow class of statutes that "criminaliz[e] fraud or corruption against the United States."  United States v. Campbell, 798 F. Supp. 2d 293, 303-04 (D.D.C. 2011); see also United States v. Ayesh, 762 F. Supp. 2d 832, 838 (E.D. Va. 2011).

conducted through a pattern of racketeering activity. See 18 U.S.C. § 1962(a)-(c). Section 1961 includes all of the possible crimes, or "predicate acts," that can constitute racketeering activity for the purposes of RICO. See 18 U.S.C. § 1961(1). The Court determined that because some RICO predicates "plainly apply to at least some foreign conduct," Section 1962 was intended to apply and does apply to racketeering conduct abroad "to the extent that the predicates alleged in the particular case themselves apply extraterritorially." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2102. The Supreme Court concluded that "[t]his unique structure makes RICO the rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality." Id. at 2103.

Despite its conclusion that the substantive RICO provision applies extraterritorially, the Supreme Court determined that the civil RICO private right of action provision, 18 U.S.C. § 1964(c), must be analyzed separately. RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2106. Noting that "a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to conduct abroad," the Supreme Court concluded that nothing in the text or context of Section 1964(c) indicated that Congress clearly intended to provide for a private right of action to individuals who suffered RICO injuries abroad. Id. at 2107-08.

Lazarenko argues that Section 981 is essentially the same as Section 1964(c) — the civil RICO private right of action provision — and like Section 1964(c), the text of the Section 981 provides no indication that the civil forfeiture provision applies and was intended to apply to conduct abroad. Claimant's Suppl. Br. at 4-6; Claimant's Suppl. Reply at 5-6. The Court disagrees. Although the text of Section 981 provides no indication that the statute applies abroad, the structure of the statute is similar to the structure of Section 1962, the substantive

provision of the RICO statute. Both statutes incorporate other criminal statutes as a means to determine what conduct is proscribed, and in the case of Section 981, what specific property is subject to forfeiture.

Section 981(a)(1)(C) lists as predicate acts the violation of specific criminal statutes and other "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7). Section 1956(c)(7) defines specified unlawful activity to include "any act or activity constituting an offense listed in section 1961(1)" — in other words, the same list of predicate crimes that the Supreme Court determined allowed for the extraterritorial application of the substantive RICO provision in 18 U.S.C. § 1962. Section 1956(c)(7) also includes certain offenses "against a foreign nation" that necessarily apply to foreign conduct. See 18 U.S.C. § 1956(c)(7)(B). The structure of Section 981(a)(1)(C) and the statutes that it incorporates clearly indicate that Congress intended Section 981(a)(1)(C) to apply to some conduct abroad. See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2101. The Court therefore concludes that Section 981(a)(1)(C) applies extraterritorially to the extent that the underlying criminal statute or the specified unlawful activity applies to conduct abroad.

Section 981(a)(1)(A) directly incorporates three money laundering statutes: 18 U.S.C. §§ 1956, 1957, and 1960. Sections 1956 and 1957, violations of which are alleged here, explicitly provide for extraterritorial application, with certain limitations as to their reach. See 18 U.S.C. §§ 1956(f), 1957(d); see also infra at 15-24. The Court therefore concludes that the structure of Section 981(a)(1)(A) also indicates that the provision applies and was intended to apply to conduct abroad to the extent that the conduct comes within the terms of the extraterritorial provisions of Sections 1956 and 1957. See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2101. As the Supreme Court noted in RJR Nabisco, "when a statute provides for

some extraterritorial application, the presumption against extraterritoriality operates to limit that provision by its terms." Id. at 2102 (quoting Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 265).

The Court's next inquiry can be summarized in the following way: For the money laundering claims, brought under Section 981(a)(1)(A), the Court has already noted that these statutes have express extraterritorial provisions, and the Court therefore must determine whether the alleged conduct falls within the extraterritorial terms of the money laundering statutes. There is no need for the Court to look at the "focus" of the money laundering statutes. See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2101. For the other claims, brought under Section 981(a)(1)(C), the Court must determine whether the underlying criminal statute or the specified unlawful activity applies extraterritorially and, if it does not, determine whether the alleged conduct would constitute a permissible domestic application of the statute by looking at the statute's "focus." Id.

*B. Extraterritorial Reach of the United States' Claims*

1. Fifth, Sixth, and Eighth Claims — Money Laundering Under 18 U.S.C. § 1956

The United States brings three claims for relief under 18 U.S.C. § 1956. It asserts that under 18 U.S.C. § 981(a)(1)(A) the defendants in rem are property involved in a transaction or attempted transaction or traceable to violations of three money laundering provisions: money laundering, in violation of Section 1956(a)(1)(B)(i) (Fifth Claim); international money laundering, in violation of Section 1956(a)(2)(B)(i) (Sixth Claim); and conspiracy to commit money laundering, in violation of Section 1956(h) (Eighth Claim). See Am. Compl. ¶¶ 140-47, 152-55.

The language of 18 U.S.C. § 1956 expressly indicates that Congress intended for the statute to apply to conduct abroad. Section 1956(f) states that "[t]here is extraterritorial jurisdiction over the conduct prohibited by this section if — (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000." There is no dispute that (1) Mr. Lazarenko and his alleged coconspirators are not U.S. citizens and (2) the transactions or the series of related transactions alleged in the Amended Complaint exceed $10,000 dollars. The Court therefore must determine whether the transactions alleged in the Amended Complaint occurred "in part in the United States."

Lazarenko concedes that a transfer from a foreign account to an account in a U.S. financial institution and a transfer from a U.S. account to a foreign financial institution occur in part in the United States under 18 U.S.C. § 1956(f). Reply at 29; see, e.g., United States v. Hawit, No. 15-cr-0252, 2017 WL 663542, at *9 (E.D.N.Y. Feb. 17, 2017); United States v. Galvis-Pena, No. 09-cr-0025, 2012 WL 425240, at *3-4 (N.D. Ga. Feb. 9, 2012); United States v. Stein, No. 93-cr-0375, 1994 WL 285020, at *5 (E.D. La. June 23, 1994). Further, the legislative history of the statute indicates that Congress intended the provision to apply to situations where "a person transfers by wire the proceeds of a [crime] from a bank in the United States to a bank in a foreign country." S. Rep. 99-443, at 14 (1986).

Lazarenko argues, however, that for several of the in rem defendants the United States has alleged only transactions that "passed through a correspondent bank account" in the United States as electronic funds transfers ("EFTs") and that such transfers do not occur in part in the United States under Section 1956(f). Mem. at 28-30. In other words, Lazarenko maintains

that an EFT is a single foreign transaction from one foreign country to another that does not

occur in the United States and only "momentarily pass[es] through the U.S. banking system,"

rather than two separate transactions — one transaction that enters the United States and one

transaction that exits the United States.  Id. at 13.

The Court addressed this argument in All Assets I.  See 571 F. Supp. 2d at 12-13.

In his original motion to dismiss, Lazarenko argued that EFTs are not transfers under 18 U.S.C.

§ 1956(a)(1) or (2) because each EFT is a single transaction from a foreign bank account to

another foreign bank account that only incidentally passes through a U.S. financial institution.

Id. at 13.  The Court rejected this argument.  Based on Second Circuit precedent, the Court

concluded that for each EFT "at least two transactions occurred:  first, funds moved from the

originating back to the intermediary bank; then the intermediary bank was to transfer the funds to

the destination bank. . . . While the two transactions can occur almost instantaneously,

sometimes they are separated by several days."  Id. (quoting United States v. Daccarett, 6 F.3d

37, 54 (2d Cir. 1993)).

