UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-0798 (PLF) |
| | ) | |
| ALL ASSETS HELD AT BANK JULIUS | ) | |
| Baer & Company, Ltd., Guernsey | ) | |
| Branch, account number 121128, in the | ) | |
| Name of Pavlo Lazarenko et al., | ) | |
| | ) | |
| Defendants In Rem. | ) | |
| | ) | |

<u>OPINION</u>

This matter is before the Court on the motion of the United States for summary judgment to strike the claim of Pavel Lazarenko, also known as Pavlo Lazarenko, to the defendant assets held in correspondent bank accounts in the name of European Federal Credit Bank Limited ("Eurofed") in Switzerland and Lithuania, and all assets traceable thereto (collectively, "Correspondent Assets"). <u>See</u> United States' Motion for Summary Judgment to Strike Pavel Lazarenko's Claims to All Defendant Assets Held in Switzerland and Lithuania [Dkt. No. 1317].[1] Mr. Lazarenko has also filed a cross-motion to dismiss the Correspondent

---

[1]      Unless otherwise specified, the terms "correspondent bank accounts" or "correspondent accounts" in this Opinion refer to bank accounts that Eurofed established in its own name at financial institutions in Switzerland and Lithuania, in which it stored the bulk of the money deposited by its customers. The term "Correspondent Assets" refers to the defendant assets held in Eurofed's name in the correspondent bank accounts in Switzerland and Lithuania, <u>and all assets traceable thereto</u>, as enumerated in paragraphs 5(f), (g), (h), and (j) of the First Amended Verified Complaint for Forfeiture <u>In Rem</u> ("Amended Complaint"). <u>See</u> Amended Complaint [Dkt. No. 20] ¶ 5(f)-(h), (j).

Assets or, in the alternative, for partial summary judgment. See Claimant Pavel Lazarenko's Cross-Motion to Dismiss the Lithuanian and Swiss Res or, in the Alternative, for Partial Summary Judgment [Dkt. No. 1356].

        Upon consideration of the parties' written submissions, the relevant legal authorities, and the entire record in this case, the Court will grant the United States' motion for summary judgment and deny Mr. Lazarenko's cross-motions to dismiss and for partial summary judgment.[2]

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   History of this Civil Forfeiture Proceeding

        The Court's prior opinions summarize the factual and procedural history of this case, starting with the criminal prosecution of Mr. Lazarenko in 2004 and continuing through this long-running in rem civil forfeiture proceeding. See United States v. All Assets Held at Bank Julius Baer & Co., Ltd. ("All Assets XI"), Civil Action No. 04-0798, 2020 WL 7640213,

---

[2]      The filings reviewed in connection with these motions include the following documents and their attachments:  Amended Complaint [Dkt. No. 20]; Notice of Errata for First Verified Amended Complaint for Forfeiture In Rem [Dkt. No. 214]; United States' Motion for Summary Judgment to Strike Pavel Lazarenko's Claims to All Defendant Assets Held in Switzerland and Lithuania ("U.S. Mot.") [Dkt. No. 1317]; Claimant Pavel Lazarenko's Cross-Motion to Dismiss the Lithuanian and Swiss Res or, in the Alternative, for Partial Summary Judgment [Dkt. No. 1356]; Claimant Pavel Lazarenko's Opposition to Plaintiff's Motion to Strike His Claims to the Lithuanian and Swiss Res and Cross-Motion to Dismiss, or in the Alternative, for Partial Summary Judgment ("Lazarenko Opp.") [Dkt. No. 1355]; Plaintiff United States of America's Reply Brief in Support of Motion for Summary Judgment to Strike Pavel Lazarenko's Claims to All Defendant Assets Held in Switzerland and Lithuania ("U.S. Reply") [Dkt. No. 1367]; United States of America's Opposition to Claimant Pavel Lazarenko's Cross-Motion to Dismiss the Lithuanian and Swiss Res, or in the Alternative, for Partial Summary Judgment ("U.S. Opp.") [Dkt. No. 1373-1]; Reply in Further Support of Pavel Lazarenko's Cross-Motion to Dismiss or in the Alternative Partial Summary Judgment for the European Eurofed Res ("Lazarenko Reply") [Dkt. No. 1384]; Revised Declaration of Jed M. Silversmith [Dkt. No. 1385]; and March 1, 2023 Joint Status Report [Dkt. No. 1470].

at *2 (D.D.C. Dec. 23, 2020) (collecting prior opinions).  In brief, Mr. Lazarenko was "a prominent Ukrainian politician who, with the aid of various associates, was 'able to acquire hundreds of millions of United States dollars through a variety of acts of fraud, extortion, bribery, misappropriation and/or embezzlement' committed during the 1990s."  United States v. All Assets Held at Bank Julius Baer & Co., Ltd. ("All Assets IV"), 959 F. Supp. 2d 81, 85 (D.D.C. 2013) (quoting Amended Complaint ¶¶ 1, 10).

### B.  The Swiss and Lithuanian Assets

In May 2004, the United States filed an in rem forfeiture complaint seeking forfeiture of various funds on deposit in foreign bank accounts in Guernsey and Antigua and Barbuda.  See Verified Complaint for Forfeiture In Rem [Dkt. No. 1] ¶ 1.  The following year, in June 2005, the United States filed an Amended Complaint identifying additional accounts for forfeiture, including the following accounts in Switzerland and Lithuania:

> (f)   All assets on deposit at Credit Suisse (Geneva), in account number 0251-562927-6, in the name of European Federal Credit Bank Limited.  These defendant assets are located in Switzerland and were last valued at approximately $4,822,598.45 in United States dollars;
>
> (g)   All assets held at Banque SCS Alliance S.A. (Geneva) in account number 5491, in the name of European Federal Credit Bank Limited.  These defendant assets are located in Switzerland and were last valued at approximately $483,629.69 in United States dollars;
>
> (h)   All assets held at Vilniaus Bankas held for the benefit of European Federal Credit Bank Limited, formerly held at accounts 073721 and 073420 at Bankas Hermis in the name of European Federal Credit Bank Limited.  In February[] 2000, Bankas Hermis merged with Vilniaus Bankas, and the account number for the defendant assets is believed to have changed to 5110730 or other account numbers at Vilniaus Bankas.  These defendant assets are located in Lithuania and were last valued at approximately $29,344,05[0].35 in United States dollars[.]

Amended Complaint ¶ 5(f)-(h).[3]  The Amended Complaint also names as defendants "all assets traceable to the above-mentioned proceeds and property, including but not limited to, any interest accrued or assets held in related sub-accounts or escrow accounts."  Id. ¶ 5(j).

 The Amended Complaint alleges that Mr. Lazarenko sought to conceal and layer criminal proceeds by "creating and causing the creation of various shell corporations and trusts and through the opening of numerous bank accounts," into which Mr. Lazarenko "and his associates would deposit or direct the deposit of money from individuals and businesses in Ukraine, and transfer or direct the transfer of money to Lazarenko or to entities he and his associates controlled."  Amended Complaint ¶ 55.  The Swiss and Lithuanian accounts are among those into which Mr. Lazarenko "transferred the proceeds of [his] criminal conduct."  Id. ¶ 77.  The complaint goes on to explain the timeline of various transfers of funds into the Swiss and Lithuanian accounts.  See id. ¶¶ 102-13.

 In 2004, shortly after the plaintiff filed the original complaint in this action, this Court granted the plaintiff's ex parte motion for a restraining order covering all of the in rem assets named as defendants in the complaint.  See Restraining Order [Dkt. No. 3].[4]  After the plaintiff filed an amended complaint in 2005, the Court issued an amended restraining order,

---

[3] The United States' notice of errata for the Amended Complaint makes the following changes and clarifications to paragraph 5(h) of the Amended Complaint:  Vilniaus Bankas became SEB Vilniaus Bankas in April 2005; the account number is believed to have changed to "no. LT 89 7044 0600 0000 1794" at SEB Vilniaus Bankas; and these assets were last valued at approximately $29,641,735.31 in United States dollars and additional sums in other currencies.  See United States' Notice of Errata for First Verified Amended Complaint for Forfeiture In Rem [Dkt. No. 214].

[4] In this Opinion, "restraining orders" refer to the orders issued by this Court restraining the in rem defendants.  "Freeze orders" refer to orders issued in Antigua, Switzerland, or Lithuania restraining the portions of the res in those countries.

which remains in force today.  See Amended Restraining Order [Dkt. No. 23].  That order

prohibits certain enumerated parties from taking "any action that would affect the availability or

value of the Defendants In Rem including, but not limited to, withdrawing, transferring,

assigning, pledging, distributing, encumbering, wasting, secreting or otherwise disposing of or

diminishing the value of, by any means, all or any part of the Defendants In Rem."  Id. at 7.  The

order further directs that any financial institutions holding any assets subject to the order must

"maintain such assets so as to continue to preserve their value and, for such purposes, are

authorized to invest them for purposes of capital appreciation and accrual of interest in the

normal course of business and in accordance with generally accepted practices for the

management of such assets."  Id.

     In July 2005, Mr. Lazarenko filed a verified claim in response to the United

States' Amended Complaint.  See Verified Claim and Statement of Interest or Right in Property

Subject to Forfeiture In Rem [Dkt. No. 29].  In his claim, Mr. Lazarenko asserts that he is the

"beneficial owner" of the Swiss and Lithuanian funds.  See id. at 5.  In addition, in July 2005,

Mr. Lazarenko also filed a motion to dismiss the Amended Complaint, which this Court denied

in March 2007.  See United States v. All Assets Held at Bank Julius Baer & Co., Ltd. ("All

Assets I"), 571 F. Supp. 2d 1, 3 (2008).

### C.  Eurofed's Liquidation Proceedings in Antigua

     The United States alleges that Mr. Lazarenko and an associate, Peter Kiritchenko,

obtained a controlling interest in Eurofed in 1997, becoming majority shareholders of the bank

and placing Mr. Lazarenko in control of its investment decisions.  See Plaintiff's Statement of

Facts in Support of its Motion for Summary Judgment to Strike the Claim of Eurofed Bank

("Pl.'s Stmnt.") [Dkt. No. 282] ¶¶ 1, 4.  Mr. Lazarenko and his criminal associates were both the

bank's primary owners, the United States alleges, and also its primary depositors. See id. ¶¶ 2-4. According to the United States, the funds held by Eurofed on Mr. Lazarenko's behalf were spread across a number of bank accounts – one in Mr. Lazarenko's own name and six in the names of corporate entities that he allegedly controlled: Lady Lake Investments; Fairmont Group, Ltd.; Firstar Securities, Ltd.; Guardian Investment Group, Ltd.; Nemuro Industrial Group; and Orby International, Ltd. See Amended Complaint ¶ 5(d).

