UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-0798 (PLF) |
| | ) | |
| ALL ASSETS HELD AT BANK JULIUS | ) | |
| Baer & Company, Ltd., Guernsey | ) | |
| Branch, account number 121128, in the | ) | |
| Name of Pavlo Lazarenko et al., | ) | |
| | ) | |
| Defendants In Rem. | ) | |

---

OPINION

This matter is before the Court on the motions of the United States for default judgment against four groups of defendant assets in this long-running forfeiture proceeding. One motion is opposed by the Liquidators of Eurofed Bank Limited ("Liquidators"); the other three are opposed by Pavel Lazarenko, the Ukrainian former politician whose alleged extortion and money laundering are the reason the government argues the assets are forfeitable. Upon consideration of the parties' written submissions, the relevant legal authorities, and the entire record in this case, the Court will grant the United States' motions for default judgment. The Court will not certify the judgments against these defendant assets as final, however, as there are other related groups of assets that remain proper defendants in this proceeding.[1]

---

[1] The motions for default judgment and related motions pending before the Court in this matter include: United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Certain Defendant Assets Located in Liechtenstein ("U.S. Liechtenstein Mot.") [Dkt. No. 1480]; United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Defendant Balford Trust Assets Located in Guernsey ("U.S. Balford Trust

Mot.") [Dkt. No. 1481]; United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Milchenko Account Assets in Antigua & Barbuda ("U.S. Milchenko Acct. Mot.") [Dkt. No. 1484]; Objection to Affidavit in Support of Default (Dkt. 1483) and Motion to Enforce Settlement Agreement ("1st Mot. to Enforce") [Dkt. No. 1486]; Objection to Entry of Default Judgment Against the Milchenko Account Assets and Motion to Enforce Settlement Agreement ("2d Mot. to Enforce") [Dkt. No. 1488]; Pavel Lazarenko's First Motion to Lift Clerk's Entries of Default (Dkt. Nos. 1438, 1477) ("Lazarenko Set Aside Mot.") [Dkt. No. 1493]; Opposition to the United States' Motions for Default Judgment (Dkts. 1480, 1481) and Cross Motion for an Evidentiary Hearing Pursuant to Fed. R. Civ. P. 55(b)(2)(C) ("Lazarenko Liechtenstein and Balford Trust Opp.") [Dkt. No. 1495]; and United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Defendant Eurofed Correspondent Assets Located in Lithuania and Switzerland ("U.S. Correspondent Mot.") [Dkt. No. 1507].

The filings reviewed in support of and in opposition to the default judgment and related motions include:  Affidavit in Support of Default Against Defendant Eurofed Correspondent Assets Located in Lithuania and Switzerland ("Correspondent Aff.") [Dkt. No. 1478]; Objection to Entry of Clerk's Default ("Obj. re Correspondent Assets") [Dkt. No. 1479]; Memorandum of Law in Support of United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Certain Defendant Assets Located in Liechtenstein ("U.S. Liechtenstein Mem.") [Dkt. No. 1480-1]; Memorandum of Law in Support of United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Defendant Balford Trust Assets Located in Guernsey ("U.S. Balford Trust Mem.") [Dkt. No. 1481-1]; Affidavit in Support of Default Against Defendant Milchenko Account Assets Located in Antigua ("Milchenko Acct. Aff.") [Dkt. No. 1483]; Milchenko Acct. Aff., Exhibit 5 ("Reg. Ltr.") [Dkt. No. 1483-5]; Memorandum of Law in Support of United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Milchenko Account Assets in Antigua & Barbuda ("U.S. Milchenko Acct. Mem.") [Dkt. No. 1484-1]; Objection to Affidavit in Support of Default (Dkt. 1483) and Motion to Enforce Settlement Agreement ("Obj. re Milchenko Acct") [Dkt. No. 1485]; Objection to Entry of Default Judgment Against the Milchenko Account Assets and Motion to Enforce Settlement Agreement ("Liquidators' Milchenko Acct. Opp.") [Dkt. No. 1487]; Response to Liquidator's Objections to Entry of Clerk's Default and Default Judgment as to Milchenko Account Assets and Motion to Enforce Settlement Agreement ("U.S. Milchenko Acct. Resp.") [Dkt. No. 1489]; Reply in Support of Liquidators Motion to Enforce Settlement Agreement ("Liquidators' Reply") [Dkt. No. 1490]; Memorandum of Law in Support of Pavel Lazarenko's First Motion to Lift Clerk's Entries of Default (Dkt. Nos. 1438, 1477) ("Lazarenko Set Aside Mem.") [Dkt. No. 1494]; Opposition to Pavel Lazarenko's First Motion to Lift Clerk's Entries of Default as to Beranco, Ylorex, and Tanas Assets and Balford Trust Assets ("Gov't Lazarenko Set Aside Opp.") [Dkt. No. 1497]; Response to Pavel Lazarenko's Opposition to Motion for Default Judgment as to Beranco, Ylorex, and Tanas Assets and the Balford Trust Assets ("U.S. Liechtenstein and Balford Trust Resp.") [Dkt. No. 1498]; Reply in Support of Pavel Lazarenko's First Motion to Lift Clerk's Entries of Default (Dkt. Nos. 1438, 1477) ("Lazarenko Set Aside Reply") [Dkt. No. 1499]; Memorandum of Law in Support of United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Defendant Eurofed Correspondent Assets Located in Lithuania and Switzerland ("U.S.

Through his oppositions to the government's motions, Mr. Lazarenko has expended considerable effort to prevent default judgment against the assets to which he believes he is entitled.  But this effort comes too late and, at this point, is directed at the wrong court.  This Court has already held that Mr. Lazarenko lacks sufficient legal interest in the defendant assets at issue for him to defend them from forfeiture on the merits.  It is these decisions – not the default judgments the Court grants today – that are the real source of Mr. Lazarenko's inability to regain possession of the assets.  Even if the Court were to give Mr. Lazarenko everything he requests through his oppositions and deny default judgment against the assets at issue, Mr. Lazarenko would still lack the ability to further participate in this suit with respect to those assets.  And even if there were other claimants (with standing) who could defend the assets, it would be those claimants who could potentially win possession of the assets through litigation.  Mr. Lazarenko's path to possibly regaining his ability to litigate in this action on the merits, however, is a straightforward and common one.  Once judgment has been entered as to all defendant assets in this action, Mr. Lazarenko will be able to appeal this Court's orders striking his claims for lack of standing.

---

Correspondent Mem.") [Dkt. No. 1507-1]; Opposition to Motion for a Default Judgment ("Lazarenko Correspondent Opp.") [Dkt. No. 1509]; and Plaintiff United States of America's Reply Brief in Support of Motion for Entry of Default Judgment and for Order of Forfeiture Against Defendant Eurofed Correspondent Assets Located in Lithuania and Switzerland ("U.S. Correspondent Reply") [Dkt. No. 1510].

Other filings reviewed in connection with the instant motions and cited frequently in this Opinion include:  First Amended Verified Complaint for Forfeiture In Rem ("Am. Compl.") [Dkt. No. 20]; Verified Claim and Statement of Interest of Right in Property Subject to Forfeiture in Rem ("2005 P. Lazarenko Cl.") [Dkt. No. 29]; and Stipulation and Settlement Agreement and Order Thereon ("Sett. Agreement") [Dkt. No. 334].

I. BACKGROUND

The Court's prior opinions summarize the factual and procedural history of this case, starting with the criminal prosecution of Pavel Lazarenko in 2004 and continuing through this long-running in rem civil forfeiture proceeding.  See United States v. All Assets Held at Bank Julius Baer & Co., Ltd. ("All Assets XI"), Civil Action No. 04-0798, 2020 WL 7640213, at *2 (D.D.C. Dec. 23, 2020) (collecting prior opinions).  In brief, Mr. Lazarenko was "a prominent Ukrainian politician who, with the aid of various associates, was 'able to acquire hundreds of millions of United States dollars through a variety of acts of fraud, extortion, bribery, misappropriation and/or embezzlement' committed during the 1990s."  United States v. All Assets Held at Bank Julius Baer & Co., Ltd. ("All Assets IV"), 959 F. Supp. 2d 81, 85 (D.D.C. 2013) (quoting Am. Compl. ¶¶ 1, 10).

In May 2004, the United States filed an in rem forfeiture complaint seeking forfeiture of various funds on deposit in foreign bank accounts in Guernsey and Antigua and Barbuda.  See Verified Complaint for Forfeiture In Rem [Dkt. No. 1] ¶ 1.  In June 2005, the United States filed an amended complaint identifying additional accounts for forfeiture.  See Am. Compl. ¶ 5.  The defendant assets identified in the amended complaint included:

> (b)  All assets held at Credit Suisse (Guernsey) Limited, in account numbers 41610 and 41950 in the name of Samante Limited as Trustees of the Balford Trust.  These assets are located in Guernsey, one of the Channel Islands.  [At the time of the First Amended Verified Complaint for Forfeiture In Rem t]hese defendant assets were last valued at approximately $147,919,401.13 in United States dollars;
>
> (c)  All assets held at Credit Suisse (Guernsey) Limited, in account number 41843 in the name of Credit Suisse Trust Limited - Escrow Account Re: BT Trust.  These assets are located in Guernsey, one of the Channel Islands.  [At the time of the First Amended Verified Complaint for Forfeiture In Rem t]hese defendant assets were last

valued at approximately £14,308.52 in pounds sterling of the United Kingdom;

[. . . .]

(e)  Approximately $1.6 million in United States dollars held at Bank of Nova Scotia (Antigua) in the name of the Registrar of the High Court of Antigua & Barbuda, formerly on deposit in account 120512 held for the benefit of Alexander Milchenko (deceased) at Eurofed Bank Limited of Antigua & Barbuda (hereinafter "Eurofed").  Eurofed is now in liquidation under the supervision, management, and/or control of the receivers Charles Walwyn and Robert Wilkinson of PricewaterhouseCoopers, and these defendant assets, together with additional monies, were placed into certificates of deposit in the name of the Registrar of the High Court of Antigua & Barbuda.  As of the date of receivership in November 1999, these defendant assets were valued at approximately $1,616,632.99 in United States dollars;

(f)  All assets on deposit at Credit Suisse (Geneva), in account number 0251-562927-6, in the name of European Federal Credit Bank Limited.  These defendant assets are located in Switzerland and were last valued at approximately $4,822,598.45 in United States dollars;

(g)  All assets held at Banque SCS Alliance S.A. (Geneva) in account number 5491, in the name of European Federal Credit Bank Limited.  These defendant assets are located in Switzerland and were last valued at approximately $483,629.69 in United States dollars;

(h)  All assets held at Vilniaus Bankas held for the benefit of European Federal Credit Bank Limited, formerly held at accounts 073721 and 073420 at Bankas Hermis in the name of European Federal Credit Bank Limited.  In February, 2000, Bankas Hermis merged with Vilniaus Bankas, and the account number for the defendant assets is believed to have changed to 5110730 or other account numbers at Vilniaus Bankas.  These defendant assets are located in Lithuania and were last valued at approximately $29,344,05.35 in United States dollars;

(i)  All assets held at various accounts in Liechtenstein and formerly on deposit at Liechtensteinisch Landesbank AG and LGT Bank in Liechtenstein AG in the names of Orilles Stiftung, Gruztam Stiftung, Lesja Stiftung, NRKTO 7541 or held for the benefit of Pavlo Lazarenko.  These former accounts include, but are not

limited to Liechtensteinisch Landesbank AG accounts 187.991.53 (Orilles Stiftung), 187.991.69 (Gruztam Stiftung), 187.991.39 or 187.991.32 (Lesja Stiftung), 527.908.09, 187.764.68, and 187.775.88 (NRKTO 7541), and LGT Bank in Liechtenstein AG accounts 143806 (Orilles Stiftung), 142807 (Gruztam Stiftung), 142808 (Lesja Stiftung). These defendant assets were last valued at the equivalent of approximately $7 million in United States dollars and are held at:

> (i) Verwaltungs-und PrivatBank AG account number 325.295.900, in the name of Beranco Engineering Establishments;

> (ii) Verwaltungs-und PrivatBank AG account number 326.284.900, in the name of Ylorex Establishments;

> (iii) LGT Bank in Liechtenstein AG account numbers 0153633 AB and 0153633 AC, in the name of Tanas AG;

[. . . .]

> (j) And all assets traceable to the above-mentioned proceeds and property, including but not limited to, any interest accrued or assets held in related sub-accounts or escrow accounts.

Am. Compl. ¶ 5(b), (c), (e)-(h), (i)(i)-(iii), (j).[2]

The Court issued in rem arrest warrants for these assets in August 2005.

August 10, 2005 Minute Entry. Throughout 2006, local foreign officials served these warrants on most of the custodians of the assets. Declaration of Notice and Publication [Dkt. No. 153] at 1-2. Service on the last custodian – the bank holding the accounts of the Antiguan government – occurred in 2008. Id. at 1. The government published notice of the forfeiture action via newspapers in 2005 and via the internet in 2008. Id. at 2-3. It sent direct notice to known

---

[2]     The United States' notice of errata for the amended complaint makes the following changes and clarifications to paragraph 5(h) of the amended complaint: Vilniaus Bankas became SEB Vilniaus Bankas in April 2005; the account number is believed to have changed to "no. LT 89 7044 0600 0000 1794" at SEB Vilniaus Bankas; and these assets were last valued at approximately $29,641,735.31 in United States dollars and additional sums in other currencies. United States' Notice of Errata for First Verified Amended Complaint for Forfeiture In Rem [Dkt. No. 214].

potential claimants to the assets via 429 addresses in 44 countries.  Id. at 3.  These notices

advised potential claimants of the procedures required to file proper claims to the assets and

proper answers to the complaint, including the deadlines set out by the Supplemental Rules in

effect at the time.  Id.; see SUPP. R. G(4)(b)(ii); SUPP. R. C(6)(a) (as amended 2002).