Lazarenko argues that the case on which the Court relied, United States v.

Daccarett, is no longer good law and that "the Second Circuit has since limited Daccarett in the

forfeiture context."  Mem. at 41; see also Mot. Hr'g Tr. (Jan. 25, 2017) at 55 [Dkt. 886].  All of

the decisions Lazarenko cites, however, deal with largely unrelated issues.  See Mem. at 39-41.[6]

---

[6]        In United States v. Cosme, the Second Circuit discussed a wholly unrelated part
of the Daccarett opinion dealing with Fourth Amendment seizures and concluded that when the
government seizes a res without a warrant from an intermediary bank under the exigent
circumstances exception, it must still get a warrant to justify an extended seizure of the res.  796
F.3d 226, 235 (2d Cir. 2015).  In Export-Import Bank of the United States v. Asia Pulp & Paper,
the Second Circuit held that "an EFT temporarily in the possession of an intermediary bank may
not be garnished under the [Federal Debt Collection Procedures Act] to satisfy a judgment owed
by the beneficiary or originator of that EFT."  609 F.3d 111, 122 (2d Cir. 2010).  In Shipping

The Court finds no support in any of these three decisions for the proposition that Daccarett is no longer persuasive authority on the issue presented here.  The Court therefore again concludes that EFTs are two transactions:  one transaction into the United States and one transaction out of the United States.[7]  This conclusion, however, does not end the inquiry of whether EFTs are conduct occurring in part in the United States sufficient to satisfy the extraterritorial provision of 18 U.S.C. § 1956(f).

As the Court noted in All Assets I, Congress enacted the money laundering statute "to criminalize the use of United States financial institutions as clearinghouses for criminal money laundering and conversion into United States currency."  571 F. Supp. 2d at 12; see also

---

Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd., the Second Circuit held that EFTs in the temporary possession of an intermediary bank are not subject to attachment under Rule B of Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions because they are not the property of either the originator or the beneficiary under New York law.  585 F.3d 58, 70-71 (2d Cir. 2009).  In Daccarett, by contrast, the only question was whether the assets were attachable while in transit as EFTs, without regard to who had a property interest in the assets, an irrelevant consideration for forfeiture purposes.  Id. at 69.

[7]     To further support his position that EFTs do not occur "in part" in the United States, as required by Section 1956(f), Lazarenko cites post-Morrison decisions in which EFTs have been considered, but in other contexts.  See, e.g., United States v. Prevezon Holdings Ltd., 122 F. Supp. 3d at 71 (concluding that a single EFT is not "sufficient to overcome the presumption against the wire fraud statute's extraterritorial application"); Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 513 B.R. 222, 228 n.1 (S.D.N.Y. 2014) (concluding that EFTs are not sufficient for a domestic application of section 550(a) of the Bankruptcy Code); Univ. Trading & Inv. Co. v. Tymoshenko, No. 11-7877, 2012 WL 6186471, at *3 (S.D.N.Y. Dec. 12, 2012) (declining to exercise personal jurisdiction over a defendant based on EFTs given a "lack of clear precedent" on the issue for personal jurisdiction analysis).  None of these cases is on point.  Indeed, Lazarenko has cited only one case that potentially supports his conclusion that EFTs do not occur "in part" in the United States for purposes of 18 U.S.C. § 1956(f).  In United States v. Lloyds TSB Bank PLC, the Court mentioned in a footnote the government's "faint reliance" on EFTs to support venue under Section 1956; but — addressing the issues before it — the Court ultimately determined that the fact that EFTs "may or did pass electronically through the New York banking system" was not relevant for forum non conveniens or subject matter jurisdiction analysis.  639 F. Supp. 2d 314, 324 n.4 (S.D.N.Y. 2009).  The Court is unpersuaded by any of these decisions because these cases present different concerns than the question at issue here.

S. Rep. 99-433, at 2 (1986). Lazarenko argues, however, that EFTs are not an "abuse of the U.S. financial system," because the individual does not deliberately choose to have the transfer pass through a U.S. financial institution; the foreign bank decides which intermediary bank to use. Reply at 27. The fact that Lazarenko himself or one of his associates did not direct the transfer to go through the United States does not mean that EFTs passing through the U.S. banking system do not significantly affect interstate and foreign commerce in the United States. As Lazarenko acknowledges, U.S. dollars are "the dominant reserve currency for the international financial system," Reply at 1, and 95 percent of "all international transfers in U.S. dollars pass through the United States as EFTs." Mem. at 1. These EFTs are transferred through one of a handful of wire payments systems in the United States and represent billions of dollars in transfers every day at and through U.S. financial institutions. See Banque Worms v. BankAmerica, Int'l, 570 N.E.2d 189, 194 (N.Y. 1991). To conclude that the money laundering statute does not reach EFTs simply because Lazarenko himself did not choose a U.S. bank as the correspondent or intermediate bank for his wire transfers would frustrate Congress's intent to prevent the use of U.S. financial institutions "as clearinghouses for criminals." All Assets I, 571 F. Supp. 2d at 12.

Lazarenko also argues that to conclude that an electronic funds transfer through the United States constitutes conduct occurring in part in the United States sufficient to satisfy 18 U.S.C. § 1956(f) would allow the United States to forfeit "proceeds of all crimes, anywhere in the world" simply because the actors used U.S. dollars that were then transferred through the U.S. financial system. Reply at 1. Such a conclusion, he maintains, would "extend[] jurisdiction to at least 330,000 daily payment orders, with an aggregate daily value of $1.450 trillion, none of which have anything whatsoever to do with the United States." Reply at 28. This is not an

accurate statement. Congress limited the extraterritorial reach of the money laundering statutes to crimes that involve monetary transactions derived from the proceeds of specified unlawful activity conducted in part in the United States and involving a transaction or series of transactions over $10,000. See 18 U.S.C. § 1956(f). Furthermore, although the use of U.S. currency alone would not be sufficient under 18 U.S.C. § 1956(f), Congress is justified in protecting U.S. financial institutions from those "seeking out the safety and stability of the U.S. dollar," who then transfer money derived from unlawful activity through the U.S. financial system. Opp. at 14; see also All Assets I, 571 F. Supp. 2d at 12. These limitations "ensur[e] that Federal extraterritorial jurisdiction is confined to significant cases" where "the interests of the United States are involved." S. Rep. 99-433, at 14.

The definition of the term "transaction" in 18 U.S.C. § 1956(c) is further indication that Congress intended Section 1956 to cover EFTs. The statute defines a transaction as, among other things, "a deposit, withdrawal, transfer between accounts, . . . or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected." 18 U.S.C. § 1956(c)(3) (emphasis added). This definition strongly suggests that Congress intended to target EFTs that merely pass through a U.S. financial institution in Section 1956. This Court therefore concludes that EFTs that pass through a U.S. financial institution constitute conduct that occurs in part in the United States under 18 U.S.C. § 1956.