According to the United States, by the end of 1997, Eurofed held over $100 million of Mr. Lazarenko's money in these accounts. See Pl.'s Stmnt. ¶ 4. The funds of the six corporations allegedly affiliated with Mr. Lazarenko make up the bulk of the money at issue here: Mr. Lazarenko's personal bank account appears to have held only approximately $150,000 by 1999, while the combined value of the six companies' accounts exceeded $93 million. Eurofed apparently maintained few of its deposits in Antigua itself. Instead, it established "correspondent" bank accounts in its own name at various other financial institutions around the world, in which it stored the bulk of the money deposited by its customers. See Declaration of Andrew Lewczyk in Support of Plaintiff's Motion for Summary Judgment to Strike the Claim of Eurofed Bank [Dkt. No. 286], Ex. P at 5. "These correspondent bank accounts were not held for the benefit of any particular depositor," according to Eurofed's appointed liquidators (the "Liquidators"). Id. at 8. "As a result, a customer's deposits were not located in any particular location or correspondent account." Id. In other words, if hypothetical Eurofed customers Sally, Sam, and Sue each deposited $40 with Eurofed in Antigua, the bank may well have divided that $120 among four of its own correspondent bank accounts in Switzerland, Lithuania, Liechtenstein, and the United States (placing, say, $30 into each account), making it impossible to trace Sally's $40 deposit to any of Eurofed's four correspondent accounts.

On October 29, 1999, the High Court of Justice of Antigua and Barbuda granted Antigua's Office of Drug and Money Laundering Control Policy's ("ONDCP") request for an order freezing all Eurofed assets linked to Mr. Lazarenko. The apparent basis for the Antiguan freeze order was Mr. Lazarenko's criminal prosecution in Switzerland on money laundering charges, for which he was later convicted, and the alleged connection between those charges and the funds held at Eurofed. See Declaration of Charles William Augustine Walwyn in Support of Liquidators' Opposition to Plaintiff's Motion for Summary Judgment to Strike the Claim of Eurofed Bank and Exhibits ("Walwyn Decl.") [Dkt. No. 288-17 to 288-28] ¶ 2, Ex. B. The Antiguan freeze order prohibited Mr. Lazarenko and several of his associates and affiliated companies from removing any of their funds from Antigua or in any way disposing of or diminishing those funds. See id. Ex. B at 2.

On November 15, 1999, the Antiguan financial authorities placed Eurofed into receivership, pursuant to the International Business Corporations Act of Antigua and Barbuda (the "IBC Act"). See Declaration of Nicolette M. Doherty in Support of Claimant Liquidators of European Federal Credit Bank (in Liquidation)'s Opposition to Plaintiff's Motion to Strike Liquidators' Claim [Dkt. No. 288-2], Exs. B, C. In fulfillment of their responsibilities, in late November 1999 the receivers transferred approximately $76 million to Antigua that was being held in Eurofed correspondent bank accounts located within the United States. After Eurofed was liquidated and dissolved, see infra at 8, the Liquidators kept this money in a trust account that they established for Eurofed funds. See Pl.'s Stmnt. ¶¶ 6-8. By contrast, the Liquidators have not been able to secure the return of other Eurofed funds that were held in overseas correspondent accounts back to Antigua. Specifically, Eurofed deposits are still being maintained in accounts at Credit Suisse in Switzerland (last valued at approximately $4.8

million), Banque SCS Alliance S.A. in Switzerland (last valued at nearly $500,000), and Vilniaus Bankas in Lithuania (last valued at approximately $29.3 million) as of 2005.  See Amended Complaint ¶ 5(f)-(h).  The Eurofed deposits located at these three institutions make up the in rem defendants named in paragraphs 5(f), 5(g), and 5(h) of the United States' Amended Complaint.  See id.

On December 3, 1999, the Antiguan High Court of Justice rescinded its previous receivership order and instead directed that Eurofed be liquidated and dissolved pursuant to the IBC Act.  See Walwyn Decl., Ex. E.  On July 7, 2000, granting an ex parte application by the ONDCP, the High Court of Justice issued an order directing that "all funds of Pavel Lazarenko and all his associated accounts frozen by Order of this Court" (in October of the previous year) be forfeited to the Antiguan government.  See id., Ex. F at 2.  Both Mr. Lazarenko and the Liquidators promptly appealed this forfeiture order to the Court of Appeal for Antigua and Barbuda of the Eastern Caribbean Supreme Court.  See id., Ex. H at 1.  In addition, the Liquidators, pending appeal, placed Eurofed's funds into an interest-bearing account held at the Bank of Nova Scotia in the name of the Registrar of the High Court of Justice.  See id., Ex. G at 1.  The Liquidators' appeal of the July 7, 2000 Antiguan forfeiture order was stayed by agreement of the parties, see id., Ex. J, ¶ 4, while Mr. Lazarenko's appeal of that order continued and ultimately succeeded.  On April 27, 2001, the Court of Appeal ruled that the October 29, 1999 Antiguan freeze order and the July 7, 2000 forfeiture order were not authorized by the Antiguan money laundering statute under the authority of which they ostensibly were issued.  See id., Ex. H, ¶ 1.

A few days after the Court of Appeal ruled that the forfeiture and freeze orders were invalid, the Antiguan money laundering authorities applied for a new freeze order from the

High Court of Justice.  That court issued another ex parte order on May 2, 2001, directing that

"[a]ll the rights and interests" of Mr. Lazarenko, "whether in his name or otherwise," be "frozen

until further order."  Walwyn Decl., Ex. I, ¶¶ 1-2.  This order applied to any interests of

Mr. Lazarenko in money held "within the account maintained by the Registrar . . . at the St

John's Branch of the Nova Scotia Bank" or "within any account maintained by the liquidators of

Eurofed Bank Ltd."  Id.

        In light of this new Antiguan freeze order, Eurofed's Liquidators applied for their

own order from the High Court of Justice later that month.  The Liquidators explained to the

court that the money held in the account of the Registrar of the High Court of Justice made up

the vast majority of the liquidation estate.  See Walwyn Decl., Ex. J, ¶¶ 3-6.  The Liquidators

further maintained that the innocent depositors and creditors of Eurofed who were not alleged by

the government to be affiliated with Mr. Lazarenko "have been prejudiced by the fact that their

funds have been removed from the liquidation together with the funds of [Mr. Lazarenko] and

place[d] in the account of the Registrar."  Id. ¶ 10.  Accordingly, the Liquidators proposed a pro

rata division of the funds being held in the Registrar's account, under which the funds of

Mr. Lazarenko and the six companies he allegedly controlled would remain frozen in the

Registrar's account, while the funds of the remaining third-party depositors of Eurofed would be

released to the Liquidators for use in the liquidation.  See id. ¶ 7.

        The Liquidators also described the basis for their conclusions about which funds

should be regarded as Lazarenko-related and remain frozen.  At the time – although

Mr. Lazarenko himself had asserted ownership of the six companies alleged to be under his

control and had made claims in the liquidation for over $100 million of Eurofed funds based on

that purported ownership – the Liquidators were not "able to independently verify ownership of

the companies." Walwyn Decl., Ex. J at 6. Taking a conservative approach, the Liquidators recommended treating the combined sum of the money in Mr. Lazarenko's personal bank account and the accounts of the six companies over which he claimed ownership as potentially Lazarenko-related for the purposes of the Antiguan freeze order. Because Mr. Lazarenko "ha[d] not provided any evidence supporting a claim any higher than this" amount, the Liquidators reasoned that the remainder of the funds could safely be regarded as non-Lazarenko-related and used to fund the liquidation claims of third-party depositors and creditors. Id. at 6-7.

In other words, the Liquidators proposed that all funds potentially related to Mr. Lazarenko would remain in the Registrar's account, but that the remainder of the funds, which by all reports came from innocent third parties, would be released to the Liquidators for use in funding the liquidation. After pro rata calculations and reductions, the Liquidators' proposal called for the release of nearly $20 million to the Liquidators, while approximately $65 million in potentially Lazarenko-related funds would stay in the Registrar's account. See Walwyn Decl., Ex. J at 10-11.

In an order dated November 6, 2003, the High Court of Justice granted the Liquidators' motion and directed the Registrar to release the nearly $20 million from its account at the Bank of Nova Scotia to the Liquidators "for the purpose of pro rata payment to third party depositors and creditors" and for expenses of the liquidation. See Walwyn Decl., Ex. K, ¶ 2. "The funds designated to Pavlo Lazarenko and associated companies," however, totaling approximately $65 million, were to "remain frozen at the Bank of Nova Scotia, Antigua in the account of the Registrar of the High Court until further order." Id., Ex. K, ¶ 5. Since the division of funds in 2003, the Liquidators report that they have used the $20 million released to them to make distributions to validated depositors and creditors. See Walwyn Decl. ¶ 16. The

"total unrestrained funds in the Liquidators' possession . . . is $4,347,542 [as of 2012], and
therefore, there is a deficit in the liquidation estate of at least $5,799,280." Id. ¶¶ 16-17.

### D. Eurofed's Claim and Settlement

On August 12, 2013, this Court granted in part and denied in part the United
States' motion for summary judgment to strike Eurofed for lack of standing. See All Assets
IV, 959 F. Supp. 2d at 84. The Court ruled that Eurofed had standing to contest the forfeiture of
the defendant assets located in Antigua and Barbuda but lacked standing to contest the forfeiture
of the defendant assets located in Switzerland and Lithuania. On November 14, 2014, the Court
approved a stipulation and settlement agreement between the United States and Eurofed. See
Stipulation and Settlement Agreement and Order Thereon [Dkt. No. 334]. The settlement
agreement dismissed the United States' forfeiture action against 22.54% of (1) the sum of the
interest accrued on the approximately $71 million in funds that reflect the pro rata share
established in the liquidation of Eurofed of the balance of the alleged Lazarenko accounts, and
(2) the total combined amount of the res held in the Swiss and Lithuanian bank accounts. See id.
at 5-7. The settlement agreement also dismissed Eurofed's claim to all defendants in rem in this
action. See id. at 7.

## II.  LEGAL FRAMEWORK

### A. Motion to Strike

In a forfeiture action brought in rem pursuant to a federal statute, at any time
before trial, the United States "may move to strike a claim or answer . . . because the claimant
lacks standing." SUPP. R. G(8)(c)(i)(B). Such a challenge to a party's claim and answer "may be
presented . . . as a motion to determine after a hearing or by summary judgment whether the

claimant can carry the burden of establishing standing by a preponderance of the evidence."
Supp. R. G(8)(c)(ii)(B).