In June 2004, Mr. Lazarenko timely filed a verified claim to some defendant

assets and an answer to the United States' complaint.  See Verified Claim and Statement of

Interest of Right in Property Subject to Forfeiture in Rem [Dkt. No. 5]; Claimant Pavel

Lazarenko's Verified Answer to Complaint for Forfeiture In Rem [Dkt. No. 9].  He filed an

amended claim in response to the government's amended complaint in July 2005.  See

2005 P. Lazarenko Cl.  Also in July 2005, Mr. Lazarenko filed a motion to dismiss the amended

complaint, which this Court denied in March 2007.  See Claimants' Motion to Dismiss First

Amended Verified Complaint for Lack of Subject Matter Jurisdiction and Failure to State a

Claim Upon Which Relief Can Be Granted [Dkt. No. 27]; United States v. All Assets Held at

Bank Julius Baer & Co., Ltd. ("All Assets I"), 571 F. Supp. 2d 1, 3 (D.D.C. 2008).  The Court

held that the government's allegations regarding Mr. Lazarenko's conduct and its connection to

the defendant assets met the heightened pleading standards set by the Supplemental Rules.  All

Assets I, 571 F. Supp. 2d at 16.  The United States "adequately alleged facts supporting 'a

reasonable belief that the government will be able to meet its burden of proof at trial' with

respect to each of its . . . claims."  Id. at 17 (quoting SUPP. R. G(2)(f)).  Mr. Lazarenko has filed

several amended answers to the complaint.  See Claimant Pavel Lazarenko's Verified Answer to

First Amended Verified Complaint for Forfeiture In Rem [Dkt. No. 268]; Claimant Pavel

Lazarenko's Amended Answer [Dkt. No. 882]; Claimant Pavel Lazarenko's Amended Answer to

the Amended Complaint [Dkt. No. 998].

One other individual and two corporations filed claims seeking payment from the defendant assets, generally:  Alexei Ditiatkovsky, Universal Trading & Investment Company, Inc. ("UTICo"), and OAO Gazprom.  See Verified Claim and Statement of Interest of Claimant Alexei Ditiatkovsky [Dkt. No. 26]; Claimant Universal Trading & Investment Co. Inc.'s Amended Claim [Dkt. No. 135]; Verified Claim and Statement of Interest of Claimant OAO Gazprom [Dkt. No. 64].  In 2011, this Court held that both UTICo and OAO Gazprom lacked statutory and constitutional standing to contest forfeiture of any defendant assets, and entered judgment on the pleadings dismissing OAO Gazprom and UTICo from this action.  See United States v. All Assets Held at Bank Julius, Baer & Co., Ltd. ("All Assets III"), 772 F. Supp. 2d 205, 212, 218 (D.D.C. 2011); Order (Mar. 25, 2011) [Dkt. No. 226]; United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 772 F. Supp. 2d 191, 199 (D.D.C. 2011); Order (Mar. 25, 2011) [Dkt. No. 228].  In 2015, Alexei Ditiatkovsky withdrew his claim.  See Claimant Alexei Ditiatkovsky's Notice of Withdrawal of Answer to First Amended Verified Complaint for Forfeiture In Rem and Dismissal of All Claims for Relief Therein [Dkt. No. 335].  Other claims – many of which have also been dismissed – sought payment from specific defendant assets, or from groups of defendant assets.   See infra Sections III.B.1, III.C.2.

In 2017, Mr. Lazarenko moved for partial judgment on the pleadings.  See Claimant Pavel Lazarenko's Motion for Partial Judgment on the Pleadings and Partial Summary Judgment [Dkt. No. 539].  The Court granted this motion in part.  While the Court had previously held that the United States adequately pled all of its legal claims, intervening Supreme Court decisions meant that some of the statutes under which the government sought forfeiture lacked extraterritorial reach.  United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 251 F. Supp. 3d 82, 85-86, 101, 103 (D.D.C. 2017).  For those claims, the United

States failed to sufficiently allege that the relevant defendant assets were proceeds of domestic conduct.  Id. at 101, 103; see United States v. All Assets Held at Bank Julius, Baer & Co., Ltd. ("All Assets VII"), 315 F. Supp. 3d 90 (D.D.C. 2018) (clarifying these holdings).  The Court held, however, that the United States alleged sufficient facts to support its claims with respect to most of the statutes under which it sought forfeiture, and all of the asset groups remained as defendants.  United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 251 F. Supp. 3d at 96, 97-99, 100, 104; see All Assets VII, 315 F. Supp. 3d at 100.  The United States alleged that each defendant asset was forfeitable under any of the statutory claims.  Am. Compl. ¶¶ 124, 129, 134, 139, 143, 147, 151, 155; see United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 251 F. Supp. 3d. at 97.

## II.  LEGAL FRAMEWORK

### A.  Civil Forfeiture

"Civil forfeiture actions are brought against property, not people. The owner of the property may intervene to protect his interest."  United States v. All Funds in Acct. Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain, 295 F.3d 23, 25 (D.C. Cir. 2002).  Such actions are governed by the procedures set forth in 18 U.S.C. § 983 and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), a subset of the Federal Rules of Civil Procedure.  See FED. R. CIV. P. SUPP. R. A(1)(B) [hereinafter SUPP. R.].  When the government files a complaint for forfeiture, "any person claiming an interest in the seized property may file a claim asserting such person's interest in the property in the manner set forth in the Supplemental Rules."  18 U.S.C. § 983(a)(4)(A); see SUPP. R. G(5)(a)(i).  "The only way for a third party to intervene in a civil forfeiture case is to file a claim to the property and an answer to the Government's complaint

pursuant to [Supplemental] Rule G(5)."  STEFAN D. CASSELLA, ASSET FORFEITURE LAW IN THE UNITED STATES § 7-13(a), at 371 (3d ed. 2022); see United States v. 8 Gilcrease Lane, Quincy Fla. 32351, 641 F. Supp. 2d 1, 4-6 (D.D.C. 2009) (holding that putative claimants have no separate right to intervene under Rule 24 of the Federal Rules of Civil Procedure).  Courts generally expect claimants to adhere strictly to the Supplemental Rules, and term this requirement "statutory standing."  See United States v. All Assets Held at Bank Julius Baer & Co., Ltd. ("All Assets XIII"), Civil Action No. 04-0798, 2023 WL 5000213, at *7-8 (D.D.C. Aug. 4, 2023).

     In addition to demonstrating statutory standing, a claimant must also demonstrate Article III standing.  United States v. $487,825.000 in U.S. Currency, 484 F.3d 662, 664 (3d Cir. 2007).  To do so, a claimant must show a "'colorable claim on the [defendant] property . . .' – typically, an ownership or possessory interest, . . . 'because an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property.'"  United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1090 (D.C. Cir. 2017) (citation omitted) (first quoting United States v. Emor, 785 F.3d 671, 676 (D.C. Cir. 2015); and then quoting United States v. $515,060.42 in U.S. Currency, 152 F.3d 491, 497 (6th Cir. 1998)).  At any time before trial, the United States "may move to strike a claim or answer . . . because the claimant lacks standing."  SUPP. R. G(8)(c)(i)(B).

### B.  Default Judgment

     The default judgment procedure allows a court to end litigation "when the adversary process has been halted because of an essentially unresponsive party."  Gilmore v. Palestinian Interim Self-Gov't Auth., 843 F.3d 958, 965 (D.C. Cir. 2016) (quoting H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Rule 55 of the Federal Rules of Civil Procedure "specifies a two-step process for a party seeking to obtain a default judgment."  Boland v. Elite Terrazzo Flooring, Inc., 763 F. Supp. 2d 64, 66 n.1 (D.D.C. 2011).  Rule 55(a) provides for entry of default by the Clerk of Court "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  FED. R. CIV. P. 55(a).  An entry of default "simply is an official recognition of the fact that one party is in default" and "is an interlocutory step that is taken under Rule 55(a) in anticipation of a final judgment." 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2692 (4th ed. 2024).

Upon the entry of default by the Clerk, the Court has discretion to enter default judgment.  See FED. R. CIV. P. 55(b)(2).  "[T]he factual allegations of the complaint are deemed admitted, which usually establishes the defendant's liability."  Serv. Emps. Int'l Union Health & Welfare Fund v. N. Am. Cleaning Servs. Co. Inc., 264 F. Supp. 3d 1, 4 (D.D.C. 2017); see Thomson v. Wooster, 114 U.S. 104, 111 (1885).  But "where the allegations of the complaint, even if true, are legally insufficient to make out a claim," a district court may deny an application for default judgment.  United States v. Oil Tanker Bearing IMO No. 9116512, 480 F. Supp. 3d 39, 43 (D.D.C. 2020) (quoting Gutierrez v. Berg Contracting, Inc., Civil Action No. 19-3044, 2000 WL 331721, at *2 (D.D.C. Mar. 20, 2000)).  "[T]he plaintiff is entitled to a default judgment only if the complaint states a claim for relief."  Jackson v. Corr. Corp. of Am., 564 F. Supp. 2d 22, 27 (D.D.C. 2008) (quoting Descent v. Kolitsidas, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005)); see City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 n.23 (2d Cir. 2011) (collecting cases from courts of appeals holding the same).  If a court decides that more than the factual allegations of the complaint are required to establish the defendant's

liability, or for any other reason necessary "to enter or effectuate judgment," the court may hold hearings to "establish the truth of any allegation by evidence" or to "investigate any other matter." FED. R. CIV. P. 55(b)(2).

Default judgment "is no less appropriate when the defendant in question is property," and when the plaintiff is the United States. United States v. All Assets Held in Acct. No. XXXXXXXX, in the Name of Doraville Properties Corp., at Deutsche Bank Int'l, Ltd. in Jersey, Channel Islands ("United States v. Doraville Properties"), 330 F. Supp. 3d 150, 156 (D.D.C. 2018). "[U]nless a claimant properly intervenes to raise defenses to its forfeiture, the defendant property is deemed to have 'failed to plead or otherwise defend' against the allegations" and is subject to default. Id. (quoting FED. R. CIV. P. 55(a)). "If no one files a claim within the deadlines prescribed by [the Supplemental Rules], or if the only claims have been dismissed or withdrawn, the Government may move for the entry of default judgment." CASSELLA, supra, § 7-14(a), at 387. It is necessary to treat an in rem defendant to which there are no proper claims like an in personam defendant who fails to appear because a proper claimant is the only litigant who can defend in rem property from forfeiture. Without at least one proper claimant, there would be "interminable delay and continued uncertainty as to" ownership of the property were the litigation to continue. See H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe, 432 F.2d at 691.

When a court enters an order of default judgment against a defendant asset, "it does not necessarily follow that the order is final and appealable." United States v. Doraville Properties, 330 F. Supp. 3d at 159. This is because an order in a case involving multiple claims or defendants – as there often are in forfeiture actions – is generally not final until the district court has "disposed of all claims against all parties." Capitol Sprinkler Inspection, Inc. v. Guest

Servs., Inc., 630 F.3d 217, 221 (D.C. Cir. 2011).  Under Rule 54(b) of the Federal Rules of Civil

Procedure, however, a court may "direct entry of a final judgment as to one or more, but fewer

than all, claims or parties" if the court expressly finds "that there is no just reason for delay."

FED. R. CIV. P. 54(b).  "This exception permits courts to balance 'the demonstrated need for

flexibility in providing for appellate review in complex cases' with the goal of avoiding

'piecemeal appellate review.'"  United States v. Doraville Properties, 330 F. Supp. 3d at 159

(quoting Blue v. D.C. Pub. Schs., 764 F.3d 11, 15 (D.C. Cir. 2014)).  "The basic purpose of Rule

54(b) is to avoid the possible injustice of a delay in entering judgment on a distinctly separate

claim or as to fewer than all of the parties until the final adjudication of the entire case by

making an immediate appeal available."  10 WRIGHT, MILLER & KANE, supra, § 2654.

## III.  DISCUSSION

There are eight motions before the Court – four from the United States, two from

Pavel Lazarenko, and two from the Liquidators.  These motions concern four groups of

defendant assets:  (1) the assets held at Credit Suisse (Guernsey) Limited in the name of Samante

Limited as Trustees of the Balford Trust and those held in the same bank in a related escrow

account in the name of Credit Suisse Trust Limited – Escrow Account Re: BT Trust, as well as

all assets traceable thereto (collectively, "Balford Trust Assets"), see Am. Compl. ¶ 5(b), (c), (j);

(2) the assets held in the name of Beranco Engineering Establishments, Ylorex Establishments,

and Tanas AG at multiple banks in Liechtenstein, and all assets traceable thereto (collectively,

"Liechtenstein Accounts"), see id. ¶ 5(i)(i)-(iii), (j); (3) the assets held in correspondent bank

accounts in the name of European Federal Credit Bank Limited in Switzerland and Lithuania,

and all assets traceable thereto (collectively, "Correspondent Assets"), see id. ¶ 5(f)-(h), (j); and

(4) the assets formerly on deposit in an account at Eurofed Bank Limited of Antigua & Barbuda

for the benefit of Alexander Milchenko, and all assets traceable thereto (collectively, "Milchenko Account Assets"). See id. ¶ 5(e), (j).