The Court recognizes that whether an EFT is sufficient conduct for extraterritorial application under 18 U.S.C. § 1956(f) is a question of first impression in this Court and has not been considered widely. Opening an account in the United States or transferring money to and from accounts in the United States is certainly more substantial conduct than transferring money through an intermediary bank's U.S. account. In this case, the United States alleges that

Lazarenko and his associates transferred millions of dollars to and from accounts in the United States and between foreign bank accounts as EFTs that passed through U.S. financial institutions. See, e.g., Am. Compl. ¶¶ 31, 34, 42-43, 50-51. In the Court's view, this conduct is precisely what Congress intended to prevent in enacting the money laundering statutes — the use of U.S. financial institutions as clearinghouses for criminal money laundering. It is conduct that fits well within the statute's requirement of conduct that "occurs in part in the United States" under Section 1956(f). Extraterritorial jurisdiction therefore is proper under the express terms of the statute.[8]

The United States has alleged sufficient facts that the defendants in rem are property derived from violations of 18 U.S.C. § 1956(a)(1), (a)(2), and (h). See All Assets I, 571 F. Supp. 2d at 11-14; see, e.g., Am. Compl. ¶¶ 31, 34, 39, 55-56, 61-64, 88, 94. The Court therefore will deny Lazarenko's motion for judgment on the pleadings with respect to the Fifth, Sixth, and Eighth Claims.[9]

---

[8] Lazarenko also requests that the Court require the United States to identify any accounts that exclusively hold funds that were transferred as EFTs and that it lift the restraint on those accounts. See Mem. at 41. He asks the Court to reconsider its decision — based in part on Daccarett — that funds that passed through U.S. financial institutions as EFTs could be subject to seizure. Mem. at 39-41; see All Assets I, 571 F. Supp. 2d at 13. He argues that "Daccarett . . . only permits the seizure of funds from the intermediary bank while in transit through the New York bank, which is not what happened in Mr. Lazarenko's case." Mem. at 41. The Court finds no support for this proposition in the cases on which Lazarenko relies or in any other authority. As the Court noted, supra at 17-18, these cases arise from patently different contexts, and they say nothing regarding whether funds that passed through U.S. financial institutions as EFTs could later be subject to forfeiture. The Court therefore will deny Lazarenko's request to lift the restraint on any account containing only funds that were transferred as EFTs.

[9] Each money laundering claim requires that the government allege that the money is the proceeds of "specified unlawful activity," which is conduct prohibited by certain enumerated criminal statutes. See 18 U.S.C. § 1956(c)(7). The United States argues that EFTs are conduct that occurs in part in the United States under Section 1956(f), see Opp. at 32-37, but it also assumes that the money laundering claims can only survive a motion for partial judgment

## 2. Seventh Claim — Engaging in Transactions with the Proceeds of Money Laundering Under 18 U.S.C. § 1957

Section 1957, which prohibits engaging in, or attempting to engage in, a monetary transaction in criminally derived property of a value greater than $10,000 and that is derived from specified unlawful activity, also contains an extraterritorial provision. See 18 U.S.C. § 1957(a). An individual violates Section 1957 if the offense "takes place in the United States." Id. § 1957(d)(1). But an individual also violates Section 1957(a) if the offense "takes place outside of the United States" so long as the defendant is a United States person. Id. § 1957(d)(2). By statute, a "United States person" includes any person within the United States and any corporation organized under the laws of any state. 18 U.S.C. § 3077(2).

---

on the pleadings if the statute prohibiting the specified unlawful activity alleged for each money laundering claim also applies extraterritorially. See Opp. at 32; see also United States v. Prevezon Holdings Ltd., 122 F. Supp. 3d at 70 (concluding that the allegations of wire fraud could not constitute specified unlawful activity for a money laundering claim because the wire fraud statute does not apply extraterritorially and the complaint did not allege "sufficiently domestic conduct" for wire fraud). The Court is not convinced that this is correct.

As the Supreme Court has made clear, courts may consider the structure of a statute, including references to other statutes, when determining whether a statute applies extraterritorially. See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2101-02. Section 1956, however, includes an express extraterritorial provision. See 18 U.S.C. § 1956(f). Once a court determines that there is clear congressional intent for the statute to apply abroad, it limits the extraterritorial application to the terms of the statute. See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2102 (citing Morrison v. Nat'l Austl. Bank. Ltd., 561 U.S. at 265). "Section 1956(f), which explicitly sets forth the requirements for Section 1956's extraterritorial application, does not indicate in any way that the underlying specified unlawful activity must also be extraterritorial in nature." United States v. Hawit, 2017 WL 663542, at *9 n.13.

Even if the Court were to adopt the approach assumed by the government and applied in Prevezon Holdings, the Court would still conclude that the United States has alleged sufficient claims for money laundering under Sections 1956 and 1957 because the Amended Complaint alleges proper claims for interstate transportation and receipt of property stolen or taken by fraud and foreign extortion as the specified unlawful activity of the money laundering claims. See infra at 25-27, 34-35.

Lazarenko argues that the Court must dismiss this claim because none of the defendants in rem is a "United States person" under Section 1957(d)(2). Reply at 26.[10] The Court need not consider this argument, however, because Section 1957(d)(1) covers both wire transfers and EFTs. First, although few courts have considered where a monetary transaction "takes place" under Section 1957, the Court is satisfied that transfers to accounts in U.S. financial institutions and from accounts in U.S. financial institutions are monetary transactions that "take place" in the United States. See United States v. Black, 469 F. Supp. 2d 513, 538 (N.D. Ill. 2006) (concluding that a transfer from Canada to a financial institution in Chicago is a transaction that "took place" in the United States); United States v. Approximately $25,829,681.80 in Funds, No. 98-2682, 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999) (same).

Second, the Court concludes that the statute's definition of monetary transaction also covers EFTs. Under 18 U.S.C. § 1957, a monetary transaction includes any "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1) (emphasis added). This definition suggests that Section 1957 prohibits even EFTs that merely pass through a U.S. financial institution. See also supra at 16-21. This Court therefore concludes that EFTs that pass through a U.S. financial institution take place in the United States under 18 U.S.C. § 1957(d)(1).

---

[10] In a recent status report, Lazarenko states that there is a legal dispute between the parties regarding whether one of Lazarenko's associates was a United States person for purposes of 18 U.S.C. §§ 1956(h) and 1957. Reply Report at 2. Lazarenko asks the Court for guidance on this legal issue. Id. The Court declines to offer such guidance because Lazarenko failed to present this issue in his opening brief or at oral argument, and the United States has had no opportunity to respond.

The United States alleges numerous transactions into and out of U.S. accounts, numerous EFT transactions that passed through U.S. financial institutions, and checks drawn on U.S. accounts. <u>See</u>, <u>e.g.</u>, Am. Compl. ¶¶ 56, 64, 72, 74, 80, 83-84, 106, 111-13, 115. These facts are sufficient to support the Seventh Claim that the defendants <u>in rem</u> are property derived from or traceable to a violation of 18 U.S.C. § 1957. The Court therefore denies Lazarenko's motion for judgment on the pleadings with respect to the Seventh Claim.

### 3. First Claim — Interstate Transportation and Receipt of Property Stolen or Taken by Fraud Under 18 U.S.C. §§ 2314 and 2315

Before turning to the extraterritoriality analysis with respect to the First Claim, the Court addresses Lazarenko's argument that 18 U.S.C. §§ 2314 and 2315 do not apply to the "intangible harms" asserted in the Amended Complaint. Mem. at 15 n.9. Citing <u>Dowling v. United States</u>, 473 U.S. 207 (1985), Lazarenko argues that Sections 2314 and 2315 do not apply because the United States has alleged that Lazarenko deprived the people of Ukraine of the intangible right of honest services. Mem. at 15 n.9; Reply at 10-11. Under Lazarenko's theory, Sections 2314 and 2315, which prohibit the transfer and receipt of money unlawfully taken by fraud, would not apply in any instance of honest services fraud.