Summary judgment is appropriate only if "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the movant is entitled to judgment as a matter of
law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); see Baumann v. District of
Columbia, 795 F.3d 209, 215 (D.C. Cir. 2015); Fed. R. Civ. P. 56(a), (c). In making that
determination, the Court must view the evidence in the light most favorable to the non-moving
party and draw all reasonable inferences in that party's favor. See Baumann v. District of
Columbia, 795 F.3d at 215; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. A disputed fact is
"material" if it "might affect the outcome of the suit under the governing law." Talavera v.
Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.
at 248). A dispute over a material fact is "genuine" if it could lead a reasonable jury to return a
verdict in favor of the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Grimes
v. District of Columbia, 794 F.3d 83, 94-95 (D.C. Cir. 2015).

Although all reasonable inferences must be drawn in favor of the non-moving
party, that party's opposition to the summary judgment motion must consist of more than mere
unsupported allegations or denials, and must instead be supported by affidavits, declarations, or
other competent evidence, setting forth specific facts showing that there is a genuine issue for
trial. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The
non-moving party is required to provide evidence that would permit a reasonable jury to find in
her favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). For the
purposes of the summary judgment motion, the specific facts as presented by the non-moving

party "will be taken to be true." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  If the

non-movant's evidence is "merely colorable" or "not significantly probative," summary

judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50; see also Scott v.

Harris, 550 U.S. at 380 ("[W]here the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is 'no genuine issue for trial.'" (quoting Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986))).

 "Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge at summary

judgment." Barnett v. PA Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting

Pardo-Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)).  "The inquiry performed [at

this phase] is the threshold inquiry of determining whether there is the need for a trial – whether,

in other words, there are any genuine factual issues that properly can be resolved only by a finder

of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty

Lobby, Inc., 477 U.S. at 250.

### B.  Standing in Civil Forfeiture Actions

 "Civil forfeiture actions are brought against property, not people.  The owner of

the property may intervene to protect his interest." United States v. All Funds in Account

Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain, 295

F.3d 23, 25 (D.C. Cir. 2002).  Because the United States, rather than the claimant, is the plaintiff

and bears the burden of proving the property's forfeitability, "[t]he function of standing in a

forfeiture action is . . . truly threshold only – to ensure that the government is put to its proof

only where someone with a legitimate interest contests the forfeiture." United States v.

$557,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 79 (2d Cir. 2002); see also United States v. $17,900 in U.S. Currency, 859 F.3d 1085, 1089-90 (D.C. Cir. 2017).

Civil forfeiture actions are governed by the procedures set forth in 18 U.S.C. § 983 and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), a subset of the Federal Rules of Civil Procedure. When the government files a complaint for forfeiture, "any person claiming an interest in the seized property may file a claim asserting such person's interest in the property in the manner set forth in the Supplemental Rules." 18 U.S.C. § 983(a)(4)(A); see also SUPP. R. G(5)(a).

When the government moves to strike a claim for lack of standing pursuant to Rule G(8)(c) of the Supplemental Rules, the claimant has the burden of "establishing standing by a preponderance of the evidence." SUPP. R. G(8)(c)(ii)(B). "To prevail, a claimant must meet both Article III and statutory standing requirements." United States v. $17,900 in U.S. Currency, 859 F.3d at 1089 (internal quotations omitted). "The term 'statutory standing' relates to a claimant's ability to show that he has satisfied whatever statutory requirements Congress has imposed for contesting a civil forfeiture action in federal court, while 'Article III standing' [or 'constitutional standing'] relates to the claimant's ability to show that he has a sufficient interest in the property to satisfy the case-or-controversy requirement of Article III of the Constitution." United States v. 8 Gilcrease Lane, Quincy, Fla. 32351, 641 F. Supp. 2d 1, 5-6 (D.D.C. 2009) (citing Stefan D. Cassella, ASSET FORFEITURE IN THE UNITED STATES: A TREATISE ON FORFEITURE LAW § 9-4 at 326 (2006)).

Because the United States, rather than the claimant, is the plaintiff and bears the burden of proving the property's forfeitability, "[t]he function of standing in a forfeiture action is therefore truly threshold only – to ensure that the government is put to its proof only where

someone with a legitimate interest contests the forfeiture." United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d at 79; see also United States v. $17,900 in U.S. Currency, 859 F.3d at 1089-90.

1.   Statutory Standing

In order to demonstrate statutory standing in an in rem forfeiture proceeding, a claimant must have "assert[ed] [their] interest in the property in the manner set forth in the Supplemental Rules." United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 228 F. Supp. 3d 118, 122 (D.D.C. 2017) (citing 18 U.S.C. § 983(a)(4)(A); All Assets IV, 959 F. Supp. 2d at 96 n.10). The statutory standing requirement is grounded in 18 U.S.C. § 983, which limits intervention in civil forfeiture actions to "any person claiming an interest in the seized property" who "file[s] a claim asserting such person's interest in the property in the manner set forth in the Supplemental Rules." 18 U.S.C. § 983(a)(4)(A). Supplemental Rule C requires a claimant to file a "verified statement of right or interest" that "must describe the interest in the property that supports the person's demand for its restitution or right to defend the action." SUPP. R. C(6)(a)(i)-(ii); see also 18 U.S.C. § 983(a)(4)(A) ("[A]ny person claiming an interest in the seized property may file a claim asserting such person's interest in the property[.]"). "This statement is known as a 'verified claim' and is essential to conferring statutory standing upon a claimant in a forfeiture action." United States v. 8 Gilcrease Lane, Quincy, Fla. 32351, 638 F.3d 297, 299 n.1 (D.C. Cir. 2011) (alterations omitted) (citing United States v. $125,938.62, 370 F.3d 1325, 1328 (11th Cir. 2004) (per curiam)). Supplemental Rule G says that a claimant

contesting the United States' forfeiture must file a claim that "state[s] the claimant's interest in the property." SUPP. R. G(5)(a)(i)(B).[5]

Courts generally expect claimants to "adhere strictly" to these statutory requirements governing civil forfeiture proceedings. United States v. All Assets Held at Bank Julius Baer & Co. ("All Assets II"), 664 F. Supp. 2d 97, 101 (D.D.C. 2009); United States v. Funds from Prudential Secs., 300 F. Supp. 2d 99, 104 (D.D.C. 2004) ("[I]n order to have standing to challenge a forfeiture proceeding, a claimant must strictly comply with the pleading requirements of Supplemental Rule C(6).") (internal citation omitted) (referring to Supplemental Rule C(6), the predecessor of Supplemental Rules G(5) and G(6)).

While courts may "excuse" procedural failings "so long as the 'underlying goals of' the Supplemental Rules 'are not frustrated,'" All Assets II, 664 F. Supp. 2d at 102 (citing United States v. Funds from Prudential Secs., 300 F.Supp.2d at 104 (collecting cases)), the Third Circuit has identified compliance with the Supplemental Rules' requirement that a claimant must file a verified claim as the "most significant requirement." United States v. $487,825 in U.S. Currency, 484 F.3d 662, 664 (3d Cir. 2007), as amended (May 14, 2007) (discussing Supplemental Rule C). See also United States v. $39,557.00, More or Less, in U.S. Currency, 683 F. Supp. 2d 335, 339 (D.N.J. 2010) (saying the same about Supplemental Rule G). This is because the requirement for a verified claim serves the dual purposes of (1) forcing claimants to "come forward as quickly as possible . . . so that the court may hear all interested parties and resolve the dispute without delay," and (2) minimizing "the danger of false claims by

---

[5]    On December 1, 2006, Supplemental Rule G went into effect. See 2006 U.S. ORDER 20 (C.O. 20) (April 12, 2006), available at http://www.supremecourt.gov/orders/courtorders/frcv06p.pdf (stating that Supplemental Rule G governs cases filed after December 1, 2006, and "insofar as just and practicable, all proceedings then pending").

requiring claims to be verified or solemnly affirmed." United States v. $487,825 in U.S. Currency, 484 F.3d at 664-65; see also United States v. All Funds on Deposit with R.J. O'Brien & Assocs., 783 F.3d 607, 618 (7th Cir. 2015).  "A claimant who fails to file a verified [claim] has no standing to contest a forfeiture." United States v. $487,825 in U.S. Currency, 484 F.3d at 665.

### 2.   Constitutional Standing

Constitutional standing is one of the three "inter-related judicial doctrines" that – along with the requirements of mootness and ripeness – "ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies.'" Worth v. Jackson, 451 F.3d 854, 855 (D.C. Cir. 2006) (quoting U.S. CONST. art. III, § 2).  Standing is an Article III requirement under which plaintiffs must show, at an "irreducible constitutional minimum," that:  (1) they have suffered an injury in fact – the invasion of a legally protected interest which is concrete and particularized; (2) the injury is fairly traceable to the challenged conduct (a causal connection) of the defendant; and (3) a favorable decision on the merits likely will redress the injury.  Lujan v. Defs. of Wildlife, 504 U.S. at 560-61; see also TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021); Worth v. Jackson, 451 F.3d at 857-58.  The alleged injury must be concrete and particularized and actual or imminent, not conjectural or hypothetical.  See TransUnion LLC v. Ramirez, 141 S. Ct. at 2203; Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016); Lujan v. Defs. of Wildlife, 504 U.S. at 560; Worth v. Jackson, 451 F.3d at 858.

"Standing is a threshold consideration in all cases, including civil forfeiture cases." United States v. One-Sixth Share of Mass Millions Lottery Ticket ("United States v. One-Sixth Share"), 326 F.3d 36, 40 (1st Cir. 2003).  In the civil forfeiture context, the D.C. Circuit has explained that "the requirements for a claimant to demonstrate constitutional standing

to challenge a forfeiture are very forgiving." United States v. $17,900 in U.S. Currency, 859

F.3d at 1089 (citing United States v. Emor, 785 F.3d 671, 676 (D.C. Cir. 2015)) (alterations

omitted). "While some courts have focused on whether a party had an ownership or possessory

interest under state law at the time of forfeiture, other courts have noted [that] it is the injury to

the party seeking standing that remains the ultimate focus." United States v. Emor, 785 F.3d

at 676 (internal citations omitted); see also United States v. 8 Gilcrease Lane, Quincy,

Fla. 32351, 641 F. Supp. 2d at 6 ("[I]n a civil forfeiture case, a claimant's constitutional standing

turns upon whether the claimant has a sufficient interest in the property to create a case or

controversy.") (citation omitted) (internal quotation marks omitted). "In general, any colorable

claim on the property suffices, if the claim of injury is "redressable, at least in part, by a return of

the property." United States v. Emor, 785 F.3d at 676 (citation omitted).

  The nature of a claimant's asserted property interest is "defined by the law of the

State" – or here, nation – "in which the interest arose." United States v. One Lincoln

Navigator, 328 F.3d 1011, 1013 (8th Cir. 2003); see also United States v. $100,348 in U.S.