        The United States seeks default judgment against each group of assets. U.S. Liechtenstein Mot.; U.S. Balford Trust Mot.; U.S. Milchenko Acct. Mot; U.S. Correspondent Mot. Mr. Lazarenko opposes default judgment against the Balford Trust Assets, the Liechtenstein Accounts, and the Correspondent Assets, and asks the Court to set aside the Clerk's entry of default against the Balford Trust Assets and Liechtenstein Accounts. Lazarenko Liechtenstein and Balford Trust Opp.; Lazarenko Correspondent Opp.; Lazarenko Set Aside Mot. Mr. Lazarenko also seeks an evidentiary hearing as to the Balford Trust Assets and Liechtenstein Accounts. Lazarenko Liechtenstein and Balford Trust Opp. The Liquidators oppose default judgment against the Milchenko Account Assets and ask the Court to enforce a related settlement agreement that they signed with the United States. Liquidators' Milchenko Acct. Opp.[3]

        This multitude of motions raises only two real questions with respect to each group of defendant assets: Is default judgment warranted? And, if so, should the Court certify the judgment as final? The Court will answer the first question with respect to the Balford Trust Assets and Liechtenstein Accounts together, then with respect to the Milchenko Account Assets,

---

[3]    The Liquidators filed substantially the same document four times: once as an objection to the affidavit in support of default against the Milchenko Account Assets, see Obj. re Milchenko Acct., once as a response to the motion for default judgment against the same, see Liquidators' Milchenko Acct. Opp, and twice as a "Motion to Enforce [the] Settlement Agreement." See 1st Mot. to Enforce; 2d Mot. to Enforce. Because the later two motions do not ask the Court to take any action other than denying default or default judgment, and because the Liquidators' arguments are most appropriately made as a response to the government's motion for default judgment, see United States v. All Assets Held at Bank Julius Baer & Co., Ltd., Civil Action No. 04-0798, 2023 WL 8803554, at *1-2 (D.D.C. Dec. 18, 2023), the Court will cite the Liquidators' response to the United States' motion for default judgment against the Milchenko Account assets and not the Liquidators' other filings.

and then with respect to the Correspondent Assets.  The Court will answer the second question

with respect to all of the assets at issue in the motions.  But first, the Court will address two

threshold issues applicable to multiple groups of defendant assets.

### A. Threshold Issues

#### 1. Mr. Lazarenko's Ability to Make Arguments

Because the Court has already decided that Mr. Lazarenko lacks constitutional

standing to defend the Balford Trust Assets, Correspondent Assets, and Liechtenstein Accounts

from forfeiture, see infra Sections III.B.1, III.C.2.b, the United States argues that all of Mr.

Lazarenko's oppositions to its motions for default judgment against these assets are

inappropriate.  See U.S. Liechtenstein and Balford Trust Resp. at 2-3; U.S. Correspondent Reply

at 2-4.[4]  The Court rejects this view and will consider Mr. Lazarenko's arguments against default

judgment.  While Article III of the U.S. Constitution prevents Mr. Lazarenko from litigating on

the merits in support of assets he has no standing to defend, it does not prevent the Court from

considering arguments he has made against default judgment.  This is because Mr. Lazarenko is

still a party to this action and, whether a motion for default judgment is opposed or not, "the

district judge is required to exercise sound judicial discretion in determining whether the

judgment should be entered."  10A WRIGHT, MILLER & KANE, supra, § 2685; see EMI Apr.

Music Inc. v. Rodriguez, 691 F. Supp. 2d 632, 634 (M.D.N.C. 2010).  "[T]he entry of a default

judgment is not automatic," Mwani v. bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote

omitted), and "the party making the request is not entitled to a default judgment as of right."

---

[4]      Unlike Mr. Lazarenko with respect to the Balford Trust Assets, Correspondent
Assets, and Liechtenstein Accounts, the Liquidators have constitutional standing as to the group
of defendant assets against which they oppose default judgment, the Milchenko Account Assets.
See All Assets IV, 959 F. Supp. 2d 81, 97-101.

10A WRIGHT, MILLER & KANE, supra, § 2685.  The Court may consider Mr. Lazarenko's

arguments to aide in its independent evaluation of whether default judgment is warranted.

   In support of its position that the Court may not consider Mr. Lazarenko's

arguments against default judgment, the United States cites an unpublished opinion from the

D.C. Circuit holding that a civil asset forfeiture claimant "lacks Article III standing to contest [a]

default in a proceeding in which he was not a party."  United States v. All Assets Held in the Inv.

Portfolio of Blue Holding (1) Pte. Ltd. on Behalf of Traceable to Ridley Grp. Ltd., 712 F. App'x

13, 14 (D.C. Cir. 2018); see U.S. Correspondent Reply at 2.  But the facts and circumstances of

that case are distinguishable.  There, the court of appeals emphasized that the claimant failed to

oppose the motion for default judgment before he appealed and was not a party because he had

no further basis to participate in any of the forfeiture proceedings.  Here, Mr. Lazarenko did

oppose the motions for default and is still a party to the proceeding because he continues to hold

verified claims and has constitutional standing to litigate with respect to certain other assets in

this action.  See infra Section III.D.  The government also cites United States v. Doraville

Properties, 330 F. Supp. 3d 150, for the proposition that a claimant cannot contest entry of

default judgment against an asset after his claim to that asset has been stricken.  U.S.

Correspondent Reply at 3.  But in Doraville Properties, the court did exactly what this Court will

do here.  It considered the claimant's arguments on the merits – even though it had already found

the claimant to lack standing – because the arguments against default judgment raised "issues

that the Court itself must consider."  United States v. Doraville Properties, 330 F. Supp. 3d

at 155.

2.  General Requirements of the Supplemental Rules

Before entering default judgment against assets to which there are no remaining claims, the Court must satisfy itself that the allegations of the United States' operative complaint are sufficiently pled and that the complaint meets the other requirements of the Supplemental Rules.  See United States v. Twenty-Four Cryptocurrency Accts., 473 F. Supp. 3d 1, 4-5 (D.D.C. 2020) (citing SUPP R. G(2)).  In addition, "[b]efore a default judgment is entered pursuant to a complaint for forfeiture in rem, the government must also show that it complied with the notice requirements contained in the Supplemental Rules."  Id. at 5 (quoting United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd., Civil Action No. 17-1166, 2018 WL 3949962, at *5 (D.D.C. 2018) (Harvey, Mag. J.)).  The question of whether the United States' allegations are sufficiently pled is best discussed with regard to each particular group of defendant assets.  See infra Sections III.B.2.a, III.C.3.b, III C.4.a.  But the other requirements of the Supplemental Rules, including the notice requirements, are appropriately analyzed before the Court discusses the details of each defendant asset at issue.

The government's amended complaint in this action meets the requirements of the Supplemental Rules.  It is verified, Am. Compl. at 49; states the grounds for subject-matter jurisdiction, in rem jurisdiction, and venue, id. ¶¶ 2-4; describes the defendant assets, and their location, with reasonable particularity, id. ¶ 5; and identifies the statute under which the forfeiture action is brought.  Id. ¶ 1.

As for notice, at the time the government initiated this action, the Supplemental Rules required it to give only publication notice, via newspaper.  SUPP. R. C(4) (as amended 2002).  The rules also required claimants to file verified claims within 30 days of service of the complaint or of publication notice, and answers within 20 days of filing the claims.  Id. C(6)(a)

(as amended 2002).  In 2006, the Supplemental Rules were significantly amended.  See

Amendments to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture

Actions, 547 U.S. 1255 (2006).  The amended Supplemental Rules, which went into effect after

the government amended its complaint and are still in effect today, require direct notice to "any

person who reasonably appears to be a potential claimant on the facts known to the government,"

SUPP. R. G(4)(b)(i), in addition to publication notice.  See id. G(4)(a).  The amended rules also

allow for publication notice via a government website instead of in a newspaper.

Id. G(4)(a)(iv)(C).

          The government published notice of this forfeiture action in newspapers in 2005

and on its official forfeiture website in 2008.  Declaration of Notice and Publication [Dkt.

No. 153] at 2-3.  Between June 2005 and August 2008, it sent direct notice to known potential

claimants to the assets at 429 addresses in 44 countries.  Id. at 3.  These notices advised potential

claimants of the procedures required to file proper claims to the assets and proper answers to the

complaint.  Id.  They included the deadlines set out by the Supplemental Rules in effect at the

time.  Notice letters sent to addresses in the United States prior to the adoption of the amended

Supplemental Rules advised that claims needed to be filed within thirty days of notice, and

answers within thirty days of the filing of claims.  Affidavit of Andrew Lewczyk in Support of

the Declaration of Notice and Publication [Dkt. No. 153-4] ¶ 5.  Notice letters sent to addresses

in the United States after the Supplemental Rules were amended advised that claims needed to be

filed within thirty-five days – to addresses outside of the United States, fifty-five days.  Id.

These notices also informed potential claimants that answers needed to be filed within twenty

days of the filing of claims.  Id.  All the deadlines set forth in these notices have long ago

expired.

Notice was provided to the custodians of the defendants in rem through service of process.  See SUPP. R. G(3).  Local authorities served the amended complaint, arrest warrant, summons, and restraining order for the Balford Trust Assets on the bank holding the assets, Credit Suisse (Guernsey), in June 2006; the same documents for the Liechtenstein Accounts on the three banks holding those assets – LGT Bank, Liechtensteinische Landesbank, and Verwaltungs-und PrivatBank AG – in January 2006; the same documents for the Milchenko Account Assets on the bank where the assets were held, Bank Nova Scotia in Antigua, in September 2008; and the same documents for the Correspondent Assets on the Lithuanian bank where the assets were held in February 2006, and on the Swiss banks where the assets were held in June of the same year.  Declaration of Notice and Publication [Dkt. No. 153] at 1-2.  These notices satisfied the requirements of the Supplemental Rules.

## B.  The Balford Trust Assets and Liechtenstein Accounts

### 1.  The Assets

The Balford Trust is an irrevocable, discretionary trust created by Mr. Lazarenko in Guernsey.  United States v. All Assets Held at Bank Julius, Baer & Co., Ltd. ("All Assets IX"), 480 F. Supp. 3d 1, 8-9 (D.D.C. 2020).  Samante Limited, a corporation, is the only trustee, and four members of Mr. Lazarenko's family are the only beneficiaries.  Id. at 8-9, 24-25.  In addition to being the settlor, Mr. Lazarenko is also the "protector" of the Balford Trust, meaning that the trustee cannot take certain actions without his consent.  Id. at 9-10.

Mr. Lazarenko's verified claim included the Balford Trust Assets, in which Mr. Lazarenko asserted a "residual and reversionary interest."  2005 P. Lazarenko Cl. at 3, 5.  In 2020, this Court struck Mr. Lazarenko's claim to the assets, holding that he lacked Article III standing to litigate on their behalf.  All Assets IX, 480 F. Supp. 3d at 16, 18, 19-20, 21, 22-23,

24, 25, 26, 27, 28.  Mr. Lazarenko lacked constitutional standing because he had not shown the required "colorable claim" to the assets.  See United States v. $17,900.00 in U.S. Currency, 859 F.3d at 1090 (quoting United States v. Emor, 785 F.3d at 676).  Even if, as a matter of law, Mr. Lazarenko's asserted "residual and reversionary" interest in the Balford Trust Assets could give rise to Article III standing, Mr. Lazarenko did not sufficiently show that he had such an interest. All Assets IX, 480 F. Supp. 3d at 16-17.  The Court also held that Mr. Lazarenko lacked statutory standing to assert any interest in the assets that he did not state in his verified claim. See id. at 17.

Three other members of the Lazarenko family have also filed verified claims to the Balford Trust Assets.  See Verified Claim and Statement of Interest of Right in Property Subject to Forfeiture in Rem [Dkt. No. 872]; Verified Claim and Statement of Interest of Right in Property Subject to Forfeiture in Rem [Dkt. No. 873]; and Verified Claim and Statement of Interest of Right in Property Subject to Forfeiture in Rem [Dkt. No. 874].[5]  Each of these claims has been stricken.  In 2019, the Court struck Alexander Lazarenko's claims due to his serious violations of discovery orders.  See United States v. All Assets Held at Bank Julius, Baer & Co., Ltd. ("All Assets VIII"), Civil Action No. 04-0798, 2019 WL 6910067 (D.D.C. Dec. 19, 2019). And in 2021, the Court struck Ekaterina and Lecia Lazarenko's claims for lack of Article III standing.  See United States v. All Assets Held at Bank Julius Baer & Co., Ltd. ("All Assets

---

[5]      At the start of this forfeiture action, in 2005, Alexander Lazarenko filed a claim to the Balford Trust Assets for himself and on behalf of Pavel Lazarenko's daughters, Lecia and Ekaterina Lazarenko, over which Alexander Lazarenko had power of attorney.  See Verified Claim and Statement of Interest of Right in Property Subject to Forfeiture in Rem [Dkt. No. 28]. To comply with amendments to the Supplemental Rules that had been added after Alexander Lazarenko filed his 2005 claim, and in response to this Court's order, Alexander Lazarenko, Ekaterina Lazarenko, and Lecia Lazarenko each re-filed claims to the Balford Trust Assets in 2017.  See United States v. All Assets Held at Bank Julius, Baer & Co., Ltd. ("All Assets VI"), 228 F. Supp. 3d 118, 127-28 (D.D.C. 2017).

XII"), 2021 WL 4060353, at *14, *16 (D.D.C. Sept. 7, 2021), aff'd in part, No. 21-5226, 2022

WL 17490371 (D.C. Cir. Dec. 7, 2022).  Ekaterina and Lecia Lazarenko's status as discretionary

beneficiaries to the trust was too contingent to support constitutional standing.  Id. at *12.  Their

arguments for standing based on their ability to litigate on behalf of others also failed.  Id. at

*15-16.  At this point, there are no remaining claims to the Balford Trust Assets.

   The Liechtenstein Accounts are assets held by two Liechtenstein banks in the

name of Beranco Engineering Establishments, Ylorex Establishments, and Tanas AG.  See Am.

Compl. ¶5(i)(i)-(iii).  According to the United States, these assets were comprised of proceeds of

Pavel Lazarenko's illicit activities.  Id. ¶¶ 77, 114-119; see All Assets XI, 2020 WL 7640213,

at *2.  Mr. Lazarenko's verified claim included the Liechtenstein Accounts.  See 2005 P.

Lazarenko Cl. at 4.  In 2020, the Court struck Mr. Lazarenko's claim to these assets, holding, as

with the Balford Trust Assets, that he lacked statutory and Article III standing.  See All

Assets XI, 2020 WL 7640213, at *5-13.  Mr. Lazarenko lacked statutory standing because his

verified claim failed to describe his interest in the assets, which had no clear connection to him

after they were moved out of the accounts he owned.  Id. at *10-12.  Mr. Lazarenko did not

provide evidence of a colorable interest in the assets, and thus lacked Article III standing as well.

Id. at *9-10.  His argument that a Ukrainian freeze order conferred such an interest failed

because the order showed neither that Ukraine would be able to forfeit the assets nor that Mr.