In <u>Dowling v. United States</u>, the Supreme Court considered whether a defendant, who had transported phonorecords of musical performances for which he had not paid royalties, had transported goods that were "stolen, converted or taken by fraud for purposes of [18 U.S.C.] § 2314." 473 U.S. at 215-16 (internal quotation marks omitted). The Court concluded that he had not, relying in part on the intangible nature of copyright and other intellectual property. <u>Id</u>. at 216-18. It stated that Section 2314 "seems clearly to contemplate a physical identity between the items unlawfully obtained and those eventually transported." <u>Id</u>. at 216.

Lazarenko seeks to extend this conclusion to honest services fraud because the right of honest services is an intangible right. See Mem. at 15 n.9.[11] He cites no case that stands for the proposition that Sections 2314 and 2315 cannot apply to the proceeds of honest services fraud, and it would seem to frustrate the purpose of the statute to exclude an entire type of fraud for which Congress has provided an explicit remedy. As the United States correctly notes, the physical item unlawfully obtained and transported in this case is money, which falls under both statutes. See 18 U.S.C. §§ 2314, 2315; see also United States v. Gilboe, 684 F.2d 235, 238 (2d Cir. 1982).

### a.  18 U.S.C. § 2314

The Court next turns to the question of whether Section 2314 by its terms applies extraterritorially and, if it does not, whether the conduct relevant to the statute's focus occurred in the United States.  A person violates Section 2314 if he or she "transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud."  18 U.S.C. § 2314.  As Lazarenko notes, Section 2314 includes only a general reference to "foreign commerce," which the Supreme Court has found insufficient to rebut the presumption against extraterritoriality.  See Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 248 (citing EEOC v. Arabian Am. Oil Co., 499 U.S. at 251).  "[E]ven statutes that contain broad language in their

---

[11]    Lazarenko does not rely on Skilling v. United States, 561 U.S. 358, for his argument with respect to 18 U.S.C. §§ 2314 and 2315.  In Skilling, the Supreme Court concluded that schemes to defraud a victim of the intangible right of honest services under the mail and wire fraud statutes must allege bribes or kickbacks.  561 U.S. at 408-09.  Schemes alleging only a conflict of interest are insufficient.  Id.  These conclusions say nothing about the intangible harm argument Lazarenko makes here.

definitions of 'commerce' that expressly refer to 'foreign commerce' do not apply abroad."

EEOC v. Arabian Am. Oil Co., 499 U.S. at 251.

Having concluded that Section 2314 does not rebut the presumption against extraterritoriality, the Court turns to whether the Amended Complaint alleges a domestic application of Section 2314 by looking to the statute's focus. The text of the statute indicates that the focus of Section 2314 is the transportation or transfer of property. The legislative history also supports this conclusion. In enacting 18 U.S.C. § 2314, Congress was primarily concerned with the movement of stolen property across state lines. See Dowling v. United States, 473 U.S. at 218-20 (discussing legislative history).[12] The legislative history also suggests that Congress intended Section 2314 to apply to both interstate transportation and transportation into and out of the United States. See H. Rep. 152, at A374 (1945) (noting that Section 2314 applies to "transportation from one State, Territory, or the District of Columbia to another State, Territory, or the District of Columbia, or to a foreign country, or from a foreign country to any State, Territory, or the District of Columbia"). The Court therefore concludes that the focus of Section 2314 is the transportation or transfer of property. Applying Section 2314 to wire transfers into and out of the United States of money allegedly unlawfully taken constitutes a "domestic application" of Section 2314.

The Amended Complaint alleges numerous wire transfers into and out of the United States, which is sufficient for Section 2314. See, e.g., Am. Compl. ¶¶ 123-24. It also

_____

[12] Lazarenko argues that the focus of Sections 2314 and 2315 is more limited: the transportation of stolen property "in order to escape the reach of law enforcement encumbered by jurisdictional boundaries." Reply at 8 (citing Dowling v. United States, 473 U.S. at 220). The Court is not persuaded. The Supreme Court's extraterritoriality decisions do not indicate that courts must narrow a statute's focus to the precise example provided in the legislative history. To do so, would ignore the broader language in the text of the statute.

alleges numerous transfers in the form of EFTs that pass through the United States.  See, e.g., id.

¶¶ 56, 79-80, 97, 115.  In light of the Court's determination that each EFT is two separate

transactions — a transaction into an account in the United States and a transaction out of an

account in the United States — Section 2314 also applies to EFTs.  See United States v.

Daccarett, 6 F.3d at 54.  Lazarenko's argument that EFTs are not the "focus" of Section 2314 is

beside the point.  See Reply at 7.  The Court therefore will deny Lazarenko's motion for

judgment on the pleadings with respect to the First Claim and 18 U.S.C. § 2314.

### b.  18 U.S.C. § 2315

The text of 18 U.S.C. § 2315 illustrates even clearer congressional intent for the

statute to apply to the conduct alleged in the Amended Complaint.  A person violates Section

2315 if he or she "receives, possesses, [or] conceals" more than $5,000 that has "crossed a State

or United States boundary after being stolen, unlawfully converted, or taken, knowing the same

to have been stolen, unlawfully converted, or taken."  18 U.S.C. § 2315.  As noted above, the

Amended Complaint alleges numerous wire transfers into and out of the United States of money

allegedly unlawfully taken.  See, e.g., Am. Compl. ¶¶ 123-24.  Section 2315 explicitly proscribes

the conduct alleged here:  concealing property that has "crossed a . . . United States boundary."

Because the Court has concluded that each EFT crosses a U.S. border once upon entering a U.S.

account and once upon exiting a U.S. account, Section 2315 clearly applies to EFTs.  See United

States v. Daccarett, 6 F.3d at 54.  The Court therefore will deny Lazarenko's motion for

judgment on the pleadings with respect to the First Claim and 18 U.S.C. § 2315.[13]

---

[13]     Within the Supreme Court's extraterritoriality framework, the Court's conclusion
can be seen in one of two ways.  Section 2315 rebuts the presumption against extraterritoriality
because the statutory language clearly encompasses conduct that must start or end outside of the

4.  Second Claim — Hobbs Act Extortion Under 18 U.S.C. § 1951

The Hobbs Act provides, as relevant here:  "Whoever in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion" violates Section 1951.  18 U.S.C. § 1951(a).  The statute defines commerce as "all commerce between any point in a State, Territory, Possession, or the District of Columbia, and any point outside thereof; all commerce between points within the same State through any place outside such State; and all commerce over which the United States has jurisdiction."  Id. § 1951(b)(3).

The United States argues that the broad language of the statute and the references to foreign commerce indicate Congress's intent for Section 1951 to apply extraterritorially.  Pl.'s Suppl. Br. at 6.  As discussed supra at 25-26, prior Supreme Court precedent dooms this argument.  See Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 248; EEOC v. Arabian Am. Oil Co., 499 U.S. at 251.  The United States also argues that the statute's prohibition of conduct that "in any way or degree" affects commerce indicates that the statute applies extraterritorially.  Pl.'s Suppl. Br. at 6.  But the word "any," which "ordinarily connotes breadth, . . . is insufficient to displace the presumption against extraterritoriality."  RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2108.  The Court therefore concludes that the language of the Hobbs Act does not rebut the presumption against extraterritoriality.  It must determine whether the United States alleges a domestic application of the Hobbs Act by looking to the statute's focus.