Currency, 354 F.3d 1110, 1119 (9th Cir. 2004); United States v. One-Sixth Share, 326 F.3d

at 45. But while state law defines a claimant's interest in specific property, "federal law

determines the effect of [that] interest on [the claimant's] right to bring a claim." United States

v. U.S. Currency, $81,000.00, 189 F.3d 28, 33 (1st Cir. 1999) (citing United States v. Nat'l Bank

of Com., 472 U.S. 713, 722 (1985)); see also United States v. 5 S 351 Tuthill Rd., 233

F.3d 1017, 1021 (7th Cir. 2000) ("State law defines and classifies property interests for purposes

of the forfeiture statutes, while federal law determines the effect of the property interest on the

claimant's standing."); United States v. BCCI Holdings, Luxembourg, S.A., 69 F.

Supp. 2d 36, 57 (D.D.C. 1999) (same).

At the summary judgment stage, the question is "whether a fairminded jury could find that the claimant had standing on the evidence presented." United States v. $133,420.00 in U.S. Currency, 672 F.3d 629, 638 (9th Cir. 2012). "When the government moves to strike a claim for lack of standing, a claimant has the burden to establish standing by a preponderance of the evidence." United States v. $17,900.00 in U.S. Currency, 859 F.3d at 1089 (citing SUPP. R. G(8)(c)); see also United States v. $148,840.00 in U.S. Currency, 521 F.3d 1268, 1273 (10th Cir. 2008) ("[A] claimant must prove by a preponderance of the evidence that he has a facially colorable interest in the res such that he would be injured if the property were forfeited to the United States; otherwise, no case or controversy exists capable of federal court adjudication."). Each claimant must therefore "point to some evidence in the record that would allow a reasonable factfinder to conclude" that the claimant has "a cognizable interest in the assets potentially subject to forfeiture." All Assets II, 664 F. Supp. 2d at 104-05. When the government moves to strike a claim because the claimant lacks standing, courts must not conflate the standing inquiry "with the merits determination that comes later." United States v. One-Sixth Share, 326 F.3d at 41; see also United States v. One Lincoln Navigator, 328 F.3d at 1013; United States v. $17,900 in U.S. Currency, 859 F.3d at 1091. "Although a claimant must make an initial evidentiary showing of such an interest, a claimant need not definitively prove the existence of that interest." United States v. $148,840 in U.S. Currency, 521 F.3d at 1273; see also United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d at 79; United States v. 116 Emerson St., 942 F.2d 74, 78 (1st Cir. 1991).

"[S]tanding 'must be supported . . . with the manner and degree of evidence required at [each] successive stage[] of litigation.'" United States v. $17,900 in U.S. Currency, 859 F.3d at 1090 (citing Lujan v. Defs. of Wildlife, 504 U.S. at 561). Further, "[a]

variety of property interests may serve as the basis for a claimant's entitlement to contest a civil

forfeiture, including not only ownership but also possessory and other lesser forms of interest."

All Assets IV, 959 F. Supp. 2d at 99.  Accordingly, "[t]he type of interest claimed dictates the

type of evidence required to establish standing."  Id. at 99-100 (citing United States v. $148,840

in U.S. Currency, 521 F.3d at 1274).

      For instance, when a claimant responding to a summary judgment motion

predicates his claim on an ownership interest, the "manner and degree of evidence required" is

the "assertion of ownership" combined with "some evidence of ownership."  United States v.

$17,900 in U.S. Currency, 859 F.3d at 1090 (citing United States v. $239,400, 795

F.3d 639, 642-43 (7th Cir. 2015)).  When assessing the "sufficiency and probity of the evidence

that purports to demonstrate a colorable ownership interest," therefore, "courts generally look to

'indicia of dominion and control such as possession, title, and financial stake.'"  All Assets

IV, 959 F. Supp. 2d at 100 (citing United States v. $38,570 U.S. Currency, 950 F.2d 1108, 1113

(5th Cir. 1992)).

## III.  DISCUSSION

      The United States has filed a motion for summary judgment to strike

Mr. Lazarenko's claim to the Correspondent Assets – that is, the defendant assets held in

Eurofed's name in the correspondent bank accounts in Switzerland and Lithuania, and all assets

traceable thereto, as enumerated in paragraphs 5(f), (g), (h), and (j) of the Amended Complaint.

See Amended Complaint ¶ 5(f)-(h), (j); see also supra n.1.  Mr. Lazarenko, in turn, has filed a

motion to dismiss the Correspondent Assets and, in the alternative, for summary judgment as to a

Lithuanian account and a Swiss account.  For the following reasons, the Court will grant the

United States' motion and deny Mr. Lazarenko's motions.

*A. United States' Motion to Strike Mr. Lazarenko's Claim*

The United States argues that Mr. Lazarenko has not carried his burden of demonstrating both statutory and Article III standing to contest the forfeiture of the Correspondent Assets. See U.S. Mot. at 12.  The Court agrees with the United States.

1.   Statutory Standing

a.   Forfeiture of Statutory Standing Objection

Mr. Lazarenko argues that the United States has forfeited its right to object to his statutory standing. See Lazarenko Opp. at 17.  According to Mr. Lazarenko, he first signed a verified claim form in 2005, and he contends that the United States cannot raise an objection to the contents of the claim form over fifteen years later. See id.  He asserts that the United States has had prior opportunities to raise this objection, including when it challenged Eurofed's standing to these same assets and Mr. Lazarenko's standing with respect to other portions of the res. See id. at 18.

The Court agrees with the United States that it has not forfeited its right to object to Mr. Lazarenko's statutory standing, but for different reasons from what the United States argues.  The government argues that the Court previously ruled that standing is a jurisdictional issue and thus the doctrine of judicial estoppel does not apply to bar the United States' standing objection. See U.S. Reply at 4-5 (citing United States v. All Assets Held at Bank Julius Baer & Co., Ltd. ("All Assets IX"), 480 F. Supp. 3d 1, 26 (D.D.C. 2020)).  Although the United States is correct that the Court has ruled on both the issue of judicial estoppel and the issue of standing as a jurisdictional matter, neither concept is relevant here. Judicial estoppel – the doctrine that a party is barred "from asserting a claim in a legal proceeding that is inconsistent with a claim

taken by that party in a previous proceeding," United States v. All Assets Held at Bank Julius

Baer & Co., Ltd., 229 F. Supp. 3d 62, 72 (D.D.C. 2017) (quoting Marshall v. Honeywell Tech.

Sys. Inc., 828 F.3d 923, 928 (D.C. Cir. 2016)) – is different from the concept of forfeiture, which

is a party's "failure to make the timely assertion of a right." Hamer v. Neighborhood Hous.

Servs. of Chi., 138 S. Ct. 13, 17 n.1 (2017) (quoting United States v. Olano, 507 U.S. 725, 733

(1993)). And unlike Article III standing, statutory standing is not an issue of subject matter

jurisdiction that implicates the Court's power to adjudicate a case. See Lexmark Int'l Inc. v.

Static Control Components, Inc., 572 U.S. 118, 128 n.4 (2014). Rather, statutory standing is "an

inquiry into whether the statute at issue conferred a 'cause of action' encompassing 'a particular

[party's] claim.'" United States v. Emor, 785 F.3d at 677 (citing Lexmark Int'l Inc. v. Static

Control Components, Inc., 572 U.S. at 127-28). The Court has not previously addressed the

issue of forfeiture of a statutory standing objection.

       The question in this case is whether the United States has forfeited its objection to

Mr. Lazarenko's lack of statutory standing by raising it more than fifteen years after

Mr. Lazarenko first signed his verified claim form. The Court concludes that there is nothing in

Supplemental Rule G that suggests that the United States has forfeited its objection at this point

in the proceedings. Rule G(8)(c)(i) provides that "[a]t any time before trial, the government may

move to strike a claim . . . because the claimant lacks standing." SUPP. R. G(8)(c)(i). Pursuant to

this rule, the United States may object to a claimant's lack of standing – statutory or

constitutional – at any time before trial.

       Beyond the text of the rule, case law confirms that the United States has not

forfeited its objection. In Hamilton v. Atlas Turner, Inc., the Second Circuit considered "all of

the relevant circumstances" in determining whether the defendant had forfeited a defense.

Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61 (2d Cir. 1999).  The court noted that "[a]lthough the passage of time alone is generally not sufficient to indicate forfeiture of a procedural right, the time period provides the context in which to assess the significance of the defendant's conduct, both the litigation activity that occurred and the opportunities to litigate the jurisdictional issue that were foregone."  See id. (citations omitted).  Here, Mr. Lazarenko argues that the United States had plenty of opportunities to challenge his statutory standing but failed to do so prior to this motion.  See Lazarenko Opp. at 18.  But as the United States points out, certain information relevant to Mr. Lazarenko's statutory standing – like whether his claim is premised on any rights arising under Swiss or Lithuanian law – became apparent only through fact discovery, which took many years.  See U.S. Reply at 5.  The circumstances here do not indicate that the United States was sitting on opportunities to raise a motion to strike and failed to do so in a timely fashion.  Rather, it is entirely reasonable for the United States to file a summary judgment motion to strike after taking the time to develop the record in fact discovery.  Accordingly, the Court concludes that the United States did not forfeit its objection to Mr. Lazarenko's lack of statutory standing.

### b.   Mr. Lazarenko's Interest in the Correspondent Assets

The United States argues that Mr. Lazarenko has failed to meet his burden to establish statutory standing to oppose forfeiture of the Correspondent Assets.  See U.S. Mot. at 13.  In order to establish statutory standing, a claimant "must have assert[ed] [their] interest in the property in the manner set forth in the Supplemental Rules."  All Assets IX, 480 F. Supp. 3d at 14 (citation and internal quotation marks omitted).  Supplemental Rule C requires a claimant to file a "verified statement of right or interest" that "must describe the interest in the property that supports the person's demand for its restitution or right to defend the action."  Supp.

R. C(6)(a)(i)-(ii).  At the summary judgment stage, the claimant must establish, by a

preponderance of the evidence, that he in fact has an interest in the property.  See All Assets

IX, 480 F. Supp. 3d at 12; United States v. $17,900 in U.S. Currency, 859 F.3d at 1089.

  On July 26, 2005, Mr. Lazarenko filed a claim to the Correspondent Assets and

identified himself as the "beneficial owner" of those accounts.  See Verified Claim and

Statement of Interest or Right in Property Subject to Forfeiture In Rem [Dkt. No. 29].  The

United States argues that Mr. Lazarenko's assertion that he is a "beneficial owner" of the

defendant assets in the liquidation proceedings in Antigua is not sufficient to establish that he has

an interest in the Correspondent Assets in Switzerland and Lithuania.  See U.S. Mot. at 13-15.  In

response, Mr. Lazarenko asserts that he is the beneficial owner of the funds held in six corporate

accounts that are the subject of the Eurofed liquidation proceedings in Antigua, and that Eurofed

in turn deposited funds into the Correspondent Assets, thus making him the beneficial owner of

the Correspondent Assets.  See Lazarenko Opp. at 17.  He argues that this purported beneficial

ownership is sufficient to establish statutory standing to challenge the forfeiture of the

Correspondent Assets.  See id.