Lazarenko would obtain an interest in the assets if Ukraine did so.  Id. at *7-8.  Like the Balford

Trust Assets, there are no remaining claims to the Liechtenstein Accounts.[6]

---

[6]  The general claims to the defendant assets also encompassed the Balford Trust
Assets and Liechtenstein Accounts, and have also been dismissed.  See supra at 8.

2.  Default Judgment

The United States moves for default judgment against the Balford Trust Assets and the Liechtenstein Accounts.  U.S. Liechtenstein Mot.; U.S. Balford Trust Mot.  Mr. Lazarenko opposes both motions and asks the Court to set aside the entries of default against the assets.  Lazarenko Liechtenstein and Balford Trust Opp.; Lazarenko Set Aside Mot.[7]  Mr. Lazarenko also moves for an evidentiary hearing "to assess the truth, not just the sufficiency, of the Government's allegations."  Lazarenko Liechtenstein and Balford Trust Opp. at 2.  The Court will enter default judgment against the Balford Trust Assets and Liechtenstein Accounts because there are no remaining claims to the assets, the United States' allegations against the assets are sufficiently pled, and Mr. Lazarenko's arguments lack merit.  The Court will also deny Mr. Lazarenko's request for an evidentiary hearing, as a hearing would serve no purpose in these circumstances.  The Court discusses each of these conclusions in turn.

a.  Remaining Claims and Factual Allegations

All verified claims to these assets have been either withdrawn or stricken.  Because there are no remaining claims, the assets are in default.  United States v. Doraville Properties, 330 F. Supp. 3d at 154.  In accordance with the Federal Rules of Civil Procedure, the United States applied for and received Clerk's entries of default against the Liechtenstein Accounts and Balford Trust Assets in April 2021 and September 2023, respectively.  Clerk's Entry of Default [Dkt. No. 1438] (Liechtenstein Accounts); Clerk's Entry of Default [Dkt. No. 1477] (Balford Trust Assets); see Fed. R. Civ. P. 55(b).

---

[7]     The oppositions to default judgment and motions to set aside entry of default against the Balford Trust Assets are joined by Mr. Lazarenko's daughters, Ekaterina and Lecia Lazarenko.  Lazarenko Liechtenstein and Balford Trust Opp. at 1; Lazarenko Set Aside Mot. at 1.

Because default judgment should not be entered against a defendant if the plaintiff fails to state a claim against that defendant, see United States v. Oil Tanker Bearing IMO No. 9116512, 480 F. Supp. 3d at 43, the Court must evaluate whether the United States' allegations with respect to the Balford Trust Assets sufficiently support its forfeiture claims.  The relevant pleading standard by which the Court evaluates the United States' complaint is that articulated in the Supplemental Rules:  whether the complaint states "sufficiently detailed facts to support a reasonable belief that the government [would] be able to meet its burden of proof at trial."  SUPP. R. G(2)(f).

The Court has already held that six of the government's original eight legal claims for forfeiture meet this standard.  See All Assets VII, 315 F. Supp. 3d at 101.  Two of those six allege that the defendant assets constitute or are traceable to proceeds of violations of offenses that are considered "specified unlawful activity" under 18 U.S.C. § 1956(c)(7).  See 18 U.S.C. § 981(a)(1)(C); United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 251 F. Supp. 3d at 86, 101, 103, 104.  These offenses are:  interstate transportation and receipt of property stolen or taken by fraud under 18 U.S.C. §§ 2314 and 2315, Am. Compl. ¶¶ 120-24, and offenses against a foreign nation under 18 U.S.C. § 1956(c)(7)(B)(ii) and (iv).  Am. Compl. ¶¶ 136-39.  Four of the six legal claims allege that the defendant assets were involved in money laundering offenses.  See 18 U.S.C. § 981(a)(1)(A); United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 251 F. Supp. 3d at 86, 96, 97.  These offenses are:  conduct designed to conceal the nature, location, source, ownership, or control of proceeds of a specified unlawful activity under 18 U.S.C. § 1956(a)(1)(B)(i), Am. Compl. ¶¶ 141-43; international transportation, transmission, or transfer of proceeds of a specified unlawful activity under 18 U.S.C. § 1956(a)(2)(B)(i), Am. Compl. ¶¶ 145-47; engaging in or attempting to engage in monetary transactions affecting

interstate or foreign commerce with more than $10,000 in proceeds of a specified unlawful

activity under 18 U.S.C. § 1957, Am. Compl. ¶¶ 149-51; and conspiracy to engage in money

laundering under 18 U.S.C. § 1956(h).  Am. Compl. ¶¶ 153-55.

   To briefly reiterate the factual allegations supporting these claims for forfeiture,

the United States maintains that Mr. Lazarenko and his associates ran four illegal "schemes."

See Am. Compl. ¶¶ 20-49.  The first scheme involved Mr. Lazarenko using his government

positions to extract benefits from private corporations and individuals.  See United States v. All

Assets Held at Bank Julius Baer & Co., Ltd., 251 F. Supp. 3d at 105.  Through the second

scheme, Mr. Lazarenko conspired to divert over $20 million in Ukrainian government funds for

his personal use by orchestrating fraudulent sales through two state-owned enterprises that he

oversaw by virtue of his government position.  Id. at 106.  The third scheme, conducted at a time

when Mr. Lazarenko's official duties included overseeing the Ukrainian energy sector, made Mr.

Lazarenko over $200 million in kickbacks from Ukrainian natural gas contracts.  Id. at 107.  And

in the fourth scheme, Mr. Lazarenko led the Ukrainian government to buy prefabricated houses

from a corporation run by one of his associates at an almost $1 million markup per house.  Id.

at 109.

   The United States further alleges that Mr. Lazarenko laundered his illicit earnings

from these schemes through bank accounts in the United States, Switzerland, Antigua, Guernsey,

Poland, Liechtenstein, and Cyprus, among other countries and, together with an associate,

purchased a controlling interest in Eurofed to do the same.  Am. Compl. ¶¶ 13, 14.  "By creating

and causing the creation of various shell corporations and trusts and through the opening of

numerous bank accounts, Lazarenko and his associates would deposit or direct the deposit of

money from individuals and businesses in Ukraine, and transfer or direct the transfer of money to Lazarenko or to entities he and his associates controlled." Id. ¶ 55.

That these facts sufficiently support the government's remaining legal claims, however, does not end the Court's inquiry.  The complaint must also support a reasonable belief that the United States would be able to meet its burden to connect Mr. Lazarenko's illegal activities to the assets against which the United States seeks default judgment – here, the Balford Trust Assets and Liechtenstein Accounts.  For the "specified unlawful activity" offenses, see 18 U.S.C. § 981(a)(1)(C), this connection must be one of tracing the assets to the proceeds of the illegal activities.  "[T]he proceeds of an offense comprise any property . . . that the wrongdoer would not have obtained or retained but for having committed the crime."  CASSELLA, supra, § 1-3(a), at 14.  With respect to bank accounts, "the Government may not satisfy its tracing burden simply by showing that criminal funds were once deposited in a particular account," but it can "use accounting principles or circumstantial evidence to show that the particular funds in the account are traceable to the underlying criminal activity."  Id. § 11-4(a), at 564.  For the money laundering offenses, the assets must have been "involved in" the illegal activity.  See 18 U.S.C. § 981(a)(1)(A).  This language covers not only "the money or other property being laundered," but also "any commissions and fees paid to the money launderer[] and any property used to facilitate the money laundering offense."  CASSELLA, supra, § 27-5, at 1177.  "[A]s a general matter, 'even otherwise untainted money may become "involved" in a money laundering offense' for these purposes 'where those funds are comingled with illicit proceeds' and 'the government produces evidence that the legitimate funds were used to conceal the source of illicit proceeds.'"  United States v. 113 Virtual Currency Accts., Civil Action No. 20-0606, 2024 WL

940141, at *5 (D.D.C. Mar. 5, 2024) (quoting United States v. Bikundi, 125 F. Supp. 3d 178, 194 (D.D.C. 2015)).

While the Court has not before evaluated the connection between the government's legal claims and the Balford Trust Assets and Liechtenstein Accounts specifically, it finds that the amended complaint is sufficient in this regard as well. As to the assets at issue here, the United States describes multiple transfers of Mr. Lazarenko's allegedly illicit earnings to the accounts comprising the Balford Trust Assets and the Liechtenstein Accounts. Am. Compl. ¶¶ 77, 81-86, 114-119. The United States alleges that over $100 million of the Balford Trust Assets started in a Credit Suisse account in the name of "Nihpro" in Geneva. Id. ¶ 82. This account was among the many Mr. Lazarenko and his associates used to hide money they were making from their illicit activities. See id. ¶¶ 55, 60. The money in the "Nihpro" account was then transferred to an account at the same bank in the name of Samante Limited as Trustee for the Balford Trust. Id. ¶ 82. It was moved again to a Credit Suisse account in New York, and yet again to a Credit Suisse account in Guernsey, its ultimate destination. Id. ¶ 83. The United States also alleges that the assets comprising the Liechtenstein Accounts began in a Banque SCS Alliance account in the name of "Carpo-53" in Switzerland. See id. ¶ 61. This was one of two accounts Mr. Lazarenko at one point used to pool substantial portions of his illicit earnings. See id. ¶¶ 51, 61. Ninety-six million dollars from this account was transferred into an account in the name of "Fairmont Group" held at a branch of the same bank in the Bahamas. Id. ¶¶ 64, 65. From this account, $42 million was transferred to the Bank of New York, $21 million of which was again transferred to an account in the name of "NRKTO 7541" at Liechtensteinische Landesbank AG. Id. ¶ 115. This $21 million was split into three other accounts at the same bank. Id. ¶ 116. Finally, $7 million of the funds from these three accounts were transferred or

withdrawn and deposited into the accounts that make up the Liechtenstein Accounts:  those in the name of Beranco Engineering Establishments, Ylorex Establishments, and Tanas AG.  Id. ¶ 119.

The Court finds that the factual allegations in the United States' complaint sufficiently support the forfeitability of the Balford Trust Assets and the Liechtenstein Accounts. The alleged transfers of Mr. Lazarenko's illicit earnings would show at the very least that the funds in those accounts were "property used to facilitate the money laundering offense[s]," CASSELLA, supra, § 27-5, at 1177, and likely also that they were assets Mr. Lazarenko "would not have obtained or retained but for having committed the crime[s]." Id. § 1-3(a), at 14.

### b.  Mr. Lazarenko's Oppositions and Motions

Mr. Lazarenko makes several arguments against default judgment.  First, he argues that the United States has not sufficiently shown that the assets are traceable to the alleged unlawful activities – in other words, that the government has not proved an element of their forfeiture case.  But this argument gets the law backwards.  Once a defendant is in default, "the factual allegations of the complaint are deemed admitted."  Serv. Emps. Int'l Union Health & Welfare Fund v. N. Am. Cleaning Servs. Co. Inc., 264 F. Supp. 3d at 4; see Escalante v. Lidge, 34 F.4th 486, 492 (5th Cir. 2022) (It is "firmly established" that "the district court takes as true the facts asserted by a plaintiff against a defaulting defendant.").  A plaintiff therefore need not prove its case, or even provide any evidence to support its case, before moving for default judgment.  This lack of an evidentiary requirement makes sense given that "it would be a waste of judicial resources to force the Government to expend time and effort in a case with no opposing party."  CASSELLA, supra, § 7-14(a), at 387.  When all verified claims to a given asset have been stricken, as they have here, there is no one who can submit evidence opposing the

alleged facts pertaining to that asset.  Imposing a separate evidentiary requirement for a default judgment motion would thus frustrate this resource-conservation purpose.  The Balford Trust Assets and Liechtenstein Accounts are in default because there are no remaining verified claims to them; because the assets are in default, no evidentiary showing on the part of the government is necessary.

Mr. Lazarenko's argument also overlooks the fact that, in this action, there <u>is</u> additional evidence to support the government's forfeiture claims.  <u>See</u> U.S. Liechtenstein and Balford Trust Resp. at 6-7.  As to Mr. Lazarenko's criminal activity itself, the government has submitted ample evidence, including depositions and testimony from Mr. Lazarenko's U.S. criminal trial, as well as Mr. Lazarenko's money laundering convictions in the United States and Switzerland.  <u>See</u> United States' Memorandum in Opposition to Claimant Pavel Lazarenko's Motion for Partial Summary Judgment [Dkt. No. 486] at 37-45; <u>see also</u> <u>United States v. Lazarenko</u>, 564 F.3d 1026, 1047 (9th Cir. 2009) (affirming Mr. Lazarenko's U.S. criminal conviction).  As to the connection between Mr. Lazarenko's criminal activity and the defendant assets, the government has submitted, among other evidence, an expert tracing report finding that around 77% of the Balford Trust Assets are criminal proceeds, <u>see</u> Expert Report of Michael J. Petron, CPA, CFA [Dkt. No. 946-1] ¶¶ 31-35; <u>id.</u> Ex. 5, as well as a supplemental expert tracing report finding that around 92% of the entirety of the defendant assets are criminal proceeds. Supplemental Expert Report of Michael J. Petron, CPA, CFA [Dkt. No. 1419-3] ¶ 7.[8]  The government also has submitted evidence that, when Mr. Lazarenko worked in the Ukrainian

---

[8]     The government's tracing expert initially determined that he lacked sufficient records to trace the funds in two of the three accounts comprising the Liechtenstein Accounts. But for the one account that he was able to trace, he determined over 90% of it to be criminal proceeds.  <u>See</u> Expert Report of Michael J. Petron, CPA, CFA [Dkt. No. 946-1] ¶ 50; <u>id.</u> Ex. 5.

government, he declared far less in income and assets than the amount of total defendant assets

he now claims in this case.  U.S. Motion to Strike Guernsey Trust Appendix 435-511 [Dkt.

No. 554-11] at 451-467; see also U.S. Related Payments Appendix 1356-1456 [Dkt. No. 509-18]

at 1414-1456 (exhibits from Mr. Lazarenko's U.S. criminal trial showing that, while he was a

public official, hundreds of millions of dollars were deposited into accounts he controlled); U.S.