The United States argues that the Amended Complaint alleges a wholly domestic application of Section 1951 because the focus of the statute is the effect on commerce, and the

United States border.  Or, as the Second Circuit has noted, "[r]egulation of conduct in crossing the United States borders is not regulation of extraterritorial conduct," and "[t]he presumption against extraterritorial application of United States statutes does not apply to statutes that regulate entering and exiting the United States."  European Cmty. v. RJR Nabisco, Inc., 764 F.3d 129, 140 n.7 (2d Cir. 2014), rev'd on other grounds, 136 S. Ct. 2090.

Amended Complaint adequately alleges an effect on commerce through the various financial transactions into, out of, and through the United States. Opp. at 20-22. To support this proposition, the United States notes that the Supreme Court has stated that the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." Stirone v. United States, 361 U.S. 212, 215 (1960). Lazarenko argues that the focus of the Hobbs Act is the extortion, which in this case, occurred abroad. Reply at 11-12.

Lazarenko has the better of the argument. It is certainly true that the Hobbs Act speaks in broad language to punish those who affect commerce, and the jurisdictional element is a critical part of any federal statute. The Court is not convinced, however, that the effect on commerce is the focus of the Hobbs Act. A review of the legislative history indicates that the extortion, robbery, or physical violence that affected commerce was the focus of congressional concern. In enacting the Hobbs Act:

> Congress was most concerned about active coercion by labor union members. The legislative history is replete with accounts of union members stopping farm produce trucks to coerce farmers into making payments to the union. Acts of robbery and extortion involving violence were the primary concern of the legislators. Thus, Congress was concerned exclusively with extortion of an active nature.

James P. Fleissner, Prosecuting Public Officials Under the Hobbs Act: Inducement as an Element of Extortion Under Color of Official Right, 52 U. CHI. L. REV. 1066, 1084 (1985) (collecting statements from congressional reports and the Congressional Record). The debate in Congress over the passage of the Hobbs Act — and its predecessor, the Anti-Racketeering Act — centered on creating a law that prohibited extortion and coercion but did not include legitimate activities such as collective bargaining, which arguably also affects commerce. See Evans v. United States, 504 U.S. 255, 262-63 (1992); United States v. Culbert, 435 U.S. 371, 377

(1978); see also S. Rep. No. 532, at 2 (1934); H. Rep. No. 1833, at 2 (1934). Considering the text and legislative history of the Hobbs Act, the Court concludes that the focus of congressional concern was the extortion, robbery, or physical violence that the statute prohibits.

The United States has not pointed to any allegations in the Amended Complaint indicating that any of the alleged extortion occurred in the United States; nor has the Court found such allegations. See Opp. at 18-22. Because 18 U.S.C. § 1951 does not apply extraterritorially and the United States has not alleged sufficient facts that the defendants in rem are the proceeds of extortion or robbery that occurred in the United States, the Court will grant judgment on the pleadings to Lazarenko with respect to the Second Claim.

### 5. Third Claim — Wire Fraud Under 18 U.S.C. §§ 1343 and 1346

The wire fraud statute applies to the transmission of communications by "wire, radio, or television . . . in interstate or foreign commerce" in the execution of a scheme to defraud. 18 U.S.C. § 1343. Relying on the Supreme Court's admonition in Morrison that "a 'general reference to foreign commerce . . . does not defeat the presumption against extraterritoriality,'" the Second Circuit has concluded that the wire fraud statute, 18 U.S.C. § 1343, does not apply extraterritorially. European Cmty. v. RJR Nabisco, Inc., 764 F.3d 129, 141 (2d Cir. 2014), rev'd on other grounds, 136 S. Ct. 2090 (quoting Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 263); see also United States v. Sidorenko, 102 F. Supp. 3d 1124, 1129 (N.D. Cal. 2015). But see United States v. Georgiou, 777 F.3d 125, 137 (3d Cir. 2015) ("Section 1343 applies extraterritorially."). [14] The Court agrees that nothing in the text, legislative history,

---

[14] The Court declines to adopt the Third Circuit's conclusion that the wire fraud statute applies extraterritorially. In concluding that the wire fraud statute applies extraterritorially, the Third Circuit stated that "the explicit statutory language indicates that it

or context of the wire fraud statute expressly rebuts the presumption against extraterritoriality. The Second Circuit went on to say, however, that "[i]f domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside of the United States." European Cmty. v. RJR Nabisco, Inc., 764 F.3d at 142; see also RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2105.

The United States does not argue that the domestic conduct alleged in this case satisfies every essential element of the wire fraud statute. See Opp. at 22-29. Rather, it argues that the "focus" of the wire fraud statute is the use of U.S. wires and that the wire fraud statute therefore may be used to prosecute fraud that largely occurs abroad. Id. at 23-24. Under the United States' theory, a domestic application of the wire fraud statute requires only the use of U.S. wires no matter where that scheme is conceived, developed, or executed. Id. at 25-26.[15] Lazarenko counters that the scheme to defraud is the focus of the wire fraud statute, and the scheme therefore must occur in the United States to constitute a domestic application of the statute. Reply at 14-15; see, e.g., Laydon v. Mizuho Bank, Ltd., No. 12-3149, 2015 WL 1515487, at *8 (S.D.N.Y. Mar. 31, 2015).

The Court agrees with Lazarenko that the focus of the wire fraud statute is the scheme to defraud — or more precisely, a scheme to defraud that involves the use of U.S. wires.

_____

punishes frauds executed in interstate or foreign commerce." United States v. Georgiou, 777 F.3d at 137-38. The Third Circuit's reasoning is in tension the Supreme Court's conclusion that a "general reference to foreign commerce . . . does not defeat the presumption against extraterritoriality." Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 263; see also EEOC v. Arabian Am. Oil Co., 499 U.S. at 251.

[15]     The United States relies on a number of pre-Morrison cases in support of its argument. See, e.g., United States v. Kim, 246 F.3d 186, 188-89 (2d Cir. 2001); United States v. Trapilo, 130 F.3d 547, 553 (2d Cir. 1997); United States v. Gilboe, 684 F.2d at 237-38.

As the Supreme Court has noted, "Section 1343 prohibits 'any scheme or artifice to defraud,' — fraud simpliciter, without any requirement that it be 'in connection with' any particular transaction or event." Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 272-73. The text of the statute indicates that Congress intended to prevent schemes to defraud facilitated by the use of U.S. wires. This is the conduct that the statute seeks to prohibit or "regulate." See id. at 267. The Court does not agree with Lazarenko, however, that the scheme to defraud must be entirely executed in the United States to constitute a domestic application of the statute. See Mem. at 22-23. The Supreme Court's extraterritoriality framework does not require that the entire scheme to defraud occur in the United States. The Court therefore must determine whether in this case "conduct relevant to the statute's focus occurred in the United States." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2101.

The Court has found little precedent regarding how much of the scheme must occur in the United States to constitute a domestic application of the wire fraud statute. One court, however, has articulated a workable test for what relevant conduct must occur in the United States for there to be a domestic application of the similarly worded mail fraud statute, 18 U.S.C. § 1341. In Elsevier, Inc. v. Grossman, Judge Katherine Polk Failla of the U.S. District Court for the Southern District of New York explained the nature of the "domestic conduct" that she considered "relevant" to the statutory focus of the mail fraud statute, when fewer than all of the essential elements of the crime occur in the United States:

> [A] defendant commits conduct "relevant" to the focus of the mail fraud statute only when: (i) the defendant commits a substantial amount of conduct in the United States; and (ii) the conduct is integral to the commission of a fraud, and (iii) at least some of the conduct involves the use of the U.S. mails.