  In a 2013 opinion, this Court observed in a footnote that the matter of whether

Mr. Lazarenko is the owner of the six corporations "may become important later."  All Assets

IV, 959 F. Supp. 2d at 89-90 n.6.  That time is now.  On December 23, 2022, the High Court of

Justice for Antigua and Barbuda entered a judgment concluding that Mr. Lazarenko is the

"beneficial owner of the bearer certificates attached to the corporations and therefore to the share

value of the funds held by [Eurofed] in the names of the corporations maintained in Switzerland

and Lithuania." March 1, 2023 Joint Status Report [Dkt. No. 1470], Ex. A ¶ 68.[6]  According to

the High Court, "a bearer share refers to 'a share in a company represented by a certificate which

states that the bearer of the certificate is the owner of the shares.'" Id. ¶ 45 (citing IBC Act § 2).

        Based on the High Court's ruling, this Court acknowledges that Mr. Lazarenko is

the beneficial owner of bearer shares attached to six corporations that deposited funds into

Eurofed before its liquidation.  This finding, however, does not lead to the automatic conclusion

that he is the beneficial owner of the Correspondent Assets.  First, the six corporations deposited

funds into Eurofed; and as the Court reasoned in a prior opinion, under Antiguan law, "funds

deposited with a bank become the property of the bank, and the depositor becomes a creditor of

the bank." See All Assets IV, 959 F. Supp. 2d at 97 ("Deposits made with Eurofed by its

customers . . . became Eurofed's assets.").  The Court also stated that during Eurofed's

liquidation, "there is no beneficial owner of the company's assets." Id. at 105.

        Second, even assuming that Mr. Lazarenko has some ownership interest in the

funds in the Antiguan liquidation proceedings, that does not translate to a beneficial interest in

the Correspondent Assets.  Under Antiguan law, "once Eurofed itself, now acting as a customer,

deposited . . . funds with financial institutions in Lithuania and Switzerland . . . Eurofed in turn

lost title to those funds." See All Assets IV, 959 F. Supp. 2d at 114.  And Mr. Lazarenko has not

provided any evidence that Swiss or Lithuanian laws govern the property rights of bank

depositors any differently from Antiguan laws.  Moreover, as the result of freeze orders issued in

Switzerland and Lithuania, the Antiguan Liquidators have never been able to transfer the

Correspondent Assets back to Antigua and under their own control. See id.  As the Court

---

[6]        The parties previously agreed that Antiguan law, including statutes and case law,
dictates the rights of the claimants in the Antiguan liquidation proceedings. See All Assets
IV, 959 F. Supp. 2d at 97.

previously concluded, Eurofed did not establish a colorable ownership interest in the
Correspondent Assets, and "at most, has a damages claim against the three financial institutions
holding those funds if they unlawfully refuse to return them." See id. at 115.  If Eurofed itself
could not establish an interest in the Correspondent Assets, it is hard to see how
Mr. Lazarenko – as a Eurofed creditor with an even more attenuated link to these funds – is a
beneficial owner of these funds.  Based on the foregoing, the Court concludes that
Mr. Lazarenko has not established by a preponderance of the evidence that he is the beneficial
owner of the Correspondent Assets.  He therefore has failed to establish statutory standing to
oppose forfeiture of the Correspondent Assets.

### 2.   Constitutional Standing

The United States also argues that Mr. Lazarenko has not suffered a concrete and
particularized injury sufficient to establish Article III standing because he lacks a present
property interest in the Correspondent Assets.  See U.S. Mot. at 15-16.  The Court agrees with
the United States.

### a.   Ownership or Control over Correspondent Assets

To determine whether a claimant has ownership over a res, courts generally look
to "indicia of dominion and control such as possession, title, and financial stake."  All Assets
IV, 959 F. Supp. 2d at 100 (quoting United States v. $38,570 U.S. Currency, 950 F.2d at 1113);
see also United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA, 545
F.3d 1134, 1140 (9th Cir. 2008).  This kind of "inquiry into a claimant's ownership interests is
often 'a surrogate for an inquiry into whether there is injury direct enough and sufficient enough
to sustain standing.'"  All Assets IV, 959 F. Supp. 2d at 104 (quoting United States v. Cambio

Exacto, S.A., 166 F.3d 522, 527 (2d Cir. 1999)); see also United States v. 8 Gilcrease Lane,

Quincy, Fla. 32351, 641 F. Supp. 2d at 6 ("[I]n a civil forfeiture case, a claimant's constitutional

standing turns upon whether the claimant has a sufficient interest in the property to create a case

or controversy." (citation omitted) (internal quotation marks omitted)).

　　　　As the United States points out, Mr. Lazarenko has never asserted an ownership

interest – beneficial or otherwise – or any other "indicia of dominion and control" over the

Correspondent Assets.  Mr. Lazarenko has not asserted that he has legal title to, signatory

authority over, or possession of the Correspondent Assets.  See U.S. Mot. at 16-17.  And Swiss

and Lithuanian bank account records do not indicate that he – as opposed to Eurofed – owns or

controls the bank accounts in these countries.  See id. at 4-5 (citing Eurofed Agreements and

Account Signatory Documents to Open Correspondent Account at Bankas Hermis (Lithuania)

[Dkt. No. 1317-4] at 24-44; Eurofed Agreements and Account Signatory Documents to Open

Correspondent Account at Banque SCS Alliance (Switzerland) [Dkt. No. 1317-4] at 45-48;

Eurofed Agreements and Account Signatory Documents to Open Correspondent Account at

Credit Suisse (Switzerland) [Dkt. No. 1317-4] at 49-53).  In response, Mr. Lazarenko argues that

he has standing because the Correspondent Assets are connected to the Antiguan liquidation

proceedings, and he is the "beneficial owner" of the assets in Antigua.  See Lazarenko Opp.

at 19.  He contends that the Antiguan Liquidators "have a mandate that include attempting to

repatriate assets outside of Antigua" and that "[t]here is no reason to think that Eurofed's foreign

assets are not subject to the liquidators' jurisdiction."  Id. at 19-20.

　　　　Mr. Lazarenko's argument is unpersuasive.  Beyond a bare claim of "beneficial

ownership" of the Correspondent Assets, Mr. Lazarenko "does not offer further explanation as to

the nature or extent of" this asserted "beneficial ownership."  U.S. Mot. at 13.  This Court,

however, has previously explained the meaning of "beneficial ownership" in the context of the

Antiguan liquidation proceedings.  In the Antiguan liquidation context, an assertion of beneficial

ownership of the assets in liquidation does not translate to an interest in the Correspondent

Assets.  First, under Antiguan law, during Eurofed's liquidation there is no beneficial owner of

its assets.  See All Assets IV, 959 F. Supp. 2d at 105.  Rather, "the corporation in liquidation is

comparable to a trustee in bankruptcy, who is vested with legal ownership of the bankrupt's

property, but who 'cannot enjoy the fruits of it himself or dispose of it for his own benefit' and

instead is 'under a duty to deal with it as directed by the statute for the benefit of all the creditors

who come in to prove a valid claim.'"  Id. at 98.  Second, Antiguan law also provides that once

Eurofed deposited funds with banks in Switzerland and Lithuania, Eurofed lost title to those

funds.  See id. at 114.  Eurofed itself could not establish a colorable ownership interest in the

Correspondent Assets, and "at most, has a damages claim against the three financial institutions

holding those funds if they unlawfully refuse to return them."  Id. at 115.  Mr. Lazarenko's claim

is even more attenuated than Eurofed's, and he likewise has not established any colorable

ownership interest in the Correspondent Assets.

      At most, as the government argues, Mr. Lazarenko is an unsecured creditor.  See

U.S. Mot. at 18.  And as this Court and others have noted, unsecured creditors lack standing to

contest the forfeiture of their debtors' property.  See United States v. BCCI Holdings

(Luxembourg), S.A., 46 F.3d 1185, 1191 (D.C. Cir. 1995) (holding that "a general creditor can

never have an interest in specific forfeited property"); United States v. All Assets Held at Bank

Julius Baer & Co., Ltd., 772 F. Supp. 2d 205, 212 (D.D.C. 2011) ("The federal courts have

consistently held that unsecured creditors do not have standing to challenge the civil forfeiture of

their debtors' property." (quoting United States v. One-Sixth Share, 326 F.3d at 41)).

The Court also concludes that Mr. Lazarenko has not demonstrated that he faces an actual or imminent – as opposed to a speculative or future – injury.  Mr. Lazarenko asserts that certain funds in the Antiguan liquidation proceeding were segregated because they belong to him.  See Lazarenko Opp. at 19-20.  Contrary to Mr. Lazarenko's assertion, however, funds in the Antiguan liquidation proceedings were only potentially segregated for him, out of an abundance of caution.  As the Court previously explained:

> Taking a conservative approach, the Liquidators recommended treating the combined sum of the money in Lazarenko's personal bank account and the account of the six companies over which he claimed ownership as potentially Lazarenko-related for the purposes of the [Antiguan High Court of Justice's] freeze order. . . .
>
> In the Liquidators' words, "at the time we proposed the 2003 segregation of funds, we conservatively attributed those funds to Lazarenko to avoid any potential argument that these funds could be subject to forfeiture.  We certainly were not disclaiming any right to use those funds in the future for liquidation purposes should the forfeiture fail, or if Lazarenko were unable to prove his ownership of those funds.  We propose the division simply to provide a mechanism to allow partial payment of third party claims and to keep the Eurofed liquidation apace."

All Assets IV, 959 F. Supp. 2d at 89, 90 n.7 (quoting Walwyn Decl. ¶ 14).  Mr. Lazarenko has not established that he has suffered an "injury direct enough and sufficient enough to sustain standing."  Id. at 104 (citation omitted).

Mr. Lazarenko next argues that the 2014 settlement between the United States and Eurofed, which this Court approved, contemplated that funds from the Correspondent Assets remaining in this action would be turned over to the Antiguan Liquidators and that striking Mr. Lazarenko's claim to these assets "renders th[e] turnover order nugatory."  Lazarenko Opp. at 20.  The Court disagrees.  The 2014 settlement envisions that the Correspondent Assets are transferred to the Liquidators if (1) the Correspondent Assets are first repatriated to the United

States from Switzerland and Lithuania, and (2) the Correspondent Assets remaining in this action are not forfeited or otherwise disposed of at the conclusion of this forfeiture proceeding. <u>See</u> U.S. Reply at 17; Stipulation and Settlement Agreement and Order Thereon [Dkt. No. 334] ¶¶ 20-21. Any injury that Mr. Lazarenko would suffer, therefore, is reliant upon these contingencies; but as the result of the freeze orders issued in Switzerland and Lithuania, the Antiguan Liquidators have never been able to transfer the Correspondent Assets back to Antigua and under the control of the Liquidators. <u>See</u> <u>All Assets IV</u>, 959 F. Supp. 2d at 114. Mr. Lazarenko's potential, future injury is not the kind of injury that is sufficiently concrete enough to confer standing. <u>See</u> <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 401 (2013) ("[R]espondents' theory of <u>future</u> injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" (citation omitted)).