Related Payments Appendix 1559-1659 [Dkt. No. 509-20] at 1559-1618 (same).

Second, Mr. Lazarenko asserts that his pending motion for summary judgment

precludes default judgment against these assets.  Lazarenko Liechtenstein and Balford Trust

Opp. at 1-2.  In his motion, Mr. Lazarenko argues that portions of the defendant assets in this

case – identified by certain payments to Mr. Lazarenko described in the amended complaint – are

not subject to forfeiture and should be dismissed.  See Claimant Pavel Lazarenko's Motion for

Partial Summary Judgment Regarding the "Unknown Payments" [Dkt. No. 426].  The motion

does not make clear where the money from these payments ended up, or what portions of which

asset groups Mr. Lazarenko seeks to dismiss.  But to the extent those payments are part of the

Balford Trust Assets or Liechtenstein Accounts, the motion is improper because Mr. Lazarenko

lacks standing to contest the forfeiture of those assets on the merits.  See supra Section III.B.1;

Memorandum Opinion and Order [Dkt. No. 1412] at 2; cf. CASSELLA, supra, § 11-5, at 580-81

("[A] claimant's motion for summary judgment will be denied as premature if . . . the claimant

has not yet established standing to contest the forfeiture.").  And to the extent those payments are

not part of the Balford Trust Assets or Liechtenstein Accounts, the pending summary judgment

motion has no relevance to the government's motions for default judgment against these two

groups of assets.

Finally, Mr. Lazarenko argues that default judgment is improper because, although his verified claim has been stricken, the answer he filed has not. Lazarenko Set Aside Mem. at 2; Lazarenko Set Aside Reply at 1-3. But this fact makes no difference. To litigate on behalf of an <u>in rem</u> defendant, the Supplemental Rules require each claimant to file a verified claim <u>and</u> an answer. SUPP. R. G(5)(a)(i), (b). Without both, Mr. Lazarenko is statutorily barred from intervening. CASSELLA, <u>supra</u>, § 7-13(a), at 371-72; <u>see</u> <u>United States v. 8 Gilcrease Lane, Quincy Fla. 32351</u>, 641 F. Supp. 2d at 5. It follows that once either is stricken, the claimant can no longer defend the asset to which their claim or answer referred.

The Court will enter default judgment against the Balford Trust Assets and the Liechtenstein Accounts. The Court will also deny Mr. Lazarenko's request for an evidentiary hearing. "Rule 55 does not require that testimony be presented as a prerequisite to the entry of a default judgment, and the court has discretion to determine whether a hearing is necessary." 10A WRIGHT, MILLER & KANE, <u>supra</u>, § 2688; <u>see</u> <u>Finkel v. Romanowicz</u>, 577 F.3d 79, 87 (2d Cir. 2009) ("In permitting, but not requiring, a district court to conduct a hearing before ruling on a default judgment, Rule 55(b) commits th[e] decision [of whether to hold a hearing] to the sound discretion of the district court."). Because of the evidence already presented by the government in this case and Mr. Lazarenko's lack of standing, the Court sees no reason to hold a hearing in which the United States would have to present further evidence.

### C. The Correspondent Assets and Milchenko Account Assets

#### 1. Eurofed and its Liquidation

Eurofed was a bank that, according to the United States, was majority-owned by Mr. Lazarenko and an associate and was closely connected to Mr. Lazarenko's illicit activities. <u>See</u> <u>All Assets IV</u>, 959 F. Supp. 2d at 85-90. By the end of 1997, the government asserts,

Eurofed held over $100 million of Mr. Lazarenko's money. Id. at 86. Eurofed also held funds belonging to one of Mr. Lazarenko's associates, Alexander Milchenko, see Am. Compl. ¶¶ 5(e), 101, as well as millions of dollars in deposits from third parties who had no connection to Mr. Lazarenko. All Assets IV, 959 F. Supp. 2d at 86. The majority of these funds were divided between "correspondent" accounts at other banks around the world. See id. Eurofed's assets included both the Correspondent Assets and the Milchenko Account Assets. See Am. Compl. ¶¶ 102-113.

In 1999, the Antiguan High Court of Justice ordered that Eurofed be dissolved, began its liquidation process, and froze certain Eurofed assets that were allegedly connected to Mr. Lazarenko. All Assets IV, 959 F. Supp. 2d at 86-87. In 2000, the High Court ordered forfeiture of these assets to the Antiguan government. Id. at 87-88. After a series of appeals, stays, and further orders, a portion of these assets, including the Milchenko Account Assets, were transferred to an account in the name of the Registrar of the High Court at the Bank of Nova Scotia in Antigua ("Registrar's Account"). Id. at 87-90; see Am. Compl. ¶ 5(e).[9] The other assets – the Correspondent Assets – remained in correspondent accounts in other countries because Eurofed was not able to secure their transfer to Antigua. All Assets IV, 959 F. Supp. 2d at 87 n.3; see Am. Compl. ¶ 5(f)-(h).

In 2003, the High Court ordered that the funds in the Registrar's Account be divided between those claimed by Mr. Lazarenko in liquidation and those claimed by others. All Assets IV, 959 F. Supp. 2d at 89-90. The funds had to be divided pro rata because the total

---

[9] These assets were briefly removed from the Registrar's Account in 2009, but were returned by 2012. See Stipulation and (Proposed) Order Regarding United States of America's Motion for Adjudication of Contempt [Dkt. No. 280]; Second Joint Status Report Regarding Re-Deposit of Defendant Assets Into Account of the Registrar of the High Court of Antigua and Barbuda [Dkt. No. 302].

amount claimed in liquidation exceeded the amount in the Registrar's Account.  See Declaration

of Charles William Augustine Walwyn in Support of Liquidators' Opposition to Plaintiff's

Motion for Summary Judgment, Exhibit J [Dkt. No. 288-27] at ECF 6, 8-11.  The pro rata share

of Mr. Lazarenko's claims stayed in the Registrar's Account, while the remaining amount was

released to the Liquidators so that they could pay third-party depositors and creditors of Eurofed,

as well as their own liquidation expenses.  All Assets IV, 959 F. Supp. 2d at 90.  The released

funds totaled around $20 million and likely included a pro rata share of the Milchenko Account

Assets; this pro rata share was in the Liquidators' possession by 2015.  See Milchenko Acct. Aff.

¶ 15.[10]  In March 2012, the Liquidators reported that they had worked to validate third-party

claims and used the $20 million released to them to make distributions to validated depositors

and creditors.  Still, they owed approximately $10 million more to depositors and creditors, and

had only around $4 million left from the released funds, leaving a deficit of around $6 million.

All Assets IV, 959 F. Supp. 2d at 90.

        As described further below, both the pro rata share of the Milchenko Account

Assets formerly held by the Liquidators and the funds that remained in the Registrar's Account

have since been relocated.  The pro rata share of the Milchenko Account Assets was transferred

to its own term deposit account at the Bank of Nova Scotia.  Milchenko Acct. Aff. ¶ 15; Reg. Ltr.

---

[10]     At the time the Court first considered the assets related to Eurofed's liquidation, it
was unclear whether the Milchenko Account Assets were designated as being potentially
Lazarenko-related in the Liquidators' calculations, and thus whether a corresponding amount of
money (reduced pro rata) was released to the Liquidators as part of the approximately $20
million they received.  See All Assets IV, 959 F. Supp. 2d at 90.  But in light of the 2014
settlement agreement between the Liquidators and the United States and its execution, see infra
Section III.C.2.a, it appears that the assets were released.  Pursuant to the agreement, the
Liquidators transferred the share of the Milchenko Account Assets in their possession to the
Registrar's Account in 2015.  Milchenko Acct. Aff. ¶ 15; Reg. Ltr. ¶ 4; see Sett. Agreement ¶ 22.
If the assets had been designated as potentially Lazarenko-related, they would already have been
in the Registrar's account, and no such transfer would have been necessary.

¶¶ 4-5; see infra Section III.C.2.a.  What remained in the Registrar's Account was transferred to a fund for the general use of the Antiguan government.  Opinion and Order [Dkt. No. 926] at 8; see infra at 54-55.

2.  Procedural History of the Milchenko Account Assets and Correspondent Assets

a.  Claims to Eurofed Assets

Five individuals filed claims seeking payment in connection to deposits to accounts at Eurofed, generally: Mervin Michaelson Onyshko, Maria de Los Angeles Collazo Garcia, Alan Mark Postles, Jacqueline Postles, and Allan Ronald Munro.  Claim of Mervin Michaelson Onyshko [Dkt. No. 68]; Claim of Maria de Los Angeles Collazo Garcia [Dkt. No. 69]; Claims of Alan Mark Postles and Jacqueline Postles [Dkt. No. 70]; Claim of Alan Ronald Munro [Dkt. No. 71].  The Court dismissed these claims because the individuals lacked standing and failed to file answers to the government's complaint.  See United States v. All Assets Held at Bank Julius Baer & Co., Ltd. ("All Assets II"), 664 F. Supp. 2d 97, 103, 106 (D.D.C. 2009).[11]

In addition, the Liquidators, on behalf of Eurofed, filed a verified claim to the defendant assets connected to the bank.  Eurofed Bank Limited's (in Liquidation) Rule C(6)(A) Verified Statement [Dkt. No. 33] at 1-2.  These claimed assets included the Milchenko Account Assets and Correspondent Assets.  Id.  On August 12, 2013, this Court granted in part and denied in part the United States' motion for summary judgment to strike the Liquidators' claim for lack of standing.  All Assets IV, 959 F. Supp. 2d at 84.  The Court ruled that the Liquidators had

---

[11]    The general claims to the defendant assets also encompassed the Milchenko Account Assets and Correspondent Assets, and have been dismissed.  See supra at 8.  Mr. Lazarenko's claim did not include the Milchenko Account Assets.  See 2005 P. Lazarenko Cl.

standing to contest the forfeiture of the defendant assets located in Antigua, including the Milchenko Account Assets, see id. at 101, but lacked standing to contest the forfeiture of the Correspondent Account Assets located abroad. Id. at 115.

On November 14, 2014, the Court approved a stipulation and settlement agreement between the United States and the Liquidators (the "Settlement Agreement"). See Sett. Agreement. The Settlement Agreement dismissed the United States' forfeiture action against 22.54% of (1) the sum of the interest accrued on the funds that remained in the Registrar's Account; and (2) the Correspondent Assets. See Sett. Agreement ¶¶ 11, 12, 17, 18. The combined amount of these dismissed assets was approximately $9 million. See U.S. Correspondent Mem. at 7. The agreement also amended the Court's 2005 restraining order to permit these dismissed assets to be released to the Liquidators and attempted to implement a procedure to transfer to the Liquidators the dismissed portion of the Correspondent Assets. See Sett. Agreement ¶¶ 18, 20, 21.[12] The Liquidators agreed to transfer the pro rata share of the Milchenko Account Assets to the Registrar's Account. Id. ¶ 22. The Settlement Agreement also provided that "[u]pon [its] entry . . . and its approval by the Antiguan High Court of Justice, Eurofed's claims to any and all Defendants in Rem in this action are hereby dismissed with prejudice." Id. ¶ 19.

---

[12]    It appears that this attempt has been unsuccessful. See Joint Status Report Regarding Implementation of Stipulation and Settlement Between Plaintiff and Claimant Eurofed Bank Regarding Assets in Switzerland and Lithuania [Dkt. No. 967] at 2-3; Joint Status Report Regarding Implementation of Stipulation and Settlement Between Plaintiff and Claimant Eurofed Bank Regarding Assets in Switzerland and Lithuania [Dkt. No. 1047] at 2. Instead of transferring all of the dismissed portion of the Correspondent Assets, the parties agreed to transfer to the Liquidators the entirety of the interest accrued on the funds that remained in the Registrar's Account, leaving a smaller portion of the Correspondent Assets to be transferred to the Liquidators at a later date. See U.S. Correspondent Mem. at 7; Reg. Ltr. ¶ 3.

On October 15, 2015, the Antiguan High Court approved the Settlement Agreement.  See Joint Status Report Regarding Implementation of Stipulation and Settlement Between Plaintiff and Claimant Eurofed Bank [Dkt. No. 820] at 2.  On November 25, 2015, the Liquidators transferred the pro rata share of the Milchenko Account Assets to the Registrar's Account.  Milchenko Acct. Aff. ¶ 15; Reg. Ltr. ¶ 4.  The Registrar of Antigua then placed this money in its own term deposit account.  Milchenko Acct. Aff. ¶ 15; Reg. Ltr. ¶ 5.

### b.  Mr. Lazarenko's Claim to the Correspondent Assets

In 2005, Mr. Lazarenko filed a verified claim to the Correspondent Assets. 2005 P. Lazarenko Cl.  In 2023, the Court struck Mr. Lazarenko's claim for lack of constitutional and statutory standing.  See All Assets XIII, 2023 WL 5000213.  Mr. Lazarenko lacked constitutional standing because his asserted interest – flowing from the Liquidators' duty to obtain the Correspondent Assets and distribute them to him through Eurofed's liquidation – was too speculative.  Id. at *14-15.  The Liquidators had no ownership interest in the Correspondent Assets, and Mr. Lazarenko was at most an unsecured creditor of the assets.  Id. at *14.  He also lacked statutory standing because, in his verified claim, he never asserted true ownership or control of the Correspondent Assets, which are located outside of Antigua.  Id. at *12.  Instead, he had asserted only that he was the "beneficial owner" of assets located in Antigua.  Id.

At the same time that the Court struck Mr. Lazarenko's claim to the Correspondent Assets, it also denied his motion for summary judgment with respect to those assets.  All Assets XIII, 2023 WL 5000213, at *20-21.  Mr. Lazarenko had not met his burden of showing that there was no genuine dispute of material fact regarding the lawful origins of the Correspondent Assets.  Id. at *21.  There was sufficient evidence in the record supporting the

United States' allegations that Mr. Lazarenko transferred proceeds of his illicit activities to Eurofed, and that Eurofed deposited those proceeds into the relevant correspondent accounts.  Id.