199 F. Supp. 3d 768, 784 (S.D.N.Y. 2016).  This test accurately reflects the focus of congressional concern:  (1) preventing schemes to defraud through the use of U.S. wires and (2) allowing the wire fraud statute to apply to the use of U.S. wires to send a communication between the United States and a foreign country.  See S. Rep. No. 1873, at 2; H. Rep. No. 2385, at 1.  The Court therefore concludes that a complaint alleges a domestic application of wire fraud when (1) a defendant or coconspirator commits a substantial amount of conduct in the United States, (2) the conduct is integral to the commission of the scheme to defraud, and (3) at least some of the conduct involves the use of U.S. wires in furtherance of the scheme to defraud.

The United States alleges that its wire fraud claim (the Third Claim) applies to all of the schemes alleged in its Amended Complaint.  See Opp. at 46-48, 50, 54-56.  But applying the Elsevier analysis to each of the alleged schemes, see infra at 36-44, the Court concludes that the United States has failed to allege sufficient domestic conduct to support a domestic claim for wire fraud.  The Court will grant judgment on the pleadings to Lazarenko with respect to the Third Claim for relief.[16]

---

[16]  Lazarenko also argues that the Court must dismiss the Third Claim because (1) the Amended Complaint fails to allege bribes or kickbacks, as required by Skilling v. United States, 561 U.S. at 399-414, and (2) the honest services fraud statute, 18 U.S.C. § 1346, does not apply extraterritorially.  Mem. at 24-28.  Contrary to Lazarenko's assertion, the Court concludes — when taking all reasonable inferences in favor of the United States — that the United States in its Amended Complaint has sufficiently alleged that Lazarenko received bribes or kickbacks. See Am. Compl. ¶¶ 24, 30, 35-44.

With respect to Lazarenko's second argument, Section 1346 is a definitional statute related to 18 U.S.C. § 1343, the wire fraud statute; it is not a separate substantive statute. Section 1346 states that "the term 'scheme or artifice to defraud' [for the purposes of 18 U.S.C. § 1343] includes a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  Because a claim for honest services fraud must be brought under 18 U.S.C. §§ 1343 as well, any claim for honest services fraud would also need to allege a proper domestic application of the wire fraud statute.  The Court therefore need not analyze the extraterritorial reach of Section 1346 separately.

6. Fourth Claim — Foreign Offenses Under 18 U.S.C. § 1956(c)(7)(B)(ii) and (iv)

Claim Four alleges offenses against a foreign nation, specifically extortion and "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." 18 U.S.C. § 1956(c)(7)(B)(ii), (iv). Section 1956(c)(7)(B) requires that the financial transactions relating to the foreign offenses occur "in whole or in part in the United States," which is consistent with the general extraterritorial provision in Section 1956(f). See 18 U.S.C. § 1956(f). Lazarenko argues that the Court must limit this claim to only financial transactions into and out of accounts in the United States because, in his view, EFTs do not "occur" in part in the United States. See Mot. at 1-3; Mem. at 28-31. The Court has already addressed and rejected this argument. See supra at 16-22.

In his reply brief, Lazarenko makes two new arguments with respect to the Fourth Claim. First, he argues that the Court must dismiss the Fourth Claim because the United States has failed to "establish all the elements of a complete [specified unlawful activity]." Reply at 19. Specifically, he argues that the United States "cannot meet [its] burden because it can neither show that venue would lie anywhere in the United States for a criminal prosecution concerning EFT transfers, nor that personal jurisdiction would have existed over Mr. Lazarenko." Id. Second, Lazarenko argues that the United States improperly brought the Fourth Claim under 18 U.S.C. § 981(a)(1)(C) and must bring this claim under a different civil forfeiture provision, 18 U.S.C. § 981(a)(1)(B), which is limited to a res located in the United States. Id. at 20-21.

The Court generally refuses to entertain arguments raised for the first time in a reply brief because it is "manifestly unfair" to the nonmoving party. Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 196 (D.C. Cir. 1992). Nevertheless, the Court may easily dismiss both of Lazarenko's new arguments. As for his first argument, Lazarenko has provided no support —

and this Court has found none — for the proposition that the United States' complaint in a civil forfeiture action must also allege proper personal jurisdiction and proper venue for the underlying specified unlawful activity.[17] The United States established subject matter jurisdiction and in rem jurisdiction in this action pursuant to 28 U.S.C. § 1355(a), (b)(2). See United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain, 295 F.3d 23, 26-27 (D.C. Cir. 2002). The United States also properly established venue pursuant to 28 U.S.C. § 1355(b)(2). See United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain, 141 F. Supp. 2d 548, 550 (D.D.C. 2001), aff'd, 295 F.3d 23.

As for Lazarenko's second argument, he maintains that the United States must bring this claim under a different provision of the civil forfeiture statute — 18 U.S.C. § 981(a)(1)(B) — which is limited to a res located in the United States. Reply at 20. In support of this proposition, Lazarenko notes that Section 981(a)(1)(B) explicitly mentions offenses "against a foreign nation," and Section 981(a)(1)(C) does not. Id. A plain reading of the text of the civil forfeiture statute shows that this argument lacks merit. Both Section 981(a)(1)(B) and Section 981(a)(1)(C) permit forfeiture of property constituting specified unlawful activity under 18 U.S.C. § 1956(c)(7)(B), the provision which details offenses against foreign nations. See 18 U.S.C. § 1956(c)(7)(B). The United States has discretion to bring a civil forfeiture action under either provision. The Court therefore will deny Lazarenko's motion for judgment on the pleadings with respect to the Fourth Claim.

---

[17]     The cases cited by Lazarenko in this portion of his reply brief discuss personal jurisdiction with regard to a civil in personam case, see Univ. Trading & Inv. Co. v. Tymoshenko, 2012 WL 6186471, at *1, and venue in a civil case by the United States against a bank. See United States v. Lloyds TSB Bank PLC, 639 F. Supp. 2d 314.

*C. Application of the Court's Extraterritoriality Analysis to the Alleged Schemes*

In its Amended Complaint, the United States alleges four factual schemes through which it claims Lazarenko and his associates amassed the money subject to forfeiture: (1) the Transfer and Concealment of Business Interests Scheme, see Am. Compl. ¶¶ 21-31; (2) the Naukovy Agriculture Scheme, see id. ¶¶ 32-34; (3) the UESU and ITERA Energy Schemes, see id. ¶¶ 35-44; and (4) the PMH/GHP Scheme. See id. ¶¶ 45-49. Lazarenko argues that the Court must dismiss or limit the claims with respect to each of these four schemes. Mem. at 31-39. The Court will conduct its extraterritoriality analysis with respect to these alleged schemes.