   In addition, Mr. Lazarenko argues that without the funds from the Correspondent Assets, there would be insufficient funds in the liquidation to fund his claims. <u>See</u> Lazarenko Opp. at 26. That alone, however, does not establish that Mr. Lazarenko has suffered an injury that is actual and imminent rather than speculative. <u>See</u> <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. at 560-61. As the United States points out, even if the plaintiff in this forfeiture action does not succeed, there is no guarantee that the Correspondent Assets will ever be returned to the Antiguan Liquidators. <u>See</u> U.S. Reply at 11-12. The Correspondent Assets are under freeze orders in Switzerland and Lithuania and remain subject to these countries' adjudication of Ukraine's pending request to restrain the assets. Moreover, the Liquidators' interest in the Correspondent Assets appears, at most, to consist of a damages claim against the Swiss and Lithuanian banks if they unlawfully refuse to return Eurofed's deposits. <u>See</u> <u>All Assets IV</u>, 959 F. Supp. 2d at 115.

b.   Mr. Lazarenko's Other Arguments

The Court is also unpersuaded by any of Mr. Lazarenko's other arguments in support of his claim that he has constitutional standing. First, Mr. Lazarenko argues that he has standing because his six corporate accounts at Eurofed were "custodial accounts," which, according to Mr. Lazarenko, means that their deposits were held in trust for safekeeping for Mr. Lazarenko and were not the property of Eurofed. See Lazarenko Opp. at 22. Mr. Lazarenko points out that the United States, in support of its 2012 summary judgment motion to strike Eurofed's claim to the Antiguan assets, took this position and argued that there was no genuine issue of material fact that Mr. Lazarenko's accounts at Eurofed were custodial and that his deposits belonged to him rather than to Eurofed. See id.; All Assets IV, 959 F. Supp. 2d at 101-02. In response to the present motion, Mr. Lazarenko appears to argue that because the Court previously found that the evidence the United States marshaled in support of this argument was "suggestive" in All Funds IV, the same evidence now supports Mr. Lazarenko's contention that his accounts at Eurofed were custodial and that he owns the funds in those accounts. See Lazarenko Opp. at 22-23. Mr. Lazarenko contends that this evidence establishes constitutional standing to challenge the forfeiture of the Correspondent Assets. See id. at 23.

The Court disagrees with Mr. Lazarenko. In 2012, the United States filed, among other documents, six identical "Custodian Agreements," each signed by a representative of one of Mr. Lazarenko's six companies. See All Assets IV, 959 F. Supp. 2d at 102. The agreements authorized Eurofed to open a custodian account for each company. See id. Mr. Lazarenko is correct that the Court stated in All Assets IV that this evidence was "suggestive" that the deposits at Eurofed may belong to Mr. Lazarenko and his six corporations, rather than to Eurofed. The Court, however, ultimately concluded that this evidence was "far too limited and ambiguous to

support a judgment, without any further factual development, that Eurofed held the money of Lazarenko and his affiliated companies in a custodial or fiduciary capacity, rather than as traditional cash deposits." Id.

   In any case, the Court's assessment of this evidence in All Assets IV has no bearing on the present motion. In the context of the government's summary judgment motion to strike Mr. Lazarenko's claim to the Correspondent Assets, the Court is considering an entirely different question from the question it considered in All Assets IV. The issue now before the Court is not whether Mr. Lazarenko can establish standing to challenge the forfeiture of the Eurofed assets in liquidation in Antigua; rather, the issue is whether Mr. Lazarenko can establish standing to challenge the forfeiture of the Correspondent Assets located in Switzerland and Lithuania. Even if the Court were to assume that the "Custodial Agreements" establish that Mr. Lazarenko's six corporations had custodial accounts with Eurofed and maintained ownership over the funds in those accounts, this does not establish Mr. Lazarenko's standing to contest the forfeiture of the Correspondent Assets. As the Court previously stated, "Antiguan law provides that a customer's financial deposits with a bank generally become assets of the bank" and "the customer is no longer the owner of the money." All Assets IV, 959 F. Supp. 2d at 114. There is no evidence that Swiss or Lithuanian law provides otherwise. Even assuming that Mr. Lazarenko's six corporations maintained ownership of their deposits at Eurofed, once Eurofed deposited those funds in bank accounts in Switzerland and Lithuania, Mr. Lazarenko was "no longer the owner of the money." Id. In addition, there is no evidence that Mr. Lazarenko – or Eurofed – established custodial accounts with the banks in Switzerland and Lithuania that permitted him to retain ownership of the deposits at those banks. Mr. Lazarenko's

argument that his accounts with Eurofed were custodial accounts therefore does not establish that he has constitutional standing with respect to the Correspondent Assets.

Second, Mr. Lazarenko argues that his <u>right to participate</u> in the Antiguan liquidation proceedings confers standing on him to raise a claim to the Correspondent Assets. <u>See</u> Lazarenko Opp. at 23. But the cases on which Mr. Lazarenko relies in support of this argument are simply not applicable here. The cases he cites recognized "loss of an opportunity to pursue a benefit" as an injury sufficient to confer standing. <u>Id</u>. at 25 (quoting <u>CC Distribs., Inc. v. United States</u>, 883 F.2d 146, 150 (D.C. Cir. 1989)); <u>see also id</u>. at 24-25 (citing <u>In re Arelma, S.A.</u>, Misc. No. 16-1339, 2019 WL 3084706, at *3-4 (D.D.C. July 15, 2019) and <u>In re $6,871,042.36 & Accrued Interest</u>, 217 F. Supp. 3d 84, 91-94 (D.D.C. 2016)). In <u>In re $6,871,042.36 & Accrued Interest</u>, for example, Judge Walton concluded that the liquidators of a bank in a separate interpleader action had standing to intervene in the case because the liquidators' injury was their inability to proceed in the interpleader action due to a protective order issued in the case. <u>See In re $6,871,042.36 & Accrued Interest</u>, 217 F. Supp. 3d at 91-94. Judge Walton explained that because the liquidators' asserted injury was the loss of an opportunity, it was irrelevant for purposes of standing whether their claim in the interpleader action would ultimately be successful. <u>See id</u>. at 93. Unlike this case and the others Mr. Lazarenko cites, Mr. Lazarenko has not lost any opportunity to pursue a benefit when he never had any interest in the Correspondent Assets to begin with.

Third, Mr. Lazarenko maintains that the United States' prior assertions in this forfeiture proceeding create a genuine issue of material fact with respect to its current summary judgment motion. <u>See</u> Lazarenko Opp. at 28. Mr. Lazarenko argues that both the Amended Complaint and Count Six of the second superseding indictment in Mr. Lazarenko's criminal trial

in the Northern District of California alleged that Mr. Lazarenko assisted in the transfer of funds between two Eurofed accounts, which is sufficient to establish standing to challenge the Correspondent Assets. See id. at 28-30. In addition, Mr. Lazarenko asserts that he has standing because the United States alleged in the Amended Complaint and other filings that Mr. Lazarenko controlled Eurofed, and – according to Mr. Lazarenko – his control over Eurofed translates to control over the Correspondent Accounts. See id.

Neither argument is persuasive. The Court previously ruled that allegations in a complaint alone cannot confer standing. See All Assets IX, 480 F. Supp. 3d at 25. Moreover, the allegations against Mr. Lazarenko, either in the Amended Complaint or in the criminal indictment, do not establish standing. As the government points out, "[s]imply because the United States alleges that Lazarenko used various accounts to launder criminal proceeds that ultimately ended up constituting the [ ] Correspondent Assets does not mean that Lazarenko owns the accounts for purposes of establishing standing." U.S. Reply at 15. Furthermore, the United States' prior assertions regarding Mr. Lazarenko's control of Eurofed also do not confer standing. Regardless of the extent of Mr. Lazarenko's control over Eurofed, if Eurofed itself did not have a colorable interest in the Correspondent Assets sufficient to establish standing, Mr. Lazarenko certainly does not either.

Finally, Mr. Lazarenko argues that he has standing because Ukraine has restrained the Correspondent Assets in order to use these funds to satisfy its claims against Mr. Lazarenko pursuant to Ukrainian criminal proceedings. See Lazarenko Opp. at 31; Opposition to Plaintiff's Motion to Strike Pavel Lazarenko's Claim to the Assets Held in Liechtenstein ("Lazarenko Liechtenstein Opp.") [Dkt. No. 1319] at 8 (page number citations refer to electronic case filing numbers). Mr. Lazarenko contends that because the Correspondent Assets may be used by

Ukraine to satisfy a judgment against him, he has an interest in ensuring that the assets are not

forfeited and instead remain available to satisfy that potential judgment.  See Lazarenko

Liechtenstein Opp. at 10.  Mr. Lazarenko raised this same argument with respect to portions of

the res located in Liechtenstein.  See Lazarenko Opp. at 31.  As the Court explained in a prior

opinion, "[t]o establish the nature of his interest . . . Mr. Lazarenko must first show that the

restraint gives Ukraine an interest in the [Correspondent] Accounts under [Swiss and Lithuanian]

law and then show that Ukraine's interest gives Mr. Lazarenko an interest" under the laws of

those countries.  All Assets XI, 2020 WL 7640213, at *7.  He must also "demonstrate that his

interest is constitutionally cognizable under United States law."  Id.  He has failed to do either.

      The freeze orders issued by Switzerland and Lithuania do not establish that

Ukraine has a legally enforceable interest under Swiss or Lithuanian law that is being invaded by

these forfeiture proceedings.  Ukraine "merely sought [Switzerland and Lithuania's] assistance to

restrain the assets in anticipation of prosecution," and these countries granted Ukraine's request

and issued freeze orders "as part of the pre-judicial investigation in criminal proceedings."  All

Assets XI, 2020 WL 7640213, at *8 (internal quotation marks omitted).  The freeze orders issued

by Switzerland and Lithuania "do[] not guarantee that Ukraine will be able to forfeit these

accounts, nor has Mr. Lazarenko offered other evidence to prove such a guarantee."  Id.  But

even assuming that Ukraine has a legally enforceable interest, Mr. Lazarenko has not

demonstrated how Ukraine's interest provides him with an interest in the Correspondent Assets

under Swiss or Lithuanian law.  Moreover, assuming further that Mr. Lazarenko does have an

interest based on the Swiss and Lithuanian freeze orders, Mr. Lazarenko has failed to show how

this "derivative, contingent" interest is sufficient to give him standing as a claimant to the

Correspondent Accounts under established constitutional standing jurisprudence.  Id.