### 3.  Default Judgment Against the Milchenko Account Assets

The United States moves for default judgment against the Milchenko Account Assets.  U.S. Milchenko Acct. Mot.[13]  The Liquidators oppose the motion.  Liquidators' Milchenko Acct. Opp.  The Court will enter default judgment against the Milchenko Account Assets because there are no remaining claims to the assets, the United States' allegations against the assets are sufficiently pled, and the Liquidators' arguments lack merit.

### a.  Remaining Claims

There is no dispute (and the Court has confirmed) that, aside from the Liquidators' claims, all remaining claims to the Milchenko Account Assets have been dismissed or withdrawn.  The Liquidators, however, argue that default judgment is inappropriate because they still have a claim to the Milchenko Account Assets – whatever portion of their verified claim that was not dismissed in the Settlement Agreement.  See Liquidators' Milchenko Acct. Opp. at 2-5.  Therefore, to determine whether these assets are subject to default, the Court must first determine what portion of the Liquidators' claim was dismissed through the Settlement Agreement.

"Settlement agreements are contracts, and courts interpret them accordingly." Pigford v. Vilsack, 75 F. Supp. 3d 462, 466 (D.D.C. 2014).  "When a [legal claim] is settled

---

[13]     The United States filed a motion for default judgment against the Milchenko Account Assets at the same time that it submitted an affidavit in support of default.  U.S. Milchenko Acct. Mot. at 2 n.1.  The United States did this "[i]n an effort to mollify concerns raised by the liquidators of Eurofed Bank Limited of Antigua & Barbuda that they would not be provided an opportunity to oppose this Motion for entry of a default judgment."  Id.

extra-judicially through settlement agreements, this Court has applied the principles of contract

law . . . 'to determine what claims the parties intended to foreclose from future litigation.'"

Dodge v. Trustees of Nat. Gallery of Art, 326 F. Supp. 2d 1, 9 (D.D.C. 2004) (quoting Sirmans

v. Caldera, 138 F. Supp. 2d 14, 19 (D.D.C. 2001) (cleaned up)).  "The judicial task in construing

a contract is to give effect to the mutual intentions of the parties.  Where the language of a

contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily

ascribed to those words reflects the intentions of the parties."  Mesa Air Grp., Inc. v. Dep't of

Transp., 87 F.3d 498, 503 (D.C. Cir. 1996) (cleaned up).  Any assertions of ambiguity in the

terms of the agreement must be established by objective evidence.  See id.

        Through the Settlement Agreement, the Liquidators agreed that their "claims to

any and all Defendants in Rem in this action are hereby dismissed with prejudice."  Sett.

Agreement ¶ 19.  On its face, this language would seem to settle the question of whether the

Liquidators still have claims to defendant assets.  But the Liquidators argue that this provision of

the agreement does not mean what it seems to say because other provisions indicate that the

Liquidators maintained whatever portion of their claim necessary to seek the Milchenko Account

Assets in Antiguan court.  Liquidators' Milchenko Acct. Opp. at 2-4.  In support, the Liquidators

primarily rely on two paragraphs of the Settlement Agreement.  See id.; Liquidators' Reply

at 2-4.  The first, Paragraph 24, states:

> The Parties anticipate that Antiguan law may require the Liquidators
> to make future distributions with respect to the Milchenko Account
> because the total claim related to the Milchenko Account exceeds
> the current pro-rata allocation of $1,318,079.24 by $298,553.75. . . .
> [I]n the event that Antiguan law requires future distributions with
> respect to the Milchenko Account, such potential distributions are
> not intended to be dismissed from these forfeiture proceedings and
> such distributions will be made by the Liquidators to the account in
> the name of the Registrar currently holding the pro-rata share of the
> Lazarenko Accounts, or in a manner consistent with any forfeiture

order that may be issued by this Court and confirmed by the
Antiguan courts.

Sett. Agreement ¶ 24.  This paragraph, however, fails to negate the Settlement Agreement's clear

statement that the Liquidators dismissed their claims to the Milchenko Account Assets.

Paragraph 24's operative language refers to "distributions" made through the liquidation of

Eurofed.  To state the obvious, these distributions are money, not verified claims under the

Supplemental Rules.  This money is "not intended to be dismissed from these forfeiture

proceedings."  Id.  It is therefore portions of the defendant assets that Paragraph 24 retains as part

of this forfeiture action, not the Liquidators' claims.

Other language in Paragraph 24 explains the reason why the parties may have

believed it necessary to clarify that the Settlement Agreement did not dismiss any of the assets

formerly in Alexander Milchenko's Eurofed account.  In the process of liquidating Eurofed, the

Liquidators are obligated to make distributions under and in accordance with Antiguan law –

distributions to depositors and creditors of Eurofed, to the Antiguan government, or to anyone

else required by such law.  See All Assets IV, 959 F. Supp. 2d at 87-90.  But the pro rata share of

the Milchenko Account Assets released to the Liquidators may not be enough to make these

required distributions.  This is because "the total claim related to the Milchenko Account

exceeds" the portion of the account assets that the Liquidators possessed at the time of the

Settlement Agreement.  See Sett. Agreement ¶ 24.[14]  "The Parties anticipate[d]" that the

---

[14]     It is not entirely clear to what the words "total claim" refer.  They could refer to
the amount of assets formerly in the Milchenko Account claimed by the United States as an in
rem defendant in this forfeiture action (i.e., the Milchenko Account Assets).  They could also
refer to the amount of assets that the Liquidators sought as a claimant in this action.  Or they
could refer to claims made by third parties to the assets in Antiguan liquidation proceedings.
Either way, the phrase "total claim" serves the same purpose – to illustrate that the total amount
of the assets from the Milchenko Account likely exceeds what is currently available to the
parties.

Liquidators thus may need to make "future distributions" of the Milchenko Account Assets from other sources, such as the Correspondent Assets or the interest accrued from funds in the Registrar's Account.  See id.  The Settlement Agreement, however, dismissed portions of both potential sources of the remainder of the Milchenko Account Assets from this forfeiture action. Id. ¶ 18.  Without Paragraph 24, the Settlement Agreement could have been interpreted to dismiss assets that the Liquidators might ultimately need to distribute in liquidation.

Paragraph 24 serves to foreclose this interpretation.  Because "future distributions with respect to the Milchenko Account" are not "dismissed from these forfeiture proceedings," Sett. Agreement ¶ 24, any future assets that Antiguan law deems to have been part of the Milchenko Account Assets remain defendant assets in this action.  They remain defendant assets even if they were part of the asset groups partially dismissed by the Settlement Agreement.  This was the function of Paragraph 24; it was not, as the Liquidators urge, to "reserve[] their right to seek the Milchenko Account in Antigua."  See Liquidators' Milchenko Acct. Opp. at 3.

Other provisions of the Settlement Agreement support this conclusion.  Three million dollars held by the Liquidators at a different bank, for example, "are not Defendants in Rem in this forfeiture action," "[e]xcept for any portion of those funds which may be paid towards the Milchenko Account as contemplated in" Paragraph 24 and another paragraph relating to the Milchenko Account Assets.  Sett. Agreement ¶ 16 (emphasis added).  And a percentage of the Correspondent Assets, as well as of interest from the Registrar's Account, "shall be dismissed with prejudice, except as provided in" Paragraph 24 and another paragraph limiting dismissal of assets for which distributions are required under Antiguan law.  Id. ¶ 18 (emphasis added).  Both of these provisions reflect a desire to maintain the forfeitability of all of the assets formerly in the Milchenko Account.  In short, Paragraph 24 is about what assets the

United States agreed to dismiss from the forfeiture action in exchange for the Liquidators'

dismissal of their claims.  It does not speak to the extent to which the Liquidators dismissed their

claims, and fails to overcome the plain meaning of the language that does.

The Liquidators also contend that "Antiguan law, not a non-merits-based U.S.

default, governs the distribution of funds in Antigua."  Milchenko Acct. Opp. at 4.  In support,

they point to Paragraph 34 of the Settlement Agreement:

> This Stipulation and Settlement Agreement is governed by the laws
> of the United States and Antigua. The Parties agree that exclusive
> jurisdiction and venue for any dispute arising between and among
> the Parties regarding how this Stipulation and Settlement Agreement
> affects the U.S. forfeiture proceedings will be in this Court. The
> Parties also agree that exclusive jurisdiction and venue for any
> dispute arising between and among the Parties regarding how this
> Stipulation and Settlement Agreement affects Eurofed's liquidation
> proceedings will be in Antigua.

Sett. Agreement ¶ 34.

The Liquidators' argument about this paragraph fails on multiple levels.  First,

this paragraph is a choice of <u>forum</u> provision, not a choice of <u>law</u> provision.  <u>Compare</u>

15 Timothy Murray, Corbin on Contracts § 83.6 (rev. ed. 2024) ("Forum Selection

Agreements") <u>with</u> <u>id</u>. § 83.9 ("Choice of Law Agreements").  It assigns jurisdiction and venue –

to the United States for proceedings related to this action, and to Antigua for proceedings related

to Eurofed's liquidation – but is silent as to which country's law applies where.

Second, even if the Settlement Agreement did mandate the use of Antiguan law, it

did not mandate the use of Antiguan law for all issues relating to "the distribution of funds in

Antigua."  <u>See</u> Liquidators' Milchenko Acct. Opp. at 4.  Instead, the Settlement Agreement

describes the narrower category of "Eurofed's liquidation proceedings."  Sett. Agreement ¶ 34.

This forfeiture action is distinct from such proceedings, and therefore does not fall within the

category the Settlement Agreement assigned to Antiguan courts.  Of course, as the Liquidators acknowledge (and lament), the outcome of this action will likely have effects in Antigua, <u>see</u> Liquidators' Reply at 2 – which it should, given that some of the assets the United States seeks are located in that country.

Third, the Liquidators contradict their own assertion that Antiguan law governs Antiguan funds.  They concede that, if the United States were to obtain Antiguan funds through a U.S. forfeiture proceeding on the merits, the Settlement Agreement would allow the distribution of those funds to the United States on the basis of U.S. law.  <u>See</u> Liquidators' Reply at 4.  But their only support for distinguishing between judgments based on the merits of U.S. forfeiture law and judgments based on U.S. procedural law (of default) are two words in the Settlement Agreement – "in fact," <u>see</u> <u>id</u>. – that in context have nothing to do with choice of law.  <u>See</u> Sett. Agreement ¶ 15 ("Eurofed makes no representations and takes no position regarding whether the alleged Milchenko Account is <u>in fact</u> held for the benefit of Alexander Milchenko or whether such funds are subject to forfeiture." (emphasis added)).

The Liquidators may be correct that the result of entering default judgment against the Milchenko Account Assets will be the United States seeking to enforce that judgment in Antigua.  <u>See</u> Liquidators' Reply at 2.  And they also may be correct that they gave up their right to oppose such enforcement through the Settlement Agreement.  <u>Id</u>.; <u>see</u> Sett. Agreement ¶ 25.  But the purpose of a claim to an asset in U.S. forfeiture proceedings is to defend the asset against forfeiture.  When the Liquidators gave up their claims, they gave up their ability to do so.  And if the United States could not attempt to enforce a judgment of forfeiture in another country when a significant portion of the defendant assets are in that country, the forfeiture would have little effect.  None of this is an "end-run around the basic principles of forfeiture law."  <u>See</u>

Liquidators' Reply at 4.  Rather, it is the natural consequence of leaving assets with no one to defend them in a forfeiture action.

In sum, when the Liquidators agreed to "dismiss[] with prejudice" "claims to any and all Defendants in Rem in this action," Sett. Agreement ¶ 19, the Court understands them to have meant what they clearly said.  The Liquidators thus have no remaining claim to the Milchenko Account Assets, as they unambiguously dismissed that claim through the Settlement Agreement.  Nothing else in the agreement precludes this Court from entering default judgment against the Milchenko Account Assets.

### b.  Factual Allegations

The Court evaluates whether the government's complaint states "sufficiently detailed facts to support a reasonable belief that the government [would] be able to meet its burden of proof at trial" with regard to the Milchenko Account Assets.  See SUPP. R. G(2)(f).  As described previously, the government's factual allegations regarding Mr. Lazarenko's illicit activities support its legal claims for forfeiture.  See supra at 23-25.  Specific to the Milchenko Account Assets, the government sufficiently alleges that the assets are connected to these activities.  The United States asserts that nearly $1.5 million of the Milchenko Account Assets came from an account at Eurofed in the name of "Orphin" that was controlled by another of Mr. Lazarenko's associates and into which Mr. Lazarenko deposited money he made from his illicit activities.  Am. Compl. ¶ 101; see id. ¶¶ 67, 68.

The Liquidators argue that the United States has provided insufficient evidence to support default judgment against the Milchenko Account Assets.  Liquidators' Milchenko Acct. Opp. at 1-2.  This argument fails – as it did when made by Mr. Lazarenko with respect to other defendant assets – because no evidence is required to seek default judgment.  When a

defendant is in default, "the factual allegations of the complaint are deemed admitted."  Serv.
Emps. Int'l Union Health & Welfare Fund v. N. Am. Cleaning Servs. Co. Inc., 264 F. Supp. 3d
at 4; see United States v. Doraville Properties, 330 F. Supp. 3d at 159.  The authorities cited by
the Liquidators do not support their position.  See Liquidators' Milchenko Acct. Opp. at 1-2.
Instead, the very sentence they quote in support – when read in its entirety – confirms that
default judgment is proper if "the government alleged ample facts in its complaint to establish a
reasonable belief that the government could prove by a preponderance of the evidence that these
funds were subject to civil in rem forfeiture."  United States v. $1,071,251.44 of Funds
Associated with Mingzheng Int'l Trading Ltd., 324 F. Supp. 3d at 41 (emphasis added).  And the
provisions of the forfeiture statute that the Liquidators cite describe the government's burden of
proof at trial; they make no mention of default judgment.  See 18 U.S.C. § 983(c).  No additional
evidence is required to grant default judgment on the basis of a party's well-pleaded facts.