For the statutes that by their terms apply extraterritorially, 18 U.S.C. §§ 1956 and 1957, the Court already has determined that the conduct alleged falls within the language of the extraterritorial provisions of those statutes. See supra at 15-24, 34-35; see also RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2102. Having concluded that some of the statutes at issue here do not apply extraterritorially, however, the Court must also determine whether the conduct alleged in this case involves domestic applications of those statutes. See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. at 2101. The Court may conduct this analysis at this stage of the litigation because the Supreme Court has stated that it is appropriate to consider extraterritoriality under a Rule 12(b)(6) standard. See Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. at 253-54. The same analysis necessarily applies to a motion for judgment on the pleadings brought under Rule 12(c). See supra at 7-9. Consistent with the law governing Rule 12(b)(6) and Rule 12(c), the Court will grant the United States "the benefit of all inferences that can be derived from the facts alleged" in its Amended Complaint, United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 772 F. Supp. 2d at 197 (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d at 1276), but it need not accept the parties' legal conclusions. Id. The Court will limit

its analysis to the facts alleged in the Amended Complaint and Lazarenko's First Amended Answer.  See supra at 7-9.

              1.   The Transfer and Concealment of Business Interests Scheme

        The United States alleges that "Lazarenko, by virtue of his government positions [including when he served as First Vice Prime Minister and Prime Minister], exerted influence over the economic and governmental structures within the Dnepropetrovsk region of Ukraine." Am. Compl. ¶ 21.  It further alleges that Lazarenko was able to arrange for the appointment of certain individuals to regional and state government positions and steer state-owned enterprises "to conduct business with certain private corporations and individuals."  Id. ¶ 22.  For example, the Amended Complaint alleges that Lazarenko informed Peter Nikolayevich Kiritchenko "that he worked with everyone on a 50/50 percentage basis."  Id. ¶ 26.  Mr. Kiritchenko then transferred 50 percent of the ownership in his company, Agrosnabsbyt/ASS, to Lazarenko, and ultimately paid Lazarenko at least $30 million, some of which was transferred through bank accounts in the United States.  Id. ¶¶ 26, 31.  Lazarenko also allegedly received a 50 percent ownership in Dneproneft, a corporation formed by Alexei Alexandrovich Ditiatkovsky, also a resident of Ukraine.  Id. ¶ 28.  The United States alleges that Ditiatkovsky paid at least $5 million dollars to Lazarenko that was transferred through accounts in the United States.  Id. ¶ 29.

        Lazarenko concedes that with respect to this scheme the Amended Complaint sufficiently alleges foreign extortion and bribery, in violation of 18 U.S.C. 1956(c)(7)(B)(ii) and (iv) (Fourth Claim).  Mem. at 32; Reply at 30.  He argues, however, that this scheme must be limited to defendants in rem "where the funds were deposited into a U.S. bank account rather than merely transited through a U.S. correspondent account."  Mem. at 32.  Because this Court

has already concluded that EFTs occur "in part in the United States" for the purpose of the money laundering claims, the Court rejects Lazarenko's argument.

Each EFT is two separate transactions that cross the U.S. border. See supra at 16-18, 25-27. The EFTs and other alleged wire transfers are sufficient to allege interstate transportation and receipt of property stolen or taken by fraud, in violation of 18 U.S.C. §§ 2314 and 2315 (First Claim). See Am. Compl. ¶ 31. The scheme also sufficiently alleges foreign extortion and bribery, in violation of 18 U.S.C. 1956(c)(7)(B)(ii) and (iv) (Fourth Claim). See id. ¶¶ 24, 26, 28, 30. Finally, the scheme sufficiently alleges violations of the money laundering claims for transfers into and out of U.S. accounts and EFTs, in violation of 18 U.S.C §§ 1956 and 1957 (Fifth, Sixth, Seventh, and Eighth Claims) because these transfers occurred in part in the United States. See id. ¶¶ 25, 31.

The United States does not allege that any of the extortion related to this scheme occurred in the United States, and thus does not allege a valid claim for Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Second Claim). Similarly, because the United States has not alleged that a substantial amount of the scheme to defraud occurred in the United States, the Amended Complaint does not allege a valid claim for wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Third Claim). The Court therefore limits this scheme to the following claims for relief: interstate transportation and receipt of property stolen or taken by fraud (First Claim), foreign extortion and bribery (Fourth Claim), and the money laundering claims (Fifth, Sixth, Seventh, and Eighth Claims).

### 2. The Naukovy Agriculture Scheme

As to the Naukovy Agriculture Scheme, the United States alleges that Lazarenko conspired to divert Ukrainian government funds for his personal use by orchestrating fraudulent

sales through two state-owned enterprises that he oversaw by virtue of his government position. Am. Compl. ¶ 32. The United States alleges that Lazarenko defrauded the Ukrainian government of at least $23.4 million through this scheme. Id. Lazarenko acquired the funds through transactions that passed through financial institutions in the United States. Id. ¶¶ 33-34.

Lazarenko concedes that with respect to this scheme the Amended Complaint alleges a violation of interstate transportation and receipt of property stolen or taken by fraud, in violation of 18 U.S.C. §§ 2314 and 2315 (First Claim) and foreign theft and embezzlement, in violation of 18 U.S.C. § 1956(c)(7)(B)(iv) (Fourth Claim). Mem. at 33. He argues, however, that the Amended Complaint only alleges EFTs with respect to this scheme, and therefore it must be dismissed. Id. at 32-33. As the Court previously has stated, EFTs are sufficient for interstate transportation and receipt of property stolen or taken by fraud, see supra at 25-27, and for the money laundering claims under 18 U.S.C. §§ 1956(f) and Section 1957(d)(1). See supra at 15-24. The Amended Complaint therefore sufficiently alleges a claim for interstate transportation and receipt of property stolen or taken by fraud, in violation of 18 U.S.C. §§ 2314 and 2315 (First Claim) and the money laundering claims, in violation of 18 U.S.C. §§ 1956 and 1957 (Fifth, Sixth, Seventh, and Eighth Claims). See Am. Compl. ¶ 34. The Amended Complaint also sufficiently alleges the foreign offenses, in violation of 18 U.S.C. § 1956(c)(7)(B)(ii) and (iv) (Fourth Claim). See id. ¶¶ 32-34.

The United States argues that the Amended Complaint alleges a valid claim of wire fraud, in violation of 18 U.S.C. § 1343 (Third Claim), with respect to this scheme. See Opp. at 47. Relying on the test set forth supra at 32-33, the Court concludes that the Amended Complaint does not sufficiently allege that substantial conduct of the Naukovy Agriculture Scheme occurred in the United States. Although wire transfers to reap the proceeds of a scheme

to defraud are integral to any such scheme, wire transfers through the United States, without more, are not sufficient to state a claim for a domestic application of the wire fraud statute.

In its opposition, the United States does not state that the Naukovy Agriculture Scheme alleges a claim for Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Second Claim). Nor does the Amended Complaint allege that any extortion related to this scheme occurred in the United States. The Court therefore limits this scheme to the following claims for relief: interstate transportation and receipt of property stolen or taken by fraud (First Claim), foreign extortion and bribery (Fourth Claim), and the money laundering claims (Fifth, Sixth, Seventh, and Eighth Claims).

### 3. The UESU and ITERA Energy Scheme

The UESU and ITERA schemes stem from Lazarenko's position as Vice Prime Minister, when he was in charge of the energy sector in Ukraine. See Am. Compl. ¶ 35. Lazarenko allegedly granted various privileges to United Energy Systems of Ukraine ("UESU"), which was controlled by one of his associates, Yulia Tymoshenko, and others. Id. ¶ 36. The United States alleges that UESU received a contract to deliver natural gas from RAO Gazprom, and UESU would then distribute the natural gas in Ukraine. Id. Rather than UESU paying its debts to RAO Gazprom, the United States alleges that Lazarenko "authorized execution of a $200,000,000 guaranty in favor of RAO Gazprom for the delivery of natural gas by UESU, thereby causing the Ukrainian government to pledge to use state funds to repay the debts of UESU to RAO Gazprom." Id. UESU and other corporate entities subsequently paid Lazarenko at least $162 million through financial transactions that passed through U.S. financial institutions. Id. ¶¶ 38-40.