None of the plethora of arguments made by Mr. Lazarenko shows that his asserted injury is sufficiently concrete, particularized, and imminent to confer Article III standing. Rather, they are at best speculation and conjecture.  And as Justice Kavanaugh succinctly put it: "No concrete harm, no standing."  TransUnion LLC v. Ramirez, 141 S. Ct. at 2200. Mr. Lazarenko has failed to establish by a preponderance of the evidence that he has standing to oppose forfeiture of the Correspondent Assets.

### 3.    Procedural Objections

Mr. Lazarenko lodges two procedural objections to the United States' motion. First, Mr. Lazarenko argues that the United States "bears the burden at every phase of the proceeding to use admissible evidence or evidence which is capable of being converted into admissible evidence" but that it has cited documents that do not appear to be capable of being converted into admissible evidence.  Lazarenko Opp. at 14 (citing Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000)).  Mr. Lazarenko cites as examples Eurofed and Bankas Hermis records and argues that it would be "pure speculation to assume" that a records custodian would be able to authenticate these records.  Id.

In order to make use of a record or other evidence to support a motion for summary judgment, the evidence must be capable of being converted into admissible evidence. See Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d at 1369 ("While a nonmovant is not required to produce evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence.").  The Court agrees with the United States that the evidence it relied on is capable of being converted into admissible evidence.  Given that a records custodian authenticated bank records during Mr. Lazarenko's criminal trial, there is no reason to believe that a records custodian would be unavailable to

authenticate records in this proceeding.  And, as the United States points out, many of these

records have been authenticated already.  See U.S. Reply at 9 n.2 (citing SEB Bankas (Lithuania)

Authentication Material [Dkt. No. 1367-1] at 1-2) (page number citations refer to electronic case

filing numbers).

Second, Mr. Lazarenko argues that his responses to interrogatories – which the

United States cites in support of its arguments – are not admissions because he did not have

firsthand knowledge of the statements that he "parroted" in response to questions.  See

Lazarenko Opp. at 14-15.  In response, the United States argues that "[t]o permit Lazarenko to

use evidence to support a position he asserted, but preclude the United States from using the

same evidence to support the exact same position would frustrate the purpose of civil discovery."

U.S. Reply at 9 n.1.  While there certainly is logic to the government's position, the Court has

not relied on Mr. Lazarenko's interrogatory responses in this Opinion, and it does not resolve

Mr. Lazarenko's objection here.

For the foregoing reasons, both of Mr. Lazarenko's procedural objections to the

United States' motion for summary judgment fail.

B.  *Mr. Lazarenko's Cross-Motions to Dismiss and for Partial Summary Judgment*

Mr. Lazarenko has filed a cross-motion to dismiss the Correspondent Assets from

this case.  He argues that the Court lacks in rem jurisdiction over the Correspondent Assets

because the funds are not within the constructive control of the Court.  He requests that the Court

certify an interlocutory appeal on this issue in the event that the Court denies his motion.  See

Lazarenko Opp. at 31, 38.  In the alternative, Mr. Lazarenko cross-moves for partial summary

judgment with respect to a Lithuanian account and a Swiss account that are part of the

Correspondent Assets.  See id. at 33, 37.  He argues that the United States has not provided any

admissible evidence tracing the funds in these accounts to Mr. Lazarenko's criminal activities. See id.

As the Court has concluded, Mr. Lazarenko lacks standing to contest the forfeiture of the Correspondent Assets, see supra Section III.A, and he therefore does not have standing to bring this motion to dismiss or for partial summary judgment. See SUPP. R. G advisory committee's notes ("[Rule G(8)(c)(ii)] directs that a motion to strike a claim or answer be decided before any motion by the claimant to dismiss the action. A claimant who lacks standing is not entitled to challenge the forfeiture on the merits."). Even assuming that Mr. Lazarenko had standing, however, both of his motions would fail on the merits. The Court will deny Mr. Lazarenko's motion to dismiss and his motion for partial summary judgment.

### 1.   Mr. Lazarenko's Cross-Motion to Dismiss

Mr. Lazarenko moves to dismiss the Correspondent Assets on the grounds that the Court lacks in rem jurisdiction over these funds. See Lazarenko Opp. at 31. As an initial matter, an objection to in rem jurisdiction is not an objection to subject matter jurisdiction; it is akin to an objection to personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. See 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1351 (3d ed. 2023) ("Although Rule 12(b)(2) only refers to 'lack of personal jurisdiction,' the provision presumably is sufficiently elastic to embrace a defense or objection that the district court lacks in rem or quasi-in-rem jurisdiction . . . ." (quoting FED. R. CIV. P. 12(b)(2))).[7]

---

[7]      In his reply brief in support of his cross-motion, Mr. Lazarenko suggests in a heading title that his challenge is to the Court's subject matter jurisdiction. See Lazarenko Reply at 22. The rest of his argument, however, is devoted to discussing in rem jurisdiction only. See id. at 22-25. The Court treats Mr. Lazarenko's argument as a challenge to in rem jurisdiction rather than to subject matter jurisdiction.

The United States argues that while Mr. Lazarenko styles his argument as a

motion to dismiss, he references facts not included in the Amended Complaint, which is

improper on a motion to dismiss.  See U.S. Opp. at 27 n.3.  The Court, however, may consider

relevant documents outside of the pleadings when reviewing a challenge to personal jurisdiction.

See Queen v. Schmidt, Civil Action No. 10-2017, 2015 WL 5175712, at *8 (D.D.C.

Sept. 3, 2015) ("On a motion to dismiss for lack of personal jurisdiction under

Rule 12(b)(2) . . . the Court need not accept all of the plaintiffs' allegations as true.  It 'may

receive and weigh affidavits and other relevant matter outside of the pleadings to assist in

determining the jurisdictional facts.'" (citations and brackets omitted)); Sanchez-Mercedes v.

Bureau of Prisons, 453 F. Supp. 3d 404, 414 (D.D.C. 2020) (citing Mwani v. bin Laden, 417

F.3d 1, 7 (D.C. Cir. 2005)).  Any "factual discrepancies appearing in the record must be resolved

in favor of the plaintiff."  Crane v. N.Y. Zoological Soc., 894 F.2d 454, 456 (D.C. Cir. 1990).

Furthermore, in considering a challenge to personal jurisdiction under Rule 12(b)(2), reviewing

documents outside of the pleadings does not convert this motion to dismiss into a motion for

summary judgment.  See Flynn v. Ohio Bldg. Restoration, Inc., 260 F. Supp. 2d 156, 161

(D.D.C. 2003) ("By considering documents outside the pleadings on a motion to dismiss

pursuant to Rules 12(b)(1) and 12(b)(2), the Court does not convert the motion into one for

summary judgment.").

Mr. Lazarenko challenges the Court's in rem jurisdiction over the Correspondent

Assets, arguing that the Court lacks constructive control over these assets.  See Lazarenko Opp.

at 31.  He contends that the Court does not have constructive control due to the Swiss and

Lithuanian freeze orders issued in connection with Ukraine's restraint on the assets.  See id.  He

also points out that the Court has issued numerous repatriation orders during the course of this

litigation and that Switzerland and Lithuania have ignored all of these orders. See Lazarenko

Reply at 22. The Court disagrees.

First, Mr. Lazarenko incorrectly characterizes Supplemental Rule G(3)(c) to

require constructive control of a res. See SUPP. R. G(3)(c). Supplemental Rule G(3)(c) governs

the procedural requirements of arrest warrants and does not address in rem jurisdiction

requirements. Second, the Court disagrees with Mr. Lazarenko's assertion that constructive

possession is required in order for the Court to have in rem jurisdiction over the Correspondent

Assets. In United States v. All Funds in Account Nos. 747.034/278, 747.009/278,

& 747.714/278 in Banco Espanol de Credito, Spain ("Banco Espanol"), the D.C. Circuit

explained that 28 U.S.C. § 1355(b) – the same jurisdictional statute at issue here – is meant to

provide district courts with "jurisdiction to order the forfeiture of property located in foreign

countries." Banco Espanol, 295 F.3d at 27. The D.C. Circuit acknowledged the traditional rule,

cited by Mr. Lazarenko, that courts must have actual or constructive possession of a res in order

to have in rem jurisdiction; but it recognized that Section 1355(b) provides an independent basis

for in rem jurisdiction. See id. at 25-27. The court concluded that Section 1355(b) grants in rem

jurisdiction and that a foreign country's "compliance and cooperation determines only the

effectiveness of the forfeiture orders of the district courts, not their jurisdiction to issue those

orders." Id. at 27.[8]

---

[8]     28 U.S.C. § 1355 provides that "[a] forfeiture action or proceeding may be
brought in (A) the district court for the district in which any of the acts or omissions giving rise
to the forfeiture occurred, or (B) any other district where venue for the forfeiture action or
proceeding is specifically provided for in section 1395 of this title or any other statute." 28
U.S.C. § 1355(b)(1).

The statute also provides: "Whenever property subject to forfeiture under the laws of the
United States is located in a foreign country, or has been detained or seized pursuant to legal
process or competent authority of a foreign government, an action or proceeding for forfeiture

Mr. Lazarenko argues that <u>Banco Espanol</u> is not factually similar to this case because the Swiss and Lithuanian governments have ignored repatriation orders to release portions of the Correspondent Assets to the United States. <u>See</u> Lazarenko Reply at 24. But the D.C. Circuit explained in <u>Banco Espanol</u> that a foreign country's cooperation determines only the <u>effectiveness</u> of a court's forfeiture orders, not the court's <u>jurisdiction</u> to issue those orders. <u>See</u> <u>Banco Espanol</u>, 295 F.3d at 27. Moreover, contrary to Mr. Lazarenko's assertion, the Swiss and Lithuanian governments have in fact cooperated with this Court in freezing the Correspondent Assets pursuant to the Court's July 8, 2005 restraining order. <u>See</u> U.S. Opp. at 4 (citing Swiss Federal Office of Justice Letter (Oct. 5, 2006) [Dkt. No. 286] at 365; Lithuanian Temporary Restriction of Property Rights (Feb. 9, 2006) [Dkt. No. 286] at 390) (page number citations refer to electronic case filing numbers)). The fact that the Swiss and Lithuanian governments are also recognizing Ukraine's requested restraint on the Correspondent Assets and have not yet repatriated those assets prior to entry of a final judgment in this action does not mean that these governments are wholly uncooperative with the Court's restraint on the assets. <u>See</u> May 19, 2017 Joint Status Report [Dkt. No. 967] (describing Lithuanian authorities' reluctance to permit pre-judgment transfer of the funds in Lithuania to the United States and their subsequent extension of the Court's restraining order over those assets). For these reasons, the Court concludes that it has <u>in rem</u> jurisdiction to adjudicate the forfeiture of the Correspondent Assets.