### c.  Lack of Entry of Default

The Court will enter default judgment against the Milchenko Account Assets.
The Court will do so even though the Clerk of Court has not yet entered default against the
assets.  Usually, "[a] plaintiff must first obtain an entry of default from the clerk of the court"
before they "seek an entry of default judgment."  Peak v. D.C., 236 F.R.D. 13, 15 (D.D.C. 2006);
see also WRIGHT, MILLER & KANE, supra, § 2692.  But where it would not be unfair to a
defendant, "courts have excused the failure to obtain entry of default prior to an application for
default judgment, and have instead included an order for entry of default with a decision on the
merits of the application for default judgment."  Hirsch v. Innovation Int'l, Inc., Civil Action
No. 91-4130, 1992 WL 316143, at *1 (S.D.N.Y. Oct. 19, 1992).

The United States submitted its affidavit in support of default against the assets along with its motion for default judgment, allowing the Liquidators to file numerous responses arguing against default judgment.  See supra note 3; Liquidators' Reply.  Moreover, the United States filed the affidavit and the motion simultaneously, instead of waiting for the Clerk's entry of default, because the Liquidators had previously raised the concern that entering default before they had the opportunity to respond would be procedurally unfair.  U.S. Milchenko Acct. Mot. at 2 n.1; see Objection to Entry of Clerk's Default and Motion to Enforce Settlement Agreement [Dkt. No. 1475] at 1-2.  The government's simultaneous filing, though irregular, was warranted and fair in this circumstance.  Therefore, the Court will excuse the government's failure to obtain entry of default prior to an application for default judgment and will include an entry of default in the Order accompanying this Opinion.  See Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *1.

### 4.  Default Judgment Against the Correspondent Assets

The United States moves for default judgment against the portion of the Correspondent Assets remaining in this action.  U.S. Correspondent Mot.  This portion is equal to the original Correspondent Assets minus $4,657,720.26 of the assets dismissed by the Settlement Agreement.  See U.S. Correspondent Mem. at 7.[15]  Mr. Lazarenko opposes the motion.  Lazarenko Correspondent Opp.[16]  The Court will enter default judgment against the

---

[15]    The United States and the Liquidators have agreed on the allocation of the dismissed Correspondent Assets:  "the $4,657,720.26 is comprised of $3,950,609.02 from the assets held at SEB Vilniaus Bankas, $642,286.80 from the assets held at Credit Suisse (Geneva), and $64,724.44 of the assets held at Banque SCS Alliance S.A. (Geneva) as set forth in paragraphs 5(f), 5(g), and 5(h) of the Amended Complaint."  U.S. Correspondent Mem. at 7.

[16]    Unlike against the Milchenko Account Assets, the Liquidators do not object to default judgment against the Correspondent Assets.  U.S. Correspondent Mot. at 3.

Correspondent Assets because there are no remaining claims to the assets, the United States'

allegations against the assets are sufficiently pled, and Mr. Lazarenko's arguments lack merit.

### a. Remaining Claims and Factual Allegations

All verified claims to the Correspondent Assets have been either withdrawn or

stricken.  Because there are no remaining claims, the assets are in default.  United States v.

Doraville Properties, 330 F. Supp. 3d at 154.  In accordance with the Federal Rules of Civil

Procedure, the United States submitted an affidavit in support of the Clerk's entry of default

against the assets in September 2023.  Correspondent Aff.; see FED. R. CIV. P. 55(b).  Mr.

Lazarenko objected to the affidavit.  Obj. re Correspondent Assets.  On December 18, 2023, the

Court ruled that Mr. Lazarenko's objection was procedurally improper.  United States v. All

Assets Held at Bank Julius Baer & Co., Ltd., 2023 WL 8803554.  The Clerk entered default

against the Correspondent Assets on December 21, 2023.  Clerk's Entry of Default [Dkt.

No. 1506].

The Court evaluates whether the government's complaint states "sufficiently

detailed facts to support a reasonable belief that the government [would] be able to meet its

burden of proof at trial" with regard to the Correspondent Assets.  See SUPP. R. G(2)(f).  As

described previously, the government's factual allegations regarding Mr. Lazarenko's illicit

activities support its legal claims for forfeiture.  See supra at 23-25.  Specific to the

Correspondent Assets, the United States alleges that Mr. Lazarenko and an associate purchased a

majority share of Eurofed in order to facilitate and conceal transfers of funds from their illicit

activities.  Am. Compl. ¶ 66.  The Correspondent Assets are comprised of four correspondent

bank accounts:  one in Credit Suisse (Geneva), id. ¶ 5(f), one in Banque SCS Alliance S.A.

(Geneva), id. ¶ 5(g), and two at Vilniaus Bankas (formerly Bankas Hermis) in Lithuania.

Id. ¶ 5(h).  According to the government, in August and September 1997, approximately $25 million of criminal proceeds moved from Mr. Lazarenko's "Nihpro" account, through an account controlled by one of Mr. Lazarenko's associates, into Eurofed's Credit Suisse (Geneva) account. Id. ¶¶ 102-04.  Approximately $10 million was transferred into Eurofed's Banque SCS Alliance S.A. (Geneva) account from a different Eurofed correspondent account in August 1997.  Id. ¶ 106.  And $23 million was transferred into the same account from an account controlled by one of Mr. Lazarenko's associates and in the name of "GHP Corporation," the business entity associated with the prefabricated home scheme.  Id. ¶ 107; see id. ¶¶ 45-49.

As for the Lithuanian Vilnius Bankas accounts, the United States alleges that, in July 1998, one of these accounts received $9 million of funds from an account in the name of one of Mr. Lazarenko's business entities, "Lady Lake Investments," id. ¶¶ 93-95, and $21 million from different accounts under the control of Mr. Lazarenko and his associates in the name of another of Mr. Lazarenko's business entities, "Firstar."  Id. ¶¶ 96-97; see id. ¶ 68.  The government further alleges that $25 million of assets belonging to Mr. Lazarenko and his associates was transferred from other Eurofed accounts to the Vilnius Bankas accounts.  Id. ¶¶ 109-113.  The Court concludes that these allegations sufficiently support the forfeitability of the Correspondent Assets.

b.  Mr. Lazarenko's Arguments

Mr. Lazarenko makes several arguments in opposition to default judgment against the Correspondent Assets.  But none are substantially different from the arguments he makes with respect to the Balford Trust Assets or Liechtenstein Accounts, and none have merit.  First, he argues that there is "good cause" to allow litigation to continue rather than enter default

judgment.  Lazarenko Correspondent Opp. at 2; see FED. R. CIV. P. 55(c).[17]  In the default

judgment context, the "good cause" standard normally focuses on the factors laid out by the D.C.

Circuit in Keegel v. Key West & Caribbean Trading Co.:  "whether (1) the default was willful,

(2) a set-aside would prejudice [the] plaintiff, and (3) the alleged defense was meritorious."

627 F.2d 372, 373 (D.C. Cir. 1980).  Mr. Lazarenko articulates his arguments solely in terms of

these factors.  See Lazarenko Correspondent Opp. at 3-11.  But the Keegel factors are "not

exclusively" those which the Court may take into account; "other relevant equitable factors may

also be considered."  Gilmore v. Palestinian Interim Self-Gov't Auth., 843 F.3d at 966 (cleaned

up); see Waifersong, Ltd. Inc. v. Classic Music Vending, 976 F.2d 290, 292 (6th Cir. 1992)

("[T]he district court enjoys considerable latitude under the 'good cause shown' standard.").

This is because "Rule 55(c)'s 'good cause' determination is a balance of the equities" that is

"designed to empower courts to consider the equities that specially arise in a given case."

Gilmore v. Palestinian Interim Self-Gov't Auth., 843 F.3d at 966.  Here, the Keegel factors fail

to capture the most relevant equitable considerations.

       The Correspondent Assets are in default because no one, including Mr.

Lazarenko, has shown a sufficient legal interest in the assets to give rise to standing.  Contrast

this situation with the standard case of a defendant in default because they failed to make a

required filing on time – or even, in a civil forfeiture action, where an in rem defendant is in

---

[17]      Although the "good cause" standard is articulated by the Federal Rules of Civil Procedure in relation to motions to set aside entries of default and traditionally applied in that context, the Court will consider it in relation to Mr. Lazarenko's opposition because "federal courts often view opposition to a motion for the entry of a default judgment as a motion to set aside the [entry of] default." 10 WRIGHT, MILLER & KANE, supra, § 2692; see Meehan v. Snow, 652 F.2d 274, 276 (2d Cir. 1981).  After all, it would make little sense to find that there is good cause to set aside a defendant's default, but that default judgment should be entered against the defendant anyway.

default because a claim was struck for failing to follow one of the procedural requirements of the Supplemental Rules.  See SUPP. R. G(5)(a).  In those cases, after a court excuses the default, the defendant or claimant can make the required filing or correct the claim.  Here, the claimants whose claims to the Correspondent Assets have been stricken can do neither.  Their lack of sufficient interest in the assets cannot be corrected through a belated or amended filing.  Any showing of good cause would therefore require Mr. Lazarenko to show that there exist claimants with constitutional and statutory standing to defend the assets.  Mr. Lazarenko has made no such showing.

As for Mr. Lazarenko's arguments about the Keegel factors, he is correct that the Correspondent Assets' default cannot be characterized as "willful."  See Lazarenko Correspondent Opp. at 3-4.  But he is wrong that failing to grant default judgment would not prejudice the United States.  See id. at 4; U.S. Correspondent Reply at 6-7.  With no proper claims to the assets left, the government now has a right to them, and denying default judgment would deny it that right.  Although the United States could conceivably seek forfeiture of the same assets as substitute assets through Mr. Lazarenko's criminal case in the Northern District of California, this fact leads to no "windfall outcome."  See Lazarenko Correspondent Opp. at 4. The United States has a separate right to the assets forfeited through Mr. Lazarenko's criminal case – a right which must be fulfilled through substitute assets only because Mr. Lazarenko made the original forfeited assets unavailable.  See United States v. Lazarenko, No. 21-10225, 2022 WL 4127712, at *1 (9th Cir. Sept. 12, 2022).  If this Court were to deny default judgment against the Correspondent Assets, it would cause prejudice to the United States by turning two groups of assets to which it is entitled – the Correspondent Assets and the assets originally ordered forfeited in Mr. Lazarenko's criminal case – into only one.

Finally, Mr. Lazarenko attempts to repackage the argument he has asserted with respect to other groups of defendant assets – that the United States has not provided sufficient evidence of the Correspondent Assets' forfeitability, see supra at 27-28 – as a "meritorious defense" under the "good cause" standard. Lazarenko Correspondent Opp. at 4-5. As is true with respect to the other defendant assets, however, it is the allegations in the United States' complaint that dictate the appropriateness of default judgment, not the evidence (or lack thereof) obtained through discovery.[18] Contrary to Mr. Lazarenko's assertions, these allegations are sufficient. Mr. Lazarenko is also wrong that the fact that some of the government's legal claims against the defendant assets in this action have been stricken changes the analysis. See Lazarenko Correspondent Opp. at 8. The same was true at the time the Court denied Mr. Lazarenko's motion for summary judgment and held that the United States' allegations with respect to the Correspondent Assets were sufficient. See All Assets XIII, 2023 WL 5000213, at *20. The government alleges that all defendant asset groups are subject to forfeiture under any of the legal theories laid out in its amended complaint. See Am. Compl. ¶¶ 124, 139, 143, 147, 151, 155. The Court concludes that the government has alleged sufficient facts to show that it is likely to be able to prove that the Correspondent Assets are subject to forfeiture at least through its money laundering claims. See supra Section III.B.2.a.

---

[18]     In his opposition to this motion, Mr. Lazarenko quotes a recent case in this district for the proposition that, in order to obtain default judgment, "[t]he Government 'must prove [its] entitlement to the relief requested using detailed affidavits or documentary evidence.'" Lazarenko Correspondent Opp. at 5 (second alteration in original) (quoting United States v. 113 Virtual Currency Accts., 2024 WL 940141, at *3). But this language refers to the requirements a plaintiff must satisfy for a court to award damages through default judgment, not the requirements for determining liability. See Ventura v. L.A. Howard Constr. Co., 134 F. Supp. 3d 99, 103 (D.D.C. 2015). Moreover, in the case cited by Mr. Lazarenko, the court entered default judgment based on the allegations in the government's complaint. See United States v. 113 Virtual Currency Accts., 2024 WL 940141, at *4-9.

Even if the United States did have to make some evidentiary showing, the evidence provided in this case thus far is enough to support its allegations.  See U.S. Correspondent Reply at 5-6.  As this Court recently held in denying Mr. Lazarenko's motion for summary judgment against the Correspondent Assets:

> [T]he United States has pointed to sufficient evidence in the record to demonstrate that there is a connection between Mr. Lazarenko's criminal activities and the funds in Lithuania and Switzerland.  For example, the United States' tracing expert Michael Petron has written expert reports analyzing the funds deposited into Lazarenko-related accounts at Eurofed and concluded that the deposits are traceable to Mr. Lazarenko's criminal activities.  Eurofed then made deposits at Vilniaus Bankas and Banque SCS Alliance, and, once deposited, those assets did not suddenly lose their criminal origin or the history of their involvement in laundering.  With respect to the Lithuanian Vilniaus Bankas account, there is evidence that Eurofed made a number of deposits into this account.  With respect to the Swiss Banque SCS Alliance account, there is also evidence that Eurofed made deposits into this account, and – as Mr. Lazarenko notes – the United States has produced bank statements through 1998 showing the movement of Eurofed funds into this account.  Mr. Lazarenko argues that the United States offers no evidence that any supposedly tainted funds that Eurofed deposited at Vilniaus Bankas or Banque SCS Alliance were still in those accounts at the time that the accounts were restrained.  But regardless of whether there is evidence of whether the supposedly tainted funds that Eurofed deposited at Vilniaus Bankas or Banque SCS Alliance remained in those accounts at the time that the accounts were restrained, the Court concludes that the United States has proffered sufficient evidence that Eurofed funds connected with Mr. Lazarenko's criminal activity were deposited into the Vilniaus Bankas and Banque SCS Alliance accounts.