With respect to the ITERA scheme, the United States alleges that the ITERA corporations — which had affiliated corporations, such as ITERA International Energy, Corporation and ITERA International LLC, that were incorporated in the United States — were awarded exclusive gas distribution rights during Lazarenko's tenure as Vice Prime Minister. Am. Compl. ¶ 41. Various ITERA corporations and Lazarenko's associates subsequently made payments through U.S. financial institutions to accounts under Lazarenko's personal control. Id. ¶¶ 43-44. The payments totaled more than $53 million. Id. ¶¶ 42-44.

Lazarenko concedes that with respect to the UESU scheme the Amended Complaint alleges sufficient facts to support a claim for foreign bribery, in violation of 18 U.S.C. § 1956(c)(7)(B)(iv) (Fourth Claim). See Mem. at 36-37; Am. Compl. ¶¶ 36, 38-40. Based on the analysis with respect to EFTs, supra at 16-18, the Court concludes that the Amended Complaint also alleges sufficient facts to state a claim for interstate transportation and receipt of property stolen or taken by fraud, in violation of 18 U.S.C. §§ 2314 and 2315 (First Claim), and for the money laundering claims, in violation of 18 U.S.C. §§ 1956 and 1957 (Fifth, Sixth, Seventh, and Eighth Claims). See Am. Compl. ¶¶ 39-40.

The Hobbs Act extortion and wire fraud claims are a different matter. The Amended Complaint does not allege a valid claim for Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Second Claim), because the Amended Complaint does not allege that the extortion or bribery occurred in the United States. See Opp. at 50. With respect to the wire fraud claim (Third Claim), the facts that there were financial transactions through the United States and that two U.S. corporations allegedly made payments to Lazarenko, in regard to the UESU scheme, do not constitute substantial conduct in the United States sufficient to support a

domestic application of wire fraud.[18]  The Court therefore limits the UESU Scheme to the

following claims for relief:  interstate transportation and receipt of property stolen or taken by

fraud (First Claim), foreign bribery (Fourth Claim), and the money laundering claims

(Fifth, Sixth, Seventh, and Eighth Claims).

        As for the ITERA scheme, Lazarenko argues that it must be dismissed in full or,

in the alternative, that the Court should grant summary judgment in his favor.  Mem. at 37-38.

He asks the Court to look outside of the pleadings so that he may illustrate that there is no

genuine dispute of material fact that U.S.-based ITERA International Energy did not make

payments to Lazarenko from the United States, see Reply at 33, and that ITERA International

Energy made payments only for merchandise, not bribes.  See Mem. at 37; Reply at 33.  The

Court declines to consider this motion as a summary judgment motion because the parties

submitted briefing before discovery was closed.  See supra at 6-7.[19]

---

18     The parties also dispute whether the Amended Complaint adequately alleges a valid claim for honest services fraud for this scheme.  See Mem. at 34-37; Opp. at 50-51. Lazarenko argues that there are three separate allegations regarding the UESU scheme: (1) non-disclosure of a conflict of interest, (2) quid pro quo foreign bribery in regard to the guaranty in favor of RAO Gazprom, and (3) fraudulent titling of natural gas that UESU received from RAO Gazprom.  Mem. at 34-36; see also Am. Compl. ¶¶ 35-37.  Lazarenko argues that only the guaranty allegation is sufficient for Skilling's requirement that honest services fraud must allege bribes or kickbacks.  Mem. at 34-35.  In addition, Lazarenko asks the Court to limit the UESU scheme based on arguments made by the government in Lazarenko's criminal proceeding and the district court's findings about the UESU scheme in a 2003 order regarding Rule 29 of the Federal Rules of Criminal Procedure.  Id. at 35.  Because the Court has already determined that the wire fraud statute does not apply extraterritorially and that the Amended Complaint does not state a claim for a domestic application of the wire fraud statute, the Court need not address these arguments.

19     Lazarenko also asks the Court to make 13 findings of fact with respect to the ITERA Scheme.  See Claimant Pavel Lazarenko's Proposed Findings of Fact at 1-2 [Dkt. 539-2]. The United States opposes this request because Lazarenko made the request before the end of fact discovery, and the factual record before this Court is incomplete.  See United States' Response to Claimant Pavel Lazarenko's "Proposed Findings of Fact" (ECF No. 539-3) at 1

Considering only the pleadings, the Court concludes with respect to the ITERA Scheme that the Amended Complaint alleges sufficient facts to state a claim for foreign bribery in violation of 18 U.S.C. § 1956(c)(7)(B)(iv) (Fourth Claim), see Am. Compl. ¶¶ 41-42; a claim for interstate transportation and receipt of property stolen or taken by fraud, in violation of 18 U.S.C. §§ 2314 and 2315 (First Claim), see id. ¶¶ 42-43; and claims for money laundering, in violation of 18 U.S.C. §§ 1956 and 1957 (Fifth, Sixth, Seventh, and Eighth Claims). See id.

## 4. The PMH/GHP Scheme

The United States alleges that Lazarenko used his position as Prime Minister of Ukraine to favor GHP Corporation "by ensuring that the Ukrainian Cabinet of Ministers entered into a contract with GHP Corporation for the purchase of six prefabricated homes." Am. Compl. ¶ 45. GHP Corporation purchased the homes from Pacific Modern Homes ("PMH"), based in Elk Grove, California. Id. ¶ 46. GHP Corporation purchased the homes for $524,763, and then GHP Corporation agreed to sell the homes to the Ukrainian government for $1,416,000. Id. ¶¶ 46-47. Lazarenko argues that these facts do not state a valid claim for a domestic application of honest services fraud, 18 U.S.C. §§ 1343 and 1346. Mem. at 38. The United States does not argue that the scheme alleges honest services fraud, but it maintains that there is a claim for money and property wire fraud, in violation of 18 U.S.C. § 1343. See Opp. at 55-56. It has not argued on this motion that any of the claims for relief other than wire fraud apply to the PMH/GHP Scheme. See id.

---

[Dkt. 595-1]. Although fact discovery has now closed, the parties have not had an opportunity to inform the Court of any further discovery since Lazarenko filed the instant motion in December of 2015. It is premature for the Court to make any findings of fact in connection with this motion. These arguments may be raised later in these proceedings if appropriate.

As the Court previously stated, a domestic violation of wire fraud requires that (1) the defendant or coconspirator commits a substantial amount of conduct in the United States, (2) the conduct is integral to the commission to the scheme to defraud, and (3) at least some of the conduct involves the use of the U.S. wires in furtherance of the scheme.  See supra at 32-33. The facts alleged with respect to the PMH/GHP Scheme are too bare to support a claim for wire fraud.  Presumably someone had to use a telephone or wire to contact the PMH in California, but those facts are not even alleged here.  There are also no facts alleged regarding whether Lazarenko received payments via financial transactions through U.S. institutions.  Although the prefabricated homes were allegedly shipped from California, the Court concludes that the Amended Complaint fails to establish a domestic claim for wire fraud, in violation of 18 U.S.C. § 1343 (Third Claim).

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Lazarenko's motion for partial judgment on the pleadings.  An Order consistent with this Opinion will issue this same day.

SO ORDERED.


____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  April 27, 2017