Separately, Mr. Lazarenko appears to argue that the Court's orders are advisory, in contravention of Article III's prohibition against advisory opinions, because the Swiss and

---

may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia." 28 U.S.C. § 1355(b)(2).

Lithuanian governments have not yet repatriated the Correspondent Assets.  See Lazarenko

Reply at 25.  The Fourth Circuit addressed a similar question in United States v. Batato, 833

F.3d 413 (4th Cir. 2016).  In that case, the Fourth Circuit found no issue with the district court's

power to hear the case because it was "likely, rather than speculative" that New Zealand and

Hong Kong would honor a forfeiture order from a U.S. court because these foreign jurisdictions

had already "cooperatively detained the res by issuing orders restraining the defendant property

pursuant to th[e] [U.S.] litigation."  Id. at 422.  Similarly, here, the Swiss and Lithuanian

governments have implemented the Court's restraining order, even if they have not yet

repatriated the Correspondent Assets pending resolution of this matter.  Because Switzerland and

Lithuania have already "cooperatively detained the res" in their respective jurisdictions, it is

"likely, rather than speculative" that these countries will honor a forfeiture order from this Court

once the matter has reached final judgment.  Id.; see also United States v. All Assets Held in

Acct. No. XXXXXXXX, 471 F. Supp. 3d 192, 208 (D.D.C. 2020).

Finally, the Court concludes that an interlocutory appeal on this issue is

unwarranted.  Under 28 U.S.C. § 1292, there is a high bar for certification of an interlocutory

appeal.  See 28 U.S.C. § 1292.  Pursuant to Section 1292(b), the district court may certify an

order for immediate appeal if it makes the following three findings: "(1) the order involves a

controlling question of law; (2) a substantial ground for difference of opinion concerning the

ruling exists; and (3) an immediate appeal would materially advance [the ultimate termination

of] the litigation."  United States v. Honeywell Int'l, Inc., Civil Action No. 08-0961, 2021

WL 2493382, at *2 (D.D.C. June 18, 2021) (citing Molock v. Whole Foods Mkt. Grp., 317 F.

Supp. 3d 1, 4 (D.D.C. 2018)); see also In re Rail Freight Fuel Surcharge Antitrust Litig., Misc.

No. 07-0489, 2021 WL 2433737, at *4 (D.D.C. June 15, 2021).  Interlocutory appeal is only

appropriate if all three requirements are satisfied.  See Walsh v. Ford Motor Co., 807

F.2d 1000, 1002 n.2 (D.C. Cir. 1986) (stating that the district court must make all three findings

described in the statute); United States v. Honeywell Int'l, Inc., 2021 WL 2493382, at *2 (same);

In re Rail Freight Fuel Surcharge Antitrust Litig., 2021 WL 2433737, at *4 (same).  "This

screening procedure serves the dual purpose of ensuring that [interlocutory] review will be

confined to appropriate cases and avoiding time-consuming jurisdictional determinations in the

court of appeals."  Coopers & Lybrand v. Livesay, 437 U.S. 463, 474-75 (1978).

      Here, the D.C. Circuit's decision in Banco Espanol is directly controlling, and the

law on the issue of in rem jurisdiction is settled in this Circuit.  See Banco Espanol, 295 F.3d

at 27.  Thus, no "substantial ground for difference of opinion concerning the ruling exists."

See 28 U.S.C. § 1292(b); APCC Servs., Inc. v. Sprint Commc'ns Co., 297 F. Supp. 2d 90, 97-98

(D.D.C. 2003) ("[S]ubstantial ground for difference of opinion is often established by a dearth of

precedent within the controlling jurisdiction and conflicting decisions in other circuits.  [It] also

exists where a court's challenged decision conflicts with decisions of several other courts."

(citations omitted)).  This issue is therefore inappropriate for interlocutory appeal.

      2.   Mr. Lazarenko's Cross-Motion for Partial Summary Judgment

      In the alternative, Mr. Lazarenko moves for partial summary judgment against the

portions of the Correspondent Assets that are held at Vilniaus Bankas in Lithuania and Banque

SCS Alliance in Switzerland.  See Amended Complaint ¶ 5(g)-(h).[9]  In the Amended Complaint,

---

[9]     According to the Amended Complaint, in February 2000, Vilniaus Bankas
merged with Bankas Hermis, the bank at which Eurofed originally made deposits.  According to
the United States' notice of errata for the Amended Complaint, Vilniaus Bankas became SEB
Vilniaus Bankas in April 2005.  For the purposes of this Opinion, the Court refers to the res in
Lithuania as the funds in Vilniaus Bankas and considers Bankas Hermis, Vilniaus Bankas, and
SEB Vilniaus Bankas to be interchangeable.

the United States brought eight claims against the defendants in rem pursuant to two provisions

of 18 U.S.C. § 981(a)(1)(C), the federal civil forfeiture statute. See id. ¶¶ 120-55. Claims One

through Four were brought pursuant to Section 981(a)(1)(C) and Claims Five through Eight were

brought pursuant to Section 981(a)(1)(A). See id. Under Section 981(a)(1)(C), property is

subject to forfeiture if it "constitutes or is derived from proceeds traceable to a violation of

[specific statutes] or any offense constituting 'specified unlawful activity' . . . or a conspiracy to

commit such offense." 18 U.S.C. § 981(a)(1)(C). In cases involving unlawful activities, the

term "proceeds" means "property of any kind obtained directly or indirectly, as the result of the

commission of the offense giving rise to forfeiture, and any property traceable thereto." Id.

§ 981(a)(2)(A). Under Section 981(a)(1)(A), property "involved in a transaction or attempted

transaction in violation of [specific money laundering statutes], or any property traceable to such

property" is also subject to forfeiture. Id. § 981(a)(1)(A). "Construing the federal money

laundering statute, the D.C. Circuit has made clear that otherwise untainted money may become

'involved' in a money laundering offense" for purposes of forfeitability "where those funds are

comingled with illicit proceeds" and "the government produces evidence that the legitimate

funds were used to conceal the source of illicit proceeds." United States v. Bikundi, 125 F.

Supp. 3d 178, 194 (D.D.C. 2015) (citing United States v. Braxtonbrown–Smith, 278

F.3d 1348, 1351-55 (D.C. Cir. 2002)).

   Mr. Lazarenko argues that the United States has not met its burden under

Section 981(a)(1)(A) or (C) to establish that the assets in Vilniaus Bankas or Banque SCS

Alliance are connected to Mr. Lazarenko's criminal activities. See Lazarenko Opp. at 36-37.

The United States responds by asserting that by the time Mr. Lazarenko's funds were deposited

into Eurofed and then subsequently into these foreign accounts, the funds already constituted

property derived from criminal proceeds and property involved in money laundering.  <u>See</u> U.S.
Opp. at 31.

        Because Mr. Lazarenko is the moving party on this cross-motion, he bears the
burden of showing that there is no genuine dispute of material fact regarding the non-criminal
origins of the funds in the Vilniaus Bankas and Banque SCS Alliance accounts.  <u>See</u> FED. R. CIV.
P. 56(a).  He has not met that burden.  Contrary to Mr. Lazarenko's assertions, the United States
has pointed to sufficient evidence in the record to demonstrate that there is a connection between
Mr. Lazarenko's criminal activities and the funds in Lithuania and Switzerland.  For example,
the United States' tracing expert Michael Petron has written expert reports analyzing the funds
deposited into Lazarenko-related accounts at Eurofed and concluded that the deposits are
traceable to Mr. Lazarenko's criminal activities.  <u>See</u> Expert Report of Michael Petron
(Apr. 21, 2016) ("Petron Report") [Dkt. No. 1283-1] at 161-204 (page number citations refer to
electronic case filing numbers); <u>see also</u> U.S. Opp. at 22.

        Eurofed then made deposits at Vilniaus Bankas and Banque SCS Alliance, and,
once deposited, "those assets did not suddenly lose their criminal origin or the history of their
involvement in laundering." U.S. Opp. at 37.  With respect to the Lithuanian Vilniaus Bankas
account, there is evidence that Eurofed made a number of deposits into this account.  <u>See</u> Petron
Report at 184-85 (page number citations refer to electronic case filing numbers).  With respect to
the Swiss Banque SCS Alliance account, there is also evidence that Eurofed made deposits into
this account, <u>see id</u>. at 183-84, and – as Mr. Lazarenko notes – the United States has produced
bank statements through 1998 showing the movement of Eurofed funds into this account.  <u>See</u>
Lazarenko Reply at 12.  Mr. Lazarenko argues that the United States offers no evidence that any
supposedly tainted funds that Eurofed deposited at Vilniaus Bankas or Banque SCS Alliance

were still in those accounts at the time that the accounts were restrained.  See id. at 7-8.  But

regardless of whether there is evidence of whether the supposedly tainted funds that Eurofed

deposited at Vilniaus Bankas or Banque SCS Alliance remained in those accounts at the time

that the accounts were restrained, the Court concludes that the United States has proffered

sufficient evidence that Eurofed funds connected with Mr. Lazarenko's criminal activity were

deposited into the Vilniaus Bankas and Banque SCS Alliance accounts.

       Relatedly, Mr. Lazarenko argues that the United States' records concerning the

Vilniaus Bankas account is not admissible as evidence and therefore cannot be considered by the

Court.  See Lazarenko Reply at 3.  Mr. Lazarenko contends that specifically, the government's

evidence of wire transfers from Eurofed to the Vilniaus Bankas account is not admissible

because these documents cannot be authenticated.  See id. at 10-11.  The Court disagrees.  As

already explained, see supra at 36, at the summary judgment stage, "a nonmovant is not required

to produce evidence in a form that would be admissible at trial, [but] the evidence still must be

capable of being converted into admissible evidence."  Gleklen v. Democratic Cong. Campaign

Comm., Inc., 199 F.3d at 1369 (second emphasis added).  Here, the United States has produced

business records for this account, and there is no reason to think that these records cannot be

authenticated.  See U.S. Reply at 9 n.2 (citing SEB Bankas (Lithuania) Authentication Material

[Dkt. No. 1367-1] at 1-2 (page number citations refer to electronic case filing numbers)).

IV.  CONCLUSION

For the foregoing reasons, the Court will grant the United States' Motion for Summary Judgment to Strike Pavel Lazarenko's Claims to All Defendant Assets Held in Switzerland and Lithuania [Dkt. No. 1317] and deny Mr. Lazarenko's Cross-Motion to Dismiss the Lithuanian and Swiss Res or, in the Alternative, for Partial Summary Judgment [Dkt. No. 1356].  An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE:   8/4/23