All Assets XIII, 2023 WL 5000213, at *21 (citations and internal quotation marks omitted).

And there is yet another reason why the Court concludes that Mr. Lazarenko has not asserted a meritorious defense.  Without constitutional standing, he cannot assert any defense to the forfeiture of the assets on the merits.  Even if the Court were to deny the United States' motions

for default judgment, the Court would still lack jurisdiction to consider the evidentiary arguments Mr. Lazarenko presses.[19]

   The Court will enter default judgment against both the Milchenko Account Assets and the Correspondent Assets.  There are no remaining claims to either group of assets, the United States' allegations against the assets are sufficiently pled, and the claimants' arguments against default judgment lack merit.

### D.  Certification of Judgments as Final

   For each of the four groups of assets, the United States asks the Court to certify the order of default judgment as final under Rule 54(b) of the Federal Rules of Civil Procedure. U.S. Liechtenstein Mem. at 7-9; U.S. Balford Trust Mem. at 7-8; U.S. Milchenko Acct. Mem. at 8-10; U.S. Correspondent Mem. at 8-10.  The United States argues that entry of a final judgment against the assets will permit immediate appeal and, once any appeal has concluded, allow the government to enforce the Court's judgment in foreign jurisdictions.  See, e.g., U.S. Milchenko Acct. Mem. at 9.  Neither Mr. Lazarenko nor the Liquidators specifically oppose certification of these default judgments as final.  Nevertheless, because the Federal Rules of Civil Procedure allow such certification "only if the court expressly determines" it to be appropriate, FED. R. CIV. P. 54(b), the Court will independently evaluate whether to certify default judgment

---

[19] Mr. Lazarenko implies that the Correspondent Assets are too commingled with other assets to be forfeitable, stating (without citing any authority) that "[c]ommingled property is not subject to forfeiture."  Lazarenko Correspondent Opp. at 8 & n.1.  This is a flatly incorrect statement of law.  "If the Government traces forfeitable property to a commingled asset . . . , and the Government is seeking forfeiture under [a] 'proceeds' theory," then "the portion of the asset traceable to the forfeitable property is subject to forfeiture."  CASSELLA, supra, § 11-3(c), at 560-61.  If the government is seeking forfeiture under a money laundering theory, otherwise untainted funds comingled with and used to conceal the source of tainted funds are generally forfeitable.  See All Assets XIII, 2023 WL 5000213, at *20.  Here, the United States seeks forfeiture under both proceeds and money laundering theories.

against the assets as final.  See Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8 (1980)

("The function of the district court under [Rule 54(b)] is to act as a dispatcher.  It is left to the

sound judicial discretion of the district court to determine the appropriate time when each final

decision in a multiple claims action is ready for appeal." (cleaned up)).

Determining whether to certify an order as a final judgment requires a two-step

analysis.  First, the Court must ensure that the order under consideration represents the "ultimate

disposition of an individual claim."  Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. at 7

(quoting Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436 (1956)).  If so, the Court must

then ask whether there is "no just reason for delay."  FED. R. CIV. P. 54(b).  "This determination

weighs both 'justice to the litigants' and 'the interest of sound judicial administration.'"  Brooks

v. Dist. Hosp. Partners, 606 F.3d 800, 806 (D.C. Cir. 2010) (quoting Curtiss-Wright Corp. v.

Gen. Elec. Co., 446 U.S. at 6, 8).  "[T]he factors pertaining to judicial administration include

whether the claims under review were separable from the others remaining to be adjudicated and

whether the nature of the claims already determined was such that no appellate court would have

to decide the same issues more than once even if there were subsequent appeals."  Id. (cleaned

up).

In cases involving multiple claims, certification under Rule 54(b) is the exception,

not the norm.  Advance Am., Cash Advance Centers, Inc. v. FDIC, 251 F. Supp. 3d 78, 80

(D.D.C. 2017).  This is because the default rule – that judgments are only final and appealable

once all claims in an action are resolved – accounts for the fact that there are often "just reason[s]

for delay."  See FED. R. CIV. P. 54(b).  The party on the losing side of a judgment on some claims

may still be litigating other claims in the same action, or may not be able to fully evaluate the

legal options before them until other claims are resolved.  The central purpose of the Rule 54(b)

exception is to promote fairness to the losing party when such circumstances do not exist.

Stewart v. Gates, 277 F.R.D. 33, 35 (D.D.C. 2011).  And even where there is danger of hardship

to the losing party, the interests of judicial administration can offer a heavy counterweight.

"Ordinarily, the presumption against piecemeal appeals will be sufficient to deny certification."

Grosdidier v. Chairman, Broad. Bd. of Governors, 774 F. Supp. 2d 76, 123 (D.D.C. 2011).

   The default judgments issued by the Court today do represent the ultimate

disposition of the claims involved.  They vest ownership of the Balford Trust Assets,

Liechtenstein Accounts, Correspondent Assets, and Milchenko Account Assets in the United

States and leave nothing for the Court to do but execute the judgements.  See United States v.

Doraville Properties, 330 F. Supp. 3d at 160.  But in light of the exceptional nature of Rule 54(b)

certification and the uncertainty surrounding the asset groups remaining in this action, the

government's request fails at the second step of the inquiry; there is "just reason for delay."

See FED. R. CIV. P. 54(b).

   After default judgment is granted against the Balford Trust Assets, Liechtenstein

Accounts, Correspondent Assets, and Milchenko Account Assets, there will be three groups of

defendant assets remaining in this action.  See U.S. Correspondent Mem. at 10 n.4.  Two of the

asset groups – those in the name of NRKTO 7541 at Liechtensteinishce Landesbank AG, Am.

Compl. ¶ 5(i)(iv), and those in the name of Pavlo Lazarenko held at Bank Julius Baer (Guernsey)

Limited, id. ¶ 5(a) – were already ordered forfeited to the United States by the district court for

the Northern District of California in Mr. Lazarenko's criminal case.  United States v.

Lazarenko, Crim. No. 00-0284, Final Order of Forfeiture as to Funds Not to Exceed

$2,794,502.80 Held at Bank Julius Baer (Guernsey) and Liechtensteinische Landesbank AG

(N.D. Cal Jun. 3, 2022) [Dkt. No. 1780].  The assets remain a part of this action, however,

because the United States has not moved to voluntarily dismiss them.  The United States represents that it will do so after it recovers the assets and is "in contact with Guernsey and Liechtenstein authorities" about enforcing the forfeiture order from the Northern District of California.  U.S. Correspondent Mem. at 10 n.4.  But the Court cannot be certain that litigation with respect to these assets is over.  If the United States were sure that it could independently recover the assets it would have no reason to keep them in this action and likely would have already moved to dismiss them.

The circumstances surrounding the third remaining group of assets – the assets formerly held at Eurofed that remained in the Registrar's Account after the pro rata allocation (the "Antiguan Res"), Am. Compl. ¶ 5(d) – are even more complicated.  In 2015, the High Court of Justice in Antigua ordered the assets transferred out of the Registrar's Account to a fund for the general use of the Antiguan government.  Opinion and Order [Dkt. No. 926] at 8; see Reg. Ltr. ¶ 6.  Mr. Lazarenko attempted to challenge this Antiguan order, but was unsuccessful.  Update to Emergency Motion to Clarify Restraining Order [Dkt. No. 683] at 6-7; see Update to Emergency Motion to Clarify Restraining Order App'x [Dkt. No. 683-2] at 186-88.  In 2017, Mr. Lazarenko nevertheless represented to the Court that he sought to negotiate with the Antiguan government over these funds.  See Opinion and Order [Dkt. No. 926] at 9.  The Court indicated that, consistent with its 2005 restraining order, it "w[ould] not stand in the way of good faith negotiations designed to preserve or maintain the value of" the Antiguan Res, id., but that Mr. Lazarenko must deposit any funds released to him through the negotiations into the Registrar's Account.  Id. at 10.  At the time, it was unclear the extent to which these funds would be available to the United States if it were to win a judgment of forfeiture – or, conversely, the extent to which the funds had already been spent by the Antiguan government.  See id. at 9.

The Court is unaware of any deposits associated with the Antiguan Res that Mr. Lazarenko has made into the Registrar's Account.  The United States is also "unaware of any action Lazarenko has taken to pursue his challenge to the Antiguan forfeiture in over five years." Joint Status Report [Dkt. No. 1502] at ECF 2.  Mr. Lazarenko represents that he is still "evaluating his legal options with respect to the Antiguan Res," id. at ECF 4, and that his "position is that the [United States] Government should first determine through the Antiguan authorities whether the Antiguan Res is available for forfeiture before Mr. Lazarenko may make an informed decision whether or not to dismiss his [Antiguan] claim."  Id. at ECF 3.  The United States now believes that the status of the Antiguan Res – if it still exists – depends on whether Mr. Lazarenko continues to challenge the Antiguan forfeiture order.  Id.  While both the United States and Mr. Lazarenko are "seeking further clarification of the status of the Antiguan Res," id. at ECF 4, and the United States has represented that it "anticipates resolving the disposition of the Antiguan res shortly," U.S. Correspondent Mem. at 10 n.4, the parties appear to be at an impasse.  The United States will not clarify whether it continues to seek the assets in this action until Mr. Lazarenko clarifies whether he continues to challenge the Antiguan forfeiture, and Mr. Lazarenko will not clarify whether he continues challenge to the Antiguan forfeiture until the United States clarifies whether it continues to seek the assets in this action.

Given all of the open questions surrounding the assets remaining in this litigation, entering a Rule 54(b) certification would not be just to all parties involved.  Nor can the Court be confident that there would not be piecemeal appeals.  There exists a possibility that litigation will continue as to all asset groups remaining.  If the United States is unable to obtain the NRKTO 7541 and Bank Julius Baer assets through the Northern District of California forfeiture order, then it may seek the same assets in this action.  If the Antiguan Res turns out to still be available,

the United States may wish to seek those assets here as well.  Because none of Mr. Lazarenko's

claims to the three groups of remaining assets have been stricken, Mr. Lazarenko would be able

to defend those assets in this Court.  But if the Court certifies for immediate appeal default

judgment against the Balford Trust Assets, Correspondent Assets, or Liechtenstein Accounts,

Mr. Lazarenko would be in the unfair position of having to defend certain groups of assets in this

Court while having to appeal judgments against other groups of assets in the D.C. Circuit.  See

United States v. Doraville Properties, 330 F. Supp. 3d at 160.

        Other claimants might be affected by a Rule 54(b) certification, too, leading to

piecemeal appeals.  For example, if the Liquidators argue that the Settlement Agreement retains

their claims to the Antiguan Res, the D.C. Circuit might have to decide two different appeals

concerning interpretation of similar language in the Settlement Agreement – one of default

judgment against the Milchenko Account Assets, and a later appeal involving the Antiguan Res.

In addition, both UTICo and OAO Gazprom filed general claims to the defendant assets in this

case.  See Claimant Universal Trading & Investment Co. Inc.'s Amended Claim [Dkt. No. 135]

¶¶ 4, 13, 127; Verified Claim and Statement of Interest of Claimant OAO Gazprom [Dkt.

No. 64] at 4-6.  The Court dismissed both entities' claims, in their entirety, for lack of standing,

and entered judgment on the pleadings dismissing UTICo and OAO Gazprom from this action.

See All Assets III, 772 F. Supp. 2d at 212, 218; Order (Mar. 25, 2011) [Dkt. No. 226]; United

States v. All Assets Held at Bank Julius Baer & Co., Ltd., 772 F. Supp. 2d at 199; Order (Mar.

25, 2011) [Dkt. No. 228].

        Neither entity has yet been able to appeal those dismissals because no final

judgment had been entered with respect to any claimant or asset.  In fact, the D.C. Circuit

rejected OAO Gazprom's attempt to appeal on the ground that this Court "never 'expressly'

directed final judgment as to Gazprom alone," nor had it "disposed of all the claims in this multi-party in rem proceeding, since the claims of four claimants, including Lazarenko himself, and the claim of the United States all remain pending." United States v. All Assets Held at Bank Julius Baer & Co. Ltd., 455 F. App'x 3, 4 (D.C. Cir. 2012) (quoting FED. R. CIV. P. 54(b)).  If the Court were to certify default judgment against some groups of defendant assets as final today, then UTICo and OAO Gazprom would be able to appeal their claims to the extent the claims involve those assets.  Later, when all of the government's other claims for forfeiture have been resolved, UTICo and OAO Gazprom would be able to appeal their claims involving the remaining assets. The D.C. Circuit thus could end up hearing two appeals from the same parties on the same set of issues.

The Court concludes that a Rule 54(b) certification at this point would be inappropriate.  It would not be just to the litigants because it could force claimants to litigate the case in this Court and in the D.C. Circuit at the same time.  And it would not be in the interest of sound judicial administration because the claims against the Balford Trust Assets, Liechtenstein Accounts, Correspondent Assets, or Milchenko Account Assets – against which the Court grants default judgment today – are not fully separable from the claims against the remaining assets in this action; the D.C. Circuit therefore could face piecemeal appeals focused on similar issues.

## IV.  CONCLUSION

For the foregoing reasons, the United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Certain Defendant Assets Located in Liechtenstein [Dkt. No. 1480], the United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Defendant Balford Trust Assets Located in Guernsey [Dkt. No. 1481], the United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Milchenko Account Assets in Antigua & Barbuda [Dkt. No. 1484], and the United States' Motion for Entry of Default Judgment and for Order of Forfeiture Against Defendant Eurofed Correspondent Assets Located in Lithuania and Switzerland [Dkt. No. 1507] are hereby GRANTED IN PART and DENIED IN PART.  The Court will enter default judgment against these defendant assets, but will not certify the judgments as final.

Pavel Lazarenko's First Motion to Lift Clerk's Entries of Default [Dkt. No. 1493] and his Cross Motion for an Evidentiary Hearing [Dkt. No. 1496] are hereby DENIED.  Both of the Liquidators' Motion[s] to Enforce Settlement Agreement [Dkt. Nos. 1486 and 1488] are also DENIED.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 8|1